Isaac D. Chaput (Bar No. 326923)
Daniel A. Rios (Bar No. 326919)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com
drios@cov.com

Alexander L. Schultz (Bar No. 340212)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4800
aschultz@cov.com

Mark W. Mosier (pro hac vice forthcoming)
Teena-Ann V. Sankoorikal (pro hac vice
forthcoming)
Alexandra J. Widas (pro hac vice forthcoming)
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
mmosier@cov.com
tsankoorikal@cov.com
awidas@cov.com

*Attorneys for Plaintiff Meta Platforms, Inc.*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| META PLATFORMS, INC., | Case No.: _____ |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| ROB BONTA, in his official capacity as Attorney General of California, | |
| Defendant. | |

# INTRODUCTION

1.      Plaintiff Meta Platforms, Inc. ("Meta") does not bring this complaint lightly.  Now that the Ninth Circuit has ruled that Meta's individual participation is necessary if an as-applied challenge to Sections 27001, 27002(b)(2), and 27002(b)(4) (the "personalized feeds restrictions") of California Senate Bill 976 (the "Act" or "S.B. 976") is to go forward, Meta brings this as-applied challenge to defend its First Amendment rights.

2.      Meta's Facebook, Instagram, and Threads services collectively enable billions of people around the world to share ideas, offer support, and discuss important topics, including politics, public health, and social issues.  In other words, subject to Meta's content moderation policies, Meta's services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).  And "users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 105 (quotation omitted).  By California's own admission, these websites are "an important tool for communication and information sharing."  S.B. 976 § 1(a).

3.      The Act's personalized feed restrictions unconstitutionally restrict Meta from curating and disseminating to teens aged 13–17 the very same "edited compilation[s] of third-party expression" that the Supreme Court held just last year "receive the First Amendment's protection."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 716 (2024).

4.      All feeds[1] of third-party content that Meta makes available on its Facebook, Instagram, and Threads services (hereinafter, "Feeds") are impacted by Meta's "expressive choices."  *Moody*, 603 U.S. at 740.

---

[1] Like the Act, this Complaint uses the term "feed" to refer to "an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device." § 27000.5.  Unless otherwise noted, statutory citations in this Complaint refer to the California Health & Safety Code.  When discussing the Act's requirements, this Complaint uses "teen," "minor," "adult," and "user" to refer only to California teens, minors, adults, account holders, and users covered by the Act.

5.      On these Feeds, through the efforts of individual employees who develop and implement Meta's content-moderation policies, and through algorithms that Meta employees design to curate third-party content, Meta presents each "user with a continually updating stream of other users' posts." *Moody*, 603 U.S. at 734.  Given the volume of content, Meta necessarily engages in "prioritization of [this user-generated] content, achieved through the use of algorithms" at scale.  *Id.*  The "selection and ranking [of this content] is based on a user's expressed interests and past activities," as well as "more general features of the communication or its creator [*i.e.*, the user]."  *Id.* at 734–35.  For example, a user may choose to see "More" or see "Less" of certain content categories, while Meta's "Community Standards"—which apply across the Facebook, Instagram, and Threads services—"detail the messages and videos that [Meta] disfavor[s]."  *Id.* at 735.  Through both human and technological processes, Meta "implement[s] those [preferences and] standards," including by "remov[ing], label[ing] or demot[ing] messages."  *Id.* at 735–36.  And in so doing, Meta, based on its values and policies, "make[s] a wealth of . . . judgments about what kinds of speech, including what kinds of viewpoints, are not worthy of promotion.  And those judgments show up in Facebook's . . . feeds" as well as the feeds on Instagram and Threads.  *Id.* at 736 n.5.

6.      In short, across Meta's Feeds, Meta makes "expressive choices" in deciding which user-generated "content [its] feeds will display, or how the display will be ordered and organized."  *Id.* at 740.  "And because that is true, [Meta's Feeds] receive First Amendment protection."  *Id.* at 740.  Such activity, "after all, is not unlike traditional media curated by human editors."  *NetChoice v. Bonta*, 152 F.4th 1002, 1014 (9th Cir. 2025) ("*NetChoice v. Bonta III*") (citing *Moody*, 603 U.S. at 731–34, 738)).  "[T]he presentation of an edited compilation of speech generated by other persons is a staple of most newspapers' opinion pages" and Meta's Feeds alike.  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995); *see also Moody*, 603, U.S. at 717–18.  Meta's Feeds thus "fall squarely within the core of First Amendment security."  *Hurley*, 515 U.S. at 570.

7.      Additionally, "[speech] can be more effective when [the speaker] know[s] the background and . . . preferences" of their audience, which will influence "how best to present a particular . . . message."  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 558 (2011).  If the State passed a law prohibiting newspaper editors from selecting or prioritizing articles for publication based on the interests of a local market, that

law would be unconstitutional. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("It has yet to be demonstrated how governmental regulation of [the editorial] process can be exercised consistent with [the] First Amendment"); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 590 (2023) ("[Creators cannot] be forced to choose between remaining silent, producing speech that violates their beliefs, or speaking their minds and incurring sanctions for doing so."). After all, newspaper editors, pamphleteers, parade organizers, and other curators of information have for decades selected third-party content with an eye towards presenting more interesting, engaging, and relevant content to their specific audiences, all within the editorial protection of the First Amendment. *See Sorrell*, 564 U.S. at 578 (recognizing that personalized information "allows [speakers] to shape their messages" to their audience, thus making the ensuing messages more effective and "helpful"). In more recent years, online services have done the same—for example, sports websites may present content focused on particular sports teams or leagues that a user is most interested in; news platforms may offer customized lists of stories personalized to their users' previous reading habits; and music streaming services may offer personalized playlists for each user informed by their previous listening habits.

8. Similarly, the State may not dictate how Meta disseminates its "expressive products," *Moody*, 603 U.S. at 716, by demanding that Meta select third-party content for display without regard to the individualized interests, preferences, or characteristics of Meta's users. Indeed, "[f]reedom to distribute information to every citizen wherever he desires to receive it is . . . clearly vital to the preservation of a free society." *Martin v. City of Struthers*, 319 U.S. 141, 146–47 (1943). And the First Amendment also protects speakers' ability to use individualized information to make the speech they disseminate more "persuasive" and "instructive" for its recipients. *Sorrell*, 564 U.S. at 578. Accordingly, "an individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated." *Id.* at 568 (quotation omitted).

9. The Act's personalized feeds restrictions would, however, prohibit Meta from using "information [that Meta] possesses," *id.*, to disseminate fully protected "compilations of [third-party] expression" beyond a State-sanctioned audience unless Meta complies with the State's editorial dictates about how Meta should "organize and prioritize" the user-generated content in its feeds, *Moody*, 603 U.S. at 716. *See* § 27000.5(a) (exempting feeds from the Act's coverage only if they satisfy State-imposed

editorial standards); *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011) (describing similar statutory regime as imposing "*governmental* authority, subject only to a parental veto"). And the Act thereby burdens Meta's ability to present third-party speech in a manner that reflects "the background and . . . preferences" of the audience receiving it. *Sorrell*, 564 U.S. at 558. Because the personalized feeds restrictions burden and restrict "a platform from compiling the third-party speech it wants in the way it wants," they are "unlikely to withstand First Amendment scrutiny." *Moody*, 603 U.S. at 718.

