Isaac D. Chaput (Bar No. 326923)
Daniel A. Rios (Bar No. 326919)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com
drios@cov.com

Alexander L. Schultz (Bar No. 340212)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4800
aschultz@cov.com

Mark W. Mosier (pro hac vice forthcoming)
Teena-Ann V. Sankoorikal (pro hac vice
forthcoming)
Alexandra J. Widas (pro hac vice pending)
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
mmosier@cov.com
tsankoorikal@cov.com
awidas@cov.com

*Attorneys for Plaintiff Meta Platforms, Inc.*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| META PLATFORMS, INC., | Case No.: 5:25-cv-09792-EJD |
| Plaintiff, | |
| v. | **PLAINTIFF META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** |
| ROB BONTA, in his official capacity as Attorney General of California, | Date: February 5, 2026 |
| Defendant. | Time: 9:00 AM |
| | Judge: Honorable Edward J. Davila |
| | Dept.: Courtroom 4 – 5th Floor |

# **TABLE OF CONTENTS**

NOTICE OF MOTION ..................................................................................................... 1

RELIEF SOUGHT ......................................................................................................... 1

INTRODUCTION .......................................................................................................... 1

STATEMENT OF THE ISSUES .................................................................................... 4

BACKGROUND ........................................................................................................... 4

I.     Facebook, Instagram, and Threads Collectively Display Billions of Users' Posts Comprising Speech Fully Protected from Government Restriction, and Meta Curates and Moderates Those Posts in Service of Meta's Values. .......................................................... 4

II.    Meta Offers Users Control over the Amount of Potentially Sensitive Content They May See on Facebook, Instagram, and Threads. .......................................................... 6

III.   Parents Already Have Several Options to Restrict or Limit their Teen's Access to Facebook, Instagram, and Threads Should They Wish to Do So. ..................................... 7

IV.   The Act's Personalized Feeds Restrictions .......................................................... 8

ARGUMENT ................................................................................................................ 9

I.    Meta's As-Applied First Amendment Challenge Is Likely to Succeed. ........................... 10

     A.    The Personalized Feeds Restrictions Trigger Heightened First Amendment Scrutiny Because They Restrict Meta from Disseminating Fully Protected Speech Beyond a State-Sanctioned Audience and Interfere with Meta's Editorial Activity. ....................................................................................... 10

           1.    The Act Burdens Meta's First Amendment Right to Disseminate Fully Protected Speech. ..................................................................... 10

           2.    The Act Burdens Meta's First Amendment Right to Exercise Editorial Control and Judgment and to Use Information it Possesses to Personalize Speech. ..................................................................... 13

     B.    The Act's Personalized Feeds Restrictions are Subject to Strict Scrutiny. ............ 16

     C.    The Personalized Feeds Restrictions Fail Both Strict and Intermediate First Amendment Scrutiny. ..................................................................... 20

           1.    The State Lacks a Sufficient Governmental Interest in Restricting Meta's Curation and Dissemination of Fully Protected Speech. ....................... 20

           2.    The Personalized Feeds Restrictions Are Not Narrowly Tailored. ........... 22

II.   The Remaining Preliminary Injunction Factors Decisively Favor Meta. ........................ 24

A.     Meta Will Suffer Irreparable Harm if the Personalized Feeds Restrictions Are Not Preliminary Enjoined. ............................................................................................... 24

B.     The Equities Tip in Meta's Favor and an Injunction Is in the Public Interest. ...... 25

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*,
   916 F.3d 749 (9th Cir. 2019) ....................................................................4, 24, 25

*Ams. For Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021)......................................................................................20

*Angelilli v. Activision Blizzard, Inc.*,
   781 F. Supp. 3d 691 (N.D. Ill. 2025) ...........................................................16

*Animal Legal Def. Fund v. Wasden*,
   878 F.3d 1184 (9th Cir. 2018) ......................................................................23

*Baird v. Bonta*,
   81 F.4th 1036 (9th Cir. 2023) .......................................................................10

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
   457 U.S. 853 (1982).................................................................................10, 12

*Berger v. City of Seattle*,
   569 F.3d 1029 (9th Cir. 2009) ......................................................................10

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983)........................................................................................17

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011)............................................................................. *passim*

*Children's Health Def. v. Meta Platforms, Inc.*,
   112 F.4th 742 (9th Cir. 2024) .............................................................. *passim*

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010)................................................................................18, 19

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011) ........................................................................23

*Computer & Commc'ns Indus. Ass'n v. Paxton*,
   747 F. Supp. 3d 1011 (W.D. Tex. 2024).......................................................19

*Computer & Commc'ns Indus. Ass'n v. Uthmeier*,
   2025 WL 1570007 (N.D. Fla. June 3, 2025) ................................................24

*Doe v. Harris*,
   772 F.3d 563 (9th Cir. 2014) ........................................................................25

*Elrod v. Burns,*
    427 U.S. 347 (1976)................................................................................24

*Erznoznik v. Jacksonville,*
    422 U.S. 205 (1975)...........................................................................12, 20

*Free Speech Coal., Inc. v. Paxton,*
    606 U.S. 461 (2025)......................................................................12, 17, 20

*Hous. Cmty. Coll. Sys. v. Wilson,*
    595 U.S. 468 (2022)................................................................................18

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995)..................................................................................3

*Lamont v. Postmaster Gen. of U.S.,*
    381 U.S. 301 (1965)................................................................................15

*M.P. by & through Pinckney v. Meta Platforms Inc.,*
    127 F.4th 516 (4th Cir. 2025) ................................................................16

*McCullen v. Coakley,*
    573 U.S. 464 (2014)................................................................................20

*Meinecke v. City of Seattle,*
    99 F.4th 514 (9th Cir. 2024) ..................................................................10

*Miami Herald Publ'g Co. v. Tornillo,*
    418 U.S. 241 (1974)......................................................................3, 13, 17

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ....................................................................... *passim*

*Nat'l Ass'n of Wheat Growers v. Bonta,*
    85 F.4th 1263 (9th Cir. 2023) ................................................................21

*Nat'l Inst. of Family & Life Advocs. v. Becerra,*
    585 U.S. 755 (2018)................................................................................23

*Neb. Press Ass'n v. Stuart,*
    427 U.S. 539 (1976)................................................................................18

*NetChoice v. Bonta,*
    152 F.4th 1002 (9th Cir. 2025) ..................................................... *passim*

*NetChoice v. Bonta,*
    761 F. Supp. 3d 1202 (N.D. Cal. 2024) .............................2, 15, 22, 23

*NetChoice v. Carr,*
    789 F.Supp.3d 1200 (N.D. Ga. 2025) ...................................................24

*NetChoice v. Weiser*,
__ F. Supp. 3d __, 2025 WL 3101019 (D. Colo. Nov. 6, 2025)..............................................17

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ..............................................................................9, 17, 20, 24

*NetChoice, LLC v. Griffin*,
2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ....................................................................11

*NetChoice, LLC v. Griffin*,
2025 WL 978607 (W.D. Ark. Mar. 31, 2025) .......................................................................24

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024)......................................................................19, 23, 24

*NetChoice, LLC v. Yost*,
778 F. Supp. 3d 923 (S.D. Ohio 2025) ...........................................................6, 11, 18, 24

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*,
475 U.S. 1 (1986)...................................................................................................................17

*Packingham v. North Carolina*,
582 U.S. 98 (2017)........................................................................................................ *passim*

*Porretti v. Dzurenda*,
11 F.4th 1037 (9th Cir. 2021) ...............................................................................................25

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ..............................................................................................................18

*Reno v. Am. C.L. Union*,
521 U.S. 844 (1997)...............................................................................................................24

*Reuber v. Food Chem. News, Inc.*,
925 F.2d 703 (4th Cir. 1991) ................................................................................................16

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ..............................................................................................24

*Students Engaged in Advancing Texas v. Paxton*,
765 F. Supp. 3d 575 (W.D. Tex. 2025)..................................................................................18

