ROB BONTA
Attorney General of California
TODD GRABARSKY
LARA HADDAD
Supervising Deputy Attorneys General
ASHA ALBUQUERQUE (SB 332901)
CHRISTOPHER KISSEL (SB 333937)
SHIWON CHOE (SB 320041)
SAMUEL SOKOLSKY (SBN 348173)
MEGHAN H. STRONG (SBN 324503)
ZELDA VASSAR (SB 313789)
WILLIAM BELLAMY (SB 347029)
Deputy Attorneys General
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-6086
Fax: (916) 324-8835
E-mail: William.Bellamy@doj.ca.gov
*Attorneys for Defendant, Rob Bonta, in his official capacity as Attorney General of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **TIKTOK INC,**<br><br>Plaintiff,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of California,**<br><br>Defendant. | Case No. 5:25-cv-09789-EJD<br><br>**DECLARATION OF DR. SERGE EGELMAN, PHD, IN SUPPORT OF DEFENDANTS' OMNIBUS OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date/Time: April 30, 2026 at 9:00 a.m.<br>Courtroom: 4 (Fifth Floor) |

| | |
|---|---|
| **META PLATFORMS, INC.,**<br>Plaintiff,<br>**v.**<br>**ROB BONTA, in his official capacity as Attorney General of California,**<br>Defendant. | Case No. 5:25-cv-09792-EJD<br><br>**DECLARATION OF DR. SERGE EGELMAN, PHD, IN SUPPORT OF DEFENDANTS' OMNIBUS OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date/Time: April 30, 2026 at 9:00 a.m.<br>Courtroom: 4 (Fifth Floor) |
| **GOOGLE LLC and YOUTUBE, LLC,**<br>Plaintiffs,<br>**v.**<br>**ROB BONTA, in his official capacity as Attorney General of California,**<br>Defendant. | Case No. 5:25-cv-09795-EJD<br><br>**DECLARATION OF DR. SERGE EGELMAN, PHD, IN SUPPORT OF DEFENDANTS' OMNIBUS OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date/Time: April 30, 2026 at 9:00 a.m.<br>Courtroom: 4 (Fifth Floor) |

## TABLE OF CONTENTS

**Page**

Background & Qualifications ..... 1
Opinions ..... 3
I. Driving Online User Engagement ..... 3
A. Collection and Use of Personal Information Online ..... 4
B. Consumers Cannot Freely Exercise Choice When It Comes to Collection and Use of Their Personal Information ..... 7
C. Algorithms ..... 12
II. Special Concerns Regarding Children's Privacy ..... 15
III. California's Protecting Our Kids from Social Media Addiction Act ..... 17
Conclusions ..... 18

## DECLARATION OF DR. SERGE EGELMAN, PH.D.

I, Dr. Serge Egelman, Ph.D., declare under the penalty of perjury that the following is true and correct:

1. I submit this declaration in support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

## BACKGROUND & QUALIFICATIONS

2. I am the Research Director of the Usable Security & Privacy Group at the International Computer Science Institute (ICSI), which is a non-profit research institute affiliated with the University of California, Berkeley. I also hold a position as a research scientist within the Electrical Engineering and Computer Sciences (EECS) Department at the University of California, Berkeley. I received my Ph.D. from Carnegie Mellon University's School of Computer Science. My research has been cited over 15,000 times, and my h-index—the most common metric for scientific impact[1]—is over 50.[2]

3. I have been performing research into online privacy for over twenty years. My research focuses on the interplay of online privacy, computer security, and human factors. In short, I study: consumer privacy and security decision making; consumer privacy preferences; privacy and security expectations; and how those expectations comport with reality (e.g., by performing technical analyses of online services and other software to examine privacy and security practices). This research involves both technical knowledge to build tools for use in measurement studies (e.g., observational studies of how user data is collected and shared in practice), as well as a deep understanding of how to apply social science methodologies (e.g., human subjects research, surveys, interviews, randomized controlled trials, etc.). I have served as an invited expert for several web standards efforts that pertained to privacy and security, and have

---

[1] J.E. Hirsch, An index to quantify an individual's scientific research output, Proc. Natl. Acad. Sci. U.S.A. 102 (46) 16569-16572, https://doi.org/10.1073/pnas.0507655102 (2005).

[2] Google Scholar (Serge Egelman), https://scholar.google.com/citations?user=WN9t4n0AAAAJ&hl=en.

received over a dozen awards from the research community (including: privacy research awards from two European data protection authorities, AEPD in Spain and CNIL in France; the USENIX Security Symposium Distinguished Paper Award, from one of the top academic computer security conferences; the Caspar Bowden Award for Outstanding Research in Privacy Enhancing Technologies; and seven paper awards from the ACM Special Interest Group on Computer-Human Interaction [SIGCHI], the top human-computer interaction conference). I have also been repeatedly invited to speak at FTC events based on my laboratory's research.

4. Over the past decade, my laboratory has been studying the mobile application ("app") ecosystem, which has included building tools to detect when personal information is accessed by mobile apps and the third parties with whom they share it. We have used these tools in peer-reviewed published research studies about consumer privacy, including examining mobile apps' compliance with various privacy regulations and platform policies.

5. One research study performed by my laboratory demonstrated that a majority of child-directed Android apps appeared to be violating the federal Children's Online Privacy Protection Act of 1998 ("COPPA") in various ways,[3] which led to major policy shifts by both Google and Apple, makers of the two leading mobile platforms. I have since been invited to give keynotes at several international conferences on child development and technology as an expert on online privacy as it pertains to children. I have also testified before the U.S. Senate on how COPPA can be improved to match the realities of modern technology and have been asked to provide feedback on draft legislation from members of both houses of Congress.

6. My *curriculum vitae*, which sets forth my experience and credentials more fully, is attached as Exhibit A. It also lists prior testimony that I have offered in other cases.

7. I am being compensated in the above-entitled case at an hourly rate of $400/hour

---

[3] Irwin Reyes, Primal Wijesekera, Joel Reardon, Amit Elazari Bar On, Abbas Razaghpanah, Narseo Vallina-Rodriguez, and Serge Egelman. *"Won't Somebody Think of the Children?" Examining COPPA Compliance at Scale.* Proceedings on Privacy Enhancing Technologies (PoPETS), 2018(3):63–83.

for preparing this declaration. My compensation is not in any way dependent on the outcome of this or any related proceeding.

8. The opinions in this declaration are my expert opinions, which are based on my personal knowledge, experience, education and training, my peer-reviewed published research and the research of others, and my knowledge of relevant technologies, as well as my reading of the legislation.

9. Portions of this declaration are taken from a declaration I authored for the California Attorney General's Office in another matter, *NetChoice v. Bonta* (N.D. Cal., Case No. 5:24-cv-07885-EJD-NMC). I include those portions here in case they aid the Court in understanding how social media sites and applications are designed to increase engagement by minors and adults.

10. If called to testify, I could and would testify competently to the truth of the matters discussed in this declaration.

## OPINIONS

11. I have reviewed SB 976, California's Protecting Our Kids from Social Media Addiction Act ("the Act").

12. I understand that SB 976 includes several features aimed at curbing excessive use of social media among children and adolescents, including by, among other things, prohibiting Internet-based services or applications that provide user-generated content from providing addictive content feeds to minors absent verifiable parental consent.

13. In my expert opinion, there is widespread use by social media companies and other online service providers of algorithmic content curation designed to encourage children to spend more time or money engaging with online services or otherwise acting against their best interests. The Act's provisions aimed at limiting minors' excessive use of social media are reasonable and technically feasible to adopt.

### I. DRIVING ONLINE USER ENGAGEMENT

14. In this section I provide background on how online services are monetized through the collection of users' personal information, how this incentivizes "engagement," and how

algorithms are used to engage users and/or manipulate them into acting against their interests.

**A. Collection and Use of Personal Information Online**

15. The "free" Internet is subsidized through the collection of users' personal information for both advertising and analytics purposes. In the case of advertising, this means showing Internet users ads that are specifically tailored to their inferred interests. In the case of analytics, this means observing how users interact with the service in order to maximize its profitability (e.g., strategically placing in-app purchase opportunities based on users' in-app behaviors, identifying the users most likely to buy expensive items based on their inferred demographics, manipulating users into spending more time using a service, etc.). In other cases, this may mean selling the user data to third parties so that they may perform these activities and other yet-unknown use cases.

16. Because so much of the Internet is supported by advertisements, one key metric that online services use is known as "engagement," which refers to the amount of time that consumers spend using a service or the frequency of interactions that consumers have with that service. That is, the more time consumers spend using a service that displays ads, the more ads that consumers are likely to be shown, and therefore the more revenue that the service can derive by charging advertisers to show those ads. User engagement "carries considerable importance, drawing in advertisers and strengthening revenue streams."[4] Similarly, the more personal information that consumers share with a service, the more likely those consumers are to see "relevant" ads, and therefore the more likely they are to click those ads. This is why "monthly active users" or "daily active users" are common performance metrics used by online services of all sizes.[5] "From a broad perspective, the level of activity of the number of monthly active users

[4] Cindy Correa. "How Social Platforms are Innovating to Boost User Engagement." *Hive Digital,* June 28, 2024, https://www.hivedigital.com/blog/how-social-platforms-are-innovating-to-boost-user-engagement/. Accessed: February 6, 2026.

[5] Carla Tardi. "Understanding Monthly Active Users (MAU): Definition and Uses in Business." *Investopedia,* October 25, 2025, https://www.investopedia.com/terms/m/monthly-

(continued…)

(MAUs) on social media is the industry's primary measure of user engagement and an indicator of a social media site's financial health."[6]

17. Specifically, Google, Meta, and TikTok all primarily make money by charging advertisers to show targeted ads to the users of their services. All three of these platforms benefit from "network effects," which is an economics term that refers to situations where the value of a service to a user is proportional to the total number of users of that service.[7] For example, it is an obvious conclusion that advertisers would pay all three companies significantly less money to show advertisements if each only had a few thousand users, but because they store detailed profile data on literally billions of people, they are able to command top dollar from advertisers (i.e., their primary customers) to target their users.

18. All three companies are incentivized to increase engagement on their platforms. The more that the users of social media platforms are engaged (i.e., spend time on the platforms), the more ad space that the platforms can sell to advertisers. They thus spend a significant amount of time and effort tuning the algorithms used to recommend content to their users because those algorithms have a profound impact on user engagement.[8] Indeed, the platforms have made no secret about the importance of increasing engagement on their platforms, since engagement

---

active-user-mau.asp. Accessed: February 6, 2026.

[6] McCay-Peet, Lori, and Anabel Quan-Haase. "A model of social media engagement: User profiles, gratifications, and experiences." Why engagement matters: Cross-disciplinary perspectives of user engagement in digital media. Cham: Springer International Publishing, 2016. 199-217.

[7] Carl Shapiro and Hal R. Varian. *Information Rules: A Strategic Guide to the Network Economy*. Boston: Harvard Business School Press, 1999.