10.     Surely, the State could not require museums or bookstores to eliminate their category classifications and place their works of art or books in random order without confronting the First Amendment—even if, in theory, the works remain available to their patrons. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 n.15 (1976) (there is "no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means"). So too here, the State cannot restrict Meta's ability to organize the fully protected user-generated speech on Meta's services in a way that will render it less "instructive" or "persuasive" for its recipients. *Sorrell*, 564 U.S. at 578. "The First Amendment [] does not go on leave when social media are involved." *Moody*, 603 U.S. at 719.

11.     The personalized feeds restrictions would also inhibit Meta's ability to exercise editorial choices it has made to enhance teen safety and well-being on Facebook, Instagram, and Threads. For example, the Act inhibits Meta's ability to de-prioritize content based on its own decisions restricting, or teens' settings indicating a desire to restrict, content that some users may find upsetting but that does not violate Meta's content moderation policies.

12.     Because the Act burdens Meta's editorial First Amendment rights and Meta's right to disseminate fully protected speech, the personalized feeds restrictions as applied to Meta's Facebook, Instagram, and Threads services are subject to strict First Amendment scrutiny. They are *also* subject to strict First Amendment scrutiny because they impose these speech burdens in a content- and speaker-based manner. But the personalized feeds restrictions cannot pass strict or even intermediate First Amendment scrutiny. While California "may be displeased" that Meta's use of personalized information makes Meta more "effective in promoting" fully protected user-generated speech on its services, the

State's logic that "the force of speech can justify the government's attempts to stifle it" is "reasoning [that] is incompatible with the First Amendment." *Sorrell*, 564 U.S. at 577.

13.    Meta stands to suffer an irreparable First Amendment injury unless Defendant is enjoined from enforcing the personalized feeds restrictions. For these reasons and more, the Court should declare the personalized feeds restrictions invalid as applied to Meta's Facebook, Instagram, and Threads services and enjoin Defendant from enforcing them.

## PARTIES & STANDING

14.    Plaintiff Meta Platforms, Inc. ("Meta") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Menlo Park, California. Meta's mission is to build the future of human connection and the technology that makes it possible.[2]

15.    Meta's Facebook, Instagram, and Threads services meet the Act's coverage definitions as each of these services: (1) constitute "internet website[s], online service[s], online application[s], or mobile application[s]" that (2) "offer users or provide users with" covered "feed[s]"—*i.e.*, "multiple pieces of media generated or shared by users [that] are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user" or the user's device that do not qualify the exclusion criteria set forth at § 27000.5(a)(1)–(7); and (3) the covered feeds constitute "a significant part of the service provided by" Facebook, Instagram, and Threads. § 27000.5(b)(1). Further, Facebook, Instagram, and Threads do not fall in the Act's exclusion criteria set forth at § 27000.5(b)(2), as these services are not limited to commercial transactions or consumer reviews and the covered feeds on them are not operated for the primary purpose of cloud storage.

16.    Meta currently provides personalized Feeds on its Facebook, Instagram, and Threads services for all of its users, adults and minors alike. Meta neither desires to nor intends to change its Feeds to publish user-generated content in accordance with the State's mandated editorial standards set forth at § 27000.5(1)–(7) should the Act be enjoined.

17.    Meta has standing to bring its challenge because it has an actual and well-founded fear that Defendant will initiate enforcement proceedings against Meta unless Meta complies with the personalized

---

[2] *Company Information*, Meta, https://about.meta.com/company-info/ (last visited November 11, 2025).

feeds restrictions.  Moreover, the personalized feeds restrictions, unless enjoined, would interfere with and burden Meta's First Amendment editorial activity and its dissemination of expressive curations of user-generated speech.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163, 167–68 (2014) (discussing First Amendment injury of "forcing [a plaintiff] to choose between refraining from [protected] speech [activity] on the one hand, or engaging in that speech and risking [enforcement] on the other"); *Virginia v. Amer. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (plaintiff had standing to bring pre-enforcement challenge as the "State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise"); *Am. Encore v. Fontes*, 152 F.4th 1097, 1113 (9th Cir. 2025) ("First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing," and "a chilling of the exercise of First Amendment rights is . . . a constitutionally sufficient injury." (cleaned up) (quoting *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013))).

18.    Defendant Rob Bonta is the California Attorney General.  Defendant is a California resident and is sued in his official capacity.  The Act gives the California Attorney General exclusive authority to enforce it.  § 27006(a).  Defendant has publicly pursued enforcement against Meta under other laws.

## JURISDICTION AND VENUE

19.    Meta's causes of action arise under 42 U.S.C. §§ 1983 and 1988 and the United States Constitution.  The Court therefore has jurisdiction under 28 U.S.C. § 1331.  This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. §§ 2201(a)–2202.

20.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1)–(2) because Defendant performs his official duties in the Northern District of California, and is therefore considered to reside in this District as a matter of law, and because the injuries giving rise to this action have been and will continue to be suffered by Meta in San Mateo County, California.

## BACKGROUND

21.    On Facebook, individuals can sign up for an account and establish mutual connections with family and friends, sharing stories, photos, videos, captions, status updates, and links (among other types

of content). People can also follow pages managed by businesses, organizations, government agencies, and public figures (such as politicians or celebrities) that share content, as well as join groups or get information about events that relate to topics of interest to them.

22. On Instagram, individuals can likewise sign up for an account and establish mutual connections with family, friends, and other creators, sharing stories, photos, videos, captions, messages, and links (among other types of content). People can also follow and interact with Instagram accounts managed by businesses, organizations, and public figures (such as politicians or celebrities) that share content.

23. On Threads, individuals can make announcements, comment on, view, and share public conversations. People can post messages or "threads," reply to others' posts, and follow profiles managed by other users, businesses, organizations, and public figures (such as politicians or celebrities) that share content.

24. Every day, users of Meta's services share billions of posts and messages that constitute speech fully protected from government restriction. Because it is impossible to display every piece of user-generated content that a user might be interested in, and because it is similarly difficult to foster social connections without prioritizing the people and ideas a user is interested in, Facebook, Instagram, and Threads display users' speech through curated "stream[s] of other users' posts." *Moody*, 603 U.S. at 734.

25. The curation process begins long before other users' posts are displayed to users. That process includes Meta's employees deciding what content-moderation policies to adopt and maintain on Facebook, Instagram, and Threads; and then implementing them through processes that include both human and automated review. An additional "key to the scheme is prioritization [and de-prioritization] of content, achieved through the use of algorithms." *Id.* Meta builds algorithms to "implement" its mission at scale—for example, to "prefer content" that it considers higher-quality (incorporating its own expressive views of quality) while "disfavor[ing] posts" that, for example, in Meta's judgment reflect a user "encourag[ing] teen suicide and self-injury." *Id.* at 734–37.

26. One way that Facebook displays content is in Feed, which shows a constantly updated and personalized list of content—for example, status updates from friends or elected officials, photos and

videos from family gatherings, articles from local or national news outlets, information about upcoming community events or religious services, and much more.

27.    Similarly, one way that Instagram displays content is Instagram Feed, which by default shows a constantly updated and curated list of photos and videos—for example, posts from friends, family, businesses, educational institutions, elected officials, neighborhood organizations, news outlets and much more.

28.    Threads also displays content in its For You feed, which shows a constantly updated mix of posts from profiles that the user follows and recommended content from creators that the user has not yet discovered.

       **1.    Meta enforces robust content moderation policies that affect what content appears throughout Facebook, Instagram, and Threads.**

29.    Meta wants Facebook, Instagram, and Threads to be places where people feel empowered to communicate.  This is why Meta has developed content moderation policies that help determine what third-party content is seen by users on Facebook, Instagram and Threads, including on each service's feeds.