*Turner Broad. Sys., Inc. v. F.C.C.*,
512 U.S. 622 (1994) ........................................................................................................18, 19

*United States v. Playboy Ent. Grp.*,
529 U.S. 803 (2000)...............................................................................................................23

*Vidal v. Elster*,
602 U.S. 286 (2024)...............................................................................................................18

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)...........................................................................................15

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*,
    536 U.S. 150 (2002)...........................................................................................10

**Constitutional Provisions**

United States Constitution,
    First Amendment ...................................................................................... *passim*

**Statutes**

Cal. Health & Safety Code § 27000.5.......................................................... *passim*

Cal. Health & Safety Code § 27001.............................................................. *passim*

Cal. Health & Safety Code § 27002......................................................1, 2, 8, 25

Cal. Health & Safety Code § 27006.....................................................................9

Cal. Senate Bill 976 (2024) § 1................................................................... *passim*

**Other**

Am. Psych. Ass'n, *Health Advisory on Social Media Use in Adolescence* (May 2023)...............21

Assembly Comm. on Privacy and Consumer Prot., *Report on S.B. 976* (July 2, 2024)................19

Nat'l Acads. of Sciences, Eng'g, and Med., *The Relation Between Social Media and
    Health*, *in* Social Media and Adolescent Health 91 (2024)  .....................................22

*Senate Floor Session*, California State Senate (May 20, 2024),
    https://www.senate.ca.gov/media/senate-floor-session-20240520.........................................19

U.S. Surgeon Gen., *Social Media and Youth Mental Health* (2023)............................................21

## NOTICE OF MOTION AND MOTION

**TO THE DEFENDANT, AND ITS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on February 5, 2026 at 9:00 AM, in Courtroom 4 of the above-entitled Court, located at 280 South 1st Street, San Jose, CA, 95113, Plaintiff Meta Platforms, Inc. ("Meta") will and hereby does move this Court, under Local Rule 7-2 and Fed. R. Civ. P. 65, for a preliminary injunction prohibiting Defendant Rob Bonta in his official capacity as Attorney General of California ("Defendant)" from enforcing Sections 27001, 27002(b)(2), and 27002(b)(4) (the "personalized feeds restrictions") of California Senate Bill 976 (the "Act" or "S.B. 976") against Meta with respect to its Facebook, Instagram, and Threads services.  Meta stands to suffer immediate and irreparable harm without an injunction.  The personalized feeds restrictions, as applied to Meta, unconstitutionally interfere with Meta's editorial First Amendment rights and Meta's ability to disseminate fully protected speech beyond a government-sanctioned audience and so violate the First and Fourteenth Amendments to the U.S. Constitution.  This motion is based on this notice; the Memorandum of Points and Authorities; the Declarations of Lars Backstrom, Bartlett Cleland, Arcadiy Kantor, Sayed Otaru, and Alexander L. Schultz and exhibits thereto; this Court's file; and any matters properly before the Court.

## RELIEF SOUGHT

Meta respectfully requests an as-applied preliminary injunction prohibiting Defendant from enforcing the Act's personalized feeds restrictions against Meta with respect to its Facebook, Instagram, and Threads services until this matter may be resolved on the merits.  Meta requests that the Court enter such injunction on the date set for hearing on this Motion or as soon as practicable thereafter.  Meta stands to suffer immediate and irreparable harm without an injunction.  The personalized feeds restrictions unconstitutionally interfere with Meta's editorial First Amendment rights and Meta's ability to disseminate fully protected speech beyond a government-sanctioned audience.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Meta does not seek preliminary relief lightly.  Given the Ninth Circuit's ruling that Meta's individual participation is necessary if an as-applied challenge to the Act's personalized feeds restrictions is to go forward, *NetChoice v. Bonta*, 152 F.4th 1002 (9th Cir. 2025) ("*Bonta III*"), Meta brings this motion

1  to defend its First Amendment rights.  The Court should preliminarily enjoin the Act's personalized feeds

2  restrictions, which unconstitutionally restrict Meta from curating and disseminating to teens aged 13–17

3  the very same "edited compilation[s] of third-party expression" that the Supreme Court held just last year

4  "receive the First Amendment's protection."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 716 (2024); *see*

5  *also NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1221 n.4 (N.D. Cal. 2024) ("*Bonta II*") ("*Moody* discussed

6  feeds on Facebook and YouTube and found them to contain expressive elements"), *aff'd in part, rev'd in*

7  *part*, 152 F.4th at 1014 ("particular platforms' feeds" on "Facebook[] and Instagram" may be

8  "expressive").

9        All feeds[1] of third-party content that Meta makes available on its Facebook, Instagram, and

10  Threads services (hereinafter, "Feeds") are impacted by Meta's "expressive choices"—including its

11  content-moderation policies as expressed in Meta's "Community Standards."  *Moody*, 603 U.S. at 731.

12  That qualifies them as a "distinctive expressive product" fully protected by the First Amendment.  *Id.* at

13  740.  But the Act impermissibly bars Meta from disseminating these fully protected expressive products

14  beyond the State's sanctioned audience, §§ 27001(a)(2), 27002(b)(2)(a), unless Meta forsakes its editorial

15  choices in favor of the State's preferences, § 27000.5(a)(1)–(7).

16        The First Amendment permits none of this.  The State cannot bar Meta from disseminating fully

17  protected speech to willing recipients, as "Meta has a First Amendment right to use its platform

18  to . . . convey posts" on its services.  *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 759

19  (9th Cir. 2024).  Meta's dissemination and "presentation of an edited compilation of speech generated by

20

21  _____

22  [1] Meta uses the term "feed" to refer to "an internet website, online service, online application, or mobile

23  application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either

24  concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole

25  or in part, on information provided by the user, or otherwise associated with the user or the user's device."

26  § 27000.5.  Unless otherwise noted, statutory citations in this Motion refer to the California Health &

27  Safety Code.  When discussing the Act's requirements, this Motion uses "teen," "minor," "adult," and

28  "user" to refer only to California teens, minors, adults, account holders, and users covered by the Act.

other persons . . . fall[s] squarely within the core of First Amendment security." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995) (citing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)); *accord Moody*, 603 U.S. at 733–40 (addressing Meta's Feeds on Facebook).

The State also cannot dictate how Meta curates the fully protected user-generated speech on its services by forcing Meta to make these curations less personalized. If the State passed a law prohibiting newspaper editors from selecting or prioritizing articles based on the interests of a local market, that law would surely be unconstitutional. It "has yet to be demonstrated how governmental regulation of [the editorial] process can be exercised consistent with [the] First Amendment." *Tornillo*, 418 U.S. at 258. And "Meta" has the same "First Amendment right" to decide "how[] to convey posts" as do newspaper "editors." *Children's Health Def.*, 112 F.4th at 759 (quoting *Moody*, 603 U.S. at 738). Thus, the State may not dictate how Meta curates the user speech embedded in its "expressive products," *Moody*, 603 U.S. at 716, by demanding that Meta select third-party content for display without regard to the individualized interests, preferences, or characteristics of Meta's users.

Further, as the Supreme Court has recognized, speech "can be more effective when [the speaker] know[s] the background and . . . preferences" of its audience—as speakers can use individualized information to make the speech they disseminate more "persuasive" and "instructive" for recipients. *Sorrell*, 564 U.S. at 578. That is why "an individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated." *Id.* at 568 (quotation omitted)). Forcing Meta to adopt the Act's editorial regime of non-personalized curation would eliminate much of what makes Meta's services interesting and informative for individual users. It would threaten to transform Meta's services into simply a feed of whatever content is most popular for the majority of users—drowning out smaller voices and interests, and impeding Meta's goal to inspire users to make and foster social connections based on *their* preferences, subject to Meta's Community Standards. And it would also inhibit Meta's ability to exercise editorial choices it has made to enhance teen safety and well-being on Facebook, Instagram, and Threads.