[8] Arvind Narayanan, Understanding Social Media Recommendation Algorithms, 23-01 Knight First Amend. Inst. (Mar. 9, 2023), https://knightcolumbia.org/content/understanding-social-media-recommendation-algorithms [https://perma.cc/F3NP-FEQX].

metrics are used to entice investors.[9]

19. Thus, many services collect analytics data to measure engagement and then use this data to optimize and develop features that are likely to lead to greater levels of engagement (i.e., more time spent using the service or more monetizable personal information divulged to the service).[10] More engagement results in more advertisements being viewed (due to more time spent using the service), resulting in more revenue. In this case, that also means curating content "feeds" in order to entice consumers into spending more time visiting social networking websites (i.e., boosting engagement), which results in more opportunities for those consumers to encounter targeted advertisements.

20. This content curation occurs on a per-user basis: content feeds are personalized based on previous actions that the user has taken on the platform or their unique characteristics. For example, an algorithm might decide that when one user watches kitten videos, they tend to spend more time on the platform, and thus their feed might become optimized to show kitten videos. It is common for these algorithms to curate content feeds based on inferences they have made about users' interests. Algorithms that are used to recommend content to users are known as

---

[9] Chris Stokel-Walker. "Inside TikTok's latest big pitch to advertisers with new numbers showing time spent on the app and engagement metrics." *Business Insider*, September 11, 2020, https://www.businessinsider.com/leaked-tiktok-slides-engagement-time-spent-activity-2020-9. Accessed: February 6, 2026; Vintage Value Investing. "Facebook Investors Just Hit the 'Like' Button." *ETF Trends,* March 19. 2018, https://www.etftrends.com/robotics-ai-content-hub/facebook-investors-just-hit-the-like-button/. Accessed: February 6, 2026 ("When investors talk social networking sites, they want to know about [Monthly Active Users]").

[10] Filippo Menczer, "How 'Engagement' Makes You Vulnerable to Manipulation and Misinformation on Social Media." *The Conversation,* September 20, 2021, https://theconversation.com/how-engagement-makes-you-vulnerable-to-manipulation-and-misinformation-on-social-media-145375. Accessed: October 22, 2024.

"recommender systems," and have been the subject of academic study for over 30 years.[11] Industry has greatly benefitted from this research.

### B. Consumers Cannot Freely Exercise Choice When It Comes to Collection and Use of Their Personal Information

21. Opponents of the law may claim that the existence of settings and controls to regulate algorithmic feed curation make the law unnecessary, but this is wrong because it fails to consider that most consumers struggle to use these types of controls correctly. In the field of human-computer interaction (HCI),[12] it is widely understood that software interfaces must be designed such that "users must overcome the twin challenges of understanding the current state of a system and figuring out how to change it."[13] Failing to do so is often why consumers regularly fail to correctly configure software settings in accordance with their preferences. Examples of this occurring with regard to privacy and security preferences are abundant.

---

[11] See, e.g., Paul Resnick, Neophytos Iacovou, Mitesh Suchak, Peter Bergstrom, and John Riedl. 1994. GroupLens: an open architecture for collaborative filtering of netnews. In Proceedings of the 1994 ACM conference on Computer supported cooperative work (CSCW '94). Association for Computing Machinery, New York, NY, USA, 175–186; Badrul Sarwar, George Karypis, Joseph Konstan, and John Riedl. 2001. Item-based collaborative filtering recommendation algorithms. In Proceedings of the 10th international conference on World Wide Web (WWW '01). Association for Computing Machinery, New York, NY, USA, 285–295.

[12] Amon Rapp. "Human–Computer Interaction." *Oxford Research Encyclopedia of Psychology*. May 24, 2023, https://oxfordre.com/psychology/view/10.1093/acrefore/9780190236557.001.0001/acrefore-9780190236557-e-47. Accessed: February 10, 2026 ("Human-Computer Interaction (HCI) is a multidisciplinary field of research that focuses on the understanding and design of interaction between humans and computers").

[13] Kathryn Whitenton. "The Two UX Gulfs: Evaluation and Execution." *Nielsen Norman Group*. March 11, 2018, https://www.nngroup.com/articles/two-ux-gulfs-evaluation-execution/. Accessed: February 10, 2026.

22. While consumers are overwhelmingly opposed to algorithmic profiling (one study of U.S. consumers found that up to 86% do not want ads that are tailored based on their online activities),[14] consumers nonetheless continue to engage with services that appear to conflict with their stated privacy preferences. This is known as the "privacy paradox." Some stakeholders like to point out this disconnect and use it to disingenuously claim that it means that consumers do not "really" care about privacy. But the published research on the privacy paradox demonstrates that this argument is incorrect, and that there are several rational explanations for the privacy paradox, which include lack of awareness of data collection methods, poor usability, mismatched incentives, and perceived lack of agency, as I explain below.

23. In many cases, consumers simply do not understand when they are making decisions that will impact their privacy. For example, in a series of studies that I co-authored,[15] we presented subjects with different search engine interfaces, including one that annotated search results with privacy information; subjects were instructed to use the search engine to buy items from merchants of their choice. While all subjects expressed strong privacy preferences in a survey administered prior to the study (i.e., subjects were specifically screened for strong privacy preferences, so that we could explicitly test whether interface design impacted their ability to act

---

[14] J. Turow, J. King, C. J. Hoofnagle, A. Bleakley, and M. Hennessy (2009). "Americans Reject Tailored Advertising and Three Activities That Enable It." https://doi.org/10.2139/ssrn.1478214.

[15] Janice Y. Tsai Serge Egelman, Lorrie Cranor, and Alessandro Acquisti. "The effect of online privacy information on purchasing behavior: An experimental study." *Information systems research* 22, no. 2 (2011): 254-268; Serge Egelman, Janice Tsai, Lorrie Faith Cranor, and Alessandro Acquisti. "Timing is everything? The effects of timing and placement of online privacy indicators." In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems*, pp. 319-328. 2009; Julia Gideon, Lorrie Cranor, Serge Egelman, and Alessandro Acquisti. "Power strips, prophylactics, and privacy, oh my!" In *Proceedings of the Second Symposium on Usable privacy and security*, pp. 133-144. 2006.

on those preferences), we observed that without information about privacy practices presented in an easily-accessible manner, subjects made purchases from the cheapest merchants (with the worst privacy practices). By comparison, when search results were annotated with privacy ratings, subjects were significantly more likely to make purchases from merchants with more agreeable privacy policies (i.e., better aligned with participants' stated privacy preferences), even paying more money to do so. These and other studies demonstrate that people often act in ways that seem contrary to their stated privacy preferences when they are not fully aware of a business's privacy practices (e.g., due to the well-documented problems with the "notice and consent" framework, i.e., expecting consumers to read and understand privacy policies).

24. In other cases, convoluted user interfaces make it difficult for consumers to understand how to make privacy-protective decisions. This poor usability often results in consumers sharing personal information in ways that they do not expect. For example, while studies have shown that consumers have concerns about sharing personal information with the wrong audiences on social media, they nonetheless continue to overshare,[16] which has been shown to be the result of difficult-to-use privacy settings interfaces (or mismatches between the design of those interfaces and users' mental models).[17] One early study on the use of Facebook found that while participants expressed strong privacy preferences, they nonetheless shared sensitive information because more than one-in-five did not understand what Facebook's privacy settings did or how to use them, and therefore did not change them from the overly-permissive

---

[16] Maritza Johnson, Serge Egelman, and Steven M. Bellovin. 2012. Facebook and privacy: it's complicated. In Proceedings of the Eighth Symposium on Usable Privacy and Security (SOUPS '12). Association for Computing Machinery, New York, NY, USA, Article 9, 1–15. https://doi.org/10.1145/2335356.2335369.

[17] Jennifer King, Airi Lampinen, and Alex Smolen. 2011. Privacy: is there an app for that? In Proceedings of the Seventh Symposium on Usable Privacy and Security (SOUPS '11). Association for Computing Machinery, New York, NY, USA, Article 12, 1–20. https://doi.org/10.1145/2078827.2078843

defaults.[18] In a study of file-sharing software, researchers discovered that due to convoluted privacy settings interfaces, many users were inadvertently sharing their entire hard drives.[19] In a study of tools provided by the advertising industry to opt out of behavioral advertising on websites, the researchers observed:

> "Participants found many tools difficult to configure, and tools' default settings were often minimally protective. Ineffective communication, confusing interfaces, and a lack of feedback led many participants to conclude that a tool was blocking [online behavioral advertising] when they had not properly configured it to do so. Without being familiar with many advertising companies and tracking technologies, it was difficult for participants to use the tools effectively."[20]

25. Finally, many consumers simply do not believe they have agency when it comes to making online privacy decisions: because many believe that their privacy preferences will not be honored no matter the actions that they take, many choose to engage with privacy-violative services to extract benefits, believing that they will end up paying the privacy costs regardless. Similarly, many may decide it is not worth the time to locate and use privacy controls. A 2015 consumer survey concluded the following:

---

[18] Alessandro Acquisti and Ralph Gross. "Imagined communities: Awareness, information sharing, and privacy on the Facebook." In *Privacy Enhancing Technologies: 6th International Workshop*, PET 2006, Cambridge, UK, June 28-30, 2006, Revised Selected Papers 6, pp. 36-58. Springer Berlin Heidelberg, 2006.

[19] Nathaniel S. Good and Aaron Krekelberg. 2003. "Usability and privacy: a study of Kazaa P2P file-sharing." In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems (CHI '03)*. Association for Computing Machinery, New York, NY, USA, 137–144. https://doi.org/10.1145/642611.642636.

[20] Pedro Leon, Blase Ur, Richard Shay, Yang Wang, Rebecca Balebako, and Lorrie Cranor. "Why Johnny can't opt out: a usability evaluation of tools to limit online behavioral advertising." In *Proceedings of the SIGCHI conference on human factors in computing systems*, pp. 589-598. 2012.

> "[A] majority of Americans are resigned to giving up their data—and that is why many appear to be engaging in tradeoffs. Resignation occurs when a person believes an undesirable outcome is inevitable and feels powerless to stop it. Rather than feeling able to make choices, Americans believe it is futile to manage what companies can learn about them. Our study reveals that more than half do not want to lose control over their information but also believe this loss of control has already happened."[21]

26. A study specifically on young people and the privacy paradox observed:

> "Based on focus group interviews, we considered how young adults' attitudes about privacy can be reconciled with their online behavior. The "privacy paradox" suggests that young people claim to care about privacy while simultaneously providing a great deal of personal information through social media. Our interviews revealed that young adults do understand and care about the potential risks associated with disclosing information online and engage in at least some privacy-protective behaviors on social media. However, they feel that once information is shared, it is ultimately out of their control. They attribute this to the opaque practices of institutions, the technological affordances of social media, and the concept of networked privacy, which acknowledges that individuals exist in social contexts where others can and do violate their privacy."[22]

27. Relatedly, consumers continue to use apps that they find "creepy" due to a sense of learned helplessness: they do not believe that they have the power to control who receives their personal information when they participate in the digital economy.[23] Sometimes, online services are specifically designed to manipulate users into continuing to use them through the use of specially-designed algorithms.

---

[21] Joseph Turow, Michael Hennessy, and Nora Draper. "The tradeoff fallacy: How marketers are misrepresenting American consumers and opening them up to exploitation." *Available at SSRN 2820060* (2015).