30.    These policies and practices reflect Meta's judgment about how it can best create a place for free expression, give people a voice, and empower people to talk openly about the issues that matter to them.  When Meta does limit expression, it does so in the service of Meta's values of authenticity, safety, privacy, and dignity—*i.e.*, "the type of community [Meta] seeks to foster."  *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 953–54 (S.D. Ohio 2025).  Meta's editorial policies and practices are also in service of its belief that all people are equal in dignity and rights: Meta expects that users on its services will respect the dignity of others and not harass or degrade others, and, to ensure everyone's voice is valued, Meta prioritizes different views and beliefs, including "from people and communities that might otherwise be overlooked or marginalized."[3]

---

[3] *Community Standards*, Meta, https://transparency.fb.com/policies/community-standards/ (last visited Nov. 11, 2025) [hereinafter Community Standards].

31.     Meta's publicly available Community Standards[4] (which all users of Facebook, Instagram, and Threads must agree not to violate); Meta's Terms of Service[5] (to which users must agree to create an account on the Facebook service); Instagram Terms of Use[6] (to which users must agree to create an account on the Instagram service); and Threads Terms of Use[7] (to which users must agree to use the Threads service) describe what content is acceptable on Facebook, Instagram, and Threads.

32.     The Meta Terms of Service prohibit users from doing or sharing anything that is "unlawful, misleading, discriminatory or fraudulent" or that "infringes or violates someone else's rights."[8]  Similarly, the Instagram Terms of Use prohibit users from doing or sharing anything that is "unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose" or that would "violate[] someone else's rights," and from "post[ing] someone else's private or confidential information without permission."[9]  And the Threads Terms of Use incorporate the same prohibition from the Instagram Terms by reference.[10]

33.     Meta also has Community Standards that Meta employees on its Content Policy team have developed and that are enforced by both human reviewers and automated processes that Meta employees have built to implement its human-developed standards.  These Community Standards provide details about what user-generated content is not allowed on Facebook, Instagram, and Threads.  They are organized into twenty-three separate policies restricting specific categories of content related to: (1)

---

[4] *Id.*

[5] *Terms of Service Overview*, Meta (Jan. 1, 2025), https://www.facebook.com/terms.php (last visited Nov. 11, 2025) [hereinafter Meta Terms].

[6] *Terms of Use*, Instagram, https://help.instagram.com/581066165581870 [hereinafter Instagram Terms].

[7] *Threads Terms of Use*, Instagram (May 28, 2025), https://help.instagram.com/769983657850450.

[8] Meta Terms, *supra*.

[9] Instagram Terms, *supra*.

[10]     *Threads Policies and Terms*, Instagram, https://help.instagram.com/280495901606863/?helpref=hc_fnav (last visited Nov. 11, 2025) ("These Threads Terms of Use . . . supplement and amend the Instagram Terms of Use and the Meta Community Standards, which are incorporated into these Terms by reference.").

coordinating harm and promoting crime;[11] (2) dangerous organizations and individuals;[12] (3) fraud, scams, and deceptive practices;[13] (4) restricted goods and services;[14] (5) violence and incitement;[15] (6) adult sexual exploitation;[16] (7) bullying and harassment;[17] (8) child sexual exploitation, abuse, and nudity;[18] (9) human exploitation;[19] (10) suicide, self-injury, and eating disorders;[20] (11) adult nudity and sexual activity;[21] (12) adult sexual solicitation and sexually explicit language;[22] (13) hateful conduct;[23] (14)

---

[11] *Coordinating Harm and Promoting Crime*, Meta (June 26, 2025), https://transparency.meta.com/policies/community-standards/coordinating-harm-promoting-crime/.

[12] *Dangerous Organizations and Individuals*, Meta (Feb. 8, 2024), https://transparency.meta.com/policies/community-standards/dangerous-individuals-organizations/.

[13] *Fraud, Scams, and Deceptive Practices*, Meta (June 6, 2025), https://transparency.meta.com/policies/community-standards/fraud-scams.

[14] *Restricted Goods and Services*, Meta (May 14, 2025), https://transparency.meta.com/policies/community-standards/restricted-goods-services/.

[15] *Violence and Incitement*, Meta (Sep. 27, 2024), https://transparency.meta.com/policies/community-standards/violence-incitement/.

[16] *Adult Sexual Exploitation*, Meta (Oct. 30, 2025), https://transparency.meta.com/policies/community-standards/adult-sexual-exploitation/.

[17] *Bullying and Harassment*, Meta (Jan. 22, 2025), https://transparency.meta.com/policies/community-standards/bullying-harassment/ [hereinafter Bullying and Harassment].

[18] *Child Sexual Exploitation, Abuse, and Nudity*, Meta (July 31, 2025), https://transparency.meta.com/policies/community-standards/child-sexual-exploitation-abuse-nudity/.

[19] *Human Exploitation*, Meta (Sep. 19, 2025), https://transparency.meta.com/policies/community-standards/human-exploitation/.

[20] *Suicide, Self-Injury, and Eating Disorders*, Meta (May 14, 2025), https://transparency.fb.com/policies/community-standards/suicide-self-injury/ [hereinafter Suicide, Self-Injury, and Eating Disorders].

[21] *Adult Nudity and Sexual Activity*, Meta (Aug. 28, 2025), https://transparency.meta.com/policies/community-standards/adult-nudity-sexual-activity/.

[22] *Adult Sexual Solicitation and Sexually Explicit Language*, Meta (May 14, 2025), https://transparency.meta.com/policies/community-standards/sexual-solicitation/.

[23] *Hateful Conduct*, Meta (Jan. 7, 2025), https://transparency.meta.com/policies/community-standards/hateful-conduct/.

---

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

privacy violations;[24] (15) violent and graphic conduct;[25] (16) authentic identity representation;[26] (17) cybersecurity;[27] (18) inauthentic behavior;[28] (19) misinformation;[29] (20) spam;[30] (21) third-party intellectual property infringement;[31] (22) using Meta intellectual property and licenses;[32] and (23) locally illegal content, products, or services.[33]

34.     Much of the user-generated content falling within these policies is flatly prohibited—and, when detected and determined to be violating by Meta, removed—across Facebook, Instagram, and Threads.  Other category-specific policies identify content that Meta chooses to hide from teens, label, place behind a warning screen, and/or de-prioritize for certain (or all) users on Facebook, Instagram, and Threads.  For example, content celebrating or promoting suicide, self-injury, or eating disorders is prohibited and is removed for all users when detected and determined by Meta to violate its Community Standards.  Content discussing these topics (but not celebrating or promoting them) is generally allowed.  But content about recovery from suicide, self-injury, or eating disorders that may contain imagery that

---

[24] *Privacy Violations*, Meta (Oct. 2, 2024), https://transparency.meta.com/policies/community-standards/privacy-violations/.

[25] *Violent and Graphic Content*, Meta (June 26, 2025), https://transparency.meta.com/policies/community-standards/violent-graphic-content/.

[26] *Authentic Identity Representation*, Meta (Oct. 9, 2024), https://transparency.meta.com/policies/community-standards/authentic-identity-representation.

[27] *Cybersecurity*, Meta (June 26, 2025), https://transparency.meta.com/policies/community-standards/cybersecurity/.

[28] *Inauthentic Behavior*, Meta (Oct. 2, 2024), https://transparency.meta.com/policies/community-standards/inauthentic-behavior/.