Because the Act directly interferes with Meta's editorial control and judgment, it is subject to heightened First Amendment scrutiny. *See Moody*, 603 U.S. at 741 (statute interfering with Meta's curation on Facebook's Feed subject to heightened scrutiny); *Sorrell*, 564 U.S. at 563–66 (2011) (statute

restricting ability of "pharmaceutical drug manufacturers" to personalize their speech subject to heightened scrutiny). The Act is *also* subject to heightened scrutiny because it imposes these speech burdens in a discriminatory content- and speaker-based fashion. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (applying strict scrutiny to content-based burden on speech). But the Act as applied to Meta cannot pass muster under strict or even intermediate First Amendment scrutiny, as it is "seriously underinclusive" and "overinclusive" as to any purported interest the State may claim. *Id.* at 805.

Absent this Court's swift intervention, Meta stands to suffer irreparable First Amendment injury. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Bonta III*, 152 F.4th at 1024 (quotation omitted)). Because Meta is likely to succeed on its as-applied First Amendment claim, all preliminary injunction factors tip in Meta's favor. *See id.* at 1024–25 (showing likelihood of success on a First Amendment claim "'compels a finding' that the equities and public interest favor an injunction" and constitutes irreparable injury (quoting *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc)). This Court should enjoin the personalized feeds restrictions until this Court reaches a decision on the merits.

## STATEMENT OF THE ISSUES

1.  Is Meta likely to succeed on the merits of its claims that the Act's personalized feed restrictions violate the First Amendment as applied to Meta's Facebook, Instagram, and Threads services?

2.  Will Meta be irreparably harmed without an injunction against the personalized feeds restrictions?

3.  Do the balance of the hardships and public interest favor enjoining Defendant's enforcement of the Act's personalized feeds restrictions as to Meta's Facebook, Instagram, and Threads services?

## BACKGROUND

**I.  Facebook, Instagram, and Threads Collectively Display Billions of Users' Posts Comprising Speech Fully Protected from Government Restriction, and Meta Curates and Moderates Those Posts in Service of Meta's Values.**

Meta's Facebook, Instagram, and Threads services collectively enable billions of people around the world to share ideas, offer support, and discuss important topics, including politics, public health, and social issues. Backstrom Decl. ¶¶ 3–4. In other words, subject to Meta's Community Standards, Meta's services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). And "users

employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." *Id.* at 105, 107 (quotation omitted). By California's own admission, these websites are "an important tool for communication and information sharing." S.B. 976 § 1(a).

Because it is impossible to display every piece of user-generated content that a user might be interested in, and because it is similarly difficult to foster a social environment without prioritizing the people and ideas a user is interested in, Facebook, Instagram, and Threads display users' speech through curated Feeds featuring "stream[s] of other users' posts." *Moody*, 603 U.S. at 734; Backstrom Decl. ¶ 7. These feeds might present, for example, status updates from friends or elected officials, photos and videos from family gatherings, articles from local or national news outlets, information about upcoming community events or religious services, and much more.

The curation process begins long before other users' posts are displayed to users, and includes Meta's Content Policy team deciding what content-moderation policies to adopt and maintain on Facebook, Instagram, and Threads. Kantor Decl. ¶ 5. Meta implements these policies through processes that include both human and automated review. *Id.* ¶ 9. An additional "key to the scheme is prioritization [and de-prioritization] of content, achieved through the use of algorithms." *Moody*, 603 U.S. at 734; Backstrom Decl. ¶¶ 5–11. Employees at Meta have built algorithms to "implement" Meta's mission at scale—for example, to "prefer content" that it considers higher-quality (including content that Meta believes users will find personally interesting or relevant or will inspire them to create content, as part of Meta's goal of fostering a community) while removing and "disfavor[ing] posts" that, in Meta's judgment, should not be affirmatively recommended to other users or should be removed altogether such as content "encourag[ing] teen suicide and self-injury." *Moody*, 603 U.S. at 734–37; Backstrom Decl. ¶ 11; Kantor Decl. ¶¶ 10, 22.

Meta wants Facebook, Instagram, and Threads to be places where people feel empowered to communicate. This is why Meta, through its Content Policy team—which is composed of subject matter experts across a range of issues—has developed content moderation policies that help determine what third-party content is seen by users on Feeds within Facebook, Instagram and Threads. Kantor Decl. ¶ 5. Some of Meta's content moderation policies flatly prohibit certain kinds of user-generated content, and when violating content is detected and determined to be violating by Meta, it is removed across

Facebook, Instagram, and Threads. *Id.* ¶ 10. Other category-specific policies identify content that Meta chooses to hide, label, place behind a warning screen, or de-prioritize for all users (or teens in particular). *Id.* And Meta's Content Policy team also creates guidelines that set forth categories of content that are allowed on Meta's services but may not be eligible for recommendation. *Id.* ¶ 21. The policies reflect Meta's views about which types of user-generated content should and should not be available or recommended on Facebook, Instagram, and Threads. *Id.* ¶ 5. They also reflect Meta's judgment about how it can best create a place for free expression, give people a voice, and empower people to talk openly about the issues that matter to them. *Id.* When Meta does limit expression, it does so in the service of Meta's values of authenticity, safety, privacy, and dignity—*i.e.*, "the type of community [Meta] seeks to foster." *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 953–54 (S.D. Ohio 2025).

To further advance Meta's goal of creating an environment where users feel inspired to make and foster social connections, Meta will promote on its Feeds diverse topics and creators, prioritize new content from budding creators, and recommend content with the goal of inspiring users to create similar content. Backstrom Decl. ¶¶ 10–11. Meta also works towards this editorial goal by personalizing recommendations and avoiding recommendations that Meta itself considers low-quality, objectionable, particularly sensitive, or inappropriate for younger audiences. *Id.* ¶¶ 9–11. Through its content curation efforts, Meta intends to communicate a message to its users that, within the bounds of Meta's Community Standards, their particular interests and preferences are reflected on Facebook, Instagram, and Threads services and Meta wants them to feel empowered to communicate and talk openly about the topics that matter to them. *See id.* ¶ 9; Kantor Decl. ¶¶ 4, 23.

Thus, Meta's Feeds—the feeds on Facebook, Instagram, and Threads—display constantly updated, personalized, and curated lists of connected third-party content and/or recommended third-party content. "[I]*n toto*"—through Meta's editorial choices about what content to display and how to display it—these Feeds convey Meta's editorial "messages." *Moody*, 603 U.S. at 739.

## II.    Meta Offers Users Control over the Amount of Potentially Sensitive Content They May See on Facebook, Instagram, and Threads.

Meta also offers Facebook, Instagram, and Threads users tools to adjust the amount of certain types of content they see in the feeds on these services, which Meta accounts for when determining what

content to display. Otaru Decl. ¶¶ 12–18. For example, among other settings, users can use the Political Content Control setting on Instagram, Threads, and Facebook to see more or less content in their feeds that Meta, in its judgment, has determined qualifies as political content. *Id*. ¶ 13. And users on Facebook and Threads and adult users on Instagram can use the Sensitive Content Control setting to see more or less of certain categories of content in their feeds that Meta, in the judgment of its human personnel, has determined may be upsetting or offensive to some users. *Id*. ¶ 15. Through Facebook's Teen Accounts, teens aged 13-17 on Facebook are automatically defaulted by Meta into the most restrictive "Show less" setting, and teens ages 13–15 need parental approval to change that setting. *Id*.

Further, through Instagram's Teen Accounts, teens aged 13–17 will, by the end of 2025, be provided Ages 13+, Limited Content, and More Content settings. *Id*. ¶ 16. Meta's goal for the "Ages 13+" content setting is to ensure that teens see content that is generally similar to what teens would see in an age-appropriate movie, and to try and hide more content that Meta believes may be inappropriate for people under 18 (such as content where a person is describing their own personal experiences with suicide, self-injury or eating disorders). *Id*. Teens may also choose to enroll in an even stricter "Limited Content" setting (and a supervising parent or guardian can also enroll their teens in this setting) that personnel at Meta developed based on their judgment regarding what content should be permitted and not permitted in this even stricter setting. *Id*. ¶ 17.