[22] Eszter Hargittai, and Alice Marwick. "'What can I really do?' Explaining the privacy paradox with online apathy." *International journal of communication* 10 (2016): 21.

[23] Irina Shklovski, Scott D. Mainwaring, Halla Hrund Skúladóttir, and Höskuldur Borgthorsson. 2014. Leakiness and creepiness in app space: perceptions of privacy and mobile app use. In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems (CHI '14)*. Association for Computing Machinery, New York, NY, USA, 2347–2356. https://doi.org/10.1145/2556288.2557421.

28. This is all to say that the mere existence of controls that could allow a parent to make decisions about a child's algorithmic social media feed are insufficient: research on similar privacy controls suggests that consumers will be unlikely to successfully use them—assuming they even know of their existence and are able to successfully locate them.

### C. Algorithms

29. An algorithm is simply a sequence of operations: there is often an input, calculations are performed on that input, and then the results of those calculations are provided as output. Within the context of online services, algorithms are used for everything from recommending content to users to inferring a user's preferences and traits for purposes such as targeted advertising. There is no such thing as a "neutral" algorithm: algorithms are designed for specific purposes. One algorithm might be designed to show ads that maximize ad revenue, whereas another might be designed to optimize engagement through content recommendations; other algorithms might be used for more mundane tasks, such as sorting items chronologically or alphabetically. That is, the logic used to display content to users will always rely on an algorithm, even if that algorithm is as simple as displaying items chronologically. Though in practice, the algorithms used by social media companies are generally much more complex, because they are designed to drive engagement. For example, in determining the tweets that appear in a user's feed (of the hundreds of millions sent per day), X, the social media service formerly known as Twitter, weighs factors such as the number of likes, retweets, social relations, recency, perceived topic relevance, and use of embedded media, among other factors.[24]

30. While some algorithms might make objective decisions (e.g., correctly sorting a list of items by date), others are subjective and therefore less straightforward to audit for correctness (e.g., recommending content and choosing advertisements to display).[25] Algorithms

[24] Josiah Hughes, "How the Twitter Algorithm Works [2023 Guide]." Hootsuite, December 14, 2022. https://blog.hootsuite.com/twitter-algorithm/.

[25] Zeynep Tufekci, "Algorithmic Harms beyond Facebook and Google: Emergent Challenges of Computational Agency," Colorado Technology Law Journal 13, no. 2 (2015): 203-
(continued…)

are increasingly being used to make decisions about individuals that can have profound consequences, such as extending credit, housing, insurance, employment, or school admissions; in many cases there is little transparency or recourse surrounding these decisions, as they are made automatically and opaquely, and may also use incorrect or biased data.[26] Most adults do not understand if, when, and how these decisions are being made, children less so.

31. One class of algorithms, known as "recommender systems,"[27] are specifically designed to choose what content to show to which users.[28] In many cases, these algorithms are designed to optimize for user engagement: factoring in the content that a user previously engaged with to determine what new content to show the user to get them to continue engaging with the service. Obviously, the personal information collected from consumers (described earlier) is of great utility in determining what content consumers are likely to find engaging.

32. It is well known that algorithms that are optimized for increasing user engagement can also result in harm to consumers. For example, there was public outrage when the public learned that Facebook was using its content recommendation algorithms to intentionally cause emotional distress among its users. (Facebook researchers found that emotionally charged posts were more likely to lead to user engagement; Facebook thus has an incentive to use its algorithms to prioritize showing users posts that are likely to evoke emotional responses.)[29] Recent research

---

218.

[26] Danielle Keats Citron and Pasquale, Frank A., "The Scored Society: Due Process for Automated Predictions" (2014). Washington Law Review, Vol. 89, 2014, p. 1-, U of Maryland Legal Studies Research Paper No. 2014-8, Available at SSRN: https://ssrn.com/abstract=2376209.

[27] See ¶ 20.

[28] Konstan JA, Riedl J (2012). "Recommender systems: from algorithms to user experience" (PDF). User Modeling and User-Adapted Interaction. 22 (1–2): 1–23. doi:10.1007/s11257-011-9112-x. S2CID 8996665.

[29] Kashmir Hill, "Facebook Manipulated 689,003 Users' Emotions For Science." Forbes,

(continued…)

has shown that misinformation leads to greater levels of engagement for social media platforms: "(i) misinformation sources evoke more outrage than do trustworthy sources; (ii) outrage facilitates the sharing of misinformation at least as strongly as sharing of trustworthy news; and (iii) users are more willing to share outrage-evoking misinformation without reading it first."[30]

33. Researchers have observed that very few Internet users understand that their social media feeds are being curated based on complex algorithms designed to optimize for engagement. For example, one study of the Facebook feed found that "more than half of the participants (62.5%) were not aware of the News Feed curation algorithm's existence at all."[31] Others have similarly documented widely varying levels of understanding, including large proportions of consumers who are surprised to discover when their social media feeds are not chronological.[32] In my own research, I have similarly observed that many consumers do not understand that content feeds are being algorithmically curated (in ways other than chronologically).[33] Children

---

June 28, 2014. https://www.forbes.com/sites/kashmirhill/2014/06/28/facebook-manipulated-689003-users-emotions-for-science/.

[30] Killian L. McLoughlin et al., "Misinformation exploits outrage to spread online." *Science* 386,991-996(2024). doi:10.1126/science.adl2829.

[31] Motahhare Eslami, Aimee Rickman, Kristen Vaccaro, Amirhossein Aleyasen, Andy Vuong, Karrie Karahalios, Kevin Hamilton, and Christian Sandvig. 2015. "I always assumed that I wasn't really that close to [her]": Reasoning about Invisible Algorithms in News Feeds. In Proceedings of the 33rd Annual ACM Conference on Human Factors in Computing Systems (CHI '15). Association for Computing Machinery, New York, NY, USA, 153–162.

[32] Emilee Rader and Rebecca Gray. 2015. Understanding User Beliefs About Algorithmic Curation in the Facebook News Feed. In Proceedings of the 33rd Annual ACM Conference on Human Factors in Computing Systems (CHI '15). Association for Computing Machinery, New York, NY, USA, 173–182.

[33] C. Bravo-Lillo, S. Egelman, C. Herley, S. Schechter, and J. Tsai. "You needn't build that: Reusable ethics-compliance infrastructure for human subjects research." In *Cybersecurity*

(continued…)

may be even less likely to understand that their content feeds are being algorithmically curated, and that the manner in which they are being curated are designed to manipulate them.

## II. SPECIAL CONCERNS REGARDING CHILDREN'S PRIVACY

34. Data monetization is even more concerning when the data comes from children, who are unlikely to understand that this is happening, much less consent to it, but who could potentially face enormous impacts due to future usage of this data. This data may be used for manipulative marketing campaigns, but also may feed biased and unaccountable algorithms that use it to make decisions about a child's future, not to mention outright malicious uses of the data (e.g., non-custodial parents purchasing location data to geolocate a child).

35. In 2016 my research team decided to look at how well mobile apps directed at children appeared to be complying with COPPA, which has been in effect since 2000. We wrote bespoke instrumentation for the Android platform that allows us to run mobile apps and monitor exactly what personal information those apps access and with whom they share it.[34] We also used

*Research Ethics Dialog & Strategy Workshop*, 2013. https://www.microsoft.com/en-us/research/wp-content/uploads/2016/02/creds_submitted.pdf

[34] P. Wijesekera, A. Baokar, A. Hosseini, S. Egelman, D. Wagner, and K. Beznosov. "Android permissions remystified: A field study on contextual integrity." In *Proceedings of the 24th USENIX Security Symposium (USENIX Security 15)*, pages 499–514, Washington, D.C., Aug. 2015. USENIX Association; P. Wijesekera, A. Baokar, L. Tsai, J. Reardon, S. Egelman, D. Wagner, and K. Beznosov. "The feasibility of dynamically granted permissions: aligning mobile privacy with user preferences." In *Proceedings of the 2017 IEEE Symposium on Security and Privacy*, Oakland '17. IEEE Computer Society, 2017; P. Wijesekera, J. Reardon, I. Reyes, L. Tsai, J.-W. Chen, N. Good, D. Wagner, K. Beznosov, and S. Egelman. "Contextualizing privacy decisions for better prediction (and protection)." In *Proceedings of the 2018 CHI Conference on Human Factors in Computing Systems,* CHI '18, pages 1–13, New York, NY, USA, 2018. Association for Computing Machinery; J. Reardon, A. Feal, P. Wijesekera, A. E. B. On, N. Vallina-Rodriguez, and S. Egelman. "50 Ways to Leak Your Data: An Exploration of Apps'

(continued…)

our instrumentation to determine whether transmissions containing personal information were performed securely and confidentially.

36. Starting in late 2016, we began downloading as many free apps in the "Designed for Families" (DFF) program as we could find, which ended up being just under 6,000 apps.[35] The DFF program is a section of the Play Store, Google's centralized Android app market, which is exclusively for apps that are directed to children. Mobile app developers must participate in the program when they upload their app and disclose to Google that it is directed at children. As part of the program, they must affirm to Google that their app is in compliance with COPPA. Our goal was to evaluate whether that appeared to be the case in practice.

37. Of the child-directed apps that we tested, more than half appeared to be violating COPPA in one way or another: 5% collected location or other contact information and 19% collected personal information without verifiable parental consent and shared it with third parties whose public disclosures indicated they would use them for prohibited purposes (e.g., behavioral advertising); 40% transmitted personal information insecurely. Separately, 39% appeared to be violating Google's platform policies (i.e., an example of industry self-regulation) surrounding the collection of persistent identifiers for advertising and analytics purposes.[36]

38. We also examined mobile apps that had been certified by the COPPA Safe Harbor programs, meaning that the app developer claimed to participate in a private FTC-approved

---

Circumvention of the Android Permissions System." In *Proceedings of the 24th USENIX Security Symposium, USENIX Security '19,* Berkeley, CA, USA, 2019. USENIX Association. We wrote our tools for Google's Android platform only because it is open source: having the source code for the operating system allowed us to modify it for this purpose; at the time, we didn't look at Apple's iOS simply because we didn't have the source code to add the same level of instrumentation.

[35] Reyes *et al.*, *supra* note 3.

[36] *Ibid.*

compliance-certification program.[37] (We found it extraordinarily difficult to identify which mobile apps had actually been certified; none of the programs we contacted were willing to share lists of apps with us, and most of their websites did not provide this information.) Of the 237 apps we found that claimed to be Safe Harbor certified, 64% appeared to violate Google's policies on transmitting identifiers for advertising/analytics purposes, 33% transmitted personal information to prohibited third parties, and 32% transmitted personal information insecurely. We concluded that the apps that we examined, which claimed to be certified as COPPA-compliant by Safe Harbor programs, were no more likely to protect children's personal information than apps that had not been certified by these programs.[38] (This result is consistent with prior research on adverse selection in industry self-regulatory certification programs.)[39]

39. Based on this research, I have come to the conclusion that voluntary industry self-regulatory children's privacy programs are ineffective at best, and do not lead to better outcomes for consumers.[40]

## III. California's Protecting Our Kids from Social Media Addiction Act

40. From my understanding of California's Protecting Our Kids from Social Media Addiction Act, I believe that the Act's requirements are technologically feasible and not onerous based on technology that is already in widespread use.