[29] *Misinformation*, Meta (Apr. 7, 2025), https://transparency.meta.com/policies/community-standards/misinformation/.

[30] *Spam*, Meta (June 26, 2024), https://transparency.meta.com/policies/community-standards/spam/ (last visited Nov. 11, 2025) [hereinafter Spam].

[31] *Third-Party Intellectual Property Infringement*, Meta (Aug. 26, 2024), https://transparency.meta.com/policies/community-standards/intellectual-property/.

[32] *Using Meta Intellectual Property and Licenses*, Meta, https://transparency.meta.com/policies/community-standards/meta-intellectual-property (last visited Nov. 11, 2025).

[33] *Locally Illegal Content, Products, or Services*, Meta (Oct. 2, 2024), https://transparency.meta.com/policies/community-standards/locally-illegal-products-services.

could be upsetting (such as a healed scar) may be placed behind a warning screen for adults aged 18 and older while being hidden entirely from teens.[34]  And recently, Meta reviewed its age-appropriate content guidelines—the guidelines that determine what content Meta hides from teens and avoid recommending to them—against the kinds of content standards that inform age-appropriate movie ratings, with the goal of having teens see content that is generally similar to what they would see in an age-appropriate movie.[35]

35.    Meta undertakes significant efforts to develop and enforce its Community Standards.  Meta frequently collaborates with subject matter experts, including to receive input on and to craft these standards, which Meta updates regularly.  And Meta employs dedicated human reviewers and custom-built artificial intelligence technologies to enforce these standards at scale.[36]  For example, in Q2 2025 alone, Meta (through its human reviewers and its artificial intelligence technologies) took action on and removed for all users:

    a.  6.7 million pieces of content on Facebook and 10 million pieces of content on Instagram that violated its suicide, self-injury, and eating disorder policy;[37]

    b.  4.1 million pieces of content on Facebook and 3.3 million pieces of content on Instagram that violated its bullying and harassment policy;[38] and

    c.  165 million pieces of content on Facebook and 93.2 million pieces of content on Instagram that violated its spam policy.[39]

36.    Meta's enforcement teams took action on even more user-generated content in other ways, such as hiding it from teens, placing it behind a warning screen, and/or de-prioritizing it for some or all users.

---

[34] Suicide, Self-Injury, and Eating Disorders, *supra.*

[35] *Helping Teens See Age-Appropriate Content*, Meta (Oct. 14, 2025), https://transparency.meta.com/policies/age-appropriate-content/.

[36] *How Enforcement Technology Works*, Meta (Nov. 12, 2024), https://transparency.meta.com/enforcement/detecting-violations/how-enforcement-technology-works/.

[37] Suicide, Self-Injury, and Eating Disorders, *supra.*

[38] Bullying and Harassment, *supra*.

[39] Spam, *supra*.

**2.    Third-party content a user sees on Facebook, Instagram, and Threads Feeds is personalized and ranked—*i.e.*, prioritized or de-prioritized—based on Meta's editorial choices; even if third-party content on Facebook, Instagram, or Threads does not violate the Community Standards, Meta may choose not to recommend it or may de-prioritize it for independent reasons.**

37.    Meta wants to create an environment where users feel inspired to make and foster social connections on Facebook, Instagram, and Threads.  For example, Meta might promote diverse topics and creators, prioritize new content from budding creators, and recommend content with the goal of inspiring users to create similar content.  Meta also works towards this goal by personalizing recommendations and avoiding recommendations that Meta itself considers low-quality, objectionable, particularly sensitive, or inappropriate for younger audiences.[40]

38.    Through its content curation efforts, Meta intends to communicate a message to its users that, within the bounds of Meta's Community Standards, their particular interests and preferences are reflected on the Facebook, Instagram, and Threads services and Meta wants them to feel empowered to communicate and talk openly about the topics that matter to them.

39.    Thus, Meta's Feeds—the feeds on Facebook, Instagram, and Threads—display constantly updated, personalized, and curated lists of connected third-party content and/or recommended third-party content.  "[*I*]*n toto*"—through Meta's editorial choices about what content to display and how to display it—Meta's Feeds convey its editorial "messages," including that people should be able to communicate openly about the issues that matter to them.  *Moody*, 603 U.S. at 739.  Meta's editorial goal is that each user sees posts from the people, interests, and ideas that they find valuable, whether that content comes from people they are already connected to or from those they may not yet know.[41]

40.    Meta's user-specific and user-independent choices about how to "cull and organize uploaded posts in a variety of ways" create a speech environment that advances this editorial goal.  *Moody*,

---

[40]    *About Recommendations on Facebook*, Facebook Help Center, https://www.facebook.com/help/1257205004624246 (last visited Nov. 11, 2025); *Recommendations on Instagram*, Instagram, https://help.instagram.com/313829416281232 (last visited Nov. 11, 2025).

[41]    *Our Approach to Facebook Feed Ranking*, Meta (June 11, 2025), https://transparency.meta.com/features/ranking-and-content/ [hereinafter Facebook Feed Ranking].

603 U.S. at 719, 739.  For example, Meta may prioritize content it believes a particular user will find most relevant and valuable or that other users have identified as particularly newsworthy.[42]

41.    Meta will also de-prioritize content, which makes it less likely to be seen in a user's feed. Meta de-prioritizes content that it predicts will be of low value because the commenter or poster is a frequent violator of Meta's rules or the content is of a type that users broadly dislike, such as clickbait or engagement bait.  Meta also de-prioritizes third-party content if Meta predicts that the content is likely violative of its Community Standards (but has not yet confirmed as much) or if Meta predicts that the content is similar to that which a user has told Meta they do not want to see, such as through Facebook content preference settings (where users can choose to see less, *inter alia*, political or sensitive content; Instagram or Threads sensitive content controls; and Instagram's Limited Content, Ages 13+, and More Content controls.[43]

42.    Meta's Facebook Recommendation Guidelines apply to Facebook, and Meta's Instagram Recommendation Guidelines apply to Instagram and Threads.  These guidelines set forth categories of content that are allowed on Meta's services but may not be eligible for recommendation, such as content that impedes Meta's desire to foster a safe community (*e.g.*, content depicting or trivializing themes around death or depression) and content about health or finance that Meta itself considers sensitive or low-quality (*e.g.*, content promoting or depicting cosmetic procedures).

43.    Much of the content that Meta avoids recommending to adults is already completely hidden for teens.  But Meta may take the further step of not recommending to teens certain types of potentially sensitive content that is neither hidden from them nor unrecommendable for adults, such as photos or videos that may be seen as implicitly sexual.

---

[42] *Our Approach to Newsworthy Content*, Meta (Nov. 12, 2024), https://transparency.meta.com/features/approach-to-newsworthy-content/.

[43] Facebook Feed Ranking, *supra*; *How to See More of What You Want on Instagram*, Instagram (Aug. 30, 2022), https://about.instagram.com/blog/spark/tips-and-tricks/control-your-instagram-feed; *Instagram Threads Feed AI System*, Meta (Mar. 7, 2025), https://transparency.meta.com/features/explaining-ranking/ig-threads-feed/?referrer=1; *Types of Content We Demote*, Meta (July 2, 2025), https://transparency.meta.com/features/approach-to-ranking/types-of-content-we-demote.