### III. Parents Already Have Several Options to Restrict or Limit their Teen's Access to Facebook, Instagram, and Threads Should They Wish to Do So.

Parents and guardians who want to restrict, limit, control, and oversee their teen's access to Facebook, Instagram, and Threads have myriad options for doing so. Meta itself provides a number of tools—such as tools parents and guardians can use to set daily time limits for their teens or limit use during select days and hours—and publicly accessible and free educational resources for parents to learn how to use these tools. *See Id*. ¶¶ 11, 19.

Several other options also exist for parents to restrict or limit their teen's access to internet websites in general. Parents can decide whether and when to let their teens use computers, tablets, and smartphones in the first place. Schultz Decl. Ex. 16 ¶ 12. They can also determine whether, when, and how their teens access the Internet by deciding to use parental tools designed and advertised by cell service and broadband

Internet providers.  Schultz Decl. Exs. 1–4.  Many wireless routers (the devices that provide wireless Internet connectivity throughout a home) offer parental control settings, such as blocking particular websites or pausing Internet access for a particular device or user.  Schultz Decl. Ex. 5–6.  And even more parental controls are available at the device level.  For example, iPhones and iPads enable parents to approve or decline their teen's app download requests, limit the amount of time their teens can spend on the device, choose which applications their teens can use, set age-related content restrictions for those applications, filter online content, and control privacy settings; and Google and Microsoft offer similar parental controls for devices using their operating systems.  *Id.* ¶ 14; Schultz Decl. Exs. 8–12.

## IV.    The Act's Personalized Feeds Restrictions

The Act's personalized feeds restrictions prohibit covered services—including Facebook, Instagram, and Threads—from displaying covered feeds to individuals under the age of eighteen (18) years old without verifiable parental consent.  § 27001(a); *see also* §§ 27002(b)(2), (b)(4) (requiring covered services to create default settings that are effectively duplicative of this restriction).

The Act generally exempts feeds—meaning covered services can display them without restriction to minors—if they are organized and curated in accordance with the State's prescribed editorial standards set forth at Section 27000.5(a)(1)–(7).  Under the State's standards, feeds are exempt from the Act as long as the covered service agrees to curate them by only "recommending, selecting, or prioritizing for display" user-generated content based on (1) "information [that] is not persistently associated with the user or user's device, and does not concern the user's previous interactions with media generated or shared by others," (*e.g.*, curation accounting for a device's location may be exempt as not "persistently" associated with a user or their device, but curation accounting for the minor user's stated place of residence may not be) or (2) "search terms that are not persistently associated with a user's device" (*e.g.*, curation accounting for a user's search for "San Francisco Giants" content may be exempt, but it would be impermissible to display such content to the same user outside of their specific search).  § 27000.5(a)(1)–(2).  Equally, the Act generally exempts feeds if the "media recommended, selected, or prioritized for display is exclusively the next media in a preexisting sequence from the same author, creator, poster, or source and, in the case of audio or video content, is not automatically played" (*e.g.*, a chronological feed of content created by a single user a minor follows may be exempt).  § 27000.5(a)(6).

If, however, a feed is curated and organized in a manner *other* than what is prescribed by Section 27000.5(a)(1)–(7), the feed is subject to the personalized feeds restrictions.  The effect of these statutorily prescribed standards is to restrict editorial discretion as to how content can be curated and organized on a covered service.  While Meta may determine that prioritizing additional user-generated content about, say, the San Francisco Giants to a user that has demonstrated an interest that team might more "effective[ly]" make them feel welcome or help them foster social connections with other users who share that interest, *Sorrell*, 564 U.S. at 565, the State's standards would restrict Meta from doing so.  In other words, "information [a covered service] possesses is subjected to restraints on the way in which the information might be used or disseminated."  *Id.* (quotation omitted).

The Act expressly targets "social media platform[s]" for regulation and its exemptions reflect a preference for first-party content over content "generated or shared by users," because only feeds displaying the latter are subject to the Act.  § 27000.5.  The Act's statutory carveouts exempt a broad range of favored speakers and content from the personalized feeds restrictions, despite those feeds maintaining the same functionality—including "the algorithmic delivery of content"—that the State asserts is supposedly "harm[ful]."  S.B. 976 § 1(b).  For example, under the Act, Facebook, Instagram, and Threads may not display personalized feeds to teens by default; but services that do not display feeds of *user-generated* content as a significant part of their service—like many news platforms and video and music streaming services—can do so.

The Act "may only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General."  § 27006(a).  Defendant has publicly pursued enforcement against Meta under other laws.

## ARGUMENT

The Court should issue an as-applied preliminary injunction because (1) Meta "is likely to succeed on the merits," (2) both Meta and its users are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [Meta's] favor," and (4) "an injunction is in the public interest."  *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115 (9th Cir. 2024) ("*Bonta I*").  Meta is likely to succeed on the merits—and likelihood of success is the "most important factor" and "especially important" in constitutional rights cases because it "demonstrates . . . irreparable harm no matter how brief

the [constitutional] violation" and "tips the public interest sharply in [the plaintiff's] favor."  *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023).  The Court should issue a preliminary injunction.

## I.    Meta's As-Applied First Amendment Challenge Is Likely to Succeed.

In First Amendment cases, "the moving party" need only carry the "initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (citation omitted).  There can be little doubt that Meta meets this burden.  *See infra* §§ I.A–B.  The burden then "shifts to the government to justify the restriction on speech."  *Meinecke*, 99 F.4th at 521 (citation omitted).  The government cannot meet its burden to justify the Act's personalized feeds restrictions as-applied to Facebook, Instagram, and Threads.

### A.    The Personalized Feeds Restrictions Trigger Heightened First Amendment Scrutiny Because They Restrict Meta from Disseminating Fully Protected Speech Beyond a State-Sanctioned Audience and Interfere with Meta's Editorial Activity.

For multiple reasons, the Act's personalized feeds restrictions burden Meta's First Amendment rights, triggering heightened scrutiny.

#### 1.    The Act Burdens Meta's First Amendment Right to Disseminate Fully Protected Speech.

 "Freedom to distribute information to every citizen wherever he desires to receive it is . . . clearly vital to the preservation of a free society."  *Martin*, 319 U.S. at 146–47.  Here, the Act restricts Meta's First Amendment right to distribute or "disseminate" fully protected speech.  *303 Creative LLC*, 600 U.S. at 594; *see also Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (recognizing "the sender's First Amendment right to send" ideas); *cf. also Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 167 (2002) (recognizing speakers' First Amendment interest in disseminating "spontaneous speech" without having to first comply with government-imposed conditions); *Berger v. City of Seattle*, 569 F.3d 1029, 1038 (9th Cir. 2009) (similar).

The Ninth Circuit has held that "Meta has a First Amendment right to use its platform to . . . convey posts" on its services.  *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 759 (9th Cir. 2024).  And here, the Feeds that the Act prevents Meta from disseminating consist of fully protected speech.  That speech includes the recommended user-generated posts themselves—in which people can take positions and engage with others on political, social, economic, educational, religious, cultural, and other topics.

*See Packingham*, 582 U.S. at 105, 107; *Yost*, 778 F. Supp. 3d at 953; *NetChoice, LLC v. Griffin*, 2023 WL 5660155, *5–6 (W.D. Ark. Aug. 31, 2023).