41. The Act's requirement that content feeds not be based on information "associated with the user or the user's device"[41] is feasible to implement, because it involves simply modifying the algorithms that are already being used to curate content. These algorithms already

---

[37] 16 C.F.R. § 312.11.

[38] Reyes *et al.*, *supra* note 3.

[39] Benjamin Edelman. "Adverse selection in online 'trust' certifications." In *Proceedings of the 11th International Conference on Electronic Commerce*, pp. 205-212. 2009.

[40] Egelman, S., 2023. "Informing Future Privacy Enforcement by Examining 20+ Years of COPPA." Harvard Journal of Law & Technology, 37(3).

[41] Cal. Health & Saf. Code §§ 27000.5, 27001.

exist and as noted earlier in this report, are often designed to consider personal information stored about the current user to make decisions. My understanding is that the Act would require that for minor users, these algorithms be replaced with ones that do not use information provided by the minor or from the minor's device. For example, instead of prioritizing the order of social media posts shown to a user based on engagement metrics, a social media feed's algorithm could display posts chronologically. This should not be particularly onerous for social media providers to implement; indeed, some social media networks already offer users the choice over how to algorithmically curate their feeds. Bluesky, for example, allows users to choose from many different algorithms, as well as create their own,[42] and X, the social network formerly known as Twitter, offers users a choice between algorithmic recommendations from across the service or limiting content to followed accounts.[43]

42. Overall, based on my knowledge and experience, I think that the Act's requirements are both technically feasible and not overly onerous; as I point out, Plaintiffs are already required to comply with substantially similar provisions in other jurisdictions. For example, under the EU's Digital Services Act (DSA), large platforms are required to offer choices surrounding the algorithms used to curate content feeds.[44]

## CONCLUSIONS

43. For the reasons I set out in this declaration, I believe that the Act's provisions address a serious problem: the excessive use of social media by minors. It is also my professional opinion that the Act's requirements are technically feasible to implement. As I also detail in this declaration, industry self-regulation is unlikely to adequately address this problem. The technologies needed to comply with the Act's requirements already exist and, in many cases, are

---

[42] Bluesky. "Custom Feeds." https://docs.bsky.app/docs/starter-templates/custom-feeds.

[43] X Help Center. "About your For you timeline on X." https://help.x.com/en/using-x/x-timeline.

[44] European Commission. "The Digital Services Act." December 15, 2025, https://digital-strategy.ec.europa.eu/en/policies/digital-services-act. Accessed: February 3, 2026.

already in widespread use. Thus, complying with the Act will not create a new, onerous burden on regulated entities.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 18, 2026, at Berkeley, California.

Serge Egelman, Ph.D.

# EXHIBIT A

# SergeEgelman

**contact**
2150 Shattuck Avenue
Suite 250
Berkeley, CA 94704
USA

egelman@cs.berkeley.edu

## education

2009 **PhD** in Computation, Organizations, and Society — Carnegie Mellon University
School of Computer Science

2004 **BS** in Computer Engineering — University of Virginia
School of Engineering and Applied Science

## experience

**Computer Science Experts, LLC** — Boston, MA
2026–Now Partner / Consulting and Testifying Expert

**AppCensus, Inc.** — San Francisco, CA
2022–Now Chief Scientist / Co-Founder
2019–2022 CTO / Co-Founder

**International Computer Science Institute** — Berkeley, California
2016–Now Research Director, Usable Security & Privacy Group
2013–2016 Senior Researcher, Networking and Security Group

**University of California, Berkeley** — Berkeley, California
2011–Now Research Scientist, Electrical Engineering and Computer Sciences

**National Institute of Standards and Technology** — Gaithersburg, Maryland
2010–2011 Research Scientist, Visualization and Usability Group

**Brown University** — Providence, Rhode Island
2009-2010 Postdoctoral Researcher, Computer Science Department

**Microsoft Research** — Redmond, Washington
2008 Research Intern, Security and Privacy Group
2008 Research Intern, VIBE Group

**PARC** — Palo Alto, California
2006 Research Intern, Computer Science Laboratory

## publications*

### refereed journal publications

The Effect of Platform Policies on App Privacy Compliance: A Study of Child-Directed Apps
*Alomar, N., Reardon, J., Girish, A., Vallina-Rodriguez, N., and Egelman, S.* Proceedings on Privacy Enhancing Technologies (PoPETS) *2025.2 (2025).*

*Over 15,000 citations and h-index>50: https://scholar.google.com/citations?hl=en&user=WN9t4n0AAAAJ

"Protect Me Tomorrow": Commitment Nudges to Remedy Compromised Passwords
*Peer, E., Frik, A., Gilsenan, C., and Egelman, S.* ACM Trans. Comput.-Hum. Interact. *(Aug. 2024). Association for Computing Machinery.* **Norm Hardy Prize for Advances in Usable Security**

The Medium is the Message:
How Secure Messaging Apps Leak Sensitive Data to Push Notification Services
*Samarin, N., Sanchez, A., Chung, T., Juleemun, A. D. B., Gilsenan, C., Merrill, N., Reardon, J., and Egelman, S.* Proceedings on Privacy Enhancing Technologies (PoPETS) *2024.4 (2024) pp. 967–982.*

A Model of Contextual Factors Affecting Older Adults'
Information-Sharing Decisions in the U.S.
*Frik, A., Bernd, J., and Egelman, S.* ACM Transactions on Computer-Human Interaction *30.1 (Apr. 2023). Association for Computing Machinery.*

Lessons in VCR Repair:
Compliance of Android App Developers with the California Consumer Privacy Act (CCPA)
*Samarin, N., Kothari, S., Siyed, Z., Bjorkman, O., Yuan, R., Wijesekera, P., Alomar, N., Fischer, J., Hoofnagle, C., and Egelman, S.* Proceedings on Privacy Enhancing Technologies (PoPETS) *3 (2023).*

Developers Say the Darnedest Things: Privacy Compliance Processes Followed by Developers of Child-Directed Apps
*Alomar, N., and Egelman, S.* Proceedings on Privacy Enhancing Technologies (PoPETS) *4 (2022) pp. 250–273.*

Data Collection Practices of Mobile Applications Played by Preschool-Aged Children
*Zhao, F., Egelman, S., Weeks, H. M., Kaciroti, N., Miller, A. L., and Radesky, J. S.* JAMA Pediatrics *174.12 (Dec. 2020).*

Nudge Me Right: Personalizing Online Security Nudges to People's Decision-Making Styles
*Peer, E., Egelman, S., Harbach, M., Malkin, N., Mathur, A., and Frik, A.* Computers in Human Behavior *109 (Aug. 2020).*

Disaster Privacy/Privacy Disaster
*Sanfilippo, M. R., Shvartzshnaider, Y., Reyes, I., Nissenbaum, H., and Egelman, S.* Journal of the Association for Information Science and Technology *(Mar. 2020).*

Can You Pay For Privacy? Consumer Expectations and the Behavior of Free and Paid Apps
*Bamberger, K. A., Egelman, S., Han, C., Elazari, A., and Reyes, I.* Berkeley Technology Law Journal *35 (2020).*

The Price is (Not) Right: Comparing Privacy in Free and Paid Apps
*Han, C., Reyes, I., Feal, Á., Reardon, J., Wijesekera, P., Vallina-Rodriguez, N., Elazari, A., Bamberger, K. A., and Egelman, S.* Proceedings on Privacy Enhancing Technologies (PoPETS) *3 (2020).*

Investigating Users' Preferences and Expectations for Always-Listening Voice Assistants
*Tabassum, M., Kosiński, T., Frik, A., Malkin, N., Wijesekera, P., Egelman, S., and Lipford, H. R.* Proceedings of the ACM on Interactive, Mobile, Wearable and Ubiquitous Technologies (IMWUT) *3.4 (Dec. 2019). Association for Computing Machinery.*

Privacy Attitudes of Smart Speaker Users
*Malkin, N., Deatrick, J., Tong, A., Wijesekera, P., Wagner, D., and Egelman, S.* Proceedings on Privacy Enhancing Technologies *2019.4 (2019).*

"Won't Somebody Think of the Children?" Examining COPPA Compliance at Scale
*Reyes, I., Wijesekera, P., Reardon, J., On, A. E. B., Razaghpanah, A., Vallina-Rodriguez, N., and Egelman, S.* Proceedings on Privacy Enhancing Technologies *2018.3 (2018) pp. 63–83.* **Caspar Bowden PET Award**

A Usability Evaluation of Tor Launcher
*Lee, L., Fifield, D., Malkin, N., Iyer, G., Egelman, S., and Wagner, D.* Proceedings on Privacy Enhancing Technologies *2017.3 (2017) pp. 87–106.*

The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study
*Tsai, J., Egelman, S., Cranor, L., and Acquisti, A.* Information Systems Research *22.2 (2011) pp. 254–268.* **AIS Best Publication of 2011 Award / INFORMS Best Published Paper Award (2012)**

P3P Deployment on Websites
*Cranor, L. F., Egelman, S., Sheng, S., McDonald, A. M., and Chowdhury, A.* Electronic Commerce Research and Applications *7.3 (2008) pp. 274–293.*

The Real ID Act: Fixing Identity Documents with Duct Tape
*Egelman, S., and Cranor, L. F.* I/S: A Journal of Law and Policy for the Information Society *2.1 (2006) pp. 149–183.*

**refereed conference publications**

Matrioska: A User-Centric Defense Against Virtualization-Based Repackaging Malware on Android
*Zerbini, S., Doria, S., Wijesekera, P., Egelman, S., and Losiouk, E.* 2024 Annual Computer Security Applications Conference *(ACSAC '24), 2024.*

Security and Privacy Failures in Popular 2FA Apps
*Gilsenan, C., Shakir, F., Alomar, N., and Egelman, S.* Proceedings of the 32nd USENIX Security Symposium *(USENIX Security '23), 2023.*

In the Room Where It Happens: Characterizing Local Communication and Threats in Smart Homes
*Girish, A., Hu, T., Prakash, V., Dubois, D. J., Matic, S., Huang, D. Y., Egelman, S., Reardon, J., Tapiador, J., Choffnes, D., and Vallina-Rodriguez, N.* Proceedings of the 2023 ACM on Internet Measurement Conference *(IMC '23), 2023, New York, NY, USA.*

Log: It's Big, It's Heavy, It's Filled with Personal Data!
Measuring the Logging of Sensitive Information in the Android Ecosystem
*Lyons, A., Gamba, J., Shawaga, A., Reardon, J., Tapiador, J., Egelman, S., and Vallina-Rodriguez, N.* Proceedings of the 32nd USENIX Security Symposium *(USENIX Security '23), 2023.* **CNIL-INRIA Privacy Award Runner Up**

Can Humans Detect Malicious Always-Listening Assistants?
A Framework for Crowdsourcing Test Drives
*Malkin, N., Wagner, D., and Egelman, S.* Proceedings of the ACM Conference On Computer-Supported Cooperative Work And Social Computing *(CSCW '22), 2022, New York, NY, USA.*