44.     Meta also offers Facebook, Instagram, and Threads users tools to adjust the amount of certain types of content they see in the feeds on these services.  For example, users of these services can employ settings to adjust the amount of content that Meta itself has assessed that some people may not want to see (such as political content and sensitive content on topics like drugs or firearms).[44]

45.     For example, among other settings, users can use the Political Content Control setting on Instagram, Threads, and Facebook to see more or less content in their feeds that Meta, in its judgment, has determined qualifies as political content (such as content that refers to governments, elections, or social topics that may affect many people).

46.     Users on Facebook and Threads and adult users on Instagram can use the Sensitive Content Control setting to see more or less of certain categories of content in their feeds that Meta, in the judgment of its human personnel, has determined may be upsetting or offensive to some users.  Through Facebook's Teen Accounts, teens aged 13-17 on Facebook are automatically defaulted by Meta into the most restrictive "Show less" setting, and teens ages 13-15 need parental approval to change that setting.

47.     Through Instagram's Teen Accounts, teens aged 13–17 will, by the end of 2025, be provided Ages 13+, Limited Content, and More Content settings.  Meta's goal for the "Ages 13+" content setting is to ensure that teens see content that is generally similar to what teens would see in an age-appropriate movie, and to try and hide more content that Meta believes may be inappropriate for people under 18 (such as content where a person is describing their own personal experiences with suicide, self-injury or eating disorders).  Teens may also choose to enroll in an even stricter "Limited Content" setting (and a supervising parent or guardian can also enroll their teens in this setting) that personnel at Meta developed based on their judgment regarding what content should be permitted and not permitted in this even stricter setting.  A teen needs to receive the permission of their supervising parent or guardian to opt

---

[44] *See Updates to the Sensitive Content Control*, Instagram (June 6, 2022), https://about.instagram.com/blog/announcements/updates-to-the-sensitive-content-control; *About Sensitive Content Control on Instagram*, Instagram, https://www.facebook.com/help/instagram/1055538028699165/ (last visited Nov. 11, 2025); *See and Adjust Your Facebook Content Preferences*, Facebook, https://www.facebook.com/help/371675846332829/ (last visited Nov. 11, 2025); *How Teen Accounts Work on Facebook*, Facebook, https://www.facebook.com/help/1123135202753352/ (last visited Nov. 11, 2025).

out of the "Ages 13+" setting and instead enroll in the "More Content" setting. Meta will account for teens' "Limited Content," "Ages 13+," and "More Content" settings when determining what content to display in their feeds on Instagram.

48. Meta's Feeds are "therefore [not] feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards. Like them or loathe them, [Meta's] Community Standards . . . make a wealth of user-agnostic judgments about what kinds of speech, including what viewpoints, are not worthy of promotion. And those judgments show up in Facebook's . . . main feeds" in addition to those on Instagram and Threads. *Moody*, 603 U.S. at 736 n.5.

49. Moreover, Meta's ranking and recommendation systems are not based solely on predictions of what individual content item will be relevant to a user based on their activity on the service. They are also designed to promote new content from small creators to progressively larger audiences (in service of Meta's goal to inspire content creation), to ensure users see a mix of posts from users they are connected with as well as recommended posts from others, and to avoid presenting to users multiple videos in a row on the same topic or multiple videos in a row from the same creator.

### 3. Parents already have several options to restrict or limit their teen's access to Facebook, Instagram, and Threads should they wish to do so.

50. Parents who want to restrict, limit, control, and oversee their minor's access to Facebook, Instagram, and Threads have myriad options for doing so.

51. Meta empowers parents to work collaboratively with their teens to help them create, explore and connect in age-appropriate ways.[45] Parents and guardians can use supervision tools on Facebook and Instagram to, for example, set daily time limits for their teens or limit use during select days and hours; set reminders to close the app; see which accounts their teen is following, are following their teen, and that their teen has blocked; view the content topics their teen has chosen to see; remove teens' ability to see, leave, or receive comments under posts; see their teen's settings for account privacy and messaging; see and change their teen's content settings; and approve or deny their teens' requests to

---

[45] *Family Center*, Meta, https://familycenter.meta.com/ (last visited Nov. 11, 2025).

change default protection and privacy settings to a less strict state.[46]  Meta provides publicly accessible and free educational resources for interested parents to learn how to use these tools.[47]

52.    Of course, several other options also exist for parents to restrict or limit their teen's access to internet websites (including Facebook, Instagram, or Threads) in general.  Parents can decide whether and when to let their teens use computers, tablets, and smartphones in the first place.  They can also determine whether, when, and how their teens access the Internet by deciding to purchase a personal phone plan for their teen or Internet service for their household.  Cell carriers and broadband providers provide parents with tools to block certain apps and sites from their teens' devices, ensure that they are texting and chatting with trusted contacts only, and restrict access to screen time during certain hours of the day.[48]

53.    On top of that, many wireless routers (the devices that provide wireless Internet connectivity throughout a home) offer parental control settings.[49]  Parents can use these settings to block

---

[46] *Giving Teens and Parents More Ways to Manage Their Time on Our Apps*, Meta (June 27, 2023), https://about.fb.com/news/2023/06/parental-supervision-and-teen-time-management-on-metas-apps/; *Introducing Stricter Message Settings for Teens on Instagram and Facebook*, Meta (Jan. 25, 2024), https://about.fb.com/news/2024/01/introducing-stricter-message-settings-for-teens-on-instagram-and-facebook/; *Parental Supervision*, Instagram, https://help.instagram.com/309877544512275 (last visited Nov. 11, 2025); *Safety Resources for Parents*, Facebook, https://www.facebook.com/help/1079477105456277 (last visited Nov. 11, 2025); *See Who Your Teen Has Chats With on Instagram*, Instagram, https://help.instagram.com/501423385831907 (last visited Nov. 11, 2025); *Instagram Teen Accounts Will Be Guided by PG-13 Ratings*, Meta (Oct. 14, 2025), https://about.fb.com/news/2025/10/instagram-teen-accounts-pg-13-ratings/.  By virtue of teens' Instagram accounts (where Threads accounts were historically linked), these Supervision tools were also available with respect to Meta's Threads service until approximately November 2025.  Meta has now started rolling out Teen Accounts to Threads-only accounts, and intends to bring back Supervision tools specific to Threads in the near future.

[47] *See, e.g.*, *Helping Your Teen Navigate Instagram Safely*, Instagram, https://about.instagram.com/community/parents (last visited Nov. 11, 2025); *Well-Being Tools*, Meta, https://www.meta.com/safety/topics/safety-basics/tools/wellbeing/ (last visited Nov. 11, 2025); *Meta Family Center Resources Hub*, Meta, https://familycenter.meta.com/resources/ (last visited Nov. 11, 2025).

[48] *See, e.g.*, *Verizon Family*, Verizon, https://tinyurl.com/yc527nvx (last visited Nov. 11, 2025); *Guide to Parental Controls for Your Kid's Phone or Tablet*, AT&T, https://tinyurl.com/2mbnsfn5 (last visited Nov. 11, 2025); *Making Digital Parenting Easier with FamilyMode®*, T-Mobile, https://tinyurl.com/mpwr4tdd (last visited Nov. 11, 2025); *Set Up Parental Controls for Your Home Network*, Comcast Xfinity, https://tinyurl.com/5acdsnat (last visited Nov. 11, 2025).