These Feeds are *also* fully protected by the First Amendment because of how Meta's "expressive choices" affect which user-generated "content [its] feeds will display, or how the display will be ordered and organized." *Moody*, 603 U.S. at 740. Through the efforts of individual employees who develop and implement Meta's content-moderation policies, and through algorithms that Meta employees design to curate third-party content, Meta presents each "user with a continually updating stream of other users' posts." *Id.* at 734; *see* Backstrom Decl. ¶ 7; Kantor Decl. ¶ 9. Meta engages in "prioritization of [this user-generated] content, achieved through the use of algorithms." *Moody*, 603 U.S. at 704; *see* Backstrom Decl. ¶¶ 5–11. The "selection and ranking [of this content] is based on a user's expressed interests and past activities" as well as "more general features of the communication or its creator [*i.e.*, the user who generated it]." *Moody*, 603 U.S. at 734–35; Backstrom Decl. ¶ 7. Moreover, a user may choose to see "More" or see "Less" of certain content categories. *Moody*, 603 U.S. at 735; *see* Otaru Decl. ¶¶ 12–18. And Meta's Community Standards—which apply across the Facebook, Instagram, and Threads services—"detail the messages and videos that [Meta] disfavor[s]." *Moody*, 603 U.S. at 735; *see* Kantor Decl. ¶ 9. Through both human and technological processes, Meta "implement[s] those [preferences and] standards," including by "remov[ing], label[ing] or demot[ing] messages." *Moody*, 603 U.S. at 735–36; *see* Kantor Decl. ¶¶ 12–23; Otaru Decl. ¶¶ 13–17. And in so doing, Meta, based on its values and policies, "make[s] a wealth of . . . judgments about what kinds of speech, including what kinds of viewpoints, are not worthy of promotion. And those judgments show up in" Meta's Feeds across Facebook, Instagram, and Threads. *Id.* at 736 n.5.[2] "And because that is true, [Meta's Feeds] receive First Amendment

---

[2] The *Moody* Court expressly held that its reservation for "feeds whose algorithms [that] respond solely to how users act online" was inapplicable to Facebook's Feed because the content on Facebook's Feed is impacted by "independent content standards [that] make a wealth of user-agnostic [content moderation] judgments." *Moody*, 603 U.S. at 736 n.5. Facebook's Feed, and the similar feeds on Instagram and Threads, are therefore *not* "feeds whose algorithms respond solely to how users act online—giving them

protection" as "expressive products." *Id.* at 740.  Such activity, "after all, is not unlike traditional media curated by human editors." *Bonta III*, 152 F.4th at 1014 (citing *Moody*, 603 U.S. at 731–34, 738).

The Act, however, would restrict Meta from disseminating its expressive products beyond a State-sanctioned audience.  *See* § 27001.  The First Amendment does not permit the State to impose this kind of burden on the dissemination of fully protected speech.  *See Children's Health Def.*, 112 F.4th at 759 (recognizing Meta's right to "convey posts"); *Struthers*, 319 U.S. at 146–47 (recognizing the "[f]reedom to distribute information"); *Pico*, 457 U.S. at 867 (similar); *303 Creative*, 600 U.S. at 594 (First Amendment protects right to "disseminate" speech).

The same First Amendment principle applies with respect to minors.  "[O]nly in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to" minors.  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (quoting *Erznoznik v. Jacksonville,* 422 U.S. 205, 212–213 (1975)).   Those narrow and well-defined circumstances are not present here, as the Act is not prohibiting the dissemination of only constitutionally *unprotected* categories of speech, such as "obscenity for minors." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 494 (2025).  (Nor does Meta authorize users to post pornography on its services.  *See* Kantor Decl. ¶¶ 9–10.)  Instead, the Act is precluding Meta from disseminating compilations of *fully protected* speech—*i.e.*, user-generated posts

---

the content they appear to want, without regard to any independent content standards." *Id.*; *see also Bonta III*, 152 F.th at 1041 ("an algorithm [that] implements human editorial directions" "is expressive" even if an "algorithm that responds *solely* to how users act online . . . probably is not" (emphasis added) (quoting *Moody*, 603 U.S. at 736 n.5))).  Moreover, Meta's ranking and recommendation systems are not based solely on predictions of what individual content item will be relevant to a user based on their activity on the service.  They are also designed to promote new content from small creators to progressively larger audiences (in service of Meta's goal to inspire content creation), to ensure users see a mix of posts from users they are connected with as well as recommended posts from others, and to avoid presenting to users multiple videos in a row on the same topic or multiple videos in a row from the same creator.  Backstrom Decl. ¶¶ 10–11.

and Meta's "distinct expressive product[s]" that qualify for First Amendment protection.  *Moody*, 603 U.S. at 731.  The State cannot impose these speech burdens without confronting the First Amendment.

### 2. The Act Burdens Meta's First Amendment Right to Exercise Editorial Control and Judgment and to Use Information it Possesses to Personalize Speech.

The Act is also subject to First Amendment scrutiny because it restricts and interferes with Meta's editorial judgments and restricts Meta's ability to use information it possesses to personalize its expressive products.

Compilers of third-party speech—who make decisions such as what third-party "material to [include]" and the "limitations on the size and content" of the compilation—are traditionally protected by the First Amendment from the government's intrusion into their "exercise of editorial control and judgment."  *Tornillo*, 418 U.S. at 258; *see also Moody*, 603 U.S. at 731 ("Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity.").  The First Amendment "is [also] implicated" when "information [a speaker] possesses is subjected to restraints on the way in which the information might be used or disseminated"—because speech "can be more effective when [the speaker] know[s] the background and . . . preferences" of its audience, which speakers often use to determine "how best to present a particular . . . message."  *Sorrell*, 564 U.S. at 558, 568 (emphasis omitted).[3]  Here, the Act's imposed editorial standards would directly interfere with *both* Meta's editorial judgments *and* Meta's ability to use information it possesses to make personalized recommendations of third-party content.  *See* § 27000.5(a) (exempting feeds from coverage only if they satisfy State-imposed editorial standards).

For example, if a teen demonstrates an interest in science experiments or content about local scholarships, the Act would preclude Meta from recommending additional content about science experiments or local scholarships to that user unless they specifically search for "science experiment" or

---

[3] Unlike the law at issue in *Sorrell*, the Act does not even purport to advance a "privacy"-related rationale for restricting Meta's use of individualized information in its possession.  564 U.S. at 557; *see generally* § 1(a)–(b).

"local scholarships" every single time they log in. *See* § 27000.5(a)(2) (exempting feeds only if they recommend content based on "search terms that are not persistently associated with the user or user's device"). The same is true as to California trade schools or college and university content, content about military recruitment or local volunteering opportunities, the San Francisco Chronicle's content, and content from California political officials. And if a teen has already seen content from the San Francisco Chronicle or a political official—such as a breaking news story or a sound clip from a recent debate—the Act would preclude Meta from choosing not to show the exact same content to the same teen twice. *See* § 27000.5(a)(1) (generally restricting Meta from curating content based on "the user's previous interactions with media generated or shared by others").

Thus, adopting the State's editorial standards will make Meta's speech curations far less "instructive," "persuasive," and "effective," *Sorrell*, 564 U.S. at 578, for users seeking to explore the *billions* of potential user-generated posts on Meta's services covering "topics 'as diverse as human thought," *Packingham*, 582 U.S. at 105. Rather than users seeing recommended posts on topics that have meaning and value to them, the State's standards would push Meta's Feeds towards recommending whatever content is popular among the majority—drowning out smaller communities' voices, interests, and preferences in the process.

The Act will also restrict Meta from avoiding recommendations of content that it predicts will be of low value to a particular user based on their Facebook, Instagram, and Threads content preference settings. *See* § 27000.5(a)(4) (exempting certain feeds, but only if the user's "prioritization[] or deprioritization" requests concern "*specific* media" and the feed does not "automatically play[]" "audio and video content" (emphasis added)). For example, the Act may prevent Meta from de-prioritizing information about college marketing after the user has already accepted an offer to attend her preferred college, or posts about what Meta has determined reflect controversial or sensitive topics (such as non-violating posts on political issues) that the user has indicated they do not want to have recommended to them.