Runtime Permissions for Privacy in Proactive Intelligent Assistants
*Malkin, N., Wagner, D., and Egelman, S.* Eighteenth Symposium on Usable Privacy and Security *(SOUPS 2022), 2022.*

"You've Got Your Nice List of Bugs, Now What?" Vulnerability Discovery and Management Processes in the Wild
*Alomar, N., Wijesekera, P., Qiu, E., and Egelman, S.* Proceedings of the Sixteenth Symposium on Usable Privacy and Security *(SOUPS 2020), 2020.*

Actions Speak Louder than Words: Entity-Sensitive Privacy Policy and Data Flow Analysis with PoliCheck
*Andow, B., Mahmud, S. Y., Whitaker, J., Enck, W., Reaves, B., Singh, K., and Egelman, S.* 29th USENIX Security Symposium *(USENIX Security '20), 2020, Boston, MA.*

Don't Accept Candies from Strangers: An Analysis of Third-Party Mobile SDKs
*Feal, Á., Gamba, J., Tapiador, J., Wijesekera, P., Reardon, J., Egelman, S., and Vallina-Rodriguez, N.* International Conference on Computers, Privacy and Data Protection *(CPDP '20), 2020.*

A Qualitative Model of Older Adults' Contextual Decision-Making About Information Sharing
*Frik, A., Bernd, J., Alomar, N., and Egelman, S.* Workshop on the Economics of Information Security *(WEIS '20), 2020.*

Empirical Measurement of Systemic 2FA Usability
*Reynolds, J., Samarin, N., Barnes, J., Judd, T., Mason, J., Bailey, M., and Egelman, S.* Proceedings of the 29th USENIX Security Symposium *(USENIX Security '20), 2020.*

A Promise Is A Promise: The Effect of Commitment Devices on Computer Security Intentions

*Frik, A., Malkin, N., Harbach, M., Peer, E., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '19), 2019.*

Privacy and Security Threat Models and Mitigation Strategies of Older Adults
*Frik, A., Nurgalieva, L., Bernd, J., Lee, J. S., Schaub, F., and Egelman, S.* Proceedings of the 15th Symposium on Usable Privacy and Security *(SOUPS '19), 2019, Berkeley, CA, USA.*

Information Design in An Aged Care Context
*Nurgalieva, L., Frik, A., Ceschel, F., Egelman, S., and Marchese, M.* Proceedings of the 13th International Conference on Pervasive Computing Technologies for Healthcare *(PervasiveHealth '19), 2019, New York, NY, USA.*

50 Ways to Leak Your Data:
An Exploration of Apps' Circumvention of the Android Permissions System
*Reardon, J., Feal, A., Wijesekera, P., On, A. E. B., Vallina-Rodriguez, N., and Egelman, S.* Proceedings of the 24th USENIX Security Symposium *(USENIX Security '19), 2019, Berkeley, CA, USA.* **USENIX Security Distinguished Paper Award / AEPD Emilio Aced Personal Data Protection Research Award / CNIL-INRIA Privacy Award**

An Experience Sampling Study of User Reactions to Browser Warnings in the Field
*Reeder, R. W., Felt, A. P., Consolvo, S., Malkin, N., Thompson, C., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '18), 2018.*

Contextualizing Privacy Decisions for Better Prediction (and Protection)
*Wijesekera, P., Reardon, J., Reyes, I., Tsai, L., Chen, J.-W., Good, N., Wagner, D., Beznosov, K., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '18), 2018.* **SIGCHI Honorable Mention Award**

Let's go in for a closer look: Observing passwords in their natural habitat
*Pearman, S., Thomas, J., Naeini, P. E., Habib, H., Bauer, L., Christin, N., Cranor, L. F., Egelman, S., and Forget, A.* Proc. of the ACM SIGSAC Conference on Computer & Communications Security *(CCS '17), 2017, New York, NY, USA.*

Turtle Guard: Helping Android Users Apply Contextual Privacy Preferences
*Tsai, L., Wijesekera, P., Reardon, J., Reyes, I., Egelman, S., Wagner, D., Good, N., and Chen, J.-W.* Proceedings of the 13th Symposium on Usable Privacy and Security *(SOUPS '17), 2017.*

The Feasibility of Dynamically Granted Permissions:
Aligning Mobile Privacy with User Preferences
*Wijesekera, P., Baokar, A., Tsai, L., Reardon, J., Egelman, S., Wagner, D., and Beznosov, K.* Proceedings of the 2017 IEEE Symposium on Security and Privacy *(Oakland '17), 2017.*

Do or Do Not, There Is No Try: User Engagement May Not Improve Security Outcomes
*Forget, A., Pearman, S., Thomas, J., Acquisti, A., Christin, N., Cranor, L. F., Egelman, S., Harbach, M., and Telang, R.* Proc. of the 12th Symposium on Usable Privacy and Security *(SOUPS '16), 2016.*

Behavior Ever Follows Intention? A Validation of the Security Behavior Intentions Scale (SeBIS)
*Egelman, S., Harbach, M., and Peer, E.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '16), 2016.* **SIGCHI Honorable Mention Award**

The Anatomy of Smartphone Unlocking: A Field Study of Android Lock Screens
*Harbach, M., Luca, A. D., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '16), 2016.* **SIGCHI Honorable Mention Award**

Keep on Lockin' in the Free World: A Transnational Comparison of Smartphone Locking
*Harbach, M., Luca, A. D., Malkin, N., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '16), 2016.* **SIGCHI Honorable Mention Award**

The Teaching Privacy Curriculum
*Egelman, S., Bernd, J., Friedland, G., and Garcia, D.* Proceedings of the 47th ACM technical symposium on Computer Science Education *(SIGCSE '16), 2016.*

Android Permissions Remystified: A Field Study on Contextual Integrity
*Wijesekera, P., Baokar, A., Hosseini, A., Egelman, S., Wagner, D., and Beznosov, K.* 24th USENIX Security Symposium *(USENIX Security 15), 2015, Washington, D.C.*

Is This Thing On? Communicating Privacy on Ubiquitous Sensing Platforms
*Egelman, S., Kannavara, R., and Chow, R.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '15), 2015, New York, NY, USA.*

Scaling the Security Wall: Developing a Security Behavior Intentions Scale (SeBIS)
*Egelman, S., and Peer, E.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '15), 2015, New York, NY, USA.* **SIGCHI Honorable Mention Award**

Fingerprinting Web Users through Font Metrics
*Fifield, D., and Egelman, S.* Proceedings of the 19th international conference on Financial Cryptography and Data Security *(FC'15), 2015.*

Somebody's Watching Me? Assessing the Effectiveness of Webcam Indicator Lights
*Portnoff, R., Lee, L., Egelman, S., Mishra, P., Leung, D., and Wagner, D.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '15), 2015, New York, NY, USA.*

Are You Ready to Lock? Understanding User Motivations for Smartphone Locking Behaviors
*Egelman, S., Jain, S., Portnoff, R. S., Liao, K., Consolvo, S., and Wagner, D.* Proc. of the ACM SIGSAC Conference on Computer & Communications Security *(CCS '14), 2014, New York, NY, USA.*

The Effect of Developer-Specified Explanations for Permission Requests on Smartphone User Behavior
*Tan, J., Nguyen, K., Theodorides, M., Negron-Arroyo, H., Thompson, C., Egelman, S., and Wagner, D.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '14), 2014, Toronto, Canada.*

The Importance of Being Earnest [in Security Warnings]
*Egelman, S., and Schechter, S.* Proceedings of the 17th international conference on Financial Cryptography and Data Security *(FC'13), 2013, Okinawa, Japan.*

My Profile Is My Password, Verify Me! The Privacy/Convenience Tradeoff of Facebook Connect
*Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '13), 2013, Paris, France.*

Does My Password Go up to Eleven? The Impact of Password Meters on Password Selection
*Egelman, S., Sotirakopoulos, A., Muslukhov, I., Beznosov, K., and Herley, C.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '13), 2013, Paris, France.*

When It's Better to Ask Forgiveness than Get Permission: Attribution Mechanisms for Smartphone Resources
*Thompson, C., Johnson, M., Egelman, S., Wagner, D., and King, J.* Proceedings of the Ninth Symposium on Usable Privacy and Security *(SOUPS '13), 2013, Newcastle, United Kingdom.*

Android permissions: user attention, comprehension, and behavior
*Felt, A. P., Ha, E., Egelman, S., Haney, A., Chin, E., and Wagner, D.* Proceedings of the Eighth Symposium on Usable Privacy and Security *(SOUPS '12), 2012, Washington, D.C.* **SOUPS Best Paper Award (2012) / SOUPS Impact Award (2017)**

Facebook and privacy: it's complicated
*Johnson, M., Egelman, S., and Bellovin, S. M.* Proceedings of the Eighth Symposium on Usable Privacy and Security *(SOUPS '12), 2012, Washington, D.C.*

It's all about the Benjamins: Incentivizing users to ignore security advice
*Christin, N., Egelman, S., Vidas, T., and Grossklags, J.* Proceedings of the 15th international conference on Financial Cryptography and Data Security *(FC'11), 2011, Gros Islet, St. Lucia.*

Oops, I did it again: mitigating repeated access control errors on facebook
*Egelman, S., Oates, A., and Krishnamurthi, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '11), 2011, Vancouver, BC, Canada.*

Of passwords and people: measuring the effect of password-composition policies
*Komanduri, S., Shay, R., Kelley, P. G., Mazurek, M. L., Bauer, L., Christin, N., Cranor, L. F., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '11), 2011, Vancouver, BC, Canada.* **SIGCHI Honorable Mention Award**

Timing is everything?: the effects of timing and placement of online privacy indicators

*Egelman, S., Tsai, J., Cranor, L. F., and Acquisti, A.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '09), 2009, Boston, MA, USA.*

It's No Secret: Measuring the Security and Reliability of Authentication via 'Secret' Questions
*Schechter, S., Brush, A. J. B., and Egelman, S.* Proceedings of the 2009 IEEE Symposium on Security and Privacy *(Oakland '09), 2009, Los Alamitos, CA, USA.*

It's not what you know, but who you know: a social approach to last-resort authentication
*Schechter, S., Egelman, S., and Reeder, R. W.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '09), 2009, Boston, MA, USA.*

Crying wolf: an empirical study of SSL warning effectiveness
*Sunshine, J., Egelman, S., Almuhimedi, H., Atri, N., and Cranor, L. F.* Proceedings of the 18th USENIX Security Symposium *(SSYM'09), 2009, Montreal, Canada.*

Family accounts: a new paradigm for user accounts within the home environment
*Egelman, S., Brush, A. J. B., and Inkpen, K. M.* Proceedings of the 2008 ACM Conference on Computer Supported Cooperative Work *(CSCW '08), 2008, San Diego, CA, USA.*

You've Been Warned: An empirical study of the effectiveness of browser phishing warnings
*Egelman, S., Cranor, L. F., and Hong, J.* CHI '08: Proceeding of The 26th SIGCHI Conference on Human Factors in Computing Systems *(CHI '08), 2008, Florence, Italy.* **SIGCHI Honorable Mention Award**