[49] *See* Molly Price & Ry Crist, *Parental Controls are Easy to Set Up on Your Wi-Fi Router: Here's How to Do It*, CNET (June 26, 2025), https://tinyurl.com/ymsctasa.

certain websites or online services that they deem inappropriate, set individualized content filters for their teens, and monitor the websites their teens visit and the services they use.[50]  Parents can also use router settings to turn off their home Internet at particular times of day, pause Internet access for a particular device or user, or limit the amount of time that a teen can spend on a particular website or online service.[51]

54.    Additional parental controls are available at the device level.  For example, iPhones and iPads enable parents to approve or decline their teen's app download requests, limit the amount of time their teens can spend on the device, choose which applications their teens can use, set age-related content restrictions for those applications, filter online content, and control privacy settings.[52]  Google and Microsoft offer similar parental controls for devices using their operating systems.[53]  In addition, numerous third-party applications allow parents to control and monitor their teens' use of Internet-connected devices and online services.[54]

### THE ACT'S "PERSONALIZED FEEDS RESTRICTIONS"

55.    The Act's personalized feeds restrictions prohibit covered services—including Facebook, Instagram, and Threads—from displaying covered feeds to individuals under the age of eighteen (18) years old without verifiable parental consent.  § 27001(a); *see also* §§ 27002(b)(2), (b)(4) (requiring covered services to create default settings that are effectively duplicative of this restriction).

56.    However, the Act generally exempts feeds—meaning covered services can generally display them without restriction to minors—as long as they are organized and curated in accordance with the State's prescribed editorial standards set forth at Section 27000.5(a)(1)–(7).

---

[50] *See NETGEAR Smart Parental Controls*, NETGEAR, https://www.netgear.com/home/services/smart-parental-controls/ (last visited Nov. 11, 2025).

[51] *See id.*

[52] *See Use Parental Controls to Manage Your Child's iPhone or iPad*, Apple, https://tinyurl.com/2wpjvjwh (last visited Nov. 11, 2025); *Approve What Kids Buy With Ask to Buy*, Apple, https://support.apple.com/en-us/105055 (last visited Nov. 11, 2025).

[53] *See Helping You Set Digital Ground Rules*, Google Safety Center, https://tinyurl.com/43eks8uj (last visited Nov. 11, 2025); *Microsoft Family Safety*, Microsoft, https://tinyurl.com/bp9s4yrf (last visited Nov. 11, 2025).

[54] *See* Kim Key, *The Best Parental Control Software for 2025*, PCMag (Nov. 15, 2024), https://tinyurl.com/43537k92.

57.     Pursuant to those State-prescribed editorial standards, feeds are generally exempt from the Act as long as the covered service agrees to curate them by only "recommending, selecting, or prioritizing for display" user-generated content based on (1) "information [that] is not persistently associated with the user or user's device, and does not concern the user's previous interactions with media generated or shared by others" (*e.g.*, curation accounting for a device's location may be exempt as not "persistently" associated with a user or their device, but curation accounting for the minor user's stated place of residence may not be) or (2) "search terms that are not persistently associated with [a] user or user's device" (*e.g.*, curation accounting for a user's search for "San Francisco Giants" content may be exempt for a brief period, but it may be impermissible to display such content to the same user again outside of their specific search). § 27000.5(a)(1)–(2).  Equally, the Act generally exempts feeds if the "media recommended, selected, or prioritized for display is exclusively the next media in a preexisting sequence from the same author, creator, poster, or source and, in the case of audio or video content, is not automatically played" (*e.g.*, a chronological feed of content created by a single user a minor follows may be exempt).  § 27000.5(a)(6).

58.     The effect of these statutorily prescribed standards is to restrict editorial discretion as to how content can be curated and organized on a covered service.  In other words, "information [a covered service] possesses is subjected to restraints on the way in which the information might be used or disseminated."  *Sorrell*, 564 U.S. at 568 (quotation omitted).  While Meta may determine that it would be more "instructive" or "persuasive" to prioritize additional user-generated content about the San Francisco Giants to a user that has demonstrated an interest in such posts, *id.*, the State's standards would restrict Meta from doing so and thereby interfere with how Meta would organize or curate the user-generated content in Meta's Feeds.

59.     If, however, a feed is curated and organized in a manner *other* than the State-prescribed standards set forth at Section 27000.5(a)(1)–(7), the feed is subject to the personalized feeds restrictions.

60.     As applied to Meta's Feeds, the personalized feeds restrictions are both content-based and speaker-based.  The Act expressly singles out "social media platform[s]" for regulation and its restrictions reflect a preference for first-party content over content "generated or shared by users" because only feeds displaying the latter are subject to the Act.  § 27000.5(a); *see Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 592 (W.D. Tex. 2025) ("The elevation of . . . provider-generated content

over user-generated content is a content-based regulation . . . When a site chooses not to primarily offer news but instead focus on social engagement [*i.e.*, presenting user-generated content], it changes from an uncovered to covered platform.  But the type of medium has not changed, only the content primarily expressed on the platform.").  Moreover, the restrictions' coverage depends in part on determining whether the media displayed in a feed "is exclusively the next media in a preexisting sequence from the same author, creator, poster, or source," § 27000.5(a)(6), *i.e.*, whether it comes from a particular speaker.

61.    These statutory carveouts exempt a broad range of favored speakers and content from the personalized feeds restrictions.  Facebook, Instagram, and Threads may not display personalized feeds to minors by default, but services that do not display *user-generated* content as a significant part of their service—like video and music streaming services—can continue to offer feeds, including personalized feeds, and curate them however they wish without restriction.

62.    The personalized feeds restrictions are additionally content-based and speaker-based because their coverage depends on the Act's central coverage definitions, which are themselves content-based and speaker-based insofar as they exempt:  "(A) An internet website . . . for which interactions between users are limited to commercial transactions or to consumer reviews of products, sellers, services, events, or places, or any combination thereof"; and "(B) An internet website, online service, online application, or mobile application that operates a feed for the primary purpose of cloud storage." § 27000.5(b)(2).

63.    The Act "may only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General."  § 27006(a).  Defendant has publicly pursued enforcement against Meta under other laws.

## CLAIMS

64.    Meta here brings an as-applied First and Fourteenth Amendment challenge to the Act's personalized feeds restrictions as applied to Meta's Facebook, Instagram, and Threads services.[55]

---

[55] Meta's Complaint challenges the specific provision of the Act that the Ninth Circuit held Plaintiff NetChoice, LLC ("NetChoice") lacked associational standing to challenge on behalf of NetChoice's members, including Meta.  *NetChoice v. Bonta III*, 152 F.4th at 1014.  Meta is aware that NetChoice has

**COUNT ONE**

**42 U.S.C. § 1983, *Ex parte Young***

**As-Applied Violation of the First Amendment, as Incorporated by the Fourteenth Amendment**

**(Personalized Feeds Restrictions — §§ 27001, 27002(b)(2), 27002(b)(4))**

65. Meta re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

66. As applied to Facebook, Instagram, and Threads, the personalized feeds restrictions are an unconstitutional regulation of protected First Amendment expressive activity.

67. All of Meta's Feeds are impacted by Meta's "expressive choices" in deciding which user-generated "content [its] feeds will display, or how the display will be ordered and organized." *Moody*, 603 U.S. at 740. Meta "make[s] a wealth of . . . judgments about what kinds of speech, including what kinds of viewpoints, are not worthy of promotion. And those judgments show up in Facebook's . . . feeds" as well as the feeds on Instagram and Threads. *Id.* at 736 n.5. "And because that is true, [Meta's Feeds] receive First Amendment protection." *Id.* at 740. Such activity, "after all, is not unlike traditional media curated by human editors." *NetChoice v. Bonta III*, 152 F.4th at 1014 (citing *Moody*, 603 U.S. at 731–34, 738).