Similarly, the Act's imposed editorial standards would interfere with Meta's implementation of its value-based judgments that some content should be hidden or de-prioritized for certain types of users. For example, Meta determines, based on its exercise of judgment, what kinds of user-generated content may

be appropriate across its Limited Content, Ages 13+, or More content settings on Instagram. While Meta will default teens to the Ages 13+ setting on Instagram, teens may elect to instead be placed in the more restrictive Limited Content setting. But the Act restricts Meta from disseminating curated compilations of third-party speech while accounting for individual users' preferences as between the Limited Content and Ages 13+ content settings. *See* § 27000.5(a) (restricting the display of feeds based "on information provided by the user" without a pertinent exception). These "restrictions [impair [Meta's] own expression," *Bonta II*, 761 F. Supp. 3d at 1219, and burden "Meta's . . . First Amendment right to use its platform to promote views it finds congenial and to refrain from promoting views it finds distasteful" with respect to particular users, *Children's Health Def.*, 112 F.4th at 759.

It is irrelevant whether the Act would allow the same user-generated content to theoretically be encountered among the billions of daily posts on Meta's services (as the proverbial needle in the haystack). The Act still interferes with Meta's "choices about . . . *how*" to "convey posts," which are among the very decisions that give its Feeds "a particular expressive quality." *Moody*, 603 U.S. at 738. Just so here, the State cannot require Meta to reorganize the user-generated speech on its services in a way that will make it less compelling and more difficult and burdensome to navigate. *See Sorrell*, 564 U.S. at 558, 568, 578 (striking down government restriction on use of information a speaker was using to make speech more "instructive"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 n.15 (1976) (there is "no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means"); *cf. also Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307 (1965) (government-imposed impediment on dissemination of certain speech through the mail—requiring the addressee to first submit an "official . . . reply card"—burdened "First Amendment rights").

Nor does the State gain the right to interfere with Meta's editorial activity just because one of the factors Meta considers is what Meta believes its users will find particularly interesting or relevant, in addition to Meta's value-based judgments regarding what content should be removed, recommended, or placed in certain content categories (such as Limited Content versus Ages 13+). *See Sorrell*, 564 U.S. at 575–78 (First Amendment protects speakers' use of individualized information to tailor their speech to be more "persuasive"). Courts have regularly held that entities engaged in protected First Amendment

activity do not lose this protection simply because one of the goals of that activity may be to please an audience or increase future engagement with their expressive products.  *See Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991) ("[I]t is hardly unusual for publications to print matter that will please their subscribers[.]"); *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025) ("[A] newspaper company does not cease to be a publisher simply because it prioritizes engagement in sorting its content."); *Angelilli v. Activision Blizzard, Inc.*, 781 F. Supp. 3d 691, 702 (N.D. Ill. 2025) (suggesting that the First Amendment would not tolerate a "mandate that authors not end chapters on cliffhangers").

As the Supreme Court and Ninth Circuit have recognized, "Meta has a First Amendment right" to decide "whether—and, if so, how—to convey" third-party speech just "like editors, cable operators, and parade organizers" do.  *Children's Health Def.*, 112 F.4th at 759 (cleaned up) (quoting *Moody*, 603 U.S. at 738).   Newspaper editors, cable operators, parade organizers, and other curators of information have for decades selected third-party content with an eye towards presenting more interesting, engaging, and relevant content to their specific audiences, all within the editorial protection of the First Amendment. *See Sorrell*, 564 U.S. at 578 (personalized information "allows [speakers] to shape their messages" to their audience, thus making the ensuing messages more effective and "helpful").  In more recent years, online publications (*which are generally exempt from the Act's personalization requirements*) have done the same:  sports websites may present content focused on the particular sports teams or leagues a user is most interested in; news aggregators or publications may offer customized lists of stories based on users' previous reading habits; and music streaming services may create custom playlists for a user based on their previous listening habits.  The First Amendment protects the same exercises of "editorial control and judgment" when exercised on "social media."  *Moody*, 603 U.S. at 736 n.5.  Because the personalized feeds restrictions burden and restrict Meta "from compiling the third-party speech it wants in the way it wants"—including the way Meta believes the user wants it—on Facebook, Instagram, and Threads, they are subject to and "unlikely to withstand First Amendment scrutiny."  *Id.* at 718.

## B.     The Act's Personalized Feeds Restrictions are Subject to Strict Scrutiny.

The Act's interference with Meta's ability to disseminate fully protected speech pursuant to its editorial processes warrants strict scrutiny (or at a minimum intermediate scrutiny).  "It has yet to be

demonstrated how governmental regulation of [the editorial] process"—*e.g.*, the "choice of material to go into" a compilation—"can be exercised consistent with First Amendment guarantees[.]"  *Tornillo*, 418 U.S. at 258.  The personalized feeds restrictions therefore trigger strict constitutional scrutiny, just like previous government attempts to interfere with expressive editorial curation and the dissemination of fully protected speech.  *See id.*; *see also, e.g.*, *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 21 (1986) (applying strict scrutiny to a regulatory order compelling a private utility to set aside space in its billing envelope for its political opponent's message); *see also Free Speech Coal.*, 606 U.S. at 484 ("Strict scrutiny . . . is the standard for reviewing the direct targeting of fully protected speech."); *cf. Moody*, 603 U.S. at 740 (only assuming, arguendo, that intermediate scrutiny applied to state legislation interfering with Meta's editorial processes because the legislation failed that more lenient standard); *Sorrell*, 564 U.S. at 578 (applying intermediate scrutiny to state legislation interfering with the ability of "pharmaceutical drug marketers" to personalize speech because the law interfered with purely *commercial* speech).[4]

Strict scrutiny (or at least intermediate scrutiny) applies to laws interfering with editorial activity regardless of whether their scoping is content-based or speaker-based.  *See Tornillo*, 418 U.S. at 258; *Moody*, 603 U.S. at 618 (a law "prevent[ing] a platform from compiling the third-party speech it wants in the way it wants" "is unlikely to withstand First Amendment scrutiny").  And strict scrutiny is also

---

[4] As applied to Meta's Facebook, Instagram, and Threads services, the Act is not regulating purely commercial speech.  It specifically restricts how Meta can display "media generated or shared by users," § 27000.5, which, in the context of Meta's services, means the *billions* of posts made by people around the world to share ideas, offer support, and discuss important topics, including politics, public health, and social issues.  Backstrom Decl. ¶ 5; *see Packingham*, 582 U.S. at 107.  Neither this user-generated speech nor Meta's curations thereof represent speech that "does no more than propose a commercial transaction." *Bonta I*, 113 F.4th at 1115 (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983))); *see also NetChoice v. Weiser*, __ F. Supp. 3d __, 2025 WL 3101019, at *11 (D. Colo. Nov. 6, 2025) (holding that "a social media platform's curated feed" is not "commercial speech" within the meaning of *Bolger*).

warranted because the Act's personalized feeds restrictions are unparalleled in our constitutional history and tradition, *see Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474-77 (2022) ("When faced with a dispute about the Constitution's meaning or application, long settled and established practice is a consideration of great weight."); *Vidal v. Elster*, 602 U.S. 286, 301 (2024), and because they operate as a "presumptively unconstitutional" prior restraint that bans Meta from disseminating fully protected speech, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976).  Regardless, the Act's personalized feeds restrictions are *also* subject to strict scrutiny because they impose these speech burdens on Meta in a discriminatory content-based and speaker-based manner.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government" satisfies "strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015).  Laws are also content-based if they "cannot be justified without reference to the content of the regulated speech." *Id*. at 164.  And laws that "identif[y] certain preferred" or disfavored speakers are also subject to heightened scrutiny because such laws "deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).  And when speaker-based laws reflect an "aversion to what . . . disfavored speakers have to say," they too "demand strict scrutiny." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 658 (1994).