Phinding Phish: Evaluating Anti-Phishing Tools
*Zhang, Y., Egelman, S., Cranor, L. F., and Hong, J.* Proceedings of the 14th Annual Network & Distributed System Security Symposium *(NDSS '07), 2007, San Diego, CA.*

Power Strips, Prophylactics, and Privacy, Oh My!
*Gideon, J., Egelman, S., Cranor, L., and Acquisti, A.* Proceedings of the Second Symposium on Usable Privacy and Security *(SOUPS '06), 2006, Pittsburgh, PA.*

An analysis of P3P-enabled web sites among top-20 search results
*Egelman, S., Cranor, L. F., and Chowdhury, A.* Proceedings of the 8th international conference on Electronic commerce: The new e-commerce: innovations for conquering current barriers, obstacles and limitations to conducting successful business on the internet *(ICEC '06), 2006, Fredericton, New Brunswick, Canada.*

**refereed workshop publications**

Challenges in Inferring Privacy Properties of Smart Devices:
Towards Scalable Multi-Vantage Point Testing Methods
*Girish, A., Prakash, V., Egelman, S., Reardon, J., Tapiador, J., Huang, D. Y., Matic, S., and Vallina-Rodriguez, N.* Proceedings of the 3rd International CoNEXT Student Workshop *(CoNEXT-SW '22), 2022, Rome, Italy.*

Identifying and Classifying Third-Party Entities in Natural Language Privacy Policies
*Hosseini, M. B., Pragyan, K., Reyes, I., and Egelman, S.* Proceedings of the Second Workshop on Privacy in Natural Language Processing *(PrivateNLP '20), 2020.*

Do You Get What You Pay For? Comparing The Privacy Behaviors of Free vs. Paid Apps
*Han, C., Reyes, I., On, A. E. B., Reardon, J., Feal, A., Bamberger, K. A., Egelman, S., and Vallina-Rodriguez, N.* The Workshop on Technology and Consumer Protection *(ConPro '19), 2019.*

Privacy Controls for Always-Listening Devices
*Malkin, N., Egelman, S., and Wagner, D.* Proceedings of the New Security Paradigms Workshop *(NSPW '19), 2019, San Carlos, Costa Rica.*

On The Ridiculousness of Notice and Conset: Contradictions in App Privacy Policies
*Okoyomon, E., Samarin, N., Wijesekera, P., On, A. E. B., Vallina-Rodriguez, N., Reyes, I., Feal, A., and Egelman, S.* The Workshop on Technology and Consumer Protection *(ConPro '19), 2019.*

Better Late(r) than Never: Increasing Cyber-Security Compliance by Reducing Present Bias
*Frik, A., Egelman, S., Harbach, M., Malkin, N., and Peer, E.* Workshop on the Economics of Information Security *(WEIS '18), 2018.*

"What Can't Data Be Used For?" Privacy Expectations about Smart TVs in the U.S.

*Malkin, N., Bernd, J., Johnson, M., and Egelman, S.* Proceedings of the European Workshop on Usable Security *(EuroUSEC '18), 2018.*

Personalized Security Messaging: Nudges for Compliance with Browser Warnings
*Malkin, N., Mathur, A., Harbach, M., and Egelman, S.* Proceedings of the European Workshop on Usable Security *(EuroUSEC '17), 2017.*

"Is Our Children's Apps Learning?" Automatically Detecting COPPA Violations
*Reyes, I., Wijesekera, P., Razaghpanah, A., Reardon, J., Vallina-Rodriguez, N., Egelman, S., and Kreibich, C.* The Workshop on Technology and Consumer Protection *(ConPro '17), 2017.*

Information Disclosure Concerns in The Age of Wearable Computing
*Lee, L. N., Lee, J. H., Egelman, S., and Wagner, D.* Proceedings of the NDSS Workshop on Usable Security *(USEC '16), 2016.*

The Myth of the Average User:
Improving Privacy and Security Systems through Individualization
*Egelman, S., and Peer, E.* Proceedings of the 2015 Workshop on New Security Paradigms *(NSPW '15), 2015, Twente, The Netherlands.*

Teaching Privacy: What Every Student Needs to Know
*Friedland, G., Egelman, S., and Garcia, D.* Proceedings of the 46th SIGCSE technical symposium on computer science education *(Workshop), 2015.*

U-PriSM 2: The Second Usable Privacy and Security for Mobile Devices Workshop
*Chiasson, S., Crawford, H., Egelman, S., and Irani, P.* Proc. of the 15th International Conference on Human-computer Interaction with Mobile Devices and Services *(MobileHCI '13), 2013, Munich, Germany.*

Markets for Zero-day Exploits: Ethics and Implications
*Egelman, S., Herley, C., and Oorschot, P. C. van* Proceedings of the 2013 Workshop on New Security Paradigms Workshop *(NSPW '13), 2013, Banff, Alberta, Canada.*

Choice Architecture and Smartphone Privacy: There's A Price for That
*Egelman, S., Felt, A. P., and Wagner, D.* The 2012 Workshop on the Economics of Information Security *(WEIS '12), 2012, Berlin, Germany.*

How Good Is Good Enough? The sisyphean struggle for optimal privacy settings
*Egelman, S., and Johnson, M.* Proceedings of the Reconciling Privacy with Social Media Workshop *(CSCW '12 Workshop), 2012, Seattle, WA.*

It's Not Stealing if You Need It: A Panel on the Ethics of Performing Research Using Public Data of Illicit Origin
*Egelman, S., Bonneau, J., Chiasson, S., Dittrich, D., and Schechter, S.* Proceedings of the 16th International Conference on Financial Cryptography and Data Security *(FC'12), 2012.*

How to ask for permission
*Felt, A. P., Egelman, S., Finifter, M., Akhawe, D., and Wagner, D.* Proceedings of the 7th USENIX conference on Hot Topics in Security *(HotSec'12), 2012, Bellevue, WA.*

I've got 99 problems, but vibration ain't one: a survey of smartphone users' concerns
*Felt, A. P., Egelman, S., and Wagner, D.* Proceedings of the second ACM workshop on Security and privacy in smartphones and mobile devices *(SPSM '12), 2012, Raleigh, North Carolina, USA.*

Toward Privacy Standards Based on Empirical Studies
*Egelman, S., and McCallister, E.* The Workshop on Web Tracking and User Privacy *(W3C Workshop), 2011, Princeton, NJ.*

Please Continue to Hold: An Empirical Study on User Tolerance of Security Delays
*Egelman, S., Molnar, D., Christin, N., Acquisti, A., Herley, C., and Krishnamurthi, S.* Workshop on the Economics of Information Security (WEIS '10) *(WEIS '10), 2010, Cambridge, MA.*

Tell Me Lies: A Methodology for Scientifically Rigorous Security User Studies
*Egelman, S., Tsai, J., and Cranor, L. F.* Proceedings of the Workshop on Studying Online Behavior *(CHI '10 Workshop), 2010, Atlanta, GA.*

This is Your Data on Drugs: Lessons Computer Security Can Learn from the Drug War
*Molnar, D., Egelman, S., and Christin, N.* Proceedings of the 2010 Workshop on New Security Paradigms *(NSPW '10), 2010, Concord, Massachusetts, USA.*

Security user studies: methodologies and best practices
*Egelman, S., King, J., Miller, R. C., Ragouzis, N., and Shehan, E.* CHI '07 Extended Abstracts on Human Factors in Computing Systems *(CHI EA '07), 2007, San Jose, CA, USA.*

The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study
*Tsai, J., Egelman, S., Cranor, L., and Acquisti, A.* Proceedings of the 2007 Workshop on the Economics of Information Security *(WEIS '07), 2007, Pittsburgh, PA, USA.*

Studying the Impact of Privacy Information on Online Purchase Decisions
*Egelman, S., Tsai, J., Cranor, L. F., and Acquisti, A.* Proceedings of the Workshop on Privacy and HCI: Methodologies for Studying Privacy Issues *(CHI '06 Workshop), 2006, Montreal, Canada.*

### book chapters and magazine articles

50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System
Reardon, J., Feal, Á., Wijesekera, P., On, A. E. B., Vallina-Rodriguez, N., and Egelman, S. *;login:* 2019, USENIX Association.

Predicting Privacy and Security Attitudes
Egelman, S., and Peer, E. *Computers and Society*, 2015, ACM.

Crowdsourcing
Egelman, S., Chi, E., and Dow, S. *Ways of Knowing in HCI*, 2013, Springer.

Helping users create better passwords
Ur, B., Kelley, P. G., Komanduri, S., Lee, J., Maass, M., Mazurek, M., Passaro, T., Shay, R., Vidas, T., Bauer, L., Christin, N., Cranor, L. F., Egelman, S., and Lopez, J. *;login:* 2012, USENIX Association.

Suing Spammers for Fun and Profit
Egelman, S. *;login:* 2004, USENIX Association.

Installation
Egelman, S. *Peter Norton's Complete Guide to Linux*, 1999, Macmillan Computer Publishing.

User Administration
Egelman, S. *Peter Norton's Complete Guide to Linux*, 1999, Macmillan Computer Publishing.

## awards and recognition

2025 **Carnegie Mellon University CyLab Distinguished Alumni Award**
"For impactful research in usable privacy and security that has advanced consumer privacy protection on mobile platforms."

**CNIL-INRIA Privacy Award Runner Up**
*Log: It's Big, It's Heavy, It's Filled with Personal Data! Measuring the Logging of Sensitive Information in the Android Ecosystem*, with A. Lyons and J. Gamba and A. Shawaga and J. Reardon and J. Tapiador and S. Egelman and N. Vallina-Rodriguez.

2024 **Norm Hardy Prize for Advances in Usable Security**
*"Protect Me Tomorrow": Commitment Nudges to Remedy Compromised Passwords*, with A. Frik, C. Gilsenan, and E. Peer.

2022 **CNIL-INRIA Privacy Award**
*50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System*, with J. Reardon, A. Feal, P. Wijesekera, A. Elazari Bar On, and N. Vallina-Rodriguez.

**AEPD Emilio Aced Personal Data Protection Research Award**
*50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System*, with J. Reardon, A. Feal, P. Wijesekera, A. Elazari Bar On, and N. Vallina-Rodriguez.

2020 **Caspar Bowden Award for Outstanding Research in Privacy Enhancing Technologies**
*"Won't Somebody Think of the Children?" Examining COPPA Compliance at Scale*, with I. Reyes, P. Wijesekera, J. Reardon, A. Elazari, A. Razaghpanah, and N. Vallina-Rodriguez.

2019 **USENIX Security Symposium Distinguished Paper Award**
*50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System*, with J. Reardon, A. Feal, P. Wijesekera, A. Elazari Bar On, and N. Vallina-Rodriguez.

2018 **SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Contextualizing Privacy Decisions for Better Prediction (and Protection)*, with P. Wijesekera, J. Reardon, I. Reyes, L. Tsai, J.-W. Chen, N. Good, D. Wagner, and K. Beznosov.

2017 **Symposium on Usable Privacy and Security (SOUPS) Impact Award**
*Android Permissions: User Attention, Comprehension, and Behavior*, with A. P. Felt, E. Ha, A. Haney, E. Chin, and D. Wagner.