68. The Act's personalized feeds restrictions would prohibit Meta from disseminating these fully protected "compilations of [third-party] expression" beyond a State-sanctioned audience unless Meta complies with the State's editorial dictates about how Meta should "organize and prioritize" the user-generated content in Meta's Feeds. *Moody*, 603 U.S. at 716; *see* § 27000.5(a) (exempting feeds from coverage only if they satisfy State-imposed editorial standards). Because the personalized feeds restrictions burden and restrict Meta "from compiling the third-party speech it wants in the way it wants"

---

filed an action that seeks to enjoin other provisions of the Act both facially and as applied to Meta, and Meta maintains that such relief sought by NetChoice is and remains appropriate with respect to other provisions in the Act. Because NetChoice has associational standing with respect to its challenges to other provisions, Meta does not independently challenge them in this Complaint. Meta reserves the right to amend this Complaint, either as of right or with the Court's leave, to add additional claims regarding the other provisions of the Act already challenged by NetChoice should doing so prove necessary.

(which here includes the way Meta believes the user wants it) on Facebook, Instagram, and Threads, they are subject to and "unlikely to withstand First Amendment scrutiny." *Moody*, 603 U.S. at 718.

69.     The Act's imposed editorial standards would interfere with Meta's implementation of its value-based judgments that some content should be hidden for certain types of users.  For example, Meta determines, based on its exercise of judgment, what kinds of user-generated content may be appropriate across the Limited Content, Ages 13+, or More content settings on Instagram.  While Meta defaults teens to the Ages 13+ setting on Instagram, teens may elect to instead be placed in the more restrictive Limited Content setting.  But the Act would restrict Meta from disseminating curated compilations of third-party speech while accounting for individual users' preferences as between the Limited Content and Ages 13+ content settings.  *See* § 27000.5(a) (restricting the display of feeds based "on information provided by the user" without a pertinent exception).

70.     The State's editorial standards would also interfere with Meta's ability to avoid recommendations of content it believes that a user disfavors.  For example, the Act would restrict Meta from de-prioritizing content that it predicts will be of low value to a particular user based on their content preference settings across Facebook, Instagram, and Threads.  *See* § 27000.5(a)(4) (exempting certain feeds, but only if the user's "prioritization[] or deprioritization" requests concern "*specific* media" and the feed does not "automatically play[]" "audio and video content" (emphasis added)).  For example, the Act may prevent Meta from de-prioritizing information about college marketing after the user has already accepted an offer to attend her preferred college; or posts about what Meta has determined reflect controversial or sensitive topics (such as non-violating posts on political issues) that the user has indicated they do not want to have recommended to them.

71.     Meta's "right to speak is [also] implicated" by the Act because "information [Meta] possesses is subjected to restraints on the way in which the information might be used or disseminated." *Sorrell*, 564 U.S. at 568 (quotation omitted).  Speech "can be more effective when [the speaker] know[s] the background and . . . preferences" of its audience, which speakers will often use to determine "how best to present a particular . . . message." *Id*. at 558.  But the Act's imposed editorial standards directly interfere with Meta's ability to make personalized recommendations of third-party content in accordance with its Community Standards that are relevant and valuable to its users.

72.    For example, if a teen demonstrates an interest in science experiments or content about local scholarships, the Act would preclude Meta from recommending additional content about science experiments or local scholarships to that user unless they specifically enter keyword searches for "science experiment" or "local scholarships" every single time they log in.  *See* § 27000.5(a)(2) (exempting certain feeds, but only if they are recommending content based on "search terms that are not persistently associated with the user or user's device").  The same is true as to California trade schools or college and university content, military recruitment, local volunteering opportunities, the San Francisco Chronicle's content, and content from California political officials.  The list goes on and on.  And if a teen has already seen content from the San Francisco Chronicle or a political official—such as a breaking news story or a sound clip from a recent debate—the Act would preclude Meta from choosing not to show the exact same content to the same teen twice.  *See* § 27000.5(a)(1) (generally restricting Meta from curating content based on "the user's previous interactions with media generated or shared by others").

73.    The State does not gain the right to interfere with Meta's editorial activity just because one of the factors Meta considers—in addition to Meta's value-based judgments regarding what content should be removed or recommended, and for whom—is what Meta believes its users will find particularly interesting or relevant.  *See Sorrell*, 564 U.S. at 575–78 (just because speech is "instructive" or "persuasive" does not "justify the government's attempts to stifle it").  Newspaper editors, pamphleteers, parade organizers, and others to whom editorial First Amendment protection attaches have for decades selected third-party content with an eye towards presenting more interesting, engaging, and relevant content to their specific audiences.  *Id.* at 578 (recognizing that personalized information "allows [speakers] to shape their messages" to their audience, thus making the message more effective and "helpful").  In more recent years, online publications (*which are generally exempt from the Act's personalization requirements*) have done the same—for example, sports websites may present content focused on the particular sports teams or leagues a user is most interested in; news aggregators or publications may offer customized lists of stories based on users' previous reading habits; and music streaming services may create custom playlists for a user based on their previous listening habits.

74.    Because the Act's restrictions directly interfere with and burden Meta's editorial activity— and aim to replace it with State-preferred editorial standards—they are subject to strict First Amendment

scrutiny.  After all, "the presentation of an edited compilation of speech generated by other persons is a staple of most newspapers' opinion pages"—and Meta's Feeds—which "fall squarely within the core of First Amendment security." *Hurley*, 515 U.S. at 570; *see also Moody*, 603, U.S. at 717–18.  The First Amendment likewise protects speakers' use of personalized information, which "allows [speakers] to shape their messages" to their audience, thus making the message more effective and "helpful." *Sorrell*, 564 U.S. at 578.  Where, as here, an Act restricts "a platform from compiling the third-party speech it wants in the way it wants"—such as the way Meta believes the user wants it—it is "unlikely to withstand First Amendment scrutiny." *Moody*, 603 U.S. at 717.  Indeed, "[i]t has yet to be demonstrated how governmental regulation of [the editorial] process can be exercised consistent with [the] First Amendment." *Tornillo*, 418 U.S. at 258.

75.    The Act's personalized feeds restrictions are *also* subject to strict scrutiny because they are a content-based and speaker-based burden on Meta's protected editorial activity.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

76.    As applied to Meta's Feeds, the personalized feeds restrictions cannot survive strict scrutiny (or even intermediate First Amendment scrutiny).

77.    The State cannot establish that the personalized feeds restrictions as applied to Meta's Feeds on Facebook, Instagram, and Threads serve any legitimate government interest, let alone a compelling one.  While the State "possesses legitimate power to protect children from harm, that does not include a free-floating power to restrict the ideas to which children may be exposed." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024) ("*NetChoice v. Bonta I*") (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011)); *see also Erznoznik*, 422 U.S. at 213 (outside of constitutionally unprotected speech, the government may not "protect the young from ideas or images that a legislative body thinks unsuitable").  Equally, any "premise . . . that the force of speech can justify the government's attempts to stifle it" is "incompatible with the First Amendment." *Sorrell*, 564 U.S. at 577.