Here, the Act is content-based and speaker-based several times over.  The Act expressly singles out "social media platform[s]" for regulation, and its personalized feeds restrictions explicitly favor first-party content over content "generated or shared by users" because only feeds displaying the latter are subject to the Act.  § 27000.5(a).  But "the elevation of . . . provider-generated content over user-generated content is a content-based regulation. . . . When a site chooses not to primarily offer news but instead focus on social engagement [manifested through user-generated content], it changes from an uncovered to covered platform.  But the type of medium has not changed, only the content primarily expressed on the platform [has changed]." *Students Engaged in Advancing Texas v. Paxton*, 765 F. Supp. 3d 575, 592 (W.D. Tex. 2025).  Courts have repeatedly subjected statutes with similar scoping to strict scrutiny.  *See id.*; *see also, e.g.*, *Yost*, 778 F. Supp. 3d at 950–54 (scoping for services that allow users to "interact socially with other users" is content-based and subject to strict scrutiny because the social features of those

services "are inextricable from the content produced by those features"); *Computer & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1032 (W.D. Tex. 2024) (regulating only websites that "host or broadcast 'social' speech" reflects a content-based preference); *Reyes*, 748 F. Supp. 3d at 1122 (singling out "social media platforms" is a "facially content-based distinction[]").[5]

Certainly, the State cannot justify the Act's differential treatment between user-generated and non-user-generated content without recourse to content. *See Reed*, 576 U.S. at 164. Here, the Act's author and sponsors asserted that the personalized feed restrictions are "about [the] delivery of user-created content," which they describe as "harmful material to youth."[6] Defendant has similarly asserted that these restrictions address what Defendant asserts are "rabbit holes of harmful content."[7] These statements— and the Act's discriminatory restrictions on user-generated content on their face—reflect an "aversion to what [those] disfavored speakers have to say." *Turner*, 512 U.S. at 685; *see Citizens United*, 558 U.S. at 340 (laws "distinguishing among different speakers" are "too often simply a means to control content").[8]

---

[5] While the Act's coverage is nominally directed toward "internet-based service or application[s]," the bill's lead author, Sen. Skinner, remarked that the Act is *de facto* "directed" against "social media" and even expressed an intent that the Act force "Facebook" in particular to return to its "original design." *Senate Floor Session*, California State Senate (May 20, 2024), https://www.senate.ca.gov/media/senate-floor-session-20240520 at 2:21:08–2:21:20, 2:26:39–2:26:55.

[6] Assembly Comm. on Privacy and Consumer Prot., *Report on S.B. 976*, at 11 (July 2, 2024), *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240SB976 (attached as Ex. 12 to Schultz Decl.) [hereinafter July 2, 2024 S.B. 976 Report] (reporting statement of Defendant Rob Bonta in support of S.B. 976).

[7] *Id.* at 9 (reporting statement of Defendant Rob Bonta in support of S.B. 976).

[8] The Act is also speaker-based insofar as the restrictions' coverage depends in part on determining whether the media displayed in a feed "is exclusively the next media in a preexisting sequence from the same author, creator, poster, or source," § 27000.5(a)(6), *i.e.*, whether it comes from a particular speaker. And Meta maintains and preserves the argument that the Act's central coverage definition is itself content-

---

### C.    The Personalized Feeds Restrictions Fail Both Strict and Intermediate First Amendment Scrutiny.

Under strict scrutiny, Defendant must demonstrate that the Act's personalized speech restrictions represent (1) "the least restrictive means of" (2) "achieving a compelling state interest." *Ams. For Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*") (citation omitted).  Strict scrutiny is "the most demanding test known to constitutional law" and an "unforgiving" standard.  *Free Speech Coal.*, 606 U.S. at 484 (internal quotation omitted).  The Ninth Circuit has previously held that requiring social media companies to report "risk[s] of material detriment to children" "falls well short of satisfying strict First Amendment scrutiny" in relation to a purported interest "in protecting children."  *Bonta I*, 113 F.4th at 1121 (internal quotations omitted).  The State advances the same purported interest here, and *Bonta I* is "on-point authority" for why the Act's personalized feeds restrictions similarly fail strict scrutiny.  *Bonta III*, 152 F.4th at 1017.  Nor could the Act's restrictions satisfy even intermediate scrutiny, as they are not "narrowly tailored to serve a significant governmental interest" and "burden substantially more speech than necessary."  *Packingham*, 582 U.S. at 105–06 (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)).

#### 1.    The State Lacks a Sufficient Governmental Interest in Restricting Meta's Curation and Dissemination of Fully Protected Speech.

The State cannot establish that the personalized feeds restrictions as applied to Facebook, Instagram, and Threads serve any legitimate government interest, let alone a compelling one.

While the State "possesses legitimate power to protect children from harm, that does not include a free-floating power to restrict the ideas to which children may be exposed." *Bonta I*, 113 F.4th at 1121 (quoting *Brown v. Ent. Merchs.  Ass'n*, 564 U.S. 786, 794 (2011)); *see also Erznoznik*, 422 U.S. at 213 (outside of constitutionally unprotected speech, the government may not "protect the young from ideas or images that a legislative body thinks unsuitable").  But "restrict the ideas to which children may be exposed" is exactly what the personalized feeds restrictions are intended to do.  *Bonta I*, 113 F.4th at 1121.

---

based because it exempts websites "limited to commercial transactions or to consumer reviews of products." § 27000.5(b)(2).  *See Sorrell*, 564 U.S. at 559, 564–65 (statute prohibiting use of information "for marketing purposes" was content-based and subject to heightened scrutiny).

Defendant has admitted that their purpose is to restrict what Defendant describes as "rabbit holes of harmful content," and the Act's author and sponsors have similarly stated that the Act is intended to restrict the "delivery of user-created content" that they believe is "harmful material to youth."  July 2, 2024 S.B. 976 Report at 9, 11; *see also* S.B. 976 § 1(b) (asserting personalized compilations of user-generated speech might be "harm[ful]" or "addictive").  These assertions are unsurprising, as "[t]hose who seek to censor or burden free expression often assert that disfavored speech has adverse effects"—but the fact "[t]hat the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 577.  Any "premise . . . that the force of speech can justify the government's attempts to stifle it" is "incompatible with the First Amendment."  *Id.* at 577.

Even if the State could show that the personalized feeds restrictions further an interest unrelated to the suppression of free expression (it cannot), the State cannot show a *causal* connection between the specific activity regulated by the personalized feeds restrictions and any purported harms to minors. *Brown*, 564 U.S. at 799–801 (mere correlational evidence is insufficient); *see also Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1282 (9th Cir. 2023) ("[A] state may not regulate . . . speech on the back of controverted evidence.").  The legislature found that the Act's personalized feeds restrictions were justified by a 2023 report by the U.S. Surgeon General.  S.B. 976 § 1(c).  But the statements in that report were equivocal at best, recounted at length how "[s]ocial media can provide *benefits*" for youth, and certainly did not demonstrate a *causal connection* between *personalized feeds* and harms to minors.[9]  Nor did the legislature acknowledge the National Academies of Sciences, Engineering, and Medicine's March 2024 report concluding that "the scientific literature on the health effects of social media use is mixed and

---

[9] *See* U.S. Surgeon Gen., *Social Media and Youth Mental Health* 11 (2023) (emphasis added) (attached as Ex. 13 to Schultz Decl.) (noting that "[m]ost prior research to date has been correlational, focused on young adults or adults, and generated a range of results.").  Similarly, the American Psychological Association advisory cited in the U.S. Surgeon General's report (at p. 5) stated that "based on the scientific evidence to date" "[u]sing social media is not inherently beneficial or harmful to young people."  Am. Psych. Ass'n, *Health Advisory on Social Media Use in Adolescence* 3 (May 2023) (attached as Ex. 14 to Schultz Decl.).

inconclusive."[10]  At bottom, none of the selective research cited by the legislature—nor any cited in the 2023 Surgeon General report it relied on—compares personalized to non-personalized feeds, let alone demonstrates that personalized feeds themselves are causally responsible for harms to minors.

### 2.    The Personalized Feeds Restrictions Are Not Narrowly Tailored.

Even if the personalized feeds restrictions served a legitimate government interest (they do not), several tailoring flaws render them unconstitutional as applied to Facebook, Instagram, and Threads.

To begin, the personalized feeds restrictions are "seriously underinclusive." *Brown*, 564 U.S. at 802.  The Act is seriously underinclusive relative to Defendant's asserted interest of preventing minors from viewing purportedly "harmful" "user-created content."  July 2, 2024 S.B. 976 Report at 9, 11.  The Act *permits* websites to continue to show precisely the same content to minors if the minors search for it, § 27000.5(a)(2); "so long as one parent . . . says it's OK," *Brown*, 564 U.S. at 802; or if the website qualifies for any of the Act's litany of exceptions, § 27000.5.  Indeed, Defendant has judicially admitted that "the Act . . . allows platforms to show *the same content* to [minors] through different means."  Def. Rob Bonta's Opp'n to Pls' Mot. for Prelim. Inj. at 22, *NetChoice, LLC v. Bonta*, No. 5:24-cv-07885 (filed Dec. 3, 2024), ECF No. 18 (attached as Ex. 17 to Schultz Decl.) (emphasis added).

The Act is similarly underinclusive to the extent Defendant asserts that "personalized feeds" themselves are somehow harmful separate and apart from any content (which is disputed).  To begin, the Act exempts entirely the personalized feeds on countless websites that primarily disseminate non-user content—including personalized feeds on news platforms and video and music streaming services that are not primarily comprised of user-generated content.  § 27000.5.  So, for example, "a sports website such as ESPN" can present personalized feeds of content based on the sports teams or leagues that a minor has previously indicated an interest in, but "Facebook could not [do the] same" with respect to posts by the San Francisco Giants' account.  *Bonta II*, 761 F. Supp. 3d at 1227.  And the Act would even exempt *the exact same feed comprised of the exact same content recommended based on the exact same signals* as long as the provision of personalized feeds are not "a significant part" of a service.  *Id.* § 27000.5(b)(1).

---

[10] Nat'l Acads. of Sciences, Eng'g, and Med., *The Relation Between Social Media and Health*, *in* Social Media and Adolescent Health 91, 113 (2024) (attached as Ex. 15 to Schultz Decl.).

In other words, any service can continue to provide the very same feeds that the State asserts are purportedly harmful if other aspects of the overall website mean those feeds are not a "significant part" of the website. *See, e.g.*, *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1128 (D. Utah 2024) (legislation was "underinclusive" since "the Act preserves minors' access to the addictive features Defendants express particular concern with on all internet platforms other than [covered] services"). Even as to covered websites, "[t]he California Legislature is perfectly willing" to let teenagers access personalized feeds "so long as one parent . . . says it's OK." *Brown*, 564 U.S. at 802.

That the Act is "wildly underinclusive . . . is alone enough to defeat it." *Id.* (applying strict scrutiny). The Ninth Circuit has repeatedly determined that similarly poorly tailored statutes failed even intermediate scrutiny. *See Bonta II*, 761 F. Supp. 3d at 1227 ("Even on intermediate scrutiny, underinclusiveness can be fatal on its own when severe enough."); *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 773–74 (2018) ("wildly underinclusive" provision failed intermediate scrutiny); *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1204 (9th Cir. 2018) ("statute [that] is both under-inclusive and over-inclusive" failed intermediate scrutiny); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (same).

The personalized feeds restrictions are also seriously "overinclusive." *Brown*, 564 U.S. at 804. The Act restricts access to all personalized-feeds content—not just content that Defendant describes as "harmful material to youth." July 2, 2024 S.B. 976 Report at 11. It purports to address alleged harms from *time spent* on social media, §§ 1(d), (e) ("heavier usage of social media"), by imposing restrictions on *editorial judgment and content curation*. The Act's overinclusive restrictions also sweep in services—like Facebook, Instagram, and Threads—that voluntarily engage in substantial content moderation efforts, or voluntarily provide tools allowing parents and guardians to set daily time limits for their teens or limit their use during select days and hours, among many available supervision tools. Otaru Decl. ¶ 11. Meta also provides publicly accessible and free educational resources for interested parents to learn how to use these tools. *Id.* ¶ 19. Those are precisely the kinds of "voluntary" self-regulatory efforts that are less restrictive means than government intervention. *Brown*, 564 U.S. at 803; *see also, e.g.*, *Ashcroft*, 542 U.S. at 667; *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 826 (2000). And California itself "could encourage websites 'to offer voluntary [tools]'" to help parents who want to supervise their children's use

of social media and "educate children and parents" on the availability and importance of such tools. *Bonta III*, 152 F.4th at 1017 (quoting *Bonta I*, 113 F.4th at 1121).

The Act's direct "impos[ition of] *governmental* authority, subject only to a parental veto" is also "vastly overinclusive" because "its entire effect is only in support of what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 804. The Act's one-size-fits-all approach is also overbroad because it treats all minors alike, from websites' youngest users to seventeen-year-olds, regardless of differences in those minors' developmental stage. *See Reno v. Am. C.L. Union*, 521 U.S. 844, 865-66 (1997); *Am. Booksellers Ass'n*, 484 U.S. at 396. And Meta itself prohibits minors under thirteen years old from using Facebook, Instagram, and Threads. Otaru Decl. ¶ 5.

The Court should join the chorus of other courts that have struck down similarly untailored laws after applying heightened First Amendment scrutiny. *See, e.g.*, *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *17 (W.D. Ark. Mar. 31, 2025) (permanently enjoining law scoped to social media services including Facebook and Instagram); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 959 (S.D. Ohio 2025) (same); *NetChoice v. Carr*, 789 F.Supp.3d 1200, 1234 (N.D. Ga. 2025) (preliminarily enjoining same); *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007, at *15 (N.D. Fla. June 3, 2025) (preliminarily enjoining same); *see also NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1134 (D. Utah 2024) (preliminarily enjoining same). The Act's personalized feeds restrictions, as applied to Meta's Facebook, Instagram, and Threads services, fail to pass muster under the First Amendment.

## II.    The Remaining Preliminary Injunction Factors Decisively Favor Meta.

### A.    Meta Will Suffer Irreparable Harm if the Personalized Feeds Restrictions Are Not Preliminary Enjoined.

"'By bringing a colorable First Amendment claim,' [Meta] 'raises the specter of irreparable injury.'" *Bonta III*, 152 F.4th at 1024 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009)). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Meta's "colorable First Amendment claim[s]" show that it stands to "suffer irreparable harm" if the personalized feeds restrictions are not preliminarily enjoined as to its Facebook, Instagram, and Threads services. *Am. Beverage Ass'n*, 916 F.3d at 758.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      The Equities Tip in Meta's Favor and an Injunction Is in the Public Interest.**

The final two factors—"the public interest and equities—'merge' in lawsuits against the government." *Bonta III*, 152 F.4th at 1024 (quoting *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021)).  The Ninth Circuit has "repeatedly held that when plaintiffs show they are likely to succeed on a First Amendment claim, that 'compels a finding' that the equities and public interest favor an injunction." *Id*. at 1025 (quoting *Am. Beverage Ass'n*, 916 F.3d at 758).  And the Ninth Circuit has "consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (citation omitted).  Pending a resolution of this matter on the merits, "California can pursue" any legitimate regulatory interest it might have "in less intrusive ways." *Id*; *see also supra* § I.C.2.

## <u>CONCLUSION</u>

Meta respectfully requests a preliminary injunction prohibiting Defendant from enforcing Sections 27001, 27002(b)(2), and 27002(b)(4) of the Act against it until this matter may be resolved on the merits.

DATED:  November 18, 2025

Respectfully submitted,


By:   */s/ Isaac D. Chaput*

Isaac D. Chaput (Bar No. 326923)
Daniel A. Rios (Bar No. 326919)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com
drios@cov.com

Alexander L. Schultz (Bar No. 340212)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4800
aschultz@cov.com

Mark W. Mosier (pro hac vice forthcoming)
Teena-Ann V. Sankoorikal (pro hac vice forthcoming)
Alexandra J. Widas (pro hac vice pending)
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
mmosier@cov.com
tsankoorikal@cov.com
awidas@cov.com

*Attorneys for Plaintiff Meta Platforms, Inc.*