**Elected ACM Senior Member** Association for Computing Machinery (ACM)

2016 **Symposium on Usable Privacy and Security (SOUPS) Distinguished Poster Award**
*Risk Compensation in Home-User Computer Security Behavior: A Mixed-Methods Exploratory Study*, with S. Pearman, A. Kumar, N. Munson, C. Sharma, L. Slyper, L. Bauer, and N. Christin.

**SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Behavior Ever Follows Intention? A Validation of the Security Behavior Intentions Scale (SeBIS)*, with M. Harbach and E. Peer.

**SIGCHI Honorable Mention Award (Best Paper Nominee)**
*The Anatomy of Smartphone Unlocking: A Field Study of Android Lock Screens*, with M. Harbach and A. De Luca.

**SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Keep on Lockin' in the Free World: A Transnational Comparison of Smartphone Locking*, with M. Harbach, A. De Luca, and N. Malkin.

2015 **SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Scaling the Security Wall: Developing a Security Behavior Intentions Scale*, with E. Peer.

2012 **AIS Best Publication of 2011**
*The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, with J. Tsai, L. Cranor, and A. Acquisti.

**ISR Best Published Paper**
*The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, with J. Tsai, L. Cranor, and A. Acquisti.

**SOUPS Best Paper Award**
*Android Permissions: User Attention, Comprehension, and Behavior*, with A. P. Felt, E. Ha, A. Haney, E. Chin, and D. Wagner.

2011 **SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Of Passwords and People: Measuring the Effect of Password-Composition Policies*, with S. Komanduri, R. Shay, P. G. Kelley, M. Mazurek, L. Bauer, N. Christin, and L. F. Cranor.

2008 **SIGCHI Honorable Mention Award (Best Paper Nominee)**
*You've Been Warned: An Empirical Study on the Effectiveness of Web Browser Phishing Warnings*, with L. Cranor and J. Hong.

2006 **Tor Graphical User Interface Design Competition**
Phase 1 Overall Winner, with L. Cranor, J. Hong, P. Kumaraguru, C. Kuo, S. Romanosky, J. Tsai, and K. Vaniea.

**Publisher's Clearing House Finalist**
I *may* already be a winner.

## expert testimony and reports

2026 — Expert witness for the plaintiffs in *John Doe v. Cedars-Sinai Health System et al., No. 22STCV41085*. I provided a report and testimony explaining how personally-identifiable information was transmitted to third parties (e.g., using the Meta Pixel, Google Analytics, etc.) via the defendants' websites during the relevant time period.

2025-2026 — Co-authored amicus briefs in support of Google in *Google LLC, et al. v. Epic Games, Inc., Nos. 24-6256, 24-6274, & 25-521*, both before the Court of Appeals and Supreme Court.

2025-2026 — Expert witness for the plaintiffs in *Ingraham and Williams v. Capital One Financial Corporation, No. 3:24-cv-05985-TLT*. I provided a report and testimony explaining how personally-identifiable information was transmitted to third parties (e.g., using the Meta Pixel, Google Analytics, etc.) via the defendant's website during the relevant time period.

2025-2026 — Expert witness for the plaintiffs in *Gershzon et al. v. Meta Platforms, Inc., No. 3:23-cv-00083*. I provided a report and testimony explaining how personally-identifiable information was transmitted to Meta when residents performed activities on the state DMV website.

2025-2026 — Expert witness for the plaintiffs in *Bloom v. Zuffa, LLC, No. 2:2022-cv-00412*. I provided a report and testimony explaining how personally-identifiable information was transmitted to Meta via the Pixel and Conversions API when subscribers accessed the defendant's website.

2025-2026 — Expert witness for the plaintiffs in *A.T. v. BetterHelp, Inc., No. VLC-S-S-233556*. I provided a report and testimony explaining how personally-identifiable information was transmitted to Meta via the Pixel and Conversions API, amongst other third parties, when interacting with the defendant's website.

2024-2026 — Expert witness for the California Department of Justice in *NetChoice, LLC v. Bonta, No. 5:24-cv-07885-EJD-NMC*; *TikTok v. Bonta, No. 5:25-cv-9789*; *Google v. Bonta, No. 5:25-cv-9795*; and *Meta v. Bonta, No. 5:25-cv-9792*. I provided declarations explaining the relevant technologies and associated research.

2024-2026 — Expert witness for the State of New Mexico in *State of New Mexico v. Facebook Inc., No. D-101-CV-2021-00132*. I provided a report and testimony in a case stemming from Facebook's handling of consumers' personal data.

2024-2026 — Expert witness for the plaintiffs in *Garner v. Amazon.com, Inc., No. 2:21-cv-00750 (W.D. Wash.)*. I provided a report and testimony explaining how in-home "virtual personal assistants" work, as well as explaining the associated privacy concerns based on the relevant research literature. Also offered opinions on proper survey methods and HCI research in the context of an expert rebuttal report.

2025 — Expert witness for the California Department of Justice in *NetChoice, LLC v. Bonta, No. 5:25-cv-03178*. I provided a declaration opposing the motion to dismiss.

2025 — Co-authored an amicus brief in support of plaintiffs-appellees in *Shanahan v. IXL Learning, Inc., No. 24-6985*. I explained why the "notice and consent/assent" framework does not work in practice.

2025 — Expert witness for the plaintiffs in *Doe I v. Family Planning Associates Medical Group, Inc., No. 23CV037304* . I provided a declaration in support of plaintiffs' motion for preliminary approval of a class settlement.

2024-2025 — Expert witness for the plaintiffs in *Lopez et al. v. Apple, Inc., No. 4:19-cv-04577-JSW (N.D. Cal.)*. I provided a report explaining how in-home "virtual personal assistants" work, as well as explaining the associated privacy concerns based on the relevant research literature.

| | |
|---|---|
| 2023-2025 | Expert witness for the plaintiffs in *Frasco v. Flo Health, et al., No. 3:21-cv-00757 (N.D. Cal.)*. I provided an expert report and testimony—depositions and at trial—based on my forensic analysis of a mobile app's data collection behaviors (i.e., privacy analysis). I was deposed and also provided rebuttal reports of opposing experts. |
| 2023-2025 | Expert witness for the California Department of Justice in *NetChoice, LLC v. Bonta, No. 5:22-cv-08861*. I provided a declaration opposing the motion to dismiss. |
| 2024 | Expert witness for the plaintiffs in *Martinez et al. v. D2C, LLC d/b/a UNIVISION NOW, No. 1:23-cv-21394-RNS (S.D. Fla.)*. I provided a report and testimony explaining how the Meta Pixel functions and how it was used to transmit consumers' personally-identifiable information in violation of the Video Privacy Protection Act (VPPA). |
| 2024 | Expert witness for the plaintiffs in *Clark, et. al. v. Yodlee, Inc., No: 3:20-cv-05991-SK (N.D. Cal.)*. I provided a report and testimony explaining basic data protection concepts and consumer privacy expectations. |
| 2024 | Independent expert witness appointed by the court in *Czarnionka v. The Epoch Times Association, Inc., No. 1:22-cv-6348 (S.D.N.Y.)*. I was asked to perform a technical analysis to confirm that the terms of the injunctive relief were being followed. |
| 2022 | Expert witness for the plaintiffs in *Hart, et al. v. TWC Product and Technology LLC, No. 4:20-cv-3842-JST*. I provided a rebuttal report and testimony about mobile app data collection behaviors. |
| 2022 | Expert witness for the District of Columbia Office of the Attorney General in *District of Columbia v. Town Sports International LLC*. I provided a rebuttal report and testimony on proper surveying methodology. |
| 2021 | Expert witness testifying before the U.S. Senate (Committee on Commerce, Science, and Transportation), hearing on "Protecting Kids Online: Internet Privacy and Manipulative Marketing." Testimony available at: https://www.commerce.senate.gov/2021/5/protecting-kids-online-internet-privacy-and-manipulative-marketing |
| 2017-2019 | Expert witness for the plaintiffs in *Vizio, Inc., Consumer Privacy Litigation, No. 8:16-ml-02693-JLS-KES*, assisting with discovery strategy and providing explanations of relevant privacy research on users' willingness to pay for privacy in order to assist in quantifying damages. |
| 2016 | Expert witness for the FTC in *FTC v. Amazon.com, Inc., No. 2:14-cv-01038-JCC*, providing testimony on human-computer interaction (HCI) evaluation methods and critiquing opposing expert's report. |
| 2014-2015 | Expert witness for the plaintiffs in *Doe vs. Twitter, Inc., No. CGC-10-503630*, providing explanations of relevant privacy research on users' willingness to pay for privacy in order to assist in quantifying damages. |
| 2014 | Expert witness for the plaintiffs in *Levy v. Universal Parking of Florida, LLC No. 13-cv-22122 (S.D. Fla.)*, providing written testimony on basic human-computer interaction concepts as they relate to smartphone usage. |
| 2013 | Expert witness for the plaintiffs in *LinkedIn User Privacy Litigation, No. 12-cv-03088-EJD (N.D. Cal.)*, providing explanations of information security concepts and providing original research on users' privacy expectations in order to demonstrate and quantify damages. |
| 2012 | Expert witness for the plaintiffs in *Netflix Privacy Litigation, No. 5:11-cv-00379-EJD (N.D. Cal.)*, providing explanations of relevant privacy research and the economics of information privacy in order to quantify damages. |

## grants awarded

| | |
|---|---|
| 2023–2026 | **NSA: Improving Security and Safety of Neural Networks through Robust Training, Noise Augmentation, and Safety Metrics (H98230-23-C-0275)** $750,000<br>Co-PI (PI: Michael Mahoney, International Computer Science Institute) |

2023–2026 **NSF: Measuring, Validating and Improving upon App-Based Privacy Nutrition Labels (CNS-2247951/2247952/2247953)** $600,000
Principal Investigator (Collaborative with Adam Aviv, George Washington University; Chris Kanich, University of Illinois at Chicago)

2022–2025 **NSF: Developer Implementation of Privacy in Software Systems (CCF-2217771/2217772)** $750,000
Principal Investigator (Collaborative with Primal Wijesekera, International Computer Science Institute; Jon Atwell and Julian Nyarko, Stanford University)

2022–2026 **KACST-UCB Center of Excellence for Secure Computing** $6,460,000
Senior Personnel (PI: David Wagner, University of California, Berkeley)

2021–2022 **CITRIS: Auditing the Compliance of California Consumer Privacy Regulations at Scale** $60,000
Principal Investigator (Collaborative with Zubair Shafiq, University of California, Davis)

2019 **Google: ASPIRE: SDK Traffic Identification at Scale** $75,000
Principal Investigator

2018-2022 **NSF: Mobile Dynamic Privacy and Security Analysis at Scale (CNS-1817248)** $668,475
Principal Investigator

2018-2022 **NSF: Contextual Integrity: From Theory to Practice (CNS-1801501/1801307/1801316)** $1,199,462
Principal Investigator (Collaborative with Helen Nissenbaum, Cornell University; and Norman Sadeh, Carnegie Mellon University)

2018-2022 **NSF: Increasing Users' Cyber-Security Compliance by Reducing Present Bias (CNS-1817249)** $558,018
Principal Investigator

2018-2023 **NSA: The Science of Privacy: Implications for Data Usage (H98230-18-D-0006)** $3,236,424
Principal Investigator (Co-PI: Michael Tschantz, International Computer Science Institute)

2018-2019 **DHS: Scaling Contextual Privacy to MDM Environments (FA8750-18-2-0096)** $480,000
Principal Investigator

2018-2019 **Rose Foundation: AppCensus: Mobile App Privacy Analysis at Scale** $40,000
Principal Investigator (Co-PI: Irwin Reyes, International Computer Science Institute)

2018 **Cisco: Access Controls for an IoT World** $99,304
Principal Investigator

2018 **CLTC: Privacy Analysis at Scale** $50,000
Principal Investigator

2018 **CLTC: Secure Internet of Things for Senior Users** $60,590
Co-PI (PI: Alisa Frik, International Computer Science Institute)

2017 **Mozilla: Towards Usable IoT Access Controls in the Home** $46,000
Principal Investigator

2017 **Data Transparency Lab (DTL) / AT&T: Transparency via Automated Dynamic Analysis at Scale** $55,865
Principal Investigator

2017 **CLTC: Secure & Usable Backup Authentication** $48,400
Co-PI (PI: David Wagner, University of California, Berkeley)

2016 - 2017 **NSF: Teaching Security in CSP (CNS-1636590)** $200,000
Co-PI (PI: Julia Bernd, ICSI)

2016 - 2017 **DHS: A Platform for Contextual Mobile Privacy (FA8750-16-C-0140)** $664,378
Principal Investigator

2016 - 2018 **CLTC: The Security Behavior Observatory** $195,962
Principal Investigator

2016 **CLTC: Using Individual Differences to Tailor Security Mitigations** $100,000
Principal Investigator

2015 - 2018 **NSF/BSF: Using Individual Differences to Personalize Security Mitigations (CNS-1528070/BSF-2014626)** $724,732
Principal Investigator (Collaborative with Eyal Peer, Bar-Ilan University)

2015 - 2019 **NSF: Security and Privacy for Wearable and Continuous Sensing Platforms (CNS-1514211/1514457/1513584)** $1,200,000
Principal Investigator (Collaborative with David Wagner, University of California, Berkeley; and Franziska Roesner, University of Washington)

2014 - 2016 **NSF: Teachers' Resources for Online Privacy Education (DGE-1419319)** $300,000
Co-PI (PI: Gerald Friedland, ICSI)

2014 - 2017 **NSA: User Security Behavior** $200,000
Subcontract (PIs: Lorrie Cranor, Rahul Telang, Alessandro Acquisti, and Nicholas Christin; Carnegie Mellon University)

2014 **Google: Improving Security Warnings by Examining User Intent** $71,500
Principal Investigator

2013 - 2015 **NSF: Designing Individualized Privacy and Security Systems (CNS-1343433/1343451)** $132,620
Principal Investigator (Collaborative with Eyal Peer, Carnegie Mellon University)

2013 - 2016 **NSF: A Choice Architecture for Mobile Privacy and Security (CNS-1318680)** $500,000
Co-PI (PI: David Wagner, University of California, Berkeley)

2010 **Google: Designing Usable Certificate Dialogs in Chrome** $60,000
Principal Investigator

# patents awarded

2024 Method and Apparatus for Dynamic Outbound Firewalling via Domain Name System (DNS) (US Patent 12,160,407)

2023 Automatic Identification of Applications that Circumvent Permissions and/or Obfuscate Data Flows (US Patent 11,689,551)

# professional activities

### program committees

2026 Workshop on Economics and Information Security (WEIS), **Chair**

2025 USENIX Security Symposium; Workshop on Economics and Information Security (WEIS)

2024 IEEE Security & Privacy; Workshop on Economics and Information Security (WEIS); Contextual Integrity (CI) Symposium

2023 Privacy Enhancing Technologies Symposium (PETS); IEEE Security & Privacy; Workshop on Economics and Information Security (WEIS)

2022 Contextual Integrity (CI) Symposium

2021 Workshop on Economics and Information Security (WEIS)

2020 ACM CCS; Workshop on Economics and Information Security (WEIS); Symposium on Usable Privacy and Security (SOUPS); USENIX Security

2019 Privacy Enhancing Technologies Symposium (PETS); Workshop on Economics and Information Security (WEIS); Symposium on Usable Privacy and Security (SOUPS)

2018 ACM SIGCHI (Human Factors in Computing Systems); Privacy Enhancing Technologies Symposium (PETS); Workshop on Economics and Information Security (WEIS); ACM Conference on Computer and Communications Security (CCS); Symposium on Usable Privacy and Security (SOUPS); IEEE Security & Privacy (“Oakland”)

| | |
|---|---|
| 2017 | ACM SIGCHI (Human Factors in Computing Systems); USENIX Security; Privacy Enhancing Technologies Symposium (PETS); New Security Paradigms Workshop (NSPW), **Co-Chair**; Workshop on Economics and Information Security (WEIS); ACM Conference on Computer and Communications Security (CCS); Symposium on Usable Privacy and Security (SOUPS) |
| 2016 | Workshop on the Economics of Information Security (WEIS), **Chair**; New Security Paradigms Workshop (NSPW), **Co-Chair**; ACM SIGCHI (Human Factors in Computing Systems); USENIX Security; Symposium on Usable Privacy and Security (SOUPS); ACM WWW; Financial Cryptography and Data Security; Privacy Enhancing Technologies Symposium (PETS) |
| 2015 | Symposium on Usable Privacy and Security (SOUPS); USENIX Security; ACM SIGCHI (Human Factors in Computing Systems); Privacy Enhancing Technologies Symposium (PETS); Workshop on the Economics of Information Security (WEIS); ACM WWW; Financial Cryptography and Data Security |
| 2014 | ACM SIGCHI (Human Factors in Computing Systems); Financial Cryptography and Data Security; ACM WWW; Privacy Enhancing Technologies Symposium (PETS) |
| 2013 | ACM SIGCHI (Human Factors in Computing Systems); Symposium on Usable Privacy and Security (SOUPS); New Security Paradigms Workshop (NSPW); Anti-Phishing Working Group eCrime Researchers Summit |
| 2012 | Symposium on Usable Privacy and Security (SOUPS); New Security Paradigms Workshop (NSPW) |
| 2011 | Symposium On Usable Privacy and Security (SOUPS); New Security Paradigms Workshop (NSPW); Computers, Freedom, and Privacy (CFP) Conference (poster session co-chair); Software and Usable Security Aligned for Good Engineering (SAUSAGE) Workshop, **Co-Chair** |
| 2010 | Symposium On Usable Privacy and Security (SOUPS) |
| 2008 | Conference on Information and Knowledge Management (CIKM) |
| 2007 | ACM SIGCHI Workshop - Security User Studies: Methodologies and Best Practices; Anti-Phishing Working Group eCrime Researchers Summit (poster session co-chair) |
| 2006 | Computers, Freedom, and Privacy (CFP) Conference |

### standards committees

| | |
|---|---|
| 2024-Now | Invited Expert, W3C Privacy Working Group |
| 2007-2008 | Invited Expert, W3C Web Security Context (WSC) Working Group |
| 2004-2006 | Invited Expert, W3C Platform for Privacy Preferences (P3P) 1.1 Working Group |

### leadership roles

| | |
|---|---|
| 2024-Now | Advisory Board Member, Electronic Privacy Information Center (EPIC) |
| 2016-Now | Research Director, ICSI Usable Security & Privacy Group |
| 2012-Now | Director, Berkeley Laboratory for Usable and Experimental Security (BLUES) |
| 2021-2023 | Member, ICSI Scientific Leadership Council |
| 2006-2008 | Legislative Concerns Chair / Board of Directors, National Association of Graduate and Professional Students (NAGPS) |
| 2006-2008 | Vice President for External Affairs, Carnegie Mellon Graduate Student Assembly |

## graduated graduate students

2025 **Amel Bourdoucen** Aalto University (External Member)
Doctoral Dissertation: "Usable Security and Privacy of Apps in Mobile Ecosystems"

2025 **R. August See** University of Hamburg (External Member)
Doctoral Dissertation: "Emerging Threats to Online Security: Securing Systems Against Unauthorized Automation and Web Bots"

2025 **Conor Gilsenan** University of California, Berkeley
Doctoral Dissertation: "Exploring the Security and Privacy Impacts of Using 2FA Apps"

2024 **Noura Alomar** University of California, Berkeley
Doctoral Dissertation: "Towards Understanding and Improving Software Professionals' Security and Privacy Practices"

2024 **Nikita Samarin** University of California, Berkeley
Doctoral Dissertation: "Measuring and Improving Privacy Protections through Privacy Engineering Methods"

2021 **Nathan Malkin** University of California, Berkeley
Doctoral Dissertation: "Privacy Controls for Always-Listening Devices"

2019 **Ehimare Okoyomon** University of California, Berkeley
Masters Project: "On The Ridiculousness of Notice and Consent: Contradictions in App Privacy Policies"

2018 **Primal Wijesekera** University of British Columbia (External Member)
Doctoral Dissertation: "Contextual Permission Models for Better Privacy Protection"

2017 **Lynn Tsai** University of California, Berkeley
Masters Project: "TurtleGuard: Helping Android Users Apply Contextual Privacy Preferences"

2016 **Arjun Baokar** University of California, Berkeley
Masters Project: "A Contextually-Aware, Privacy-Preserving Android Permission Model"

2016 **Linda Naeun Lee** University of California, Berkeley
Masters Project: "Tor's Usability for Censorship Circumvention"

## teaching

Fall 2019 **Usable Privacy and Security** University of California, Berkeley
Designed and taught a course as part of the School of Information's Masters in Cybersecurity program. Duties included course design and development, grading assignment and exams, supervising class projects, and holding office hours.

Spring 2017, Spring 2018 **Human Factors in Computer Security and Privacy** Brown University
Instructor for a module on "user interfaces for security" as part of the Executive Masters in Cybersecurity program. Duties included course design and development, grading assignments and exams, supervising thesis projects, and holding office hours.

Fall 2007 **Information Security & Privacy (46-861)** Carnegie Mellon University
Teaching assistant duties included developing course materials (topics for lectures, assignments, and exams), grading assignments and exams, holding office hours, and mentoring students about semester-long projects.

Spring 2006 **Computers and Society (15-290)** Carnegie Mellon University
Teaching assistant duties included giving guest lectures, creating assignments and exams, grading assignments and exams, holding office hours, and mentoring students about semester-long projects.

Fall 2003 **Information Security (CS 451)** University of Virginia
Teaching assistant duties included giving guest lectures, creating assignments and exams, grading assignments and exams, and holding office hours.

Fall 2003 **Intellectual Property (TCC 200)** University of Virginia
Teaching assistant duties included grading assignments and holding office hours.

Spring 2003, Spring 2004 **Advanced Software Development Methods (CS 340)** University of Virginia
Teaching assistant duties included grading and holding office hours.

Fall 2002 **Engineering Software (CS 201J)** University of Virginia
Teaching assistant duties included grading assignments and holding office hours.