78.    At bottom, the State cannot demonstrate that the personalized feeds restrictions further an interest unrelated to the suppression of free expression.  Indeed, Defendant has admitted that the purpose of the Act's personalized feed restrictions are to restrict what Defendant describes as "rabbit holes of

harmful content."[56]   Similarly, the Act's author and sponsors have asserted that the personalized feed restrictions are "about [the] delivery of user-created content," which they describe as "harmful material to youth."[57]   This is unsurprising, as "[t]hose who seek to censor or burden free expression often assert that disfavored speech has adverse effects," but the fact "[t]hat the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers."  *Sorrell*, 564 U.S. at 577.  And even if these restrictions as applied to Meta furthered an interest unrelated to the suppression of free expression (they do not), the State cannot show a *causal* connection between the specific activity regulated by the personalized feeds restrictions and purported harms to minors.  *Brown*, 564 U.S. at 799–801 (mere correlational evidence is insufficient).

79.    The Act's personalized feeds restrictions are not properly tailored.

80.    The personalized feeds restrictions are "seriously underinclusive." *Brown*, 564 U.S. at 802. Indeed, the Act is seriously underinclusive relative to Defendant's asserted interest of preventing minors from viewing purportedly "harmful" "user-created content,"[58] as the Act permits websites to continue to show precisely the same content to minors if the minors search for it, § 27000.5(a)(2); "so long as one parent . . . says it's OK," *Brown*, 564 U.S. at 802; or if the website qualifies for any of the Act's litany of exceptions, § 27000.5.  Indeed, Defendant has judicially admitted that "the Act . . . allows platforms to show *the same content* to [minors] through different means;"[59] in other words, through different State-preferred editorial choices.

81.    The Act is similarly underinclusive to the extent Defendant asserts that "personalized feeds" themselves are somehow harmful separate and apart from any content (which is disputed).  To begin, the Act entirely exempts from regulation the personalized feeds on countless websites that primarily disseminate first-party and non-user content—including personalized feeds on video and music streaming

---

[56] Assembly Committee on Privacy and Consumer Protection, Report on SB 976, at 9 (July 2, 2024) (reporting statement of Defendant Rob Bonta in support of SB 976).

[57] *Id.* at 11 (reporting statement by "author and sponsors" of SB 976).

[58] *Id.* at 9, 11.

[59] Def. Rob Bonta's Opp'n to Pls' Mot. for Prelim. Inj. at 22, *NetChoice, LLC v. Bonta*, No. 5:24-cv-07885 (filed Dec. 3, 2024), ECF No. 18 (emphasis added).

services.  § 27000.5.  And the Act would even exempt *the exact same feed comprised of the exact same content recommended based on the exact same signals* as long as the provision of personalized feeds are not "a significant part" of the service.  *Id.* § 27000(b)(1).  In other words, any service can continue to provide the very same feeds that the State asserts are purportedly harmful if other aspects of the overall website mean those feeds are not a "significant part" of the website.  *See, e.g.*, *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1128 (D. Utah 2024) (legislation was "underinclusive" since "the Act preserves minors' access to the addictive features Defendants express particular concern with on all internet platforms other than [covered] services").  Even as to covered websites, "[t]he California Legislature is perfectly willing" to let teenagers access personalized feeds "so long as one parent . . . says it's OK." *Brown*, 564 U.S. at 802.  That the Act is "wildly underinclusive . . . is alone enough to defeat it."  *Id.* (applying strict scrutiny); *see also Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 773–74 (2018) ("wildly underinclusive" provision failed even under intermediate scrutiny).

82.    The personalized feeds restrictions are also seriously overinclusive.  The Act's restrictions sweep in services—like Facebook, Instagram, and Threads—that voluntarily engage in substantial content moderation efforts, or voluntarily provide tools allowing parents and guardians to set daily time limits for their teens or limit their use during select days and hours, among many available supervision tools.  Those are precisely the kinds of "voluntary" self-regulatory efforts that are less restrictive means to government intervention.  *Brown*, 564 U.S. at 803; *see also, e.g.*, *Ashcroft*, 542 U.S. at 667; *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 826 (2000).  Meta also provides publicly accessible and free educational resources for interested parents to learn how to use these tools.  And California itself "could encourage websites 'to offer voluntary [tools]'" to help parents who want to supervise their children's use of social media and "educate children and parents" on the availability and importance of such tools.  *NetChoice v. Bonta III*, 152 F.4th at 1017 (quoting *NetChoice v. Bonta I*, 113 F.4th at 1121).  But the Act's direct "impos[ition of] *governmental* authority, subject only to a parental veto" is "vastly overinclusive," as "its entire effect is only in support of what the State thinks parents *ought* to want."  *Brown*, 564 U.S. at 804. Moreover, for the websites the Act regulates, it restricts *all* minors' access to *all* personalized feeds for *any* amount of time.  The Act's one-size-fits-all approach is overbroad because it treats all minors alike, from websites' youngest users to seventeen-year-olds, regardless of differences in those minors'

developmental stage.  *See Reno v. Am. C.L. Union*, 521 U.S. 844, 865-66 (1997); *Am. Booksellers Ass'n*, 484 U.S. at 396.  And Meta itself prohibits minors under thirteen years old from using Facebook, Instagram, and Threads.

83.    The personalized feeds restrictions, unless enjoined, would interfere with and burden Meta's First Amendment editorial activity and its dissemination of fully protected user-generated speech. For these reasons, unless declared invalid and enjoined as applied to Meta's Instagram, Facebook, and Threads services, the personalized feeds restrictions will unlawfully burden Meta's exercise of its First Amendment rights and will irreparably harm Meta.

84.    The Act's personalized feeds restrictions violate federal law and deprive Meta of enforceable federal rights.  Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

85.    The Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing the Act's personalized feeds restrictions against Meta.

86.    The Act's personalized feeds restrictions violate the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution, thereby depriving Meta of enforceable rights; they are therefore unlawful and unenforceable against Meta.

87.    The personalized feeds restrictions are unlawful and unenforceable as applied to Facebook, Instagram, and Threads because they are unconstitutional regulations of protected First Amendment expressive activity and thereby deprive Meta of enforceable rights.

88.     The personalized feeds restrictions are unlawful and unenforceable as applied to Facebook, Instagram, and Threads because they are unconstitutional restrictions on Meta's right to disseminate fully protected speech; they thereby deprive Meta of enforceable rights.

89.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).

90.    This Court can and should exercise its equitable power to enter a declaration that the Act's personalized feeds restrictions are unconstitutional and otherwise unlawful as applied to Meta's Facebook, Instagram, and Threads services.

## **PRAYER FOR RELIEF**

Meta requests an order and judgment:

1.  Declaring that Cal. Health & Safety Code §§ 27001 and 27002(b)(2), (b)(4) are unlawful as applied to Meta's Facebook, Instagram, and Threads services;

2.  Declaring that Cal. Health & Safety Code §§ 27001 and 27002(b)(2), (b)(4) as applied to Meta's Facebook, Instagram, and Threads services, violate the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment;

3.  Enjoining Defendant and his agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act or the challenged portions of the Act against Meta;

4.  Entering judgment in favor of Meta;

5.  Awarding Meta its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

6.  Awarding Meta all other such relief as the Court deems proper and just.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DATED:  November 13, 2025                    Respectfully submitted,


By:    */s/ Isaac D. Chaput*
—————————————————————

Isaac D. Chaput (Bar No. 326923)
Daniel A. Rios (Bar No. 326919)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com
drios@cov.com

Alexander L. Schultz (Bar No. 340212)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4800
aschultz@cov.com

Mark W. Mosier (pro hac vice forthcoming)
Teena-Ann V. Sankoorikal (pro hac vice forthcoming)
Alexandra J. Widas (pro hac vice forthcoming)
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
mmosier@cov.com
tsankoorikal@cov.com
awidas@cov.com


*Attorneys for Plaintiff Meta Platforms, Inc.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF