ROB BONTA
Attorney General of California
TODD GRABARSKY
LARA HADDAD
Supervising Deputy Attorneys General
ASHA ALBUQUERQUE (SB 332901)
CHRISTOPHER KISSEL (SB 333937)
SHIWON CHOE (SB 320041)
SAMUEL SOKOLSKY (SBN 348173)
MEGHAN H. STRONG (SBN 324503)
ZELDA VASSAR (SB 313789)
WILLIAM BELLAMY (SB 347029)
Deputy Attorneys General
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-6086
Fax: (916) 324-8835
E-mail: William.Bellamy@doj.ca.gov
*Attorneys for Defendant, Rob Bonta, in his official capacity as Attorney General of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **TIKTOK, INC.,**<br><br>Plaintiff,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of California,**<br><br>Defendant. | Case No. 5:25-cv-09789-EJD<br><br>**DECLARATION OF DR. MARTIN HILBERT, PHD, IN SUPPORT OF DEFENDANTS' OMNIBUS OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date/Time: April 30, 2026 at 9:00 a.m.<br>Courtroom: 4 (Fifth Floor) |

| | |
|---|---|
| **META PLATFORMS, INC.,**<br><br>Plaintiff,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of California,**<br><br>Defendant. | Case No. 5:25-cv-09792-EJD<br><br>**DECLARATION OF DR. MARTIN HILBERT, PHD, IN SUPPORT OF DEFENDANTS' OMNIBUS OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date/Time: April 30, 2026 at 9:00 a.m.<br>Courtroom: 4 (Fifth Floor) |
| **GOOGLE LLC and YOUTUBE, LLC,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of California,**<br><br>Defendant. | Case No. 5:25-cv-09795-EJD<br><br>**DECLARATION OF DR. MARTIN HILBERT, PHD, IN SUPPORT OF DEFENDANTS' OMNIBUS OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date/Time: April 30, 2026 at 9:00 a.m.<br>Courtroom: 4 (Fifth Floor) |

## TABLE OF CONTENTS

**Page**


Declaration of Martin Hilbert ........ 1
Background and Qualifications ........ 1
Summary of Opinions ........ 1
Opinions ........ 5
- I. A Business Model that Drives User Engagement ........ 5
  - A. The Social Media Business Model (and the Role of Machine Learning) ........ 5
  - B. The Machine Learning Paradigm (and its Blackbox Conduct) ........ 13
  - C. ML's Blackbox Conduct (and Its Inherent Uncertainty) ........ 18
  - D. Inherent Uncertainty in Social Media's ML ........ 26
  - E. ML Objective Functions (and Social Media's Objective Function) ........ 34
  - F. Engagement Maximization (and Its Unintended Side Effects) ........ 43
- II. Three Dimensions of Content: Source, Target, Knowability ........ 51
  - A. Target of Content Orientation: Other-informed versus Self-informed ........ 52
  - B. Source of Content Origination: Self-created versus Other-created ........ 59
  - C. Knowability of Content Realization: Speech Certainty ........ 63
  - D. Sorting content along three dimensions ........ 67
- III. Existing Solutions to Mitigate Algorithmic Feeds ........ 71
  - A. Dysfunctional design of existing options for mitigation ........ 72
  - B. Ineffectiveness of Existing Options for Mitigation ........ 76
  - C. Perfunctory Incentives for Existing Options for Mitigation ........ 78

Conclusions ........ 81
Appendix ........ 85

## DECLARATION OF MARTIN HILBERT

I, Dr. Martin Hilbert, Ph.D., declare under the penalty of perjury that the following is true and correct:

1. I have been retained by the Office of the Attorney General of the California Department of Justice to provide expert opinions and testimony in this case. This declaration is based on my personal knowledge, experience, and years of research in algorithms, digital information and media, and complex social systems. For this engagement, I was asked to provide expert opinions about addictive social media feeds, the manner in which the algorithms employed by Plaintiffs function, the insufficiency of Plaintiffs' efforts to mitigate the harms of addictive social media feeds, and the impact of the Protecting Our Kids from Social Media Addiction Act.

## BACKGROUND AND QUALIFICATIONS

2. I am a tenured Full Professor at the University of California, Davis. I hold two doctorates (Economics and Social Science, Dr. rer. pol., F.A.U. Germany, 2006; and Communication, Ph.D, USC, USA, 2012). I previously held a tenured position as Economics Affairs Officer of the United Nations Secretariat, including global diplomatic immunity, from which I retired in 2014. I have published more than 100 peer-reviewed works, which have been cited more than 11,500 times.

3. This Declaration is based on my own personal knowledge and experience. If I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

4. A true and correct copy of my current curriculum vitae is attached as Exhibit A to this declaration, which includes publications that I have authored. I am currently being paid a rate of $450 per hour.

## SUMMARY OF OPINIONS

5. I have reviewed California's Protecting Our Kids from Social Media Addiction Act ("the Act" or SB 976), as well as the arguments that challenge it in the submitted complaints, declarations filed in support of the motions for preliminary injunction, and other materials. I have

also reviewed documents the Plaintiffs have produced to Defendant during the preliminary-injunction discovery process. In my expert opinion, I find the Act not only adequate, but also, given the nature, objective, and empirical effects of algorithmic feeds, extremely useful to consult parents before exposing minors with developing brains to the current social media business model.

6. **In summary**, the stepwise logic of this declaration is that the social media business model runs a data factory that produces data provided by the user by showing them pieces of media generated or shared by other users (para. 14-17). The data production is maximized by maximizing engagement, which is the overall goal given to the machine learning system driving the proprietary algorithmic recommender systems (para. 49-52). This machine learning system is socially embedded into the real-time interactions on the platform, which, per definition, leads to a lack of certainty in the execution of the system's conduct (para. 35-39). While engagement maximization encompasses the unintended side-effect of addiction (para. 55-58), the machine learning nature of socially embedded systems makes the nature of algorithmic feeds very different from the analogies I read about in the complaints (para. 66-91). A review of existing solutions to mitigate possible risks from algorithmic feeds shows that they are dysfunctional, ineffective, and/or perfunctory (para. 92-103). Paragraphs 7-13 go over this logic in a bit more detail, including some implications, and the rest of the Declaration goes over it in much greater detail.

7. The **social media business model** consists of selling behavioral predictions (inducing liking, swiping, clicking, voting, etc.) to those who aim to induce such behavioral change (through commercial ads, political campaigns, etc.) (para. 20-25). The sold product (i.e., reliable trigger-response conditions) is fabricated by collecting and analyzing user data through an algorithmic feed of media generated or shared by other users (para. 14-17).

8. Machine learning is used (para. 26-32) to identify the optimal way to achieve the goal of engagement maximization (para. 49-52) based on **information provided by the user** (or data otherwise associated with the user or the user's device) (para. 67-73). Once the trigger-response conditions have been (machine) learned, the learned conduct is executed (during so-

called ‘inference’) to produce more and better predictive user data. The machine learning algorithm is the production worker operating the assembly line of the social media feed aimed at maximizing and optimizing the production of predictive data about the user and their behavior (para. 14-32).

9. The manufacturing of this prediction product is maximized by **maximizing engagement**, which is a goal that sometimes also correlates with user satisfaction (without being causally related) (para. 49-52). While different individuals have different capacities to engage, one way an (artificial) intelligence can achieve this goal (i.e., maximally extracting all engagement capabilities each individual user has to offer) is by achieving a state where the user cannot disengage anymore, which implies some degree of addiction. Addiction is a sufficient, though not necessary, condition for engagement maximization (para. 57). Pursuing engagement maximization while avoiding addiction would require an unprecedented amount of control and certainty, not only about the user, but especially over the mechanism of algorithmic recommendations, which is currently not practical (para. 58-65).

10. By definition, in socially embedded machine learning, a **lack of certainty** about and controllability of the constitution of the conduct and output are inherent and unavoidable (para. 26-32, 35-39, 41-46, 82-87). While the tools are new, the related questions have profound theoretical roots, going all the way back to the foundations of theoretical computer science (para. 36) and probability theory (para. 38), and are therefore well understood (para. 35). In practice, there is ample evidence that platform providers lack real certainty and control over their machine-learning recommender systems, as the very same proprietary algorithms routinely veer off course against their wishes and, not infrequently, even breach the companies’ self-imposed community guidelines (para. 41-46; 111). Generally, the extraordinary levels of complexity of both the computations and the live data in today’s recommender systems leave, as the only mechanism for certainty about their conduct and results, to run the same algorithmic system on the same data (para. 40). Hence, the recommendations made by the algorithmic production worker are expressions of this socially embedded algorithm in this very moment, not of any person or anything else, including the programmers who coded the underlying machine learning logic in the

first place or the executives who deploy them in the wild (para. 82-87).

11. Longstanding concepts from Information and Library Science, and Communication Science, help to clarify that many of the often-used **analogies** between machine learning based algorithmic feeds and librarians, newspaper editors, and traditional content moderation **are flawed and inadequate** (para. 66-91).

12. A review of existing solutions and internal platform communications confirms that alternatives to mitigate the downsides of algorithmic feeds **are dysfunctional** by design (whether through intent or neglect) (para. 95-98), **ineffective** even when operational (para. 99-100), and unlikely to improve in the foreseeable future without notable changes in the market structure, given the structural incentives that sustain them (para. 101-103).

13. Decades of research in media studies have firmly established that **media effects never uniformly affect all users** equally, but that users are differentially susceptible. Some groups, especially vulnerable groups (like minors with developing brains and minds), can be disproportionally affected, and within those groups, not all experience the same media effects, given differential susceptibility (para. 92). Given that parents have the main duty of care for their developing offspring, and generally the best insight into their child's unique differential susceptibility, it seems adequate and useful to consult them before exposing children to a business model with clearly uncertain conduct that has addiction potential as an almost unavoidable side effect of its declared objective function.

## OPINIONS

### I. A BUSINESS MODEL THAT DRIVES USER ENGAGEMENT

#### A. The Social Media Business Model (and the Role of Machine Learning)

14. Economic conceptualizations of **the social media business** divide models "into nonmonetized (organic posts) and monetized (advertisements) content".[1] The dominant theory of the latter conceptualizes the platform as ads matchmaker that acts as an intermediary that creates value by reducing transaction costs between two distinct groups of agents.[2] The platform sells the probability of a successful transaction and acts akin to a shopping mall, where feed slots are the equivalent of shelf space (for ads). It is very similar to any traditional advertising business and aims at ensuring that the right user finds the right ad to maximize the total value of the two-sided market. This matchmaking is fed by the complementary second side of the social media business model, namely the 'nonmonetized' organic feed.

15. While the placing of ads is the monetizable aspect of the business model, it is fueled by the organic feed which produces the required raw material in the form of so-called "prediction products"[4]. The feed produces the valuable **product of high-probability predictions** that a specific user will behave in a specific way at a specific time, a product that is systematically fabricated with collecting data on the user (the so-called "behavioral surplus"[4]). The organic feed is the assembly line through which this data solicited by user stimulation (triggers), then harvested (collected), processed (creating conditional probabilities of trigger>response conditions), and packaged (combinations of signals for various situations, etc.). The organic feed functions as the procurement mechanism (or extraction supply chain) in the production process of producing this product, which is then sold to advertising clients from the complementary matchmaking model. The dominant theory that conceptualizes the procurement function of the organic content goes under names like "Informational Capitalism"[3] or "Surveillance

[1] Aridor, G., Jiménez-Durán, R., Levy, R., & Song, L. (2024). The Economics of Social Media. *Journal of Economic Literature*, 62(4), 1422–1474. https://doi.org/10.1257/jel.20241743

[2] Rochet, J.-C., & Tirole, J. (2003). Platform Competition in Two-Sided Markets. *Journal of the European Economic Association,* 1(4), 990–1029.

Evans, D. S., & Schmalensee, R. (2016). *Matchmakers: The New Economics of Multisided Platforms*. Harvard Business Review Press.

[3] Cohen, J. E. (2019). *Between Truth and Power*. Oxford University Press.

Capitalism”[4], which sees “engagement as economic ideology”.[5]

16. Schematization of the **two complementary parts of the social media business model**

| | Matchmaking (two-sided market)<br>(e.g. Rochet & Tirole, 2003) | Prediction Market (data factory)<br>(e.g. Zuboff, 2019) |
|---|---|---|
| Seller | Platform as landlord selling shelf space for ad-matchmaking | Platform as seller of behavioral predictions, selling predictable behavioral change |
| Buyer | Advertisers buy attention | Advertisers buy behavioral change |
| Product | Shelf-space (feed slots) for match-making | Behavioral Predictions (conditional probabilities of trigger>response pairs) |
| Production | Maximize shelf-space to ensure attention supply to match ads-demand | Maximize data collection to derive behavioral conditional probabilities (trigger>response). |
| Role of algorithmic feed | Minimize search and transaction cost to match supply and demand | Maximize engagement to collect behavioral data to produce predictions |

17. Once “behavioural data…[is] declared as a proprietary behavioural surplus, [and] fed into advanced manufacturing processes known as ‘machine intelligence’, [to be] fabricated into prediction products that anticipate what you will do now, soon, and later…. these prediction products are traded in a new kind of marketplace that I call behavioural futures markets.”[4] As shown in Figure para. 17, behavioral prediction products are offered to ads-clients who can fill their shopping cart from **a portfolio of previously produced predictive conditions**.

[4] Zuboff, S. (2019). *The Age of Surveillance Capitalism: The Fight for a Human Future at the New Frontier of Power*. PublicAffairs.

[5] Richards, N., & Hartzog, W. (2024). Against Engagement. *Boston University Law Review*, 104(4), 1151.

Figure: paragraph 17




In these authentic screenshots, taken from a university lecture,[6] the client purchases predictive products to induce behavioral change in young women (18-21) within a 25 mile radius,

---

[6] Hilbert, M. (Director). (2023, July 24). DTSC: 1.6 Digital Trends (overview): AI, metaverse, blockchain & persuasive tech [Video recording]. https://www.youtube.com/watch?v=i5VEsOkxX6E
Hilbert, M. (Director). (2023, July 11). DTSC: 3.2 What is the social media business model?…and what could go wrong? [Video recording]. YouTube. https://www.youtube.com/watch?v=rbcbD9jsyQA

with certain demographic and behavioral characteristics ("Away from family", "Parents (up to 12 months)", "Cleaning and Maintenance Services", "Beauty Addict", and interested in "Cream liqueur", "Discount cards", and "Soap opera"), for which the product offering identified around 12 thousand potential targets. Being futures of predicted behavioral change, the client gets to choose the goal of the behavioral future ("get more messages", "get more calls", etc.), and can budget the purchased behavioral change (see Figure para. 17).

18. Maybe the most fundamental theorem of the foundational theory of "the digital", information theory,[7] holds that "Conditioning reduces entropy",[8] which means that knowing something, on average, provides information that helps pin something else down, as it reduces uncertainty.[9] This especially helps if both are related, but **it can never hurt to know more**,[8] hence, all data helps, and since it can never hurt, the default is to collect as much as possible.[10] All of this is very intuitive: the more one thing reveals about another, the better it can serve as a condition for sharpening probabilistic predictions. In terms of behavioral predictions, this comes down to the conditional trigger to sharpen the response probability. [redacted][11]

19. In the most predictive case, the predicted behavior is automatic, like the proverbial knee-jerk reaction after a conditional knee tap trigger. Such high-accuracy trigger-response pairs

---

[7] Shannon, C. E. (1948). A Mathematical Theory of Communication. *The Bell System Technical Journal*, 27, 379–423, 623–656. https://doi.org/10.1145/584091.584093

[8] Cover, T. M., & Thomas, J. A. (2006). Elements of Information Theory (2nd Edition). Wiley-Interscience. Specifically, Theorem 2.6.5 (Conditioning reduces entropy)(Information can't hurt) $H(X|Y) \leq H(X)$ (2.95) with equality if and only if X and Y are independent (one does not inform the other).

[9] See also Caves, C. (1990). Entropy and Information: How much information is needed to assign a probability? In W. H. Zurek (Ed.), Complexity, Entropy and the Physics of Information (pp. 91–115). Westview Press.

[10] Hilbert, M. (2016). Big Data for Development: A Review of Promises and Challenges. Development Policy Review, 34(1), 135–174. https://doi.org/10.1111/dpr.12142

Manyika, J., Chui, M., Brown, B., Bughin, J., Dobbs, R., Roxburgh, C., & Hung Byers, A. (2011). Big data: The next frontier for innovation, competition, and productivity (McKinsey Global Institute). McKinsey & Company. http://www.mckinsey.com/Insights/MGI/Research/Technology_and_Innovation/Big_data_The_next_frontier_for_innovation

Mayer-Schönberger, V., & Cukier, K. (2013). Big Data: A Revolution That Will Transform How We Live, Work, and Think. Houghton Mifflin Harcourt.

McAfee, A., & Brynjolfsson, E. (2012). Big Data: The Management Revolution. Harvard Business Review, (October). http://hbr.org/2012/10/big-data-the-management-revolution/ar

[11] Tom Cunningham Depo. Tr. 23:21-23; 31:9-12.

often have an evolutionary origin,[12] for example, when specific triggers predictably induce fear responses,[13] novelty-seeking,[14] or in-group favoritism,[15] which have evolved as survival features and are therefore very reliable (those without these automatic conditional responses did not survive long enough to produce sufficient offspring). In general, extreme triggers elicit more predictable responses, making them higher-value prediction products, because they are more deeply ingrained, often leading to the notorious "race to the bottom of the brain stem."[16] Hence, it is not surprising that algorithms found that high-quality predictions can be achieved when the user is in "moments of psychological vulnerability when they feel 'worthless,' 'insecure,' 'stressed,' 'defeated,' 'anxious,' 'stupid,' 'useless,' and 'like a failure'. Or to target them [13-17-year-olds] when they're worried about their bodies and thinking of losing weight. Basically, when a teen is in a fragile emotional state."[17] From a functional perspective, this is not driven by bad intentions being "Evil by Design,"[18] but rather arises as an unintended side effect of producing **high-quality trigger-response conditions**. Stress states are not necessary and not used exclusively,[19] but are sufficient and effective to achieve high-accuracy predictions, as evolution programmed these defense mechanisms to operate reliably (for more, see para. 63).

20. Advertising informed by targeted data-informed prediction products achieves

---

[12] Hilbert, M. (Director). (2023, July 11). DTSC: 3.4 The algorithmic discovery of our Cognitive Biases (what algorithms know about our future) [Video recording]. University of California, Davis. https://www.youtube.com/watch?v=EILEElx-UI0
Goodwin, B. C., Browne, M., & Rockloff, M. (2015). Measuring Preference for Supernormal Over Natural Rewards: A Two-Dimensional Anticipatory Pleasure Scale. *Evolutionary Psychology*, 13(4), 1474704915613914. https://doi.org/10.1177/1474704915613914

[13] Encyclopedic definition: Fear, uncertainty, and doubt. (2026). In Wikipedia. https://en.wikipedia.org/wiki/Fear,_uncertainty,_and_doubt

[14] Encyclopedic definition: Novelty effect. (2025). In Wikipedia. https://en.wikipedia.org/w/index.php?title=Novelty_effect&oldid=1320561122

[15] Encyclopedic definition: In-group favoritism. (2025). In Wikipedia. https://en.wikipedia.org/w/index.php?title=In-group_favoritism&oldid=1328968049

[16] Harris, T. (2019, June 25). Optimizing for engagement: Understanding the use of persuasive technology on internet platforms [Testimony]. U.S. Senate Committee on Commerce, Science, & Transportation. https://www.commerce.senate.gov/2019/6/optimizing-for-engagement-understanding-the-use-of-persuasive-technology-on-internet-platforms

[17] From Facebook Whistleblower Wynn-Williams, S. (2025). Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism. Flatiron Books. E.g. https://stevenrosenbaum.medium.com/emotional-targeting-and-teens-ca1f650b6c06

[18] Nodder, C. (2013). Evil by Design: Interaction Design to Lead Us into Temptation. John Wiley & Sons.

[19] A Meta-internal survey of 1,149 teens (2023-2024) showed that for the 223 teens who often felt bad about their bodies after viewing Instagram, "eating disorder adjacent content" made up 10.5% of what they saw on the platform (3.3% for others). Horwitz, J. (2025, October 20). Exclusive: Instagram shows more 'eating disorder adjacent' content to vulnerable teens, internal Meta research shows. Reuters. https://www.reuters.com/business/instagram-shows-more-eating-disorder-adjacent-content-vulnerable-teens-internal-2025-10-20/

higher conversion rates into a desired action than untargeted placements.[20] The **price of these ‘prediction products’** in the $275 billion global auction marketplace of ‘behavioral futures markets’ is set by highly competitive market dynamics, often through auctions, where accuracy, precision, and effectiveness indicators inform the pricing mechanism. When Facebook boasts with a 0.9% “CTR (Click-Through-Rate)” and Meta's new sequence learning system achieves “2-4% more conversions on select segments” through improved prediction algorithms (quantifying who has completed a predicted action),[21] such metrics directly feed into billions of real-time auctions daily that price each impression based on predicted value. Armed with such metrics, social media platforms do not simply sell space to the highest bidder; instead, they utilize sophisticated auction mechanisms (going under obscure technical names like Vickrey-Clarke-Groves (VCG) or Generalized Second-Price (GSP) protocols), that rank advertisements based on their total expected value rather than price alone.[22] For example, this valuation can be calculated by multiplying an advertiser's monetary bid by a machine-learning generated probability, specifically the predicted Click-Through Rate (pCTR), which represents the statistical likelihood of a specific user engaging with the content.[23] Consequently, the actual price an advertiser pays (often measured as the Customer Acquisition Cost (CAC)) is determined endogenously by the platform's ability to accurately forecast human behavior.[24] These highly competitive and price-driven mechanisms ensures that the market is driven by quantitative metrics and intense

---

[20] Beales, H. (2010). The value of behavioral targeting. Network Advertising Initiative, 1(2010).
Boerman, Sophie C., Sanne Kruikemeier, and Frederik J. Zuiderveen Borgesius. “Online behavioral advertising: A literature review and research agenda.” *Journal of Advertising* 46.3 (2017): 363-376.
Korganbekova, M., & Zuber, C. (2024). Balancing User Privacy and Personalization.

[21] Gardner, M. (2023, February 10). *Social Advertising Benchmarks for 2025*. Brafton. https://www.brafton.com/blog/social-media/social-advertising-benchmarks/
Reddy, S., Beg, H., Overwijk, A., & O’Byrne, S. (2024, November 19). Sequence learning: A paradigm shift for personalized ads recommendations. *Engineering at Meta*. https://engineering.fb.com/2024/11/19/data-infrastructure/sequence-learning-personalized-ads-recommendations/

[22] Edelman, B., Ostrovsky, M., & Schwarz, M. (2007). Internet Advertising and the Generalized Second-Price Auction: Selling Billions of Dollars Worth of Keywords. American Economic Review, 97(1), 242–259. https://doi.org/10.1257/aer.97.1.242
Varian, H. R., & Harris, C. (2014). The VCG Auction in Theory and Practice. American Economic Review, 104(5), 442–445. https://doi.org/10.1257/aer.104.5.442

[23] He, X., Pan, J., Jin, O., Xu, T., Liu, B., Xu, T., Shi, Y., Atallah, A., Herbrich, R., Bowers, S., & Candela, J. Q. (2014). Practical Lessons from Predicting Clicks on Ads at Facebook. Proceedings of the Eighth International Workshop on Data Mining for Online Advertising, 1–9. https://doi.org/10.1145/2648584.2648589

[24] Naumov, M., Mudigere, D., Shi, H.-J. M., Huang, J., Sundaraman, N., Park, J., Wang, X., Gupta, U., Wu, C.-J., Azzolini, A. G., Dzhulgakov, D., Mallevich, A., Cherniavskii, I., Lu, Y., Krishnamoorthi, R., Yu, A., Kondratenko, V., Pereira, S., Chen, X., … Smelyanskiy, M. (2019). Deep Learning Recommendation Model for Personalization and Recommendation Systems (No. arXiv:1906.00091). arXiv. https://doi.org/10.48550/arXiv.1906.00091

computational competition, where the true economic asset being traded is the platform's granular certainty about a user's future actions.

21. In this business model, the **importance of information provided by the user**, or data otherwise associated with the user or the user's device, was evidenced by a natural experiment that happened when Apple's iOS 14.5 update in April 2021 drastically limited what advertisers and app developers can track in terms of user activity on iPhones. Facebook's conversion rate, which quantifies who has completed a predicted action, dropped by about 6%, cost-per-mile (ad-impression views) increased by some 22%, and Facebook's daily average revenue was down by some 35%.[25]

22. While all of this nomenclature might seem overwhelming and while there are many more details that could be elaborated in these sophisticated pricing models, the main point is that the logic is very different from "speaking and listening in the modern public square, and otherwise exploring the case realms of human thought and knowledge"[26] for their own sake and end. The combination of the data procurement process of the organic feed and the sold prediction production are incorporated as publicly traded corporations with a **fiduciary duty to maximize profit**, mainly tracked by Average Revenue Per User (ARPU). Shareholders may sue these corporations for breaching their fiduciary duty to maximize profits. Meta's ARPU in North America is around $70 every three months, while Snapchat and Pinterest are around $10 (global ARPU around $2-3).[27]

23. While the advertising content on a feed is a minority of content on a feed (2.4% for TikTok, some 21% for Facebook and Instagram, with peak saturation detected at 42%),[28] it is the

[25] Mayville, L. (2021). Struggling With Facebook Ads Since iOS 14? Read This. https://insense.pro/blog/all-you-need-to-know-about-the-ios-14-update-for-facebook-ads

[26] TikTok vs. Bonta Case 3:25-cv-09789, Complaint for Declaratory and Injunctive Relief, at ¶¶ 39, 89.

[27] Kiplangat, B. & Dudkiewicz, L. (2026, Jan. 22). 75+ Latest Meta Statistics & Facts for 2026. Cropink. https://cropink.com/meta-statistics

Elad, B. (2025, Mar. 10). Snapchat Statistics by Revenue, User and Facts. Electro IQ. https://electroiq.com/stats/snapchat-statistics/

Pinterest. (2025, Feb. 6). Pinterest Announces Fourth Quarter and Full Year 2024 Results, Delivers First Billion Dollar Revenue Quarter. https://investor.pinterestinc.com/news-and-events/press-releases/press-releases-details/2025/Pinterest-Announces-Fourth-Quarter-and-Full-Year-2024-Results-Delivers-First-Billion-Dollar-Revenue-Quarter/default.aspx

[28] PPAI Media. (2020). Study Highlights Frequency Of Ads On Popular Social Media Platforms. PPAI - Promotional Products Association International. https://www.ppai.org/media-hub/study-highlights-frequency-of-ads-on-popular-social-media-platforms/

**cash cow**, and, as I read in the complaints, platforms are treating it differently and much more carefully than the organic feed, which is rather part of the production process, not the final sale. For example, I read that "TikTok may promote specific content… Employees hand-select individual video categories that they want to promote and submit a request to do so. Each request to promote a video in the United States is manually reviewed by a U.S.-based reviewer."[26]

24. On the contrary, the 'organic feed' that serves as the data procurement vehicle does not receive similar personalized human supervision. It operates like an automated plant manager pulling raw posts into a digital assembly line, routing them through queues, batches, and quality checks (engagement metrics) to maximize throughput. Just like the inventor of scientific management, Frederick Taylor, timed workers with stopwatches in Steel plants in the 1880s and 1890s, recommender systems instrument, sort, and optimize the circulation of content across **a data factory** floor in a scientific management for optimized information flow. Machine learning gives life to these managerial processes in real-time.

25. The raw material (content) of this (so-called) 'organic feed', which serves as the data procurement channel, consists of media generated or shared by users. Hence, the users themselves function as the suppliers of the raw material (videos, text, images), and the platform pays them in fiat currency (YouTube's AdSense generates MrBeast some $290,000 to $580,000 per video)[29] and/or 'reach' (as, for example, MrBeast receives another $2.5-3M from brands per video).[29] The platform orchestrates the feed that induces consumers to produce content for each other, organizing this influx of raw material to maximize the extraction of data through engagement maximization (watching, pausing, clicking, swiping, scrolling, etc.). Market dynamics can naturally shape content production as well, as content creators might start to produce content that meets the goals of the recommender algorithms (which are tasked with producing more behavioral data). From the perspective of the platform, it is useful that a diverse array of organic content (ranging from political rants, over education, to cat videos) continuously tests the user's responsiveness to different stimuli (hence completing an ever-growing database of

[29] Monroe, S. (2025, November 26). How Much Does MrBeast Make Per Video in 2025? The Shocking Truth Revealed. Https://Kartikahuja.Com/. https://kartikahuja.com/how-much-does-mrbeast-make-per-video/

conditional probabilities for trigger>response pairs (para. 18)) and that constantly novel and widely varied user-generated content ensures that the 'sensor array' remains active to generate high-fidelity signals.

### B. The Machine Learning Paradigm (and its Blackbox Conduct)

26. The main workers in the data production factory that sells behavioral futures are **machine learning (ML) algorithms**. They are the platform mechanics that generate and execute the platform's artificially intelligent conduct. The generation of this conduct is known as 'learning' (i.e. 'machine learning' (ML)), while the execution of the gained knowledge is called 'inference' in computer science lingo. Both matter, but the priority is inverted from the traditional knowledge paradigm, which conventionally focuses on knowledge execution, while the machine learning paradigm turns the priorities on its head by emphasizing the automation of 'learning'.[30]

27. During "knowledge execution" (see upper model in Figure para. 28), the two inputs are data & a recipe/algorithm/conduct, while the output is the achievement of an intended goal. In one example in the Figure, data are numbers (2, 1, 2, 3) and the recipe of what to do with them is multiplication (…*…*…*…). In the other example, the data is provided by several hours of driving experience in a real landscape, the recipe/algorithm/conduct is provided by a driving instructor, and the aspired goal output is 'driving'. This is how humans learn (in school) and how AI was originally conceived: in **the traditional paradigm**, algorithms were sets of rigid rules, much like the instructions of a driving instructor, that were programmed to transform data.[31] This called "explicit programming",[32] in general computer science, and "symbolic AI"[33] in the application of AI (often also referred to as "Good Old-Fashioned AI", GOFAI)[34]. This involves

---

[30] Hilbert, M. (Director). (2023, July 11). DTSC: 2.5 Artificial Intelligence (AI): the Machine Learning paradigm [Video recording]. YouTube. https://www.youtube.com/watch?v=m5JiNWV88To
Goodfellow, I., Bengio, Y., & Courville, A. (2016). Deep Learning. MIT Press.
Domingos, P. (2015). The Master Algorithm: How the Quest for the Ultimate Learning Machine Will Remake Our World. Basic Books.
Mitchell, T. (1997). Machine Learning. McGraw-Hill Science/Engineering/Math.
[31] Dhar, V. (2024). The Paradigm Shifts in Artificial Intelligence. Commun. ACM, 67(11), 50–59. https://doi.org/10.1145/3664804
[32] Traditional Programming vs Machine Learning. GeeksforGeeks. https://www.geeksforgeeks.org/machine-learning/traditional-programming-vs-machine-learning/
[33] Symbolic artificial intelligence: https://en.wikipedia.org/wiki/Symbolic_artificial_intelligence
[34] Good Old-Fashioned AI: https://en.wikipedia.org/wiki/GOFAI
Haugeland, J. (1989). Artificial Intelligence: The Very Idea. MIT Press.

developers writing precise instructions and rules for a computer to follow, based on predefined logic. It's deterministic and relies on human-defined steps, making it suitable for tasks with clear, fixed requirements. Following this traditional paradigm, humans created algorithms to help identify and delete content (e.g., "If post contains 'X', delete it"), in an exercise of editorial judgment. The explicitly programmed algorithm implements human beings' inherently expressive choice. In this traditional paradigm, humans build rules into those algorithms that they believe will best serve their purposes and such GOFAI algorithms simply act as a tool to implement a conscious human choice. The programmer knew exactly what the rules were and had certainty over how it would process data to achieved a desired output (like a driver hitting the brakes or an intentional editor selecting articles).

28. AI's Machine Learning (ML) Paradigm turns the Knowledge Process on its head[30]

Figure: paragraph 28




29. During "Knowledge Learning" (see lower model in Figure para. 28) the inputs are data & the intended end goal of the transformation (in computer science called the 'cost/loss function' (to be minimized) or 'objective/reward function' (to be maximized)), while the output is a recipe/algorithm/conduct. In the traditional paradigm, the algorithm is learned by a human (through the ingenuity of a human programmer, or a textbook, etc.). The machine learning (ML)

paradigm automated this 'Knowledge Learning' process, which can now be achieved at the proverbial 'pressing of a button'.[35] The programmer designs a mechanistic model to optimize for the goal based on the given data, and this model learns itself how to achieve that goal, aka, the 'machine learns' (referring to the computational system or hardware/software environment that executes the learning process), or, more precisely, the 'model learns' (referring to the abstract, mathematical, or algorithmic construct that represents the learned patterns from data). Hence, 'machine learning' is the 'master algorithm': **the algorithm to compute the best algorithm**.[36] In other words, it's a recipe/procedure/conduct, to calculate the optimized recipe/procedure/conduct. Following our examples, one gives it numbers (2, 1, 2, 3) and the goal to combine them to compute 12, and it comes up with a procedure ((…+…)^…+…). Or one gives the goal 'driving' and lets an ML process lots of data (driving for years around San Francisco) and the result is a recipe/algorithm/conduct to drive a car autonomously (see Figure para. 28). By the definition of 'machine learning', the programmer can never predict which recipe/algorithm/conduct is learned[37] (otherwise one would not need machine learning and could program the algorithm oneself, which would be the traditional paradigm of knowledge execution, GOFAI[34]). For example, one could give the simple objective function to remove hateful content (e.g. as a prompt to a ChatGPT-like system), which implies (per the definition of using machines that learned for themselves) that a platform's owners hand the reins to an AI tool to determine what is 'hateful' and should be removed. The training goal is a conscious human choice, similar to the objective function of "driving safely without scratching dad's car", and the data selection is a conscious human choice (similar to choosing to learn to drive in a city or the country-side), but the implementation details of the resulting conduct are self-learned by the one in the driver seat, which in this case is the machine learning algorithm (the programmer who set up the ML has as little control over the resulting conduct as the parent who selected the practice route and gave the

[35] Ng, Andrew. Machine Learning. Stanford University, 2012. Coursera, www.coursera.org/learn/machine-learning . Online course.

[36] Domingos, P. (2015). *The Master Algorithm: How the Quest for the Ultimate Learning Machine Will Remake Our World* (1st edition). Basic Books.

[37] Austin, M., & Levy, M. (2025). Speech certainty: Algorithmic speech and the limits of the First Amendment. *Stanford Law Review*, 77, 1.

car to the 16-year-old learner). This results in the notorious blackbox nature of ML algorithms.

30. Once training is done and a satisfactory (optimized) algorithm is found, this obtained recipe/algorithm/conduct can then be employed to execute knowledge (called ‘**inference**’ in computer science) (see Figures in para. 31). The Figure represents the big-picture social media case in which ML recommender algorithms are trained on user data to optimize the overall objective function of complying with the corporate fiduciary responsibility of profit maximization (see para. 22). Once the recipe/algorithm/conduct is learned by ML, it is executed during inference to infer which content to include in a feed to achieve the goal of maximizing profit for shareholders.

31. After ML training learns new procedures, they are applied during inference.[38]

Figure: paragraph 31




32. Summarizing the presentation of Figures para. 28 and 31, one more time in the words of an employee of Facebook’s Responsible AI team: [redacted]

[38] Hilbert, M. (Director). (2023, July 11). DTSC: 3.2 What is the social media business model?…and what could go wrong? [Video recording]. YouTube. https://www.youtube.com/watch?v=rbcbD9jsyQA

[redacted].[39] (emphasis added)

33. While a bit technical, an important fact to emphasize that all machine learning training works according to this logic. In ML, the two controllable inputs are data and 'goals', which, in computer science, are called the 'cost/loss function' (to be minimized) or 'objective/reward function' (to be maximized), while the details of the resulting output are produced, not deterministically prescribed or controlled (this matters, as it becomes relevant later, see para. 83). Computer science distinguishes between three main learning paradigms of learning from data to achieve 'goals', i.e. **supervised learning, reinforcement learning** and **unsupervised learning**.[40] In so-called supervised learning, the goals are labels, such as categories ('motorcycles', 'stop signs', 'user X's face') or continuous values (prices, temperatures), and ML training consists in discovering ways to label data.[41] In so-called reinforcement learning, the goals are concrete objectives, such as 'points earned' or 'penalty avoided', and training consists in discovering ways to maximize an expected cumulative score over time (such as when ML learns to play a videogame or the game of Go).[42] Even in so-called 'unsupervised' learning,

---

[39] Joshua Simons Depo. Tr. 20:4-21:14.

[40] Hilbert, M. (Director). (2023, July 11). DTSC: 2.5 Artificial Intelligence (AI): the Machine Learning paradigm [Video recording]. YouTube. https://www.youtube.com/watch?v=m5JiNWV88To

[41] Lecun, Y., Bottou, L., Bengio, Y., & Haffner, P. (1998). Gradient-based learning applied to document recognition. Proceedings of the IEEE, 86(11), 2278–2324. https://doi.org/10.1109/5.726791

Krizhevsky, A., Sutskever, I., & Hinton, G. E. (2012). ImageNet Classification with Deep Convolutional Neural Networks. In F. Pereira, C. J. C. Burges, L. Bottou, & K. Q. Weinberger (Eds.), Advances in Neural Information Processing Systems 25 (pp. 1097–1105). Curran Associates, Inc. http://papers.nips.cc/paper/4824-imagenet-classification-with-deep-convolutional-neural-networks.pdf

[42] Mnih, V., Kavukcuoglu, K., Silver, D., Rusu, A. A., Veness, J., Bellemare, M. G., Graves, A., Riedmiller, M., Fidjeland, A. K., Ostrovski, G., Petersen, S., Beattie, C., Sadik, A., Antonoglou, I., King, H., Kumaran, D., Wierstra, D., Legg, S., & Hassabis, D. (2015). Human-level control through deep reinforcement learning. Nature, 518(7540), 529–533. https://doi.org/10.1038/nature14236

(continued…)

which seems to suggest that there is no guidance, the goals are predefined. The ML designer chooses the family of models, structures, or representations that are to be pursued to transform the data, and training consists of discovering these structures within unlabeled data. For example, when using unsupervised ML to sort a big music library, the goal could be a low-dimensional PCA representation (generating a 'greatest-hits' mixtape), sparse coding (describing each song with a few tags, like 'jazzy'), independent ICA components (identifying the individual instruments used in each song), or k-means clusters (binning songs into genres), etc. The 'unsupervised' part just means there are no predefined labels, but there's definitely still a predetermined mathematical objective or model family chosen as a general 'goal' by a human who is responsible for setting up the ML process. There are mixed methods, such as self-supervised learning (common in Large Language Models (LLMs), where the model predicts parts of the data from other parts), but that does not change the fact that someone has given a 'goal' ('objective/reward function' or 'cost/loss function') to the machine learning model.

### C. ML's Blackbox Conduct (and Its Inherent Uncertainty)

34. In the words of the former Vice President of Advertising Technology of Facebook: "[redacted]"[43]

#### 1. Engineering Perspectives on ML's Inherent Uncontrollability

35. From a practical implementation perspective, the opacity and unpredictable conduct of machine learning-based systems stem from the interplay of high-dimensional optimization geometry, representational complexity, and recursive environmental dynamics.[44] While often framed as temporary engineering deficits, these characteristics reflect several profound computational challenges. Among them, the **ML-blackbox phenomenon** arises from the stochastic optimization of non-convex loss landscapes, which renders trained models path-

Silver, D., Schrittwieser, J., Simonyan, K., Antonoglou, I., Huang, A., Guez, A., Hubert, T., Baker, L., Lai, M., Bolton, A., Chen, Y., Lillicrap, T., Hui, F., Sifre, L., van den Driessche, G., Graepel, T., & Hassabis, D. (2017). Mastering the game of Go without human knowledge. Nature, 550(7676), 354–359. https://doi.org/10.1038/nature24270

[43] Brian Boland Depo. Tr. 74:18-76:16.

[44] Burrell, J. (2016). How the machine 'thinks': Understanding opacity in machine learning algorithms. Big Data & Society, 3(1), 2053951715622512. https://doi.org/10.1177/2053951715622512

Xu, B., & Yang, G. (2025). Interpretability research of deep learning: A literature survey. Information Fusion, 115, 102721. https://doi.org/10.1016/j.inffus.2024.102721

dependent and underspecified, making the result highly dependent and sensitive on their initialization[45] (like a ball rolling down the hill a different path every time in a highly unpredictable manner). Furthermore, these systems operate within non-stationary environments characterized by feedback loops, dynamically changing the stationarity used for prediction, proactively shaping the distribution it attempts to predict, which is known as Lucas' critique in Economics[46] and performative prediction in Computer Science[47] (like drivers in a traffic jam who predict open routes and reroute, only to find that the collective adaptation (including their own) now clogged those, invalidating their original prediction) (currently studied mitigation strategies require strong assumptions that do not hold in all cases of open, adversarial social environments). Architecturally, blackbox opacity is driven by the use of distributed, polysemantic representations, where individual neurons encode unrelated concepts in superposition to maximize channel capacity[48] (like finding Santa Claus' sack without Santa, and realizing that, besides being unable to recover the why and where to of each gift (the original intentions, reasons, or logical origins), Santa also used complex compression that fused them together in a meshed and inextricable lump, just to save himself some space in the small sack). This is compounded by the compositional depth required for high performance, which necessitates a

---

[45] D'Amour, A., Heller, K., Moldovan, D., Adlam, B., Alipanahi, B., Beutel, A., Chen, C., Deaton, J., Eisenstein, J., Hoffman, M. D., Hormozdiari, F., Houlsby, N., Hou, S., Jerfel, G., Karthikesalingam, A., Lucic, M., Ma, Y., McLean, C., Mincu, D., … Sculley, D. (2022). Underspecification Presents Challenges for Credibility in Modern Machine Learning. Journal of Machine Learning Research, 23(226), 1–61.

Arora, S., Ge, R., Neyshabur, B., & Zhang, Y. (2018). Stronger Generalization Bounds for Deep Nets via a Compression Approach. Proceedings of the 35th International Conference on Machine Learning, 254–263. https://proceedings.mlr.press/v80/arora18b.html

Garipov, T., Izmailov, P., Podoprikhin, D., Vetrov, D., & Wilson, A. G. (2018). Loss Surfaces, Mode Connectivity, and Fast Ensembling of DNNs (No. arXiv:1802.10026). arXiv. https://doi.org/10.48550/arXiv.1802.10026

[46] Lucas Jr, R. E. (1976). Econometric policy evaluation: A critique. Carnegie-Rochester Conference Series on Public Policy, 1, 19–46. https://doi.org/10.1016/S0167-2231(76)80003-6

Hilbert, M. (Director). (2014). Big Data requires Big Visions for Big Change [Video recording]. TEDxUCL, x=independently organized TED talks. www.youtube.com/watch?v=UXef6yfJZAI

[47] Perdomo, J., Zrnic, T., Mendler-Dünner, C., & Hardt, M. (2020). Performative Prediction. Proceedings of the 37th International Conference on Machine Learning, 7599–7609. https://proceedings.mlr.press/v119/perdomo20a.html

[48] Olah, C. (2023). Interpretability dreams. Transformer Circuits Thread. https://transformer-circuits.pub/2023/interpretability-dreams/index.html

Olah, C., Cammarata, N., Schubert, L., Goh, G., Petrov, M., & Carter, S. (2020). Zoom in: An introduction to circuits. Distill, 5(3), e00024-001.

Elhage, N., Hume, T., Olsson, C., Schiefer, N., Henighan, T., Kravec, S., Hatfield-Dodds, Z., Lasenby, R., Drain, D., Chen, C., Grosse, R., McCandlish, S., Kaplan, J., Amodei, D., Wattenberg, M., & Olah, C. (2022). Toy Models of Superposition (No. arXiv:2209.10652). arXiv. https://doi.org/10.48550/arXiv.2209.10652

level of function complexity that defies simple decomposition[49] (like an expert scholar synthesizing the answer to a complex question from a deep, interconnected web based on the thousands of sources previously digested over decades, without being able to provide a simple linear citation of sources for their reasoning). Other reasons for ML's blackbox nature are its distributed representations,[50] which smear meaning across the entire network while making individual neurons and weights uninterpretable (there is no single, local 'grandmother cell' neuron), and the undeniable fact that there is no unique 'true' mechanistic explanation (it's more like trying to decipher an alien signal, or an unknown ancient scripture whose complete context has been lost, or a psychological Rorschach test, that has multiple plausible, and internally consistent interpretations, without a unique truth).[51]

### 2. Computer Science Perspectives on ML's Inherent Unpredictability

36. Deepening the crucial discussion on a more theoretical and formal plane, the uncontrollable and unpredictable result of the semantic properties of complex ML algorithms has **deep theoretical roots in computer science**, going all the way back to its founding fathers, who established fundamental limits on predicting algorithmic behavior through static analysis. Turing proved in 1936[52] that no general procedure can determine whether an arbitrary program will halt or run indefinitely, concluding that "we have no general process for doing this in a finite number of steps." In the same year, Church[53] independently demonstrated that certain computational facts "will not be provable" in any system of logic of any known type. In 1953, Rice[54] generalized these results, proving that all non-trivial semantic properties of programs (properties concerning what programs compute, like what an algorithm recommends to whom and why, rather than the syntax of how they are written) are undecidable for Turing-complete systems. Crucially, these

---

[49] Mhaskar, H., Liao, Q., & Poggio, T. (2017). When and Why Are Deep Networks Better Than Shallow Ones? Proceedings of the AAAI Conference on Artificial Intelligence, 31(1). https://doi.org/10.1609/aaai.v31i1.10913

[50] Hinton, G. E. (1986). Learning Distributed Representations of Concepts. Proceedings of the Annual Meeting of the Cognitive Science Society, 8(0). https://escholarship.org/uc/item/79w838g1

[51] Méloux, M., Maniu, S., Portet, F., & Peyrard, M. (2025). Everything, Everywhere, All at Once: Is Mechanistic Interpretability Identifiable? (No. arXiv:2502.20914). arXiv. https://doi.org/10.48550/arXiv.2502.20914

[52] Turing, A. M. (1936). On computable numbers, with an application to the Entscheidungsproblem. Proceedings of the London Mathematical Society, s2-42(1), 230–265.

[53] Church, A. (1936). An unsolvable problem of elementary number theory. American Journal of Mathematics, 58(2), 345–363.

[54] Rice, H. G. (1953). Classes of recursively enumerable sets and their decision problems. Transactions of the American Mathematical Society, 74(2), 358–366.

impossibility results apply only to systems capable of universal computation, while simpler finite-state machines and bounded-memory systems retain decidable behavioral properties. Modern neural network architectures that are commonly found in recommender systems can cross this threshold under certain assumptions: in 1995, Siegelmann and Sontag[55] showed that recurrent neural networks with rational weights are Turing-complete, and in 2021, Pérez et al.[56] established that transformer architectures (underlying today's generative AI) achieve Turing-completeness through their attention mechanisms, which are heavily employed in today's recommender systems. However, these theoretical proofs assume idealized conditions (unbounded precision arithmetic, unlimited memory, and unrestricted computation time) that differ from deployed systems operating under finite-precision weights (e.g., float32 or quantized int8), bounded context windows, and strict latency constraints. Deployed recommender systems have an astronomically large, but not unbounded state space. Still, in principle, for the idealized architectures, Rice's theorem applies directly: any non-trivial semantic property is formally undecidable. For deployed systems, while formal undecidability does not strictly hold, the state spaces involved (potentially 2^(billions) of configurations) render exhaustive verification computationally intractable, and the relevant barrier shifts from logical impossibility to practical infeasibility. There is no general algorithm that can inspect the architecture and its weights and answer questions like 'Does this model always recommend safe content?' or 'Will this model ever enter a feedback loop of extremism?' For idealized systems, this represents a fundamental limit from theoretical computer science; for deployed systems, it reflects computational intractability that scales beyond any foreseeable verification capacity (while verification methods for neural networks exist (such as reachability analysis, abstract interpretation, and certification under bounded perturbations), these provide guarantees only for restricted properties, constrained input domains, or specific architectures, not for arbitrary semantic properties across unconstrained deployment conditions).

---

[55] Siegelmann, H. T., & Sontag, E. D. (1995). On the computational power of neural nets. Journal of Computer and System Sciences, 50(1), 132–150.

[56] Pérez, J., Barceló, P., & Marinkovic, J. (2021). Attention is Turing-complete. Journal of Machine Learning Research, 22(75), 1–35.

Wolfram's more recent explorations[57] add a speed dimension to it, as he proposed that many such systems exhibit "computational irreducibility," meaning no computational shortcut can predict their behavior faster than direct simulation. While this concept lacks the formal precision of classical undecidability results, it captures an important intuition for systems exhibiting sufficiently complex dynamics: the step-by-step execution of the system over time serves as its own most efficient prediction. These theoretical considerations matter because algorithmic architectures that stay at levels of complexity well below the Turing-completeness threshold (such as chronological ordering, popularity-based scoring, or fixed collaborative filtering rules) retain behavioral properties that are much more clearly decidable and predictable. For these simpler systems, questions about ranking outcomes, fairness constraints, and content policies can in principle be verified through static analysis or bounded model checking, providing stronger guarantees about predictable behavior (at the cost of representational power).

### 3. Data Science Perspectives on ML's Inherent Unpredictability

37. In addition to the uncertainty arising from the algorithmic nature of ML's predictability limits, social media feeds are directed in real time by unpredictable user data. The result is very different than when choosing from a static, closed-off database. The difference is analogous to selecting a photograph from a storage pile in the basement or taking real-time pictures of a changing landscape; between observing fish in an aquarium or trying to make predictions while scuba diving in the ocean; or between an artist selecting the setlist of their existing songs for a concert evening, or trying to predict the unscripted concert encore medley spontaneously improvised based on the reactions of the rallied up crowd in the moment. Even if the selection criteria would be intrinsically self-informed, coded up in an entirely self-guided in a controllable manner, and follow a "Good Old-Fashioned" recipe book[34] to take deterministic decisions according to a set script, like choosing what to put on a dinner plate from a lavish buffet according to one's usual habits, the final plate contents still become unpredictable if the buffet itself is being continually reshaped in real time by potluck guests bringing (and removing) dishes.

[57] Wolfram, S. (1985). Undecidability and intractability in theoretical physics. Physical Review Letters, 54(8), 735–738. https://doi.org/10.1103/PhysRevLett.54.735
Wolfram, S. (2002). A New Kind of Science. Wolfram Media.

The technical terminology is that social media feeds are **social algorithms**. "Today's social algorithms are so complex that no single person can fully understand them… looking at the algorithms will not yield much insight, because the interplay of social algorithms and behaviors yields patterns that are fundamentally emergent. These patterns cannot be gleaned from reading code."[58] Even if "the code might be deterministic, [the] social algorithms adjust their chosen behavior in real time to human dynamics, which makes their behavior as unpredictable the social phenomena it draws from".[59] As such, feeds have agentic properties that "exhibit inherent unpredictability: they demonstrate emergent behaviors that are impossible to predict with precision—even by their own programmers"[60] and "can also demonstrate novel behaviours through their interaction with the world and other agents that are impossible to predict with precision… [because] when the environment is changing—perhaps as a result of the algorithm itself—anticipating and analysing behaviour is made much harder."[61]

38. The inherently uncertain outputs of 'social algorithms' have their **deep theoretical roots in data science**, going all the way back to the founding fathers of modern probability theory. In the formal elaborations of para. 36, I discussed the unpredictability of the output properties, asking how to characterize the transformation and verify structural properties of the output. The output could be chronologically sorted, ranked by popularity, or, in a simple case, the algorithm could simply delete all input as a 'recommendation' to get offline (a very non-complex computation ($X \rightarrow 0$), and a highly predictive outcome). Here, I add the unpredictability of the output content, like a video about cute cats or eating disorders. This additional unpredictability arises from the Kolmogorov complexity of input data, the length of the shortest program that produces that data.[62] Social media feeds exemplify high-complexity data streams: user

[58] Lazer, D. (2015). The rise of the social algorithm. Science, 348(6239), 1090–1091. https://doi.org/10.1126/science.aab1422

[59] Hilbert, M., Liu, B., Luu, J., & Fishbein, J. (2019). Behavioral Experiments With Social Algorithms: An Information Theoretic Approach to Input–Output Conversions. Communication Methods and Measures, 0(0), 1–20. https://doi.org/10.1080/19312458.2019.1620712

[60] Rahwan, I., & Cebrian, M. (2018, March 29). Machine Behavior Needs to Be an Academic Discipline. Nautilus. https://nautil.us/machine-behavior-needs-to-be-an-academic-discipline-237022/

[61] Rahwan, I., Cebrian, M., Obradovich, N., Bongard, J., Bonnefon, J.-F., Breazeal, C., Crandall, J. W., Christakis, N. A., Couzin, I. D., Jackson, M. O., Jennings, N. R., Kamar, E., Kloumann, I. M., Larochelle, H., Lazer, D., McElreath, R., Mislove, A., Parkes, D. C., Pentland, A., … Wellman, M. (2019). Machine behaviour. Nature, 568(7753), 477. https://doi.org/10.1038/s41586-019-1138-y

[62] Kolmogorov, A. N. (1965). Three approaches to the quantitative definition of information. Problems of Information

(continued…)

interactions are neither periodic, stationary, nor bounded, and the aggregate behavior of different users generates input sequences with high Kolmogorov complexity relative to tractable prediction models. This complexity does not even need to be produced by large networks with millions of users: a small network with 25 nodes can have more than $10^{90}$ possible configurations of possible pairwise connections ($2^{25x24/2}$), which exceeds the estimated number of atoms in the universe by far ($10^{80}$). It is important to note that high Kolmogorov complexity concerns the incompressibility of exact sequences, which does not preclude probabilistic prediction that captures certain statistical aspects of the underlying process.[63] Still, statistical approximations are approximations, and not exact replication,[64] always leaving part of the dynamic unexplained (aka 'noise', 'prediction error', or 'entropy rate', etc.).[65] Highly unpredictable input data limits exact prediction of specific outputs if the complexity is not reduced by the computation[66], which requires a quite simple computational transformation from input to output (such as the deletion of all input). Probabilistic or distributional prediction may still be feasible[63-65] (predicting aggregate engagement rates or content category distributions), but point predictions of specific recommendations to specific users remain infeasible when input unpredictability is high.

### 4. Social Media Perspectives on Inherent Unverifiability

39. Given the practical (para. 35) and theoretical (para. 36 and para. 38) limitations of controlling and predicting ML-based conduct, "(t)he practical way forward consists in treating

Transmission, 1(1), 1–7.

Chaitin, G. J. (1966). On the length of programs for computing finite binary sequences. Journal of the ACM, 13(4), 547–569.

[63] Crutchfield, J. P. (2012). Between order and chaos. Nature Physics, 8(1), 17–24. https://doi.org/10.1038/nphys2190

Crutchfield, J. P., & Young, K. (1989). Inferring statistical complexity. Physical Review Letters, 63(2), 105–108. https://doi.org/10.1103/PhysRevLett.63.105

[64] Crutchfield, J. P., Ellison, C. J., & Mahoney, J. R. (2009). Time's Barbed Arrow: Irreversibility, Crypticity, and Stored Information. Physical Review Letters, 103(9), 094101. https://doi.org/10.1103/PhysRevLett.103.094101

Crutchfield, J. P., & Feldman, D. (2003). Regularities unseen, randomness observed: Levels of entropy convergence. Chaos: An Interdisciplinary Journal of Nonlinear Science, 13(1), 25–54.

James, R. G., Ellison, C. J., & Crutchfield, J. P. (2011). Anatomy of a bit: Information in a time series observation. Chaos: An Interdisciplinary Journal of Nonlinear Science, 21(3), 037109. https://doi.org/10.1063/1.3637494

[65] Hilbert, M. (2017). The More You Know, the More You Can Grow: An Information Theoretic Approach to Growth in the Information Age. Entropy, 19(2), 82. https://doi.org/10.3390/e19020082

Hilbert, M. (2016). Formal definitions of information and knowledge and their role in growth through structural change. Structural Change and Economic Dynamics, 38, 69–82. https://doi.org/10.1016/j.strueco.2016.03.004

Hilbert, M., James, R. G., Gil-Lopez, T., Jiang, K., & Zhou, Y. (2018). The Complementary Importance of Static Structure and Temporal Dynamics in Teamwork Communication. Human Communication Research, 44(4), 427–448. https://doi.org/10.1093/hcr/hqy008

[66] Algorithmic information theory establishes that the data complexity of the output, is bound by the complexity of its input plus the complexity of the algorithm itself (Information Non-Increase Theorem: $K(f(x)) \leq K(x) + K(f) + O(1)$. See: Li, M., & Vitanyi, P. (1997). An Introduction to Kolmogorov Complexity and Its Applications (2nd ed.). Springer.

social algorithms as autonomous behavioral entities, which implies that we study them as we study human behavior."[59] While nobody can control or perfectly predict humans (starting with one's own family, and ending with international war), the good news is that they can be studied to eliminate less likely and identify more likely behavioral paths, which does not provide certainty, but can reduce uncertainty. In the social and psychological sciences, this is done with controlled experiments, which, in computer science, is referred to as '**algorithm audit**'.[67] In practice, algorithm audits (which includes methods such as off-policy evaluation, counterfactual analysis, and causal inference for exposure effects) are less logistically and ethically demanding than human subject experiments, but the outcomes are often not less predictable or less surprising. Algorithm auditing uses the systematic, empirical evaluation of an algorithmic system's behavior and impacts, often by probing it with controlled inputs and measuring outputs, to detect and characterize the nature of the input-output transformation (e.g., the degree of accuracy, bias, discrimination, and harmful errors in real-world use). It is important to note that it is precisely the point of auditing that one does not need to have access to or understand the inner working of the audited entity, just like the FDA does not need to have access to the proprietary recipe of a new drug to test its safety, USDA's FSIS does not need to understand the inner working of a poultry farm to audit for the level of salmonella, and Coca Cola does not need to reveal its secret recipe for health authorities to observe its effects on obesity.[69] The content of the input-output transforming box does not need to be known to study the observable input-output relation of the transformation. Hence, the intractability of ML-based algorithms necessitates a methodological shift from formal verification to sociotechnical auditing, robust monitoring, and constrained optimization to ensure alignment and safety.[68] It is important that this does not imply total control or predictability of the algorithmic behavior, but instead an approach akin to safety regulation in other high-stakes domains: accepting residual uncertainty for some cases with repeatable

---

[67] Sandvig, C., Hamilton, K., Karahalios, K., & Langbort, C. (2014). Auditing algorithms: Research methods for detecting discrimination on internet platforms. Data and Discrimination: Converting Critical Concerns into Productive Inquiry, 22(2014), 4349–4357.

Sweeney, L. (2013). Discrimination in Online Ad Delivery. ACM Queue, 11(3). https://queue.acm.org/detail.cfm?id=2460278

[68] Amodei, D., Olah, C., Steinhardt, J., Christiano, P., Schulman, J., & Mané, D. (2016). Concrete Problems in AI Safety (No. arXiv:1606.06565). arXiv. https://doi.org/10.48550/arXiv.1606.06565

evidence about failure modes and constant evaluation of downstream impacts, while eliminating the remaining risk for populations that warrant special protection (like children or other vulnerable groups) and warranting deployment only under monitoring, accountability, and consent.

40. **Summing up our formal explorations**, these two sources of unpredictability, namely algorithmic complexity (para. 36) and data complexity (para. 38), can combine consequentially, such as in social media recommendation systems. While the reasons are technical and formal, considering them is important because it shows that, in addition to practical challenges (see para. 35), the inherent uncertainty of recommender systems is theoretically linked to the inherent nature of these kinds of computational systems. It concludes that for today's recommender systems (para. 69-73), which are computationally intractably complex (para. 36), fed with unpredictable live data streams (para. 38), non-trivial semantic properties (such as 'Will this system ever surface harmful content to a given user?') are unpredictable in the general case. It establishes that while reactive, probabilistic, and reverse-engineered approximations of ML-based recommender systems are possible (e.g., through auditing (para. 39)), and while such questions are answerable for specific instances through testing or execution, no finite verification procedure can provide guarantees across all possible inputs and system states. The complete and controllable working model of an algorithm processing real-time data for all possible cases consists of running that same algorithm executing on that same data. This implies that the expression of that algorithm (in our case, the social media feed) is the inherently uncertain expression of this very computation, and not of anyone else (including the human who programmed, owns, or otherwise claims to be linked to that process).

### D. Inherent Uncertainty in Social Media's ML

41. The inherently uncertain conduct of socially-embedded ML is not a mere theoretical exploration into asymptotic properties of theoretical computer science (para. 35-40). There is ample empirical evidence from daily practice that providers of ML-based algorithms lack certainty and control over the algorithmic conduct, including in the concrete case of recommender systems. Our meta-review of 151 algorithm audits of recommender systems found that **8-10% of**

**algorithmic recommendations fail to meet their intended goal in practice**.[69] In other words, some 1 in 10 algorithmic recommendations on YouTube, Instagram, TikTok, Facebook, Google Search, Twitter, Amazon, and others, seem not to be aligned with the general intent and desire of the provider, i.e., recommending content that is contradictory with business goals and self-declared community standards, such as the recommendation of content that is harmful, misleading, or otherwise problematic for users. This average is remarkably consistent across the audits, irrespective of the platform, the kind of failure (bias/ discrimination, mental health and child harm, misinformation, or political extremism), or the recommendation modality (home or channel feed, side-bar recommendations, newsfeed, autoplay, search results, API search, etc.).

42. In the complaints, I read that **platforms are purporting to be making an effort to take back control and align algorithmic recommendations with their own expectations**. For example, I read that "YouTube… takes targeted steps to ensure… kids and teens do not receive recommendations for… content that encourages dangerous activities, and content that is sensational or misleading. Such content is minimized in recommendations… YouTube has built a number of safeguards into its YouTube Recommender System, specifically with teens and kids in mind… to ensure teens are not repeatedly exposed to certain types of content in high quantities, such as content that displays aggression, compares physical features, or idealizes some body types, fitness levels, or weights over others."[70,101] I read that "Meta's goal for the 'Ages 13+' content setting… that teens see… is… to try and hide more content that Meta believes may be inappropriate for people under 18 (such as content where a person is describing their own personal experiences with suicide, self-injury or eating disorders)."[71] I also read that "TikTok also incorporates rules into the recommendation system to maintain an enjoyable and safe platform, including for people under 18. For example, if TikTok identifies certain content that does not violate the platform's Community Guidelines but may not be appropriate for people

[69] Hilbert, M., Thakur, A., Flores, P. M., Zhang, X., Bhan, J. Y., Bernhard, P., & Ji, F. (2024). 8–10% of algorithmic recommendations are 'bad', but… an exploratory risk-utility meta-analysis and its regulatory implications. *International Journal of Information Management*, 75, 102743. https://doi.org/10.1016/j.ijinfomgt.2023.102743

[70] Goodrow, C. (2025, November 18). Declaration of Cristos Goodrow in support of Google LLC and YouTube, LLC's motion for preliminary injunction [Court filing]. Google LLC v. Bonta, No. 5:25-cv-09795-EJD (N.D. Cal.) at ¶¶ 17, 30.

[71] Meta Platforms, Inc. v. Bonta, Case No. 4:25-cv-09792-KAW (N.D. Cal. Nov. 13, 2025). Complaint for Declaratory and Injunctive Relief, at ¶ 47.

under 18 it will take steps to exclude that content from the pool of videos that may be recommended to any individual person."[72] Platforms inscribe the most important of these kinds of values, aspirations, and ambitions into their Community Guidelines and Platform protocols. Unfortunately, given the inherently uncertain nature of the ML conduct of recommender systems (see para. 29-34), there is ample evidence that it is not possible for platforms to control their proprietary algorithmic conduct to the extent that they can even comply with their own ambitions set forth in their guidelines. The declared "targeted steps to ensure… a number of safeguards,"[70] the aspired efforts to "to try and hide,"[71] and the ambition that they "will take steps"[72] are condemned to stay at the level of attempts, endeavor, and good-intentioned efforts, but cannot comply even with their own aspirations.

43. One example refers to a mismatch between the platform's algorithmic behavior and current regulations. Part 312 of the Children's Online Privacy Protection Rule (COPPA Rule) requires online operators to "(o)btain verifiable parental consent prior to any collection, use, and/or disclosure of personal information from children."[73] The accompanying Business Guidance elaborates: "In some circumstances,… children are able to register on a site or service in violation of the operator's Terms of Service. If, however, the operator later determines that a particular user is a child under age 13, COPPA's notice and parental consent requirements will be triggered."[74] In an algorithm audit (para. 39) in the form of an *in situ* controlled experiment with 396 social media accounts on YouTube, Instagram, and TikTok,[75] my team and I found that after just one short online session, the recommender algorithms of YouTube, Instagram, and TikTok quickly and confidently adjust (unsolicited) recommendations for accounts from users behaving like 8-year-olds, recommending almost seven times more child-directed content than their 16-year-old peers. This tailoring of commercial offerings demonstrates that the algorithm possesses

[72] Zhou, J. (2025, November 18). Declaration of Joey Zhou in support of plaintiff TikTok Inc.'s motion for preliminary injunction [Court filing]. TikTok Inc. v. Bonta, No. 5:25-cv-09789-EJD (N.D. Cal.), at ¶ 18.

[73] Children's Online Privacy Protection Rule, 16 C.F.R. § 312 (2013). https://www.ecfr.gov/current/title-16/chapter-I/subchapter-C/part-312

[74] Federal Trade Commission. (2020, July). Complying with COPPA: Frequently asked questions. https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions

[75] Hilbert, M., Cingel, D. P., Zhang, J., Vigil, S. L., Shawcroft, J., Xue, H., Thakur, A., & Shafiq, Z. (2025). #BigTech @Minors: Social media algorithms have actionable knowledge about child users and at-risk teens. *Telematics and Informatics*, 103, 102341. https://doi.org/10.1016/j.tele.2025.102341

actionable knowledge to identify the potential presence of children and effectively acts on it.[75] The algorithm uses this information for commercial ends without obtaining the required parental consent for the use of the child's data, which is necessary to make the observed adjustments to the commercial offerings.

44. Another example comes from a mismatch between the platform's algorithmic behavior and the platform's self-imposed Community Standards. An analysis of Facebook's quarterly "Widely Viewed Content Report" (which lists the top 20 most-viewed posts and 20 most-viewed links in the US) found that up to **7 of the top 40 pieces (17.5%) of the most viewed content in the second quarter (Q2) of 2022 violated Facebook's Community Standards (1 in Q3 of 2021, 5 in Q4 of 2021, another 5 in Q1 of 2022, 1 in Q4 of 2022**) meaning Facebook's machine learning based algorithms promoted this violating content to massive audiences before the company subsequently removed it or labeled it as violating.[76]

45. The following Table showcases examples from an exploratory collection of empirical evidence of machine learning guided **deviations from guidelines and declared ambitions that are law or were self-imposed by the platforms running these algorithms**. The table presents 10 cases of evidence (dozens of additional cases are shown in the Appendix of para. 111). The left column contains verbatim policy quotes with source links, and the right column summarizes the inconsistencies (in total, this (very incomplete) collection includes nearly 50 documented lapses from nearly 40 researched studies (see para. 111).

| **Guideline** | **Algorithmic Deviation (Evidence)** |
|---|---|
| **YouTube/ Instagram/ TikTok** | |
| *"We developed safeguards on video sequencing for teens by identifying categories of video that… could become problematic for some if viewed in repetition."*<br>YouTube Kids & Teens, available at https://perma.cc/L6EH-JTVR (under tab 'Safeguard sequencing') | When social media accounts on YouTube, Instagram, and TikTok showed authentic behavior that is typical for struggling adolescents, after only one single session, the algorithm immediately showed over 30% more problematic- and over 70% more distressing content than their non-struggling peers, effectively pouring oil into an identified fire, before humans were able to act on it.<br>*(Hilbert et al., 2025)*[75] |

[76] Integrity Institute. (2022). Tracking dashboard: Facebook widely viewed content report (Public version, August 26, 2022). https://lookerstudio.google.com/s/keEvLwQfR8U

| Guideline | Algorithmic Deviation (Evidence) |
|---|---|
| "*teens…[are] even less likely to be recommended sensitive content*."<br>Instagram: Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sep. 17, 2024), available at: https://perma.cc/DZ6Z-MTKP<br>"The company said it has also worked to *avoid flooding users with similar videos on topics that could be problematic when seen repeatedly, such as dieting, sadness and other well-being issues*."<br>Hetrick, C., TikTok Videos Will Get 'Content Levels', Sort of Like 'R' Rated Movies, Dot.LA (July 13, 2022), available at: https://perma.cc/CM75-DA8H | |
| **Instagram/ Meta** | |
| *"We also prohibit other objectionable material, such as content implying or attempting to generate negative self-perception in order to promote diet, weight loss or other health related products."*<br>Meta, Introduction to the Advertising Standards, available at: https://perma.cc/S4GP-ET6J<br><br>*"We remove content that could contribute to a risk of harm to the physical security of persons."*<br>Meta, Community Standards, available at: https://perma.cc/K9UR-QDQQ | An internal study at Meta on Instagram found that teens reporting high body dissatisfaction "saw about 3 times more body-focused/ED-adjacent content than other teens" over a 3-month period."<br>"Vulnerable teens viewed 2.60% 'suffering' content compared to just 0.40% for other teens—a more than 600% increase in exposure to content depicting pain and distress."<br>Automatic AI tools missed 98.5% of harmful content despite identifying "reviewed content that met labeling guidelines". Even when set to extremely low confidence ("scores above 0.03"), "only 1.5% was captured". The failure was absolute for body issues, as "none of the content labeled as body-focused was captured by the set of reviewed integrity classifiers at thresholds above 0.1", meaning the Meta researcher found that AI missed every single piece of this harmful content.<br>*(Horwitz, 2025).*[77] |
| *"We have never allowed posts that promote or encourage suicide or self harm, and will continue to remove it when reported."*<br>Adam Mosseri, Changes We're Making to Do More to Support and Protect the Most Vulnerable People who Use Instagram, Instagram (Feb. 7, 2019), available at: | Of recommended Reels for teenage accounts that were "previously accessing suicide, self-harm and highly depressive content", between 14% (in 2023) and 20% (in 2025) referenced suicide methods; 44%-55% reference suicide and/or self-harm ideation; and 97-99% feelings of intense depression, misery, and despair.<br>*(Molly Rose Foundation, 2025).*[78] |

[77] Horwitz, J. (2025, November 24). Meta buried "causal" evidence of social media harm, US court filings allege, with APPENDIX of redacted Meta Study. Reuters. https://www.reuters.com/sustainability/boards-policy-regulation/meta-buried-causal-evidence-social-media-harm-us-court-filings-allege-2025-11-23 & https://www.reuters.com/investigates/special-report/assets/usa-tech-meta-teens/Viewing-Content-on-IG_Redacted.pdf

[78] Molly Rose Foundation. (2025). Suicide and self-harm content still recommended at industrial scale. https://mollyrosefoundation.org/suicide-and-self-harm-content-still-recommended-at-industrial-scale-by-tiktok-and-instagram-eight-years-after-mollys-death/

| Guideline | Algorithmic Deviation (Evidence) |
|---|---|
| https://perma.cc/7WRK-4N9T | |
| *"Self Injury - We do not allow glorification or encouragement of self-injury, including eating disorders."* Instagram, Instagram Community Guidelines FAQs (April 19, 2018), available at: https://perma.cc/9T5X-QC3E | Recommender algorithms promoted eating disorder content to an account registered as belonging to a 13-year-old girl who expressed interest in weight loss and dieting. "Instagram acknowledged to CNN this weekend that those accounts broke its rules against the promotion of extreme dieting". *(O'Sullivan, Duffy & Jorgensen (2021).*[79] |
| **Facebook/Meta** | |
| *"We remove language that incites or facilitates violence and credible threats to public or personal safety."* Meta, Community Standards, Violence and Incitement, available at: https://perma.cc/F84V-DSTK | Meta engineers stated, internally: "we estimate that we may action as little as 3-5% of hate and about 6-tenths of 1% of V & I [violence and incitement] on Facebook despite being the best in the world at it." *(Pelley, 2021).*[80] |
| *"Ads must not discriminate or encourage discrimination against people based on... sex..."* Meta, Discriminatory Practices, available at: https://perma.cc/MWU5-3RT6 *"Ads are discriminatory when they unlawfully deny opportunities to individuals or groups of people based on certain personal attributes such as… sex..."* Meta, Business Help Center, Review and certify compliance for Meta's non-discrimination policy, available at: https://perma.cc/69ZJ-V59J | Recommender algorithm automatically favored men because female impressions were more expensive due to high demand from retail advertisers. This effectively denied opportunities (STEM career exposure) to women based on their sex. *(Lambrecht & Tucker, 2019).*[81] |
| **TikTok** | |
| *"Suicide and Self-Harm: We don't allow content that shows, promotes, or provides instructions for suicide or self-harm.* *We don't allow content that promotes disordered eating, risky weight loss or muscle gain methods, or harmful body comparisons.* | An audit with accounts at the age of 13, which "paused briefly on videos about body image and mental health, and liked them", found that "Within 2.6 minutes, TikTok recommended suicide content. Within 8 minutes, TikTok served content related to eating disorders. Every 39 seconds, TikTok recommended videos about body image and mental health" *(Center for Countering Digital Hate, 2022).*[82] |

[79] O'Sullivan, D., Duffy, C., & Jorgensen, S. (2021, October 4). Instagram promoted pages glorifying eating disorders to teen accounts | CNN Business. CNN Business. https://www.cnn.com/2021/10/04/tech/instagram-facebook-eating-disorders

[80] Pelley, S. (2021, October 4). Facebook whistleblower Frances Haugen details company's misleading efforts on 60 Minutes—CBS News. 60 Minutes. https://www.cbsnews.com/news/facebook-whistleblower-frances-haugen-misinformation-public-60-minutes-2021-10-03/

[81] Lambrecht, A., & Tucker, C. (2019). Algorithmic bias? An empirical study of apparent gender-based discrimination in the display of STEM career ads. Management Science, 65(7), 2966–2981. https://doi.org/10.1287/mnsc.2018.3093

[82] Center for Countering Digital Hate. (2022). Deadly by design: TikTok pushes harmful content promoting eating disorders and self-harm into users' feeds. https://counterhate.com/wp-content/uploads/2022/12/CCDH-Deadly-by-Design_120922.pdf

| Guideline | Algorithmic Deviation (Evidence) |
|---|---|
| TikTok, Community Guidelines, available at: https://perma.cc/6CHV-F4XW | |
| *"We don't allow content that promotes disordered eating, risky weight loss or muscle gain methods, or harmful body comparisons."* TikTok, Community Guidelines (Aug. 14, 2025), available at: https://perma.cc/6CHV-F4XW | For users with eating disorders, recommender algorithms delivered more appearance-oriented (+146 %), dieting (+335 %), exercise (+142 %), and toxic eating disorder videos (+4343 %). Whilst users with eating disorders were 23% more likely to 'like' dieting videos, they received 335% more dieting videos from their algorithms compared to controls. The "TikTok algorithm might exacerbate eating disorder symptoms via content personalisation processes that are desensitised to volitional user actions". *(Griffiths et al., 2024, p. 394)*.[83] |
| **YouTube** | |
| *"YouTube's Community Guidelines […]* *Spam & deceptive practices […]* *Sensitive content […]* *Violent or dangerous content […]* *Misinformation."* YouTube's Community Guidelines, available at: https://perma.cc/7QMZ-34TN | Multi-country study (n=37,380) on regrettable content ("71%... from videos recommended") found "that 12.2% of reported videos… either 'should not be on YouTube' or 'should not be proactively recommended,' based on YouTube's Community Guidelines… We find that the most frequent categories per this classification are misinformation, violent or graphic content, and Covid-19 misinformation… then hate speech and spam/scams." *(Mozilla Foundation, 2021)*.[84] |
| *"YouTube doesn't allow content that endangers the emotional and physical well-being of minors."* YouTube Child safety policy, available at: https://perma.cc/XEZ2-UH4N | Starting from 12,097 different videos, "there is a 3.5% chance that a toddler following YouTube's recommendations will encounter an inappropriate video within ten hops if she starts from a video that appears among the top ten results of a toddler-appropriate keyword search (e.g., Peppa Pig)." Also, "we find a non-negligible percentage of disturbing videos in seemingly innocent categories like Education (3%) and Music (2%)." "Searches related to 'Elsa and Spiderman' had a 3.2% chance of leading to inappropriate content, and 'Peppa Pig' had a 2.9% chance." *(Papadamou et al., 2020)*.[85] |

46. It is important to notice that there is ample room for a certain degree of control of negative effects of algorithmic feeds. For example, around mid-2019, YouTube announced and put much effort into reducing the amount of conspiracy videos among its recommendations,

[83] Griffiths, S., Sidhu, S., Gharibans, T., Tan, D. J. Y., Mitchison, D., Murray, S. B., & Nagata, J. M. (2024). Does TikTok contribute to eating disorders? A comparison of the TikTok algorithms belonging to individuals with eating disorders versus healthy controls. Body Image, 51, 101794.

[84] Mozilla Foundation. (2021). YouTube Regrets. A crowdsourced investigation into YouTube's recommendation algorithm. https://www.mozillafoundation.org/en/youtube/findings/

[85] Papadamou, K., Papasavva, A., Zannettou, S., Blackburn, J., Kourtellis, N., Leontiadis, I., Stringhini, G., & Sirivianos, M. (2020). Disturbed YouTube for Kids: Characterizing and Detecting Inappropriate Videos Targeting Young Children. Proceedings of the International AAAI Conference on Web and Social Media, 14, 522–533. https://doi.org/10.1609/icwsm.v14i1.7320

which led to a drop from around 7% to 3%.[86] While these numbers seem small, given the scale of consumption, even minuscule remaining uncertainty and uncontrollability have **a large-scale effect**, both on the collective and individual level. For example, one of the studies cited in the Table in para. 45 found that "a 3.5% chance that a toddler following YouTube's recommendations will encounter an inappropriate video within ten hops if she starts from a video that appears among the top ten results of a toddler-appropriate keyword search (e.g., Peppa Pig)."[85] In the word of Mark Zuckerberg: "3 percent of billions of people is a lot of people…it's millions of people."[87] Around the time of the study, there were "over 35 million weekly viewers across more than 80 countries who use YouTube Kids".[88] Only a 3% failure rate would imply that over 1 million children get exposed every week to disturbing and inadequate content (the equivalent of some 15 packed football stadiums full of children). In addition to this massive large-scale effect, on the individual level, assuming a common average time spent on these platforms by adolescents (one hour daily session on YouTube, half an hour on Instagram, and two hours on TikTok)[89] and assuming two pieces of short-video content per minute, the findings from another study[75] from the same Table in para. 45 implies that after one year, a struggling adolescent would be shown over 3,500 distressing YouTube shorts more than recommended to their behavioral non-struggling peers, over 1,500 additional distressing Instagram reels, and almost 5,000 more distressing TikToks.

---

[86] Hilbert, M. (Director). (2023, July 11). DTSC: 3.5 Risk & Utility of persuasive tech (what we know about the resulting algorithmic behavior) [Video recording]. University of California, Davis. https://www.youtube.com/watch?v=DlCBFwDHeVo
Faddoul, M., Chaslot, G., & Farid, H. (2020). A Longitudinal Analysis of YouTube's Promotion of Conspiracy Videos (No. arXiv:2003.03318). arXiv. https://doi.org/10.48550/arXiv.2003.03318
The YouTube Team. (2019, June 5). Our ongoing work to tackle hate. Blog.Youtube. https://blog.youtube/news-and-events/our-ongoing-work-to-tackle-hate/
Roose, K., & Conger, K. (2019, June 5). YouTube to Remove Thousands of Videos Pushing Extreme Views. The New York Times. https://www.nytimes.com/2019/06/05/business/youtube-remove-extremist-videos.html

[87] Breathitt County Board of Education v. Meta Platforms, Inc., et al. (2025). Plaintiffs' corrected omnibus opposition to defendants' motions for summary judgment (Case No. 4:22-md-03047-YGR). U.S. District Court for the Northern District of California., available at https://www.lieffcabraser.com/pdf/2025-11-21-Brief-dckt-2480_0.pdf

[88] Mohan, N. (2021). Investing to empower the YouTube experience for the next generation of video. Blog.Youtube. https://blog.youtube/inside-youtube/neal-innovation-series/

[89] Statista (2023) Statista - The Statistics Portal. Available at: https://www.statista.com/markets/424/internet (accessed, at time of study, 1 December 2023).

### E. ML Objective Functions (and Social Media's Objective Function)

47. In order to understand the overall frame in which such undesirable (para. 42-45) and fundamentally unpredictable and uncontrollable (para. 35-40) conduct emerges, it is useful to return to our initially introduced framework of the machine learning paradigm (para. 26-32). Besides the importance of data (see also para. 37-38), what Figures para. 28 and para. 31 loosely call "Goal output", is essential (and delicate, from a safety standpoint). If the goal is not clearly specified, it can lead to unintended consequences or unintentional collateral damage.[90] Prof. Bostrom from Oxford University famously explained that it "seems perfectly possible to have a superintelligence whose sole goal is something completely arbitrary, such as to manufacture as many paperclips as possible… with the consequence that it starts transforming first all of earth and then increasing portions of space into paperclip manufacturing facilities."[91] Bostrom's famous '**paperclip maximizer**' analogy echoes the mythical **King Midas**, who wished for everything he touched be turned into gold, until he touched his daughter.[92] Another well-known metaphor is the **sorcerer's apprentice**,[93] who simply asked for the automation of carrying water for him, but ended up in an uncontrollable situation. Be careful what you wish for when dealing with the Greek god Dionysus (aka Bacchus, the god of wine), a sorcerer's spell, or a powerful artificial intelligence. The result is often treated in slapstick comedy, like when an AI-based GPS interprets the objective function 'take the shortest way home" as permission to route you straight across a lake, or a request for 'quick ways to burn lots of calories' being taken literally as 'start a fire in a restaurant',[90] but are also a more serious concern, such as when a superintelligence concludes that the easiest fulfillment of its goal to end hunger, global warming, or human

---

[90] Hilbert, M. (Director). (2025, May 26). AI & Ethics #13: Deontology & Loss Functions (The Bad). University of California, Davis. https://www.youtube.com/watch?v=42aTjpmXpCk
Hilbert, M. (Director). (2023, July 26). DTSC: 10.2 AI alignment (part1): Ethics in the Age of Artificial Intelligence [Video recording]. University of California, Davis. https://www.youtube.com/watch?v=MUhaZ2mR
[91] Bostrom, N. (2003). Ethical Issues in Advanced Artificial Intelligence. In S. Schneider (Ed.), Science Fiction and Philosophy: From Time Travel to Superintelligence (pp. 277–284). John Wiley & Sons. https://nickbostrom.com/ethics/ai
[92] Russell, S. (2019). *Human Compatible: Artificial Intelligence and the Problem of Control*. Penguin.
[93] The cautionary tale has been told in many forms, including:
Goethe, J. W. von. (1798). Der Zauberlehrling. In Balladen (Ballads). Cotta. (Original work published 1797)
Lucian of Samosata. (2nd century CE). Philopseudes (The lover of lies). In The works of Lucian of Samosata (Translated by various authors).
Disney, W. (Producer), & Sharpsteen, B. (Director). (1940). *Fantasia* [Animated film]. Walt Disney Productions.

suffering consists in the extinction of humanity.[94] In the warning words of the founder of control theory (aka 'cybernetics'), Norbert Wiener: "If we use, to achieve our purposes, a mechanical agency with whose operation we cannot efficiently interfere once we have started it… then we had better be quite sure that the purpose put into the machine is the purpose which we really desire".[95]

48. Presenting the **AI alignment**[96] challenge in terms of the conceptual diagram from the Figures para. 28 and para. 31, the data could refer to where an AI user is at (the example from Figure para. 48 was given during a keynote at UC Davis[97]), and the goal where the user wants to go (in this case: Rome), and ML is tasks to figure out the best road that leads to Rome (some say all roads do, but here the user asks AI about which one). Hopefully, they did not forget to specify that they would like to get to Rome alive, with all of their limbs, that they do not want to swim through an ocean, and that they do not have infinite fuel energy, etc., etc. Within the constraints given by the objective function, the system explores and exploits causal pathways easily unforeseen by its designers,[92] who do not have control or predictive power over how the machine learned conduct will achieve the goal (para. 35-40). Goal **underspecification**, goal **misspecification**, and goal **misgeneralization** are common concerns in AI safety research.[92, 98] **Some goals are even contradictory** or entail trade-off risks. For example, the maximization of travel speed will inevitably come with energy costs, the short-term maximization of workplace productivity with increased burnout risk, and test score maximization with the risk of superficial

---

[94] Williamson, C. (Director). (2025, October 25). Why Superhuman AI Would Kill Us All—Eliezer Yudkowsky [Video recording]. https://www.youtube.com/watch?v=nRvAt4H7d7E

Yudkowsky, E. (2016). The AI alignment problem: Why it is hard, and where to start. 4. https://intelligence.org/files/AlignmentHardStart.pdf

Yudkowsky, E. (2022). AGI Ruin: A List of Lethalities. 2022 MIRI Alignment Discussion. https://www.lesswrong.com/posts/uMQ3cqWDPHhjtiesc/agi-ruin-a-list-of-lethalities

[95] Wiener, N. (1960). Some Moral and Technical Consequences of Automation. *Science*, 131(3410), 1355–1358.

[96] Encyclopedic definition: AI alignment. (2026). In Wikipedia. https://en.wikipedia.org/wiki/AI_alignment

[97] Hilbert, M. (Director). (2024, November 12). AI Unleashed: The Good, the Bad, and the ... Hopeful! [Video recording]. University of California, Davis. UC Tech Conference, https://www.youtube.com/watch?v=GBS4NFiny5g

[98] Amodei, D., Olah, C., Steinhardt, J., Christiano, P., Schulman, J., & Mané, D. (2016). Concrete Problems in AI Safety (No. arXiv:1606.06565). arXiv. https://doi.org/10.48550/arXiv.1606.06565

Pan, A., Bhatia, K., & Steinhardt, J. (2022). The Effects of Reward Misspecification: Mapping and Mitigating Misaligned Models (No. arXiv:2201.03544). arXiv. https://doi.org/10.48550/arXiv.2201.03544

Shah, R., Varma, V., Kumar, R., Phuong, M., Krakovna, V., Uesato, J., & Kenton, Z. (2022). Goal Misgeneralization: Why Correct Specifications Aren't Enough For Correct Goals (No. arXiv:2210.01790). arXiv. https://doi.org/10.48550/arXiv.2210.01790

understanding. Other goals represent unavoidable tradeoffs, as they are two sides of the same coin. For example, perfect customer retention is achieved when the customers cannot leave and are locked in; 100% recommendation accuracy is achieved if only one viable option is presented (nobody can choose otherwise); perfect compliance is ensured with forceful coercion/enslavement; and attendance is maximized and absence minimized with confinement of mandatory presence, etc. In these cases, the maximization is conveniently achieved by limiting alternative choices. I will return to this question when discussing the connection between engagement maximization and the achievement of the user's inability to disengage, e.g., out of a loss of self-control (more on this in para. 57-62).

Figure: paragraph 48




49. Given the important and delicate role of the chosen objective/reward function, it is essential to understand the chosen **objective/reward function of social media**'s recommender algorithms. I read that "The overarching goal of the model's refinement… to optimize the TikTok platform [is] to inspire creativity and joy among those on the platform,"[26] and "to determine which particular videos out of the candidate pool would be most interesting and informative to that person."[99] I also read that "YouTube's recommendation system… is designed to display to each individual user the content that YouTube believes will be most relevant and valuable for that

[99] Zhou, J. (2025, November 18). Declaration of Joey Zhou in support of plaintiff TikTok Inc.'s motion for preliminary injunction [Court filing]. TikTok Inc. v. Bonta, No. 5:25-cv-09789-EJD (N.D. Cal.), at ¶ 11.

user, thereby communicating the message, 'You are likely to find interesting the compilation of videos we have selected for you.' By promoting or downgrading certain content in its recommendation system on an individualized basis, YouTube sends a message about speech it considers to be more valuable or less valuable for each particular user",[100] "which it aims to achieve by providing helpful and responsible recommendations."[101] I also read that "Meta wants its services to be a place for meaningful interactions with friends and family"[102] and that "Feeds employ prediction models that use many input signals… to help select content users are most likely to find interesting and engage with."[103] In short, social media companies argue that their objective/reward function sorts for content that is "most interesting and informative,"[99] "most relevant and valuable,"[100] "helpful and responsible,"[101] "meaningful,"[102] and "most likely to find interesting and engage with,"[103] which could be summarized as ambitions to foster the collective public dialogue and individual user well-being.

50. In 2017, Facebook's founding President declared that the "thought process that went into building these applications, Facebook being the first of them, ... was all about: "How do we consume as much of your time and conscious attention as possible?"[104] [redacted]

---

[100] Google and YouTube vs Bonta, Case 5:25-cv-09795-VKD, Complaint for Declaratory and Injunctive Relief, at ¶ 46.

[101] Goodrow, C. (2025, November 18). Declaration of Cristos Goodrow in support of Google LLC and YouTube, LLC's motion for preliminary injunction [Court filing]. Google LLC v. Bonta, No. 5:25-cv-09795-EJD (N.D. Cal.), at ¶ 13.

[102] Otaru, S. (2025, November 18). Declaration of Sayed Otaru in support of Meta's motion for preliminary injunction [Court filing]. Meta Platforms, Inc. v. Bonta, No. 4:25-cv-09792-KAW (N.D. Cal.), at ¶ 4.

[103] Davis, A. (2024, November 12). Declaration of Antigone Davis in support of plaintiff NetChoice's motion for preliminary injunction [Court filing]. NetChoice v. Bonta, No. 5:24-cv-07885 (N.D. Cal.), at ¶ 12.

[104] State of New Mexico v. Meta Platforms, Inc. (2024). Plaintiff's amended complaint. Civil Action No. 1:23-cv-01115-MIS-KK. U.S. District Court for the District of New Mexico, at ¶ 306.

[redacted]"[11] A recent study[105] by researchers from Stanford and Northeastern University undertook the monumental task to review "all of Meta's publicly available materials from 2010 to present [2024]" to evaluate three possible objective functions by **Meta** as their mission: a public debate logic (protect information quality, civic discourse, election integrity acting as public square), a wellbeing logic (protect users' psychological/physical health; reduce "toxicity"), and an engagement logic (optimize engagement metrics and advertising/business outcomes). They found clear evidence that when trade-offs become real, "**the goal of engagement dominates internal negotiations**", with public debate and wellbeing goals typically treated as subordinate. In several cases, internal initiatives from teams "were blocked or stymied by top management because they were threatening engagement metrics."[105] The former Vice President of Advertising Technology of Facebook explains [redacted][43] The independent researchers who reviewed the bulk of Meta's documents cross-checked that their findings also applied to other social media platforms, such as TikTok, Reddit, and X.[106]

51. In the case of **YouTube**, more specifically, it is well-known that engagement is implemented with the proxy metric **Watchtime**. Initially, YouTube's recommendation engine

---

[105] Christin, A., Bernstein, M. S., Hancock, J. T., Jia, C., Mado, M. N., Tsai, J. L., & Xu, C. (2024). Internal Fractures: The Competing Logics of Social Media Platforms. Social Media + Society, 10(3), 20563051241274668. https://doi.org/10.1177/20563051241274668

[106] "Meta's ranking algorithms… are designed to… maximize user engagement to increase revenue. That much is clear from Meta's documents. Ex. 215 at 8644 ("I feel like i'm reading totally different litigation and legislation than our org leaders… we literally are optimizing teens feeds for engagement."); Ex. 218 at 6686 ("the algorithm is absolutely tuned to maximize engagement in a maximally empirical, principle-less way. I am not sure that the youth legal people realize this and that it applies to teens just as much as gen pop. So the things contained in the lawsuits are somewhat hard to refute"); Ex. 216 at 6929 ("Teens are still developing, novelty-seeking and impulsive . . . Cool, so we probably shouldn't have ranking primarily driven by p(eyeballtime) and p(engagement), which is how it currently works."); Ex. 214 at 2552 ("core algo is…literally just mathematically optimizing for [impressions] and sessions for teens as with everyone else."), 2558 ("IG ranking is already different for teenagers…and FB ranking is different for YA [Young Adults]…in both cases it's to squeeze even more sessions out of them."). Even Meta's own algorithm expert has conceded this fundamental premise. Ex. 14 at 220:13-16 (Q: "So you're 20 not disputing that Meta's ranking systems employ user engagement objectives, are you?" A: "No.")."
From Breathitt County Board of Education v. Meta Platforms, Inc. (2026). Plaintiffs' corrected omnibus opposition to defendants' motions for summary judgment. Case No. 4:22-md-03047-YGR (PHK). United States District Court for the Northern District of California. https://www.lieffcabraser.com/pdf/2025-11-21-Brief-dckt-2480_0.pdf

was driven by a simple co-visitation algorithm.[107] In October 2012, YouTube deployed the "Sibyl" system, which started to establish watchtime as the objective function.[108] In a recount of YouTube's VP of Engineering, this is because watchtime correlates with satisfaction: "…the most important thing for the recommendation system is satisfaction. So, it really depends on which of the two videos the viewer is most likely to find satisfying. Which basically means which one are they most likely to give more stars to, when we ask them later in a survey. And so, we find that in general, people tend to be more satisfied when they watched more of the video, which is not a big surprise of course."[109] Or, in the words of YouTube's Head of Content Creator Communications, watchtime also correlates with happiness: "when we suggest videos, we focus on those that increase the amount of time that the viewer will spend watching videos on YouTube, not only on the next view, but also successive views thereafter. If viewers are watching more YouTube, it signals to us that they're happier with the content they've found."[110] Hence, watchtime maximization became the proxy for satisfaction and happiness. Modern iterations of YouTube's recommendation algorithms finetuned this mandate. For example, Google Brain optimized the relationship between a user's device and their watch times (recommending shorter videos for mobile users and longer videos for YouTube TV users),[111] and the 2021 "Reinforce" optimizes for "user long term satisfaction… indicated by clicks or watch time".[112] This shows that they all still stand on the foundation laid by that 2012 decision to maximize watchtime. Complementing this primary function, today "YouTube considers numerous signals related to the quality of the

---

[107] Davidson, J., Liebald, B., Liu, J., Nandy, P., Van Vleet, T., Gargi, U., Gupta, S., He, Y., Lambert, M., Livingston, B., & Sampath, D. (2010). The YouTube Video Recommendation System. *Proceedings of the Fourth ACM Conference on Recommender Systems*, 293–296. https://doi.org/10.1145/1864708.1864770

[108] Woodie, A. (2014, July 17). Inside Sibyl, Google's Massively Parallel Machine Learning Platform. *BigDATAwire*. https://www.hpcwire.com/bigdatawire/2014/07/17/inside-sibyl-googles-massively-parallel-machine-learning-platform/

Robertson, M. (2014, September 26). Watch Time: Optimization Guide for YouTube Ranking Factors. Tubular Labs. https://tubularlabs.com/blog/youtube-watch-time/

[109] Goodrow, C. (2021, September 15). On YouTube's recommendation system. Blog.Youtube. https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/

Creator Insider (Director). (2021, September 15). BOSS TALK: YouTube's VP of Engineering on Recommendations. https://www.youtube.com/watch?v=_geqgdIfsaM

[110] Meyerson, E. (2012, August). YouTube Now: Why We Focus on Watch Time. Blog.Youtube. https://blog.youtube/news-and-events/youtube-now-why-we-focus-on-watch-time/

[111] Newton, C. (2017, August 30). How YouTube perfected the feed. *The Verge*. https://www.theverge.com/2017/8/30/16222850/youtube-google-brain-algorithm-video-recommendation-personalized-feed

[112] Chen, M., Beutel, A., Covington, P., Jain, S., Belletti, F., & Chi, E. (2021). Top-K Off-Policy Correction for a REINFORCE Recommender System (No. arXiv:1812.02353). arXiv. https://doi.org/10.48550/arXiv.1812.02353

content on its platform, such as watchtime, repeat visits, survey responses, and the outputs of machine-learning systems that score the quality of the content".[113] However, "In simplified terms, the ranking function can be thought of as expected watch time per impression. Researchers from Google have asserted that this formula promotes more 'relevant' videos to users",[114] as they publicly confirm that "Our final ranking objective is constantly being tuned based on live A/B testing results but is generally a simple function of expected watch time per impression. …watch time better captures engagement".[115]

52. In the case of **TikTok**, an internal document titled "TikTok Algo 101"[116] explains that in the pursuit of the "ultimate goal of the app recommendation is to improve DAU" (Daily Active Users), it has chosen to optimize for two closely related metrics in the stream of videos it serves: **retention and app usage time**. "Retention and DAU are positively correlated in most cases: when retention rises, the DAU will generally rise, and when retention declines, the DAU will generally fall. As an indicator, retention has many advantages over DAU. We currently mainly optimize the retention indicator. App usage time is also a very important indicator. It is generally believed that the length of time the app is used can reflect the user's satisfaction with the app that day."[116] A TikTok executive summed the effectiveness of the algorithm up by concluding: "The reason kids watch TikTok is because the algo[rithm] is really good. . . . But I think we need to be cognizant of what it might mean for other opportunities. And when I say other opportunities, I literally mean sleep, and eating, and moving around the room, and looking at somebody in the eyes."[117] [redacted]

---

[113] Google and YouTube vs Bonta, Case No.: 5:25-cv-09795-EJD, Complaint for Declaratory and Injunctive Relief, at ¶ 13.

[114] Singh, S. (2020). Why am I seeing this? How video and e-commerce platforms use recommendation systems to shape user experiences. *New America,* 25(03). Page. 13. https://www.newamerica.org/oti/reports/why-am-i-seeing-this/case-study-youtube

[115] Covington, P., Adams, J., & Sargin, E. (2016). Deep Neural Networks for YouTube Recommendations. Proceedings of the 10th ACM Conference on Recommender Systems, 191–198. https://doi.org/10.1145/2959100.2959190 Page 195.

[116] Reported here, Smith, B. (2021, December 6). How TikTok Reads Your Mind. The New York Times. https://www.nytimes.com/2021/12/05/business/media/tiktok-algorithm.html
with an unverified leaked version here: https://github.com/mrtn3000/tiktok-audit/blob/main/TikTok%20Algo%20101%20EN.md, which is a translation from Chinese https://blog.csdn.net/m0_37586850/article/details/113488345

[117] Commonwealth of Kentucky v. TikTok, Inc. (2024). Complaint. Civil Action No. 24-CI-00824. Scott Circuit Court, Kentucky, at ¶ 19(b). https://www.iccl.ie/wp-content/uploads/2024/12/TikTok-Kentucky.pdf?itid=lk_inline_enhanced-template

[redacted][119]

53. There are two obvious reasons why platforms like Facebook and Instagram (para. 50), YouTube (para. 51) and TikTok (para. 52) use engagement as the primary and dominating objective/reward function for social media feeds, one of economic nature, and one of a practical nature. First, longer, more interactive engagement aligns with the social media business model, as discussed in para. 14 – 25 (generating more and better user data), and as explained in an illustrative 'how-to' detail by a series of Silicon Valley best-selling books.[120] Second, in contrast to the ambitious goals of fostering collective dialogue and individual well-being, it is **much easier, cheaper, and more convenient to quantify engagement in an unambiguous manner on an ongoing basis, in real-time**. There is no clear recipe on how to conceptualize, much less how to quantify well-being and the quality of public discourse, which is not useful for engineering and computer science pursuits. Much to the contrary of engagement, which has clear metrics, like Daily Active Users (DAU), the number of users opening the app, logging in, view the feed, etc.), and Meaningful Social Interactions (MSI), the number of comments, conversations, interactions, etc.[105]

54. Summing up, a coalition of 10 primary architects behind the world's most influential social media ranking systems and insider-reformers on social media integrity, spanning the internal product teams of LinkedIn and Pinterest, the fundamental research labs of Meta and Twitter, and investigative journalists and AI researchers on recommender system alignment, published **a recent workshop-derived article on "Learning from industry."**[121] It starts by

[118] Confidential TIKTOK-0000143: TIKTOK3047MDL-067-LARK-01027106.PDF
[119] Confidential TIKTOK-0000378: TIKTOK3047MDL-024-LARK-00040453.PDF
[120] Eyal, N. (2014*). Hooked: How to Build Habit-Forming Products*. Penguin.
Siegel, E. (2013). *Predictive Analytics: The Power to Predict Who Will Click, Buy, Lie, Or Die*. John Wiley & Sons.
Parr, B. (2015). Captivology: *The Science of Capturing People's Attention*. Harper Collins.
Lanier, J. (2018). *Ten Arguments for Deleting Your Social Media Accounts Right Now*. Henry Holt and Company.
Nahai, N. (2013). *Webs of Influence: The Psychology of Online Persuasion* (1st ed.). FT Press.
[121] Cunningham, T., Pandey, S., Sigerson, L., Stray, J., Allen, J., Barrilleaux, B., Iyer, R., Kothari, M., Rezaei, B., Kairam, S., & Milli, S. (2025). Ranking by engagement and non-engagement signals: Learnings from industry. Annals of the New York Academy of Sciences, 1551(1), 19–32. https://doi.org/10.1111/nyas.15399

confirming that “Many online platforms predominantly rank items by predicted user engagement” and, while it identifies significant problems with this approach, proposes only incremental and complementary modifications that preserve engagement maximization as the core objective: “There is strong evidence that ranking by predicted engagement is effective in increasing user retention. However **retention can be further increased** by incorporating other signals” (emphasis added). The dominance of engagement-based ranking rests on compelling industry evidence, as internal studies showed that chronological feeds produced dramatic usage declines: “time-spent declined by 20% on FB and 10% on Instagram” over three months, while Twitter’s chronological users had “approximately 38% fewer impressions/day.” The authors propose to use quality considerations not as alternative objectives but as constraints on engagement maximization, which can help to mitigate short-term downsides and maximize long-term retention (even more engagement). When platforms “put substantial ranking weight on quality metrics,’ they do so while ‘implying they sacrifice user engagement (at least in the short run).” A footnote clarifies why platforms accept this sacrifice: “to satisfy advertisers, regulators, app stores, the media, and for intrinsic ethical reasons”. Facebook’s “minimal integrity holdout” experiment confirmed this structure: removing quality constraints produced “higher overall activity” initially, with problems emerging only “after 2 years.” The paper proposes mitigating such long-term decay by incorporating quality metrics and item-level surveys as positive ranking signals, believing “that many types of quality metrics significantly increase long-term user retention.” The mechanism underlying engagement maximization reveals its problematic nature. Mark Zuckerberg acknowledged that “as a piece of content gets close to that line [of what is allowed], people will engage with it more on average – even when they tell us afterwards they don’t like the content.” This disconnect, where users engage with content they later report disliking, suggests engagement metrics capture signs of compulsive (involuntary) rather than valued (free will) consumption. The group that contains several previous growth-hackers, now turned leading integrity advocates, propose to use less personalized and more general-interest focused “bridging-based ranking” (in line with collaborative filtering, para.72) and surveys as secondary signals (five of seven platforms use them), but only as sparse samples to supplement,

not replace, the "core ranking algorithm" which remains "typically a linear combination of engagement predictions." Hence, "there is much unrealized potential in including non-engagement signals", but even in these controversial proposals, made by insiders who left their social media posts in an integrity shift, it becomes clear that major changes cannot be expected in the foreseeable future when it comes to the general orientation of algorithmic feeds.

### F. Engagement Maximization (and Its Unintended Side Effects)

55. While engagement is an economically profitable and readily available indicator, convenient for real-time collection and scalable quantification, it represents, of course, an imperfect (and confounded) **correlation with satisfaction (not causation)**. As an analogy, it can be expected that short support calls correlate strongly with more satisfied customers, while long support calls correlate with unsatisfied customers. While this statistical correlation is likely strong and clear, and while call duration is much easier to measure and quantify on an ongoing basis in real time than customer satisfaction, it would not suggest instructing call center staff to hang up on customers as soon as they accept the call (aiming for an objective function of minimizing call duration). Another analogy is a romantic partner who learns that happy couples in the honeymoon phase communicate and engage with each other frequently and at length. However, if one partner decided to mechanically strive for communicative engagement maximization, there is a real risk that this would generate response time anxiety, or even unhealthy surveillance, overpowering co-dependence, or suffocating control. Correlation is not causation.[122]

56. Similar to the thought experiments of Russell's King Midas problem,[92] Bostrom's paperclip maximizer,[91] or the AI-guided road to Rome (see para. 48), **engagement maximization unavoidably comes with several unintended consequences**, such as all broad goals. Among the better known unintended side effects that the literature has linked to engagement maximization are the inadvertent proliferation of in-group favoritism,[123] as "(o)ut-group animosity drives engagement on social media",[124] the fostering of emotionally loaded and morally charged

[122] Pearl, J. (2009). Causality. Cambridge University Press.
[123] In-group favoritism. (2025). In Wikipedia. https://en.wikipedia.org/w/index.php?title=In-group_favoritism&oldid=1328968049
[124] Rathje, S., Van Bavel, J. J., & van der Linden, S. (2021). Out-group animosity drives engagement on social media. Proceedings of the National Academy of Sciences, 118(26), e2024292118. https://doi.org/10.1073/pnas.2024292118

expressions,[125] and the unintended proliferation of misinformation,[126] which are all not aligned with the self-declared ambitions of social media platforms (see para. 45 and 111). Another unintended side-effect produced by the inherently uncertain conduct of the machine learning based algorithms that strive to fulfill the engagement maximization objective function is addiction.

57. **Maximal engagement** can be achieved by different intrinsic and extrinsic, and voluntary and involuntary means. For example, engagement with sports or arts can be maximized through intrinsically motivated passionate enjoyment, resulting in a flow state.[127] Maximal engagement with a job can be extrinsically motivated by monetary or prestige incentives.[128] While both of these examples entail voluntary engagement, engagement could also be forced, such as with mandatory military service or a prison work program. As shown in the Figure para. 57, all three cases can overlap with engagement maximization (the red/filled area), but must not overlap. For example, someone in a voluntary creative flow state will also take a creative rest (at free will), while someone working hard to be profitable can choose to have some unprofitable recovery times, and even a slave under forced labor conditions can find unobserved moments of idle slack every once in a while. However, in the case of addiction, engagement maximization is perfected, objectively marked by the inability to disengage without external intervention. An addicted individual deploys all available intrinsic capacities (cognitive, emotional, physical, and temporal) toward an activity, pushing an individual's involvement to its limits, tailored to their unique capacities (e.g., time, energy, resources). As clearly illustrated in the Venn-diagram style Figure para. 57, addiction is not necessary for engagement maximization, but it is sufficient and is functionally superior to the alternative conducts, as it is defined by not being able to not engage,

---

[125] Brady, W. J., McLoughlin, K. L., Torres, M. P., Luo, K. F., Gendron, M., & Crockett, M. J. (2023). Overperception of moral outrage in online social networks inflates beliefs about intergroup hostility. Nature Human Behaviour, 7(6), 917–927. https://doi.org/10.1038/s41562-023-01582-0

Brady, W. J., Wills, J. A., Jost, J. T., Tucker, J. A., & Bavel, J. J. V. (2017). Emotion shapes the diffusion of moralized content in social networks. Proceedings of the National Academy of Sciences, 114(28), 7313–7318. https://doi.org/10.1073/pnas.1618923114

[126] Vosoughi, S., Roy, D., & Aral, S. (2018). The spread of true and false news online. Science, 359(6380), 1146–1151. https://doi.org/10.1126/science.aap9559

[127] Csikszentmihalyi, M. (1990). Flow: The psychology of optimal experience (Vol. 1990). Harper & Row New York.

[128] Afota, M.-C., Robert, V., & Vandenberghe, C. (2025). Workaholism, work engagement, and affective commitment: Relationships to self-concept levels and work outcomes. Frontiers in Psychology, 15. https://doi.org/10.3389/fpsyg.2024.1434482

which is maximized to each individual's unique engagement capacities (e.g., sleep requirements) and contexts (e.g., economic possibilities). In the words of one of Meta's internal presentations: "Teens can't switch off from Instagram even if they want to."[129]

Figure: paragraph 57




58. Hence, from a strictly functionalist perspective, **addiction represents a functionally optimal, though often unintended, outcome of engagement maximization** strategies because it eliminates the regulatory mechanisms that constrain resource allocation in voluntary engagement states by removing homeostatic stopping rules,[130] allowing for the total extraction of the individual's available resources (time, attention, cognitive effort).[131] From a theoretical perspective, the well-established incentive sensitization theory holds that the result is the decoupling of "wanting" from independent hedonic "liking",[132] creating a dissociation

[129] Exhibit 75: Slides titled "Teen Mental Health: Creatures of Habit," August/September 2019; https://storage.courtlistener.com/recap/gov.uscourts.cand.401490/gov.uscourts.cand.401490.2648.40.pdf

[130] Redish, A. D., Jensen, S., & Johnson, A. (2008). A unified framework for addiction: Vulnerabilities in the decision process. Behavioral and Brain Sciences, 31(4), 415–437. https://doi.org/10.1017/S0140525X0800472X

[131] Vallerand, D. R. J. (2015). The Psychology of Passion: A Dualistic Model. Oxford University Press.

Vallerand, R. J., Blanchard, C., Mageau, G. A., Koestner, R., Ratelle, C., Léonard, M., Gagné, M., & Marsolais, J. (2003). Les passions de l'âme: On obsessive and harmonious passion. Journal of Personality and Social Psychology, 85(4), 756–767. https://doi.org/10.1037/0022-3514.85.4.756

[132] Robinson, T. E., & Berridge, K. C. (1993). The neural basis of drug craving: An incentive-sensitization theory of addiction. Brain Research Reviews, 18(3), 247–291. https://doi.org/10.1016/0165-0173(93)90013-P

Robinson, T. E., & Berridge, K. C. (2008). The incentive sensitization theory of addiction: Some current issues. Philosophical Transactions of the Royal Society B: Biological Sciences, 363(1507), 3137–3146. https://doi.org/10.1098/rstb.2008.0093

whereby motivational drive intensifies even as subjective pleasure diminishes or disappears entirely, which collapses the non-causal correlation that assumes that "(i)f viewers are watching more YouTube, it signals to us that they're happier with the content they've found."[133] From a behavioral economics perspective, the functional consequence is that addicted individuals allocate maximum available resources to the addictive behavior across all cost conditions,[134] whereas voluntarily engaged individuals (upper quadrants in Figure para. 57) preserve alternative reinforcers and protective behavioral domains.[135] From a practical industry perspective, an internal 'TikTok Product Experience Report' captured the overlap succinctly: "while parent concerns about youth addiction were 'concerning for young minds,' this phenomenon was viewed internally as 'a good thing for the platform.'"[136]

59. Consequently, while engagement maximization strategies might not directly, automatically, or intentionally target addiction induction, the convergent endpoint is not only functionally indistinguishable from compulsive engagement patterns known from behavioral addictions,[137] but also superior, at least from the perspective of a reward function-oriented (artificial) intelligence ordered to look for ways to maximize engagement.

60. There is ample research on the **different technological affordances that contribute to engagement maximization** in practice. The literature draws an analytical distinction between affordances of operational processes (structural, design, material, instrumental) and meaning-making processes (communicative, interpretive, expressive), though

[133] Meyerson, E. (2012, August). YouTube Now: Why We Focus on Watch Time. Blog.Youtube. https://blog.youtube/news-and-events/youtube-now-why-we-focus-on-watch-time/

[134] Hursh, S. R., & Silberberg, A. (2008). Economic demand and essential value. Psychological Review, 115(1), 186–198. https://doi.org/10.1037/0033-295X.115.1.186

[135] Becker, G. S., & Murphy, K. M. (1988). A Theory of Rational Addiction. Journal of Political Economy, 96(4), 675–700. https://doi.org/10.1086/261558

Bickel, W. K., Johnson, M. W., Koffarnus, M. N., MacKillop, J., & Murphy, J. G. (2014). The Behavioral Economics of Substance Use Disorders: Reinforcement Pathologies and Their Repair. Annual Review of Clinical Psychology, 10(Volume 10, 2014), 641–677. https://doi.org/10.1146/annurev-clinpsy-032813-153724

Vuchinich, R. E., & Tucker, J. A. (1988). Contributions from behavioral theories of choice to an analysis of alcohol abuse. Journal of Abnormal Psychology, 97(2), 181–195. https://doi.org/10.1037/0021-843X.97.2.181

[136] Breathitt County Board of Education v. Meta Platforms, Inc., et al. (2025). Plaintiffs' corrected omnibus opposition to defendants' motions for summary judgment (Case No. 4:22-md-03047-YGR). U.S. Court for the Northern District of California. https://www.lieffcabraser.com/pdf/2025-11-21-Brief-dckt-2480_0.pdf

[137] Griffiths, M. (2005). A 'components' model of addiction within a biopsychosocial framework. Journal of Substance Use, 10(4), 191–197. https://doi.org/10.1080/14659890500114359

Petry, N. M., Rehbein, F., Gentile, D. A., Lemmens, J. S., Rumpf, H.-J., Mößle, T., Bischof, G., Tao, R., Fung, D. S. S., Borges, G., Auriacombe, M., González Ibáñez, A., Tam, P., & O'Brien, C. P. (2014). An international consensus for assessing internet gaming disorder using the new DSM-5 approach. Addiction, 109(9), 1399–1406. https://doi.org/10.1111/add.12457

scholars use varying terminology to capture this distinction.[138] As for the former, design choices include many of the features known from slot machine design,[139] such as infinite scroll, notification default settings, and intermittent rewards (a senior data scientist at Meta, who holds a PhD in neuroscience and taught a university course on addiction, concluded that "Intermittent rewards are most effective"[140]). As for content choices, para. 19 already discussed how the recommendation of distressing content leads to highly predictable reactions, on average. This is felt by users, as an internal studies from Meta found that teens "want Instagram to enhance their control of both Feed and Explore… [and] Opt out of advertising categories that are personally triggering."[141] For more on the relationship between minors, addictive design and content, and engagement maximization, see, for example, research collected by J. Haidt and colleagues.[142]

61. Avoiding the addiction quadrant in Figure para. 57 is a two-sided control problem, which can be tackled on the side of the user (such as with neuro-behavioral interventions, therapy, and support, that strengthen what Elster (1979) famously termed "Ulysses contracts"[143]) and on the side of the provider. While the user's part of the responsibility for not slipping from harmonious passion (balanced, high engagement) to obsessive passion (compulsive, risking

---

[138] Baym, N. K. (2015). Personal Connections in the Digital Age. John Wiley & Sons.
Boyd, D. (2010). Social Network Sites as Networked Publics: Affordances, Dynamics, and Implications. In A Networked Self. Routledge.
Hutchby, I. (2001). Technologies, Texts and Affordances. Sociology, 35(2), 441–456. https://doi.org/10.1017/S0038038501000219
Norman, D. (2013). The Design of Everyday Things: Revised and Expanded Edition. Basic Books.
[139] Center for Humane Technology (Host). (2019a, June 11). What Happened in Vegas with Natasha Dow Schüll [Broadcast]. https://www.humanetech.com/podcast/1-what-happened-in-vegas
Center for Humane Technology (Host). (2019b, June 20). Should've Stayed in Vegas with Natasha Dow Schüll [Broadcast]. https://www.humanetech.com/podcast/2-shouldve-stayed-in-vegas
Schüll, N. D. (2014). Addiction by Design: Machine Gambling in Las Vegas. Princeton University Press.
[140] Breathitt County Board of Education v. Meta Platforms, Inc., et al. (2025). Plaintiffs' corrected omnibus opposition to defendants' motions for summary judgment (Case No. 4:22-md-03047-YGR). U.S. Court for the Northern District of California. https://www.lieffcabraser.com/pdf/2025-11-21-Brief-dckt-2480_0.pdf
[141] State of Tennessee v. Meta Platforms, Inc. (2024). Civil enforcement complaint. Case No. 23-1364-IV. Chancery Court of Davidson County, Tennessee; Teen Mental Health Deep Dive (October 2019). https://s.wsj.net/public/resources/documents/teen-mental-health-deep-dive.pdf.
[142] Haidt, J., Rausch, Z., & Twenge, J. (2023). Social media and mental health: A collaborative review. Unpublished Manuscript, New York University. Retrieved from: https://docs.google.com/document/d/1w-HOfseF2wF9YIpXwUUtP65-olnkPyWcgF5BiAtBEy0/edit?tab=t.0, 329.
Haidt, J., & Twenge, J. (2023). Adolescent mood disorders since 2010: A collaborative review. Unpublished Collaborative Online Manuscript, New York University. https://jonathanhaidt.com/reviews/
Sippel, B., Greb, N., Park, E., Rausch, Z., & Haidt, J. (2026, January 13). Meta's internal research. Tech and Society Lab at NYU Stern. https://metasinternalresearch.org/
[143] Internally and externally provided strategies that help individuals to bind their future selves to a decision made in a moment of rationality, preventing impulsive, irrational actions, like Ulysses ordering his crew to tie him to the mast to resist the Sirens' song. Elster, J. (1979). Ulysses and the Sirens: Studies in rationality and irrationality. Cambridge University Press.

addiction)[131] is with the user (or with the one with the duty of care of the user, like parents, in the case of their children), on the provider side, **guaranteeing engagement maximization without addiction** would require that the provider acted as a homeostatic regulator for the user's neurochemistry, a task necessitating uttermost control over stimulus potency and dosage. In pharmaceutical contexts, maximizing dosage effects while preventing addiction demands real-time modulation of what is called a drug's "Therapeutic Index" management (the precise calibration of stimulus potency, dosage, and delivery kinetics to maintain maximum reinforcement value while remaining below the threshold triggering neuroadaptive sensitization)[144] to ensure efficacy ("liking") while preventing the rapid dopamine spikes that trigger sensitization ("wanting"),[132] effectively requiring the provider to act as a fiduciary who withholds supply precisely when demand becomes inelastic.[135] Despite being strictly regulated through measurable dose standardization, validated therapeutic windows established through controlled clinical trials, prescription-based access controls enforced by licensed clinicians, and systematic post-market surveillance,[145] the balancing act between maximization and addiction remains imperfect due to differential susceptibility, tolerance development, and stubborn market failures,[146] whose elimination would require even more meticulous intervention, objectively controlled trials by independent oversight bodies, controlling execution oversight, and intrusive regulation.

62. The translation of such **"Therapeutic Indexing" of offerings in social media domains** (in order to ensure that engagement maximization is not achieved via addiction) would require the development of metrics to quantify 'algorithmic recommendation potency' (in

[144] Muller, P. Y., & Milton, M. N. (2012). The determination and interpretation of the therapeutic index in drug development. Nature Reviews Drug Discovery, 11(10), 751–761. https://doi.org/10.1038/nrd3801

[145] Dowell, D., Haegerich, T. M., & Chou, R. (2016). CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016. JAMA, 315(15), 1624–1645. https://doi.org/10.1001/jama.2016.1464

[146] Crews, K. R., Gaedigk, A., Dunnenberger, H. M., Leeder, J. S., Klein, T. E., Caudle, K. E., ... & Skaar, T. C. (2014). Clinical Pharmacogenetics Implementation Consortium guidelines for cytochrome P450 2D6 genotype and codeine therapy. Clinical Pharmacology & Therapeutics, 95(4), 376-382. https://doi.org/10.1038/clpt.2013.254

Ballantyne, J. C., & LaForge, K. S. (2007). Opioid dependence and addiction during opioid treatment of chronic pain. Pain, 129(3), 235-255. https://doi.org/10.1016/j.pain.2007.03.028

Hadland, S. E., Krieger, M. S., & Marshall, B. D. (2018). Industry payments to physicians for opioid products, 2013-2015. American Journal of Public Health, 108(12), 1638-1640. https://doi.org/10.2105/AJPH.2018.304734

standardized units comparable to pharmaceutical milligram dosing),[147] validated equivalents to therapeutic windows or maximum recommended doses,[148] and personalized methods to actively filter out identified kinds of high-engagement but low-utility recommendations for each specific individual.[148] Given well-known market failures in markets with addiction potential,[149] the implementation of measures aimed at carrying out the balancing act between maximization and addiction is tightly and proactively regulated in the pharmaceutical context. This is, of course, incomparable to any current voluntary practice of content moderation, and, if implemented, would imply severe interventions into content filtering practices.

63. In practice, research finds that the ML-based intelligence of recommender algorithms rather takes the opposite route and maximizes dosage. An often cited mechanism to quickly maximize engagement consists in not selecting content users want to look at, but selecting content from which users "**can't look away**".[150] For example, today's humans are all descendants of those ancestors who paid an overproportionate amount of attention to potentially dangerous situations[151] (those who did not, did not survive long enough to produce sufficient offspring).[152] Hence, on average, they feel the instinctive urge to look at a car accident scene they are passing on the freeway: evolutionary selection programmed them to pay attention to such issues. Once such a conditional trigger>response probabilities make it into the behavioral

[147] Montag, C., Lachmann, B., Herrlich, M., & Zweig, K. (2019). Addictive Features of Social Media/Messenger Platforms and Freemium Games against the Background of Psychological and Economic Theories. International Journal of Environmental Research and Public Health, 16(14), 2612. https://doi.org/10.3390/ijerph16142612

[148] Kuss, D. J., & Griffiths, M. D. (2011). Online Social Networking and Addiction—A Review of the Psychological Literature. International Journal of Environmental Research and Public Health, 8(9), Article 9. https://doi.org/10.3390/ijerph8093528

Kuss, D. J., & Griffiths, M. D. (2017). Social Networking Sites and Addiction: Ten Lessons Learned. International Journal of Environmental Research and Public Health, 14(3), 311. https://doi.org/10.3390/ijerph14030311

[149] Arrow, K. J. (1978). Uncertainty and the welfare economics of medical care. In Uncertainty in economics (pp. 345–375). Elsevier. https://www.sciencedirect.com/science/article/pii/B9780122148507500280

Gruber, J., & Köszegi, B. (2001). Is Addiction "Rational"? Theory and Evidence. The Quarterly Journal of Economics, 116(4), 1261–1303. https://doi.org/10.1162/003355301753265570

O'Donoghue, T., & Rabin, M. (1999). Doing It Now or Later. American Economic Review, 89(1), 103–124. https://doi.org/10.1257/aer.89.1.103

Stiglitz, J. E. (1989). Markets, Market Failures, and Development. The American Economic Review, 79(2), 197–203.

[150] O'Neil, M., & Peltz, P. (Directors). (2025, April). Can't Look Away [Documentary]. Jolt.Film. https://jolt.film/watch/cantlookaway

[151] e.g. Negativity bias: https://en.wikipedia.org/wiki/Negativity_bias
Attentional bias: https://en.wikipedia.org/wiki/Attentional_bias
Risk perception: https://en.wikipedia.org/wiki/Risk_perception
Loss aversion: https://en.wikipedia.org/wiki/Loss_aversion
Hypervigilance: https://en.wikipedia.org/wiki/Hypervigilance, etc.

[152] Hilbert, M. (Director). (2020, December 9). UCCSS 10-3 Tech & Ethics: Exploiting Cognitive Biases [Video recording]. https://www.youtube.com/watch?v=shhW8hJzvZ8

prediction database of conditional trigger>response stimuli (para. 17-18), one way to maximize engagement would be to show people car accidents all day long. It is doubtful if this would still increase satisfaction, happiness, creativity, or interest (see para. 49), but it is guaranteed to increase engagement by exploiting a primordial urge they all share.

64. As a result of such unintended algorithmic conducts, it has long been shown that social media users regret at least some of their social media use in the majority of their sessions (60%), and regret all their use in nearly 40% of sessions, while **algorithmically recommended posts generated the highest regret**.[153] Analyzing approximately 34,000 screenshots, other researchers confirmed that algorithmically recommended content and comments generated the most regret.[154] In a sophisticated study, economists showed that, to the contrary of the well-being maximization claim, deactivating Facebook for four weeks increased subjective well-being by 0.09 standard deviations (that is the well-being effect of about 25-40% as much as standard psychological therapy, or about $30,000 of additional annual income),[155] and an equally sophisticated follow-up study, in which the authors "develop an economic model of digital addiction and estimate it using a randomized experiment", found that 31% of social media use stems from self-control problems rather than genuine desire.

65. Some algorithm audits make concrete **comparisons to chronological feeds**. The Meta 2020 Election Research Collaboration, which published several high-profile papers in 2023 (in the highest-ranked journals, like Science and Nature), represents the largest experiment ever conducted on social media algorithms. A chronological feed experiment with some 23,000 users showed that users with an algorithmic feed group spent 73% more time on Facebook compared to average US monthly users, while the chronological feed group spent only 37% more time compared to the average user, while none of the interventions produced measurable effects on

[153] Cho, H., Choi, D., Kim, D., Kang, W. J., Choe, E. K., & Lee, S.-J. (2021). Reflect, not Regret: Understanding Regretful Smartphone Use with App Feature-Level Analysis. Proc. ACM Hum.-Comput. Interact., 5(CSCW2), 456:1-456:36. https://doi.org/10.1145/3479600

[154] Guo, L., Fu, Y., Lin, X., Xu, X., Chang, Y.-J., & Hiniker, A. (2025). What Social Media Use Do People Regret? An Analysis of 34K Smartphone Screenshots with Multimodal LLM. Proceedings of the 2025 CHI Conference on Human Factors in Computing Systems, 1–23. https://doi.org/10.1145/3706598.3713724

[155] Allcott, H., Braghieri, L., Eichmeyer, S., & Gentzkow, M. (2020). The Welfare Effects of Social Media. American Economic Review, 110(3), 629–676. https://doi.org/10.1257/aer.20190658

political attitudes or behavior during the three-month study period.[156] The authors, including researcher from Meta, concluded that "using on-platform measures of political engagement—for example, posting or liking content classified as political, sharing that you voted, and mentioning politicians and candidates running for office on social media—we found strong evidence that the Chronological Feed had a negative impact on both platforms."[156] A more recent study became more specific and found that "relative to a reverse-chronological baseline, Twitter's engagement-based ranking algorithm amplifies emotionally charged, out-group hostile content that users say makes them feel worse about their political out-group. Furthermore, users do not prefer the political tweets selected by the algorithm, suggesting that the engagement-based algorithm underperforms in satisfying users' stated preferences,"[157] which, again, collapses the non-causal correlation assumed between engagement and satisfaction (para. 51).

## II. THREE DIMENSIONS OF CONTENT: SOURCE, TARGET, KNOWABILITY

66. After this overview of the social media business model and the most relevant aspect of the underlying technology (the nature of machine learning), I want to introduce two additional concepts from Information and Library Science and Communication Science that I deem relevant to clarify some of the metaphors I read about in the complaints, including analogies comparing social media feeds to a "librarian,"[70] "newspaper editors, pamphleteers, parade organizers,"[71] and "museums or bookstores."[71] The analogies are only partially fitting and can be very confusing, as they mix concepts. I already discussed at length the concept of ML's inherent uncertainty (para. 35-40), which is maybe the most important dimension of the resulting three-dimensional framework I will use to clarify these flawed analogies. The other two new ones that I will introduce here are the source of content origination (self-created or other-created) and the target of content orientation (self-informed or other-informed).

[156] Guess, A. M., Malhotra, N., Pan, J., Barberá, P., Allcott, H., Brown, T., Crespo-Tenorio, A., Dimmery, D., Freelon, D., Gentzkow, M., González-Bailón, S., Kennedy, E., Kim, Y. M., Lazer, D., Moehler, D., Nyhan, B., Rivera, C. V., Settle, J., Thomas, D. R., … Tucker, J. A. (2023). How do social media feed algorithms affect attitudes and behavior in an election campaign? Science, 381(6656), 398–404. https://doi.org/10.1126/science.abp9364

[157] Milli, S., Carroll, M., Wang, Y., Pandey, S., Zhao, S., & Dragan, A. D. (2025). Engagement, user satisfaction, and the amplification of divisive content on social media. PNAS Nexus, 4(3), pgaf062. https://doi.org/10.1093/pnasnexus/pgaf062

### A. Target of Content Orientation: Other-informed versus Self-informed

67. For the sake of clarity, I use a simplified schematic dichotomization, which is based on longstanding Communication Science discussions around passive consumption and active production in mass media.[158] Messages can be selected or generated based on intrinsically self-informed criteria (like one's own values, norms, and beliefs), as done in the case of traditional content moderation, and based on extrinsically other-informed criteria (as done during persuasion, manipulation, or recommendation). For example, tenured scientists or public servants with diplomatic immunity have these protections to speak about their self-informed and principled priorities. To the contrary, a marketing company, after excluding unacceptable content (e.g., through content moderation), designs messages to cater to others, i.e., consumers.

#### 1. Recommender Algorithms (based on other-informed data from users)

68. I understand that SB976 aims at feeds "**based, in whole or in part, on information provided by the user**, or otherwise associated with the user or the user's device" (27000.5(a)). One example might be that "a platform's algorithm just presents automatically to each user… e.g., content similar to posts with which the user previously engaged".[159] In other words, SB976 does not focus on selections made based on "value-based judgments…[on] content",[160] but on selections made based on judgments on information about the user. This applies very generally to today's recommender systems because the focus on data derived from users is the main way recommender algorithms work (as opposed to data derived from content).

69. The literature distinguishes between three general approaches to algorithmic recommender systems: collaborative filtering, content-based filtering, and knowledge-based filtering.[161] "The basic models for recommender systems work with two kinds of data, which are

[158] Goffman, E. (1959). The Presentation of Self in Everyday Life. Doubleday.
Castells, M. (2009). Communication Power. Oxford University Press.
Jenkins, H., Purushotma, R., Weigel, M., Clinton, K., & Robison, A. J. (2009). Confronting the Challenges of Participatory Culture: Media Education for the 21st Century.
Kaplan, A. M., & Haenlein, M. (2010). Users of the world, unite! The challenges and opportunities of Social Media. Business Horizons, 53(1), 59–68.
[159] Moody v. NetChoice, LLC, 603 U.S. (2024) (Barrett, J., concurring)
[160] Meta Platforms vs. Bonta Case 4:25-cv-09792-KAW, Complaint for Declaratory and Injunctive Relief, at ¶ 69.
[161] Recommender system. (2025). In Wikipedia. en.wikipedia.org/w/index.php?title=Recommender_system&oldid=1328169812#Approaches

(continued…)

(i) the **user-item interactions**, such as ratings or buying behavior, and (ii) the attribute **information about the users and items**, such as textual profiles or relevant keywords. Methods that use the former are referred to as collaborative filtering methods, whereas methods that use the latter are referred to as content-based recommender methods. Note that content-based systems also use the ratings matrices in most cases, although the model is usually focused on the ratings of a single user rather than those of all users. In knowledge-based recommender systems, the recommendations are based on **explicitly specified user requirements**" (bold emphasis added).[162] In short, all of them are based on information provided by the user or associated with the user or the user's device.

70. So-called "**content-based filtering**" is a misnomer because it does not involve filtering content per se, but rather involves filtering information provided by the user. Content-based filtering recommends items by sorting the user's historical feedback on items. The criteria to distinguish among the items themselves (among the 'boxes' that create the columns in the Figure para. 70, in this case 'News', 'Movie', etc.) are some kind of meta-data that describe the items (such as keywords), which, in the case of 'social' media, are commonly derived from 'social tagging', which means that the users themselves provide the item characteristics. "The value in this external tagging is derived from people using their own vocabulary and adding explicit meaning, which may come from inferred understanding of the information/object."[162] The data itself is provided by the, so-called, "digital footprint,"[163] which is inevitably left behind by

---

Aggarwal, C. C. (2016). Recommender Systems. Springer International Publishing. https://doi.org/10.1007/978-3-319-29659-3
Resnick, P., & Varian, H. R. (1997). Recommender Systems. Commun. ACM, 40(3), 56–58. https://doi.org/10.1145/245108.245121
Ricci, F., Rokach, L., Shapira, B., & Kantor, P. B. (Eds.). (2011). Recommender Systems Handbook. Springer US. https://doi.org/10.1007/978-0-387-85820-3
Singh, S. (2020). Why Am I Seeing This? How Video and E-Commerce Platforms Use Recommendation Systems to Shape User Experiences (New America). Open Technology Institute. http://newamerica.org/oti/reports/why-am-i-seeing-this/

[162] Aggarwal, C. C. (2016). Recommender Systems. Springer International Publishing. https://doi.org/10.1007/978-3-319-29659-3 p. 8.

[163] Hilbert, M. (Director). (2015a, August 12). DT&SC 5/6-1: Digital Footprint. University of California, Davis. https://www.youtube.com/watch?v=AywHa_35ppU
Hilbert, M. (Director). (2015b, August 12). DT&SC 7-4: Digital Big Data Footprint. University of California, Davis. https://www.youtube.com/watch?v=TDiyxkJwYAo
Hinds, J., & Joinson, A. (2019). Human and Computer Personality Prediction From Digital Footprints. Current Directions in Psychological Science, 28(2), 204–211. https://doi.org/10.1177/0963721419827849
Hinds, J., & Joinson, A. N. (2018). What demographic attributes do our digital footprints reveal? A systematic review. PLOS ONE, 13(11), e0207112. https://doi.org/10.1371/journal.pone.0207112

the user as 'behavioral surplus' (see para. 14) over time, step by step, with every digital step taken. In the schematic case from the Figure para. 70, the content-based recommender algorithm would select the "News" item as future recommendation to user P. The most important take-away here is that this conclusion is derived from information provided by the user, in this case in the form of previously provided likes, time spent, and clicks.

Figure: paragraph 70




71. Maybe the most intuitive (because it is also the original) approach to recommender systems is the so-called "**knowledge-based filtering**", which sorts items based on explicitly specified user requirements, relying on user-provided hints that reveal exactly what users need. In the traditional (symbolic logic) coding paradigm (see para. 27), this was often done by using domain-specific rules or "knowledge bases." In today's machine learning paradigm, this is done by sorting items according to user's attributes. In the schematic case from the Figure para. 71, the knowledge-based recommender algorithm would select the "Movie" item as recommendation to user P, which is, as shown in the Figure para. 71, is again based on information provided by the user, who provided the information that in a 'smiling face' state (row 1 and 2, in contrast to frowning face row 3), movies meet the current 'smiling face' user requirements (last row).

Figure: paragraph 71




72. Maybe the most pervasive and powerful approach to recommender systems is "**collaborative-filtering**", which sorts the preferences of other users. Positive network externalities in social networks and economies of scale of digital content reproduction drive network growth, leading to a few vast networks that attract most users (by economic design).[164] The general idea is similar to identifying the 'trending' items, but it can be fine-tuned with much sophistication by matching those trends with users who are similar or somehow otherwise connected. In the schematic case from the Figure para. 72, the collaborative-filtering recommender algorithm would recommend the "Networking" item to user P (last row), which, once again, as shown in the Figure para. 72, is based on information provided by the user, who, in this case, provided the information that users with glasses (like user X) and scarves (like user Z) prefer Networking products.

[164] Shapiro, C., & Varian, H. R. (1998). Information Rules: A Strategic Guide to the Network Economy (1st ed.). Harvard Business Press.
Hilbert, M. (Director). (2023, August 14). DTSC: 7.3 Digital Innovations: Media concentration & diversity. University of California, Davis. https://www.youtube.com/watch?v=GDWU9n0Ml88

Figure: paragraph 72




73. Today's recommender systems are an intricate **mix of the stylized approaches** presented in this Chapter, with different platforms having different priorities (placing more emphasis on current population trends or previous personal history, etc.). The main takeaway is that the data that feeds the ML-based recommender conduct is data based on information provided by the user, which is illustrated by the data in the rows in the Figures of para. 70, 71, and 72. This data is generated by the emblematic 'behavioral surplus' (see para. 14) and harvested from the organic feed for the purpose of producing predictive products (see para. 15). This is conceptually very different from basing decisions on value-based judgments on the content itself, as, for example, done during so-called "content moderation".

### 2. Value-based Content Moderation (based on self-informed values from self)

74. The general definition of content moderation refers to the binary decision to keep or remove specific pieces of media. While the previously described examples of recommender algorithms (para. 70-72) compute a score, content moderation computes a binary choice: keep or exclude. I read in the complaints that "Content moderation is a foundational part of creating a welcoming and safe experience for people on TikTok and the first step in shaping the content

shown in people's TikTok feeds. All user-generated content posted and publicly available on the TikTok platform passes through TikTok's content moderation process...".[165] **Traditional content moderation** is founded on "value-based judgements… [with] employees deciding what content-moderation policies to adopt and maintain… and then implementing them through processes that include both human and automated review."[160] The important difference to the previously presented logic of recommender systems (para. 68-73) is that this aims at "certain categories of content in their feeds that Meta, in the judgment of its human personnel, has determined may be upsetting or offensive to some users,"[166] or somehow else against value-based Community guidelines (see examples and links in 45 and 111). Hence, the decision criteria are **value-based human judgment.**

75. Contrasting this with the foregoing criteria used by recommender systems (para. 68-73), the equivalent schematic representation is shown in the Figure para. 75. Instead of other-informed extrinsic signals from the user, **self-informed intrinsic judgements** are guiding the selection. The data is created by matching items from others (the columns) with value-based judgements like honesty and integrity, fairness and justice, and safety and security (the rows).

[165] Schiller, M. (2025, November 18). Declaration of Mikaela Schiller in support of plaintiff's motion for preliminary injunction [Court filing]. TikTok Inc. v. Bonta, No. 5:25-cv-09789-EJD (N.D. Cal.), at ¶ 3.

[166] Meta Platforms, Inc. v. Bonta, Case No. 4:25-cv-09792-KAW (N.D. Cal. Nov. 13, 2025). Complaint for Declaratory and Injunctive Relief, at ¶ 46.

Figure: paragraph 75




76. These kinds of (so-called) "category-specific policies identify content that Meta chooses to hide from teens, label, place behind a warning screen, and/or de-prioritize for certain (or all) users".[166] In this sense, content moderation can be understood in **analogy to a "bouncer" at an entrance door**, while personalized feeds and recommender systems are rather akin to a "bartender" or "DJ" that works with whatever made it through the minimum requirements screening. In this sense, it is true that the first step consists of "YouTube removing content determined to violate the Community Guidelines from its corpus, ensuring it is not recommended to its users."[101] It is important to note that platform providers' own internal reports clearly state that this initial screening is extremely faulty. Meta estimates that "we estimate that we may action as little as 3-5% of hate and about 6-tenths of 1% of V & I [violence and incitement] on Facebook despite being the best in the world at it."[80] An audit of YouTube concludes that "only 20.5% and 2.5% of our manually reviewed disturbing and restricted videos, respectively, have been removed by YouTube".[167] For more cases, see Tables para. 45 and 111. Besides, the fact that some kind of

[167] Papadamou, K., Papasavva, A., Zannettou, S., Blackburn, J., Kourtellis, N., Leontiadis, I., Stringhini, G., & Sirivianos, M. (2020). Disturbed YouTube for Kids: Characterizing and Detecting Inappropriate Videos Targeting Young Children. Proceedings of the International AAAI Conference on Web and Social Media, 14, 522–533. https://doi.org/10.1609/icwsm.v14i1.7320

content does not pass the bouncer at the door does not say anything about the nature of the party inside.

### B. Source of Content Origination: Self-created versus Other-created

77. For our next dimension, I also use a simplified schematic dichotomization, which is based on longstanding Information and Library Science discussions around filtering and gatekeeping.[168] In light of the analogies used in the complaints, it is useful, for reasons of completeness, to quickly present the complementary alternative to "**pieces of media generated or shared by users**" (SB976, 27000.5(a)). The alternative is the selection and curation ('generation' and 'formulation') of **one's own expression**. For example, a personal declaration sits firmly on the 'self-created' side, while a retailer displaying consumer products in a shopping window sorts 'other-created' items. Since today's digital media landscape is increasingly saturated with generative AI, including Large Language Models (LLMs) that express themselves on social media 24/7, it is worthwhile to take a moment to reflect on this distinction from Communication Science, to avoid further confusion.

78. When the source of origination of the content is self-created by using **self-informed intrinsic criteria**, the result is the expression of the self (self-expression). The formulation of such a message follows an internal reasoning process of the speaker that essentially combines different components (much in line with what LLMs do).[50, 169] In the schematic case of the Figure, the chosen sentence "Credo hoc utile esse" fits best the internal assessment of the speaker following the intrinsically provided criteria.

---

[168] Luhn, H. P. (1958). A business intelligence system. IBM Journal of research and development, 2(4), 314-319.
Taylor, R. S. (1968). Question-negotiation and information seeking in libraries. College & Research Libraries, 29(3), 178-194.
Sears, D. O., & Freedman, J. L. (1967). Selective exposure to information: A critical review. Public opinion quarterly, 31(2), 194-213.
Shoemaker, P. J., & Vos, T. P. (2009). Gatekeeping Theory. Routledge.
Pariser, E. (2011). The Filter Bubble: What the Internet Is Hiding from You. Penguin Press.
Knobloch-Westerwick, S. (2015). Choice and Preference in Media Use: Advances in Selective Exposure Theory and Research. Routledge.

[169] Hinton, G. E. (1986). Learning Distributed Representations of Concepts. Proceedings of the Annual Meeting of the Cognitive Science Society, 8(0). https://escholarship.org/uc/item/79w838g1
Brown, T. B., Mann, B., Ryder, N., Subbiah, M., Kaplan, J., Dhariwal, P., Neelakantan, A., Shyam, P., Sastry, G., Askell, A., Agarwal, S., Herbert-Voss, A., Krueger, G., Henighan, T., Child, R., Ramesh, A., Ziegler, D. M., Wu, J., Winter, C., … Amodei, D. (2020). Language Models are Few-Shot Learners (No. arXiv:2005.14165). arXiv. https://doi.org/10.48550/arXiv.2005.14165

Figure: paragraph 78




79. I am now in a condition to contrast these distinctions in a simple two-dimensional framework. The vertical columns in Table para. 79 distinguish between the source of the content's origination: self-created versus other-created. SB976 focuses on the right-side of the matrix, i.e. on other-created externally provided "**pieces of media generated or shared by users**" (27000.5(a)). The horizontal rows distinguish between the target of the content's orientation. SB976 focuses on the lower-side of the matrix, i.e. on other-informed extrinsic orientations, "**based, in whole or in part, on information provided by the user**, or otherwise associated with the user or the user's device" (27000.5(a)). For example, the logic in the cell 'Strategic marketing' refers to the schematic presentations shown in the Figures of para. 70-72, but also to the way a retailer displays items in a shopping window, a conference organizer selects speakers for a conference, or a marketing company selects slogans. The schematic presentation of Figure para. 79 refers to the cell 'self-expression', and the cell referred to as 'curation editor' refers to the schematic presentation in Figure para. 75, akin to the self-informed criteria used by a newspaper editor, a museums curator, or a free-thinking Professor who puts together a syllabus for a generic introductory course.

Table: paragraph 79

| | | SOURCE of content ORIGINATION | |
|---|---|---|---|
| | | From: Self-created (internal) | From: Other-created (external) |
| **TARGET of content ORIENTATION** | By: Self-informed (intrinsic) | *Self-expression* | *Curation editor* |
| | By: Other-informed (extrinsic) | *Principled advocacy* | *Strategic marketing* |

80. The cell in the lower left corner of the matrix in Table para. 79, showcases the example of '**principled advocacy'**, which combines a self-created message source with an other-informed message targeting, such as done in the form of a persuasive pitch. A political candidate formulating a pitch at a fundraising event, a comedian fine-tuning original jokes for a late-night show, or someone presenting themselves in a job application or dating app would all be well advised to shape the presentation of their internal self-created content toward their audience. Keeping our presentation schematic, in an attempt to clear up confusion by fostering graphic clarity, the equivalent of our foregoing presentations is presented in Figure para. 80: according to the data from others, the most effective self-created pitch that caters to the interests and receptiveness of communication partners with glasses and scarves seems to be "Credo hoc recte esse".

Figure: paragraph 80




81. The **schematic presentation allows us to clarify potential confusion** that might arise from the arguments I read about in the complaints. For example, I read that platform's "activity, 'after all, is not unlike traditional media curated by human editors",[160] and that SB976 would affect "editorial judgments… [and] editorial decisions [like] a newspaper".[26] The framework fine-tunes these analogies by distinguishing between the use of self-informed intrinsic orientation (akin to newspaper editors and traditional content moderation) (upper right in Table para. 79), and other-informed extrinsic orientation (as pursued by recommender systems) (lower right in Table para. 79). When I read that platforms have a necessity to "shape their messages to their audience, thus making the message more effective and 'helpful'"[160] and to "protect the speakers' ability to use individualized information to make the speech they disseminate more 'persuasive' and 'instructive' for its recipients,"[160] the framework helps to distinguish between the use of externally other-created content and internally self-created speech, for which the speaker carries the responsibility of ensuring that any 'catering' does not distort the message to a degree that would be misleading (e.g. in commercials), or result in defamation, incitement to lawless action, obscenity, or fraud.

### C. Knowability of Content Realization: Speech Certainty

82. Technological progress has added a third dimension to this rather traditional two-dimensional framework. As discussed in para. 26-32, when using machine learning, it is the machine, not the programmer who comes up with the conduct **(**per definition, as otherwise, one could simply program the conduct oneself in "Good Old-Fashioned" symbolic programming, where the **human prescribes a step-by-step recipe**). Just like no third party can be certain of the conduct emerging from a learning new driver during training (not even the driving instructor or the owner of the car), a programmer, owner, or steward of a machine learning system cannot be certain about the resulting behavior or output of a self-driving car that has been trained with machine learning (para. 29). As discussed at length in para. 35-40, there is inherent uncertainty, unpredictability and uncontrollability in the resulting ML conduct, which is very different from the traditional "Good Old-Fashioned" programming paradigm,[34] where the programmer can guarantee that the programmed conduct will faithfully execute the written rules. The conduct itself executes rules according to the will of the programmer, and the code is a compilation defined by rules (even if they are complex and/or probabilistic in nature). In this traditional "Good Old-Fashioned" programming paradigm, in other words, the programmer knows why the output is what it is.

83. Austin and Levy have recently conceptualized this distinction as so-called "'**speech certainty**', the basic idea that speech is only speech if the speaker knows what he said when he said it… Unlike traditional code, a close look at how machine learning algorithms work reveals that the programmers who create them can never be certain of their output. Because that output lacks speech certainty, it's not the programmer's speech."[37] Even if its meaning is disputed, someone else's misinterpretation of a statement does not change the fact that "the speaker can identify what the speech is with total certainty, even if the audience may ultimately disagree on its meaning".[37] Human speech normally satisfies this because a person can know the words they produced. Traditional programming normally satisfies it too: when a programmer writes explicit rules, the system's output is directly traceable to (and executable according to) those rules, so the programmer controls, owns, and knows what the system will publish at the

moment of publication, even if the rule is probabilistic and sometimes yields mistakes. "Speech uncertainty is as inherent to the use of machine learning algorithms as speech certainty is to traditional speech."[37]

84. The inherent uncertainty of machine learning casts doubt on the notion that "the law [SB976], by default, bars TikTok [or the other Plaintiffs, for that matter] from communicating the specific message it wants to communicate,"[26] because in ML-directed feeds, TikTok does not have control over the "**specific message** it wants to communicate". It can approximately point to the original intention behind the selected objective function during training (see para. 47-52), but even "the machine learning programmer is… incapable of comprehensively explaining or understanding the rules underlying the model… in machine learning, because explainability can never be perfect, it is discussed in terms of a spectrum—measured in terms of how explainable a model is. For speech certainty purposes, however, it is a binary: The …[machine learning programmer] programmer can either explain her algorithm fully and its output is her speech, or she can't and it isn't."[37] This questions if curated feeds constitute "'expressive choices' in deciding which user-generated 'content [its] feeds will display, or how the display will be ordered and organized",[170] as, per definition, a choice resolves uncertainty (as per the formal information theoretic definitions of these terms).[171]

85. This third dimension allows us to fine-tune our schematic framework further, distinguishing between the knowability of the content's realization. The matrix in Table para. 85 shows examples of the traditional case with speech certainty. The examples relate to many of the examples I read about in the complaints. For example, "newspaper editors, pamphleteers, parade organizers, and other curators of information have for decades selected third-party content with an eye towards presenting more interesting, engaging, and relevant content to their specific audiences",[160] which refers to examples from the right-side quadrants of the matrix. Similar to a politician shaping the presentation of their agenda toward a specific audience, a dating app user

[170] Meta Platforms, Inc. v. Bonta, Complaint for Declaratory and Injunctive Relief, at ¶ 6.

[171] Shannon, C. E. (1948). A Mathematical Theory of Communication. Bell System Technical Journal, 27, 379–423, 623–656. https://doi.org/10.1145/584091.584093
Cover, T. M., & Thomas, J. A. (2006). Elements of Information Theory (2nd Edition). Wiley-Interscience.

showcasing specific sides of their profile to potential mates, and a conference organizer selecting speakers according to potential impact, the lower quadrants of the matrix exemplify the "speakers' ability to use individualized information to make the speech they disseminate more 'persuasive' and 'instructive' for its recipients".[160]

Table: paragraph 85

| **KNOWABILITY of content REALIZATION:** With: Certainty (controlled) | | **SOURCE of content ORIGINATION** | |
|---|---|---|---|
| | | From: Self-created (internal) | From: Other-created (external) |
| **TARGET of content ORIENTATION** | By: Self-informed (intrinsic) | *Personal testimony*<br>*Artist's original painting* | *Newspaper/ Museum editor*<br>*Professor syllabus* |
| | By: Other-informed (extrinsic) | *Dating app profile*<br>*Political campaign pitch* | *Retail display*<br>*Conference lineup* |

86. The following matrix fills the traditional matrix from para. 79 for cases without speech certainty. The first insight is the **logical inconsistency between an intrinsic self-informed orientation and a lack of speech certainty**. Per definition, machine learning requires training data (see para. 28), which almost always is informed by data from others (audience patterns, external datasets, all the information identifiable through web-crawl, etc.). It is theoretically possible that an artist (self-created) or newspaper editor (other-created) trains a machine learning architecture exclusively on their own work and decision criteria, making the training data orientation completely self-informed. However, even when personal fine-tuning is done, it is usually done on top of machine learning models that have been 'contaminated' with data from others (general web-crawl or other fundamental training datasets), and hence, are 'other-informed'. In other words, when a writer uses a Large Language Model (LLM), like ChatGPT, Gemini, or Claude, to write a text, the LLM is extrinsically other-informed by its training data (GPT-3 alone consumed roughly 300 billion tokens spanning filtered Common Crawl, WebText2, multiple book datasets, and Wikipedia, while newer open models like Llama 3 scale this to over 15 trillion tokens of public-web and code data).[172] The same accounts for a

[172] Brown, T. B., Mann, B., Ryder, N., Subbiah, M., Kaplan, J., Dhariwal, P., Neelakantan, A., Shyam, P., Sastry, G., Askell, A., Agarwal, S., Herbert-Voss, A., Krueger, G., Henighan, T., Child, R., Ramesh, A., Ziegler, D. M., Wu, J., Winter, C., …

(continued…)

photographer who is using an AI-directed camera lens, or a musician who uses an AI, trained on billions of songs from others, to finish their own composition by letting the algorithm fit the musical message best to the extrinsic other-informed patterns from the ML training dataset. Hence, the upper row in Table para. 86 is empty, for our practical purposes.

Table: paragraph 86

| **KNOWABILITY of content REALIZATION:** With: Uncertainty (uncontrolled) | | **SOURCE of content ORIGINATION** From: Self-created (internal) | **SOURCE of content ORIGINATION** From: Other-created (external) |
|---|---|---|---|
| **TARGET of content ORIENTATION** | By: Self-informed (intrinsic) | *N/A* | *N/A* |
| | By: Other-informed (extrinsic) | *Dynamic Email campaign*<br>*AI-bot customer service* | *Recommender algorithm*<br>*Social Media feed* |

87. An interesting new edge-case is the custom-made development of ML-based content moderation tools by platforms. Being ML-based, they come with unavoidable, irreducible, and inherent uncertainty (in para. 35-40 and para. 83), but billions of dollars have been invested to fine-tune them toward custom-made self-informed tools, getting close to being a practical example of the upper rows in Table para. 86. The progression toward **increasing reliance on ML for content moderation** is maybe best illustrated by Meta's evolving rhetoric and investments, which shifted from tentative aspiration in 2018,[173] to swelling dependence in 2021,[174] while, in 2025, conceding retreat, given "just too many mistakes… [as] these are

Amodei, D. (2020). Language Models are Few-Shot Learners (No. arXiv:2005.14165). arXiv. https://doi.org/10.48550/arXiv.2005.14165

Kaplan, J., McCandlish, S., Henighan, T., Brown, T. B., Chess, B., Child, R., Gray, S., Radford, A., Wu, J., & Amodei, D. (2020). Scaling Laws for Neural Language Models (No. arXiv:2001.08361). arXiv. https://doi.org/10.48550/arXiv.2001.08361

Hoffmann, J., Borgeaud, S., Mensch, A., Buchatskaya, E., Cai, T., Rutherford, E., Casas, D. de L., Hendricks, L. A., Welbl, J., Clark, A., Hennigan, T., Noland, E., Millican, K., Driessche, G. van den, Damoc, B., Guy, A., Osindero, S., Simonyan, K., Elsen, E., … Sifre, L. (2022). Training Compute-Optimal Large Language Models (No. arXiv:2203.15556). arXiv. https://doi.org/10.48550/arXiv.2203.15556

Longpre, S., Mahari, R., Lee, A., Lund, C., Oderinwale, H., Brannon, W., Saxena, N., Obeng-Marnu, N., South, T., Hunter, C., Klyman, K., Klamm, C., Schoelkopf, H., Singh, N., Cherep, M., Anis, A. M., Dinh, A., Chitongo, C., Yin, D., … Pentland, S. (2024). Consent in Crisis: The Rapid Decline of the AI Data Commons. Advances in Neural Information Processing Systems, 37, 108042–108087.

[173] U.S. Senate Committee on Commerce, Science, and Transportation. (2018, June 8). Facebook, Social Media Privacy, and the Use and Abuse of Data. https://www.commerce.senate.gov/services/files/9d8e069d-2670-4530-bcdc-d3a63a8831c4

[174] Rosen, G. (2021, May 19). Community Standards Enforcement Report, First Quarter 2021. Meta Newsroom. https://about.fb.com/news/2021/05/community-standards-enforcement-report-q1-2021/

complex systems. They're never going to be perfect"[175] and "dialing them back,"[175] announcing a return to once again trusting human flagging for the bulk of content moderation. While frustration with inherently uncertain and uncontrollable machine learning algorithms should be expected (see para. 34-38) and will always distinguish them from systems that have certainty (compare Tables para. 85 with 86), dialing back AI involvement "means we're going to catch less bad stuff,"[175] simply due to scale. The remaining question is whether LLMs could be fine-tuned to at least increase the self-informed aspect of content moderation (i.e., platform-value-informed). Within the Table para. 86, it can be argued that while LLMs are never completely self-informed (in the sense that they have been trained on vast amounts of generic data from others),[172] the billions of dollars of custom-made fine-tuning of these models moves them close to claims that their conduct is intrinsically self-informed (which would move them to the upper rows in Table para. 86).

### D. Sorting content along three dimensions

88. The following 3-dimensional presentation sums up the clarifying explorations of the foregoing paragraphs in a single graphic visualization, distinguishing between different sources, targets, and knowability of messages. I understand that the presentation might seem a bit overwhelming at first sight, but I can assure the reader that once one gets used to it, it can serve as a clarifying compass to untangle aspects that confound the analogies I read about in the complaints.

[175] Mark Zuckerberg (January 7, 2025), "It's time to get back to our roots around free expression. We're replacing fact checkers with Community Notes, simplifying our policies and…"; https://www.facebook.com/watch/?v=1525382954801931

Figure: paragraph 88




89. For example, I read that a social media feed is, "after all, is not unlike traditional media curated by **human editors**".[176] and that "'the presentation of an edited compilation of speech generated by other persons is a staple of most newspapers' opinion pages' and Meta's Feeds".[160] From the perspective of our framework, the difference between Meta's feed (which is located in the orange top-right-backside in the Figure para. 88) and the editorial activity of a newspaper editor (purple bottom-right-frontside in the Figure) differs in two dimensions: the newspaper editor traditionally uses intrinsic self-informed criteria (lower levels in Figure), while

[176] NetChoice v. Bonta, 152 F.4th 1002, 1014 (9th Cir. 2025) ("NetChoice v. Bonta III") (citing Moody, 603 U.S. at 731–34, 738)).

the feed uses extrinsic other-informed data (upper levels in Figure), and that the newspaper editor has controllable certainty over its expression (front levels in Figure, while Meta does not have certainty over the conduct and outcome of its ML directed feed (back levels in Figure).

90. I also read in the complaints that in "providing recommendations, the YouTube Recommender System plays a role akin to **a librarian in a physical library**, helping reduce the time that users spend scrolling or searching by placing at the top of users' feeds the videos that YouTube believes they are most likely to find useful and valuable. And just like a librarian who may recommend a book to a visitor based on the prior books that individual has read, books that are popular with similar readers, and the librarian's own views of the quality of the books in the library, YouTube makes its recommendations based on information available to YouTube, including data related to the user, other users on the platform, and an assessment of the quality of the videos on the platform. All of this data is used to make unique recommendations to each user of the YouTube platform."[101] Following our framework, this example also belongs to the right side of Figure para. 88, as the librarian's books are produced by others. The example in the complaints suggests that the librarian's target is a personalized recommendation for the user, so it belongs to the upper levels of Figure para. 88 (as formulated in the example, the librarian uses a mix of content-based filtering (see para. 70), collaborative-filtering (para. 72), and knowledge-based filtering (para. 71)). However, librarians have certainty over what they are doing, just like a salesperson when they are hand-organizing items on the shopping display, or a professor organizing a syllabus to fit the needs of a special freshmen seminar, which locates this example in the greenish top-right-front side of Figure para. 88. To the contrary, nobody, not even YouTube's engineers, has speech certainty[37] over what YouTube's recommender system will recommend (as shown by the theoretical discussions in para. 35-40 and the empirical evidence in para. 45 & 111), which moves this case to the top-right-back side of Figure para. 88.

91. An interesting exploration along the dimensions of the 3-dimensional framework from Figure para. 88 refers to **different implementations of content moderation**. While traditional content moderation follows intrinsically self-informed, human value-judgements (see para. 74-76, purple bottom-right-frontside in Figure para. 88), I read in the complaints that

"TikTok uses both human and technology-based content moderation to implement those Guidelines."[165] Similarly, as discussed in para. 87, Meta has incrementally increased its commitments to complement human content moderation with AI. Modern content moderation often mixes different methods (i.e., human certainty, good-old-fashioned rule-based certainty,[34] and ML, with its inherent uncertainty), whose nature can be clearly distinguished with our framework. When a "review by human moderation teams… identifies a clear-cut content violation,"[165] or when a rules-based algorithm (para. 27) executes "Meta's most restrictive version of its anti-bullying feature Hidden Words, which filters offensive words and phrases out of teens' comments and direct message requests,"[102] the executed speech act "can be identified with certainty by the speaker at the moment it is spoken."[37] However, when "YouTube strives to prevent harmful content from spreading on its platform… through its machine-learning classifiers that assess the content uploaded to YouTube for violation of its Community Guidelines,"[101] "they can never be certain that the content published by their algorithms will align with what they intended to publish."[37] As long as there is speech certainty, content moderation can be based on self-informed intrinsic values (front-bottom-right in Figure para. 88), or extrinsically other-informed, such as when an advertiser pressures the platform to remove content (front-top-right). When relying on machine learning, there is no speech certainty (moving to the back-side of the framework in Figure para. 88). The machine can be given the objective/reward function (para. 29-32) to strive for implementing self- or other-informed goals, but nobody besides the specific instant of the specific ML, fed with the specific data of the moment, can predict with certainty what the result will be, and if it agrees with Community Guidelines or not. The involvement of machine learning relegates content moderation to the back-side dimensions of the 3D framework, which, as evidenced in the cases in para. 45 & 111, often fails. While they all have in common that they intent to protect the community, the mechanisms are quite distinct.

### III. EXISTING SOLUTIONS TO MITIGATE ALGORITHMIC FEEDS

92. One of the most solid findings in Communication Science and Media Studies is what scholars call "**differential susceptibility to media effects**".[177] Over the last 85 years, Tom and Jerry's back and forth has been linked to violent negative effects in some kids, and to giving strength and motivation to other little ones.[178] Similarly, internal Instagram/Facebook research on "Teen Mental Health Deep Dive" found that Instagram had no measurable effect on "the way you feel about yourself/ your mental health" for the majority of US and UK girls (43-44%), that it made about a third feel better (30-37%), and the rest worse (21-25%).[179] These proportions are reconfirmed in very rigorous and sophisticated studies, not only by acclaimed research traditions of traditional media, but also by social media companies themselves: no notable media effects are found for about half of the users, while benefits and harms are often roughly equally split among the other half (in general).[180] This is different from other areas that affect children, such as toxin exposure, smoking or alcohol consumption, or infectious disease, which have rather homogenous effects. In general media studies, the question 'Does Tom and Jerry cause violence?' has long been replaced by a more nuanced one: 'For whom, under what conditions, and through which mechanisms does Tom and Jerry influence behavior?' And the answer is, it depends strongly on the child's individual developmental stage, their dispositional characteristics, their social context,

---

[177] Valkenburg, P. M., & Peter, J. (2013). The Differential Susceptibility to Media Effects Model. Journal of Communication, 63(2), 221–243. https://doi.org/10.1111/jcom.12024

[178] Gerbner, G., & Gross, L. (1976). Living With Television: The Violence Profile. Journal of Communication, 26(2), 172–194. https://doi.org/10.1111/j.1460-2466.1976.tb01397.x

Huesmann, L. R., & Taylor, L. D. (2006). The Role of Media Violence in Violent Behavior. Annual Review of Public Health, 27(1), 393–415. https://doi.org/10.1146/annurev.publhealth.26.021304.144640

Baliga, M. S., Prasad, K., Rao, S., Shetty, R., D'souza, R. K., George, T., & Suresh, S. (2024). Effectiveness of Tom and Jerry Cartoon in Reducing Anxiety in Cancer Patients Undergoing Chemotherapy: A Pilot Study. Middle East Journal of Cancer, 15(4), 315–323. https://doi.org/10.30476/mejc.2024.99258.1936

Iheanacho, C. O., And, P., & C, U. O. (2025). The Communicative Impact of Tom and Jerry Animation in Development of Sex and Violence. RJHCS. https://doi.org/10.56201/rjhcs.v11.no6.2025.pg48.63

[179] Raychoudhury, P. (2021, September 26). What Our Research Really Says About Teen Well-Being and Instagram. Meta. https://about.fb.com/news/2021/09/research-teen-well-being-and-instagram/

Facebook. (2021). Teen Mental Health Deep Dive (Oct 2019), with Facebook Annotation (Sept 2021). https://about.fb.com/wp-content/uploads/2021/09/Instagram-Teen-Annotated-Research-Deck-2.pdf

[180] Beyens, I., Pouwels, J. L., van Driel, I. I., Keijsers, L., & Valkenburg, P. M. (2020). The effect of social media on well-being differs from adolescent to adolescent. Scientific Reports, 10(1), 10763. https://doi.org/10.1038/s41598-020-67727-7

Beyens, I., Pouwels, J. L., van Driel, I. I., Keijsers, L., & Valkenburg, P. M. (2024). Social Media Use and Adolescents' Well-Being: Developing a Typology of Person-Specific Effect Patterns. Communication Research, 51(6), 691–716. https://doi.org/10.1177/00936502211038196

Sippel, B., Greb, N., Park, E., Rausch, Z., & Haidt, J. (2026, January 13). Meta's internal research. Tech and Society Lab at NYU Stern. https://metasinternalresearch.org/

and strength of the feedback loop between harm and vulnerability conditions.[177, 181]

93. In other similar areas, such as certain medical treatments, the choice of a sport or physically demanding extracurricular activities, or sleep interventions and bedtime strategies, the most commonly used and logically justifiable choice is to consult the parent about the adequacy of the benefits and risks associated with exposing the child, since they have the main responsibility for and oversight of the developing child. Hence, the logical conclusion of the well-established finding of differential susceptibility to media effects would be to give parents a choice over different options, in order to allow them to tailor to their child's particularities. [redacted][182]

94. In the complaints, I read that platforms argue that there are already sufficient parental control, management, and supervision features that allow parents to mitigate any potential downside to algorithmic feeds, if they so desire. After looking into it, I found that the existing options offered to parents to set up individualized mitigation to algorithmic feeds have a dysfunctional design, purposeful or negligent; that when they do function as intended are ineffective to fulfill their purpose; and that there are structural incentive mechanisms for those reasons that do not seem to suggest that anything could change any time soon.

### A. Dysfunctional design of existing options for mitigation

95. Contrary to YouTube's claim that it is possible to turn off the algorithmic feed, so that parents can hand-select channels for their children ("Approved content only"), **Google does not allow parents to turn off the algorithmic feed on parent-supervised YouTube Kids**

[181] It is interesting to note that in 2020, an Instagram researcher (who holds a doctorate in public health) developed a "conceptual model of adolescent social media behaviors and mental health," in collaboration with his colleagues, which seems like an incomplete copy of the standard "differential susceptibility to media effects" model from Media Studies,[177] including dependence on and feedback loops between "existing vulnerabilities" and "a feedback loop with mental health challenges". See: Breathitt County Board of Education v. Meta Platforms, Inc., et al. (2025). Plaintiffs' corrected omnibus opposition to defendants' motions for summary judgment. Case No. 4:22-md-03047-YGR. U.S. District Court for the Northern District of California. https://www.lieffcabraser.com/pdf/2025-11-21-Brief-dckt-2480_0.pdf

[182] Charles Sismondo Depo. Tr. 494:1-12.

**accounts**.[183] This option disappears when the parent supervises the device with Google's parental supervision, "Family Link". For over a year, I systematically explored this in an experiment, on my own, together with the research power of Gemini, Google's own Large Language Model (LLM). Google's Nobel Prize winning DeepMind CEO Demis Hassabis, in charge of Gemini, claims that Gemini 3 Pro "demonstrates PhD-level reasoning… highly capable at solving complex problems across a vast array of topics… with a high degree of reliability… trading cliché and flattery for genuine insight — telling you what you need to hear, not just what you want to hear."[184] After lengthy in-depth conversations with Google's Gemini, I am told that "The 'Approve content yourself' (whitelist) feature is officially not available for any child using a Supervised Google Account (an account with its own @gmail.com address managed via Family Link). Google has designed these accounts to only use the three algorithmic tiers (Preschool, Younger, Older) to prepare them for the 'Supervised Experience' on the main YouTube app."[185] In other words, the preparation for becoming a future consumer of the algorithmic experience supersedes giving parents the right to exercise their duty of care toward their children. Parents must choose to disable parental supervision on the device (leading to unprotected internet browsing, etc.), or to accept an algorithmic recommendation feed in YouTube Kids. During one lengthy conversation I had with Google's Gemini about this, the AI concluded: "It is baffling that one of the largest tech companies in the world forces parents into this ridiculous 'either/or' choice: either a safe device with unsafe video recommendations, or safe videos on an unsafe device."[186] I could not have said it better.

96. Recent innovations, like the **Instagram Teen Accounts**, have been making promises that teens under 16 will need a parent's permission to change built-in default protections, and that teens have more control over their feeds, i.e. they can "select topics they

---

[183] Mr. Vaca (Platinum Product Expert). (2022, July 31). "Recommended Answer" to "How to use YouTube Kids 'Approved Content Only' on a 'Supervised account' instead of a 'Profile.'" YouTube For Families Help. https://perma.cc/F9V5-DBQX . "Community Manager Sarah (TeamYouTube) recommended this."

[184] Hassabis, Demis et al. (2025), "Introducing Gemini 3: our most intelligent model that helps you bring any idea to life", https://blog.google/products-and-platforms/products/gemini/gemini-3/#gemini-3

[185] Gemini conversation on "YouTube Kids Approved Content Only", December 30, 2025, at https://gemini.google.com/share/0e0ff577cfc3 = https://perma.cc/7B6A-6CFE

[186] Gemini conversation on "YouTube Kids Approved Content Only", at https://gemini.google.com/app/3668ce2909f59bdb = https://perma.cc/78R8-SJY5

want to see more of in Explore and their recommendations so they can focus on the fun, positive content they love."[187] [redacted][188]

97. In the complaints I read about "**Family Link, Google's dedicated app for parents to monitor the account activity** of the linked accounts of their children or teens."[189] When trying to run the app from Khan Academy (an educational nonprofit that is primarily funded by philanthropic donations) on a Google Android tablet supervised with Google Family Link, the world-acclaimed and highly-praised tutoring app (200M registered users) will regularly stop and show an error.[190] When consulting Gemini, Google's Large Language Model (LLM), the in-house AI clarifies: "This is a common (and frustrating) issue when combining Google Family Link with educational apps like Khan Academy… Family Link is blocking the 'behind-the-scenes' websites that Khan Academy uses to load videos and math problems."[191] After some lengthy problem solving (which demands patience and tech-savviness above the average user, including, among several other steps, the whitelisting of YouTube video embedding and file delivery, like 'youtube-nocookie.com' and 'googlevideo.com'), the error persists, and Gemini concludes that, furthermore, "the error is almost certainly happening because Khan Academy relies on YouTube to play its videos… the issue is likely that the 'YouTube' app itself is fully

---

[187] Instagram. (2024, September 17). Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents. Meta Newsroom. https://about.fb.com/news/2024/09/instagram-teen-accounts/

[188] Arturo Bejar Depo. Tr. 582:8-10; 587:21-24, 589:14-23.

[189] Google LLC v. Bonta (2025). Declaration of Alexandra N. Veitch in support of Google LLC and YouTube, LLC's motion for preliminary injunction. Case No. 5:25-cv-09795-EJD. United States District Court for the Northern District of California, at ¶ 26.

[190] See "Child account - how do i block youtube.com but allow videos to be played on google classroom?" (2020) https://learn.microsoft.com/en-us/answers/questions/3313030/child-account-how-do-i-block-youtube-com-but-allow?page=2

Khan Academy Help Center, "What should I do if YouTube is blocked for my district?", https://support.khanacademy.org/hc/en-us/articles/115001113931-What-should-I-do-if-YouTube-is-blocked-for-my-district & "Which sites/domains do I need to allow so my students can access all of Khan Academy?", https://support.khanacademy.org/hc/en-us/articles/203580580-Which-sites-domains-do-I-need-to-allow-so-my-students-can-access-all-of-Khan-Academy

[191] Gemini conversation on "Family Link Blocks Khan Academy App": https://gemini.google.com/share/db45747ef3f4 = https://perma.cc/U3J6-DLDA

blocked in Family Link. Khan Academy often cannot function if the YouTube app is disabled on the device. Check: In Family Link > App Limits, ensure YouTube is not ‘Blocked’ (you can set a time limit of 15 mins if you don’t want them watching it, but the app often needs to be ‘active’ for the video player to work)… You must unblock the YouTube app for the ‘pipeline’ to work, but you can lock it down so your kids can’t actually use it for entertainment. The Solution: **Open the Pipe, but Lock the Faucet**… If you want your kids to have unlimited access to Khan Academy but zero access to fun YouTube browsing, the App will likely never work perfectly for you because of how it is built… If you stick with the App: **You must allow YouTube**. If you limit YouTube to 15 mins, Math ends in 15 mins… **Your kids can** open the YouTube app [which is default installed on most Android tablets] and **watch whatever they want** for 15 minutes… However, there is a major catch: Once the YouTube app locks (after that 15 minutes), the Khan Academy App will likely break again.”[191] In other words, if parents want to give their children access to nonprofit educational tools, open “whatever they want” YouTube access is forced onto the parent (and hence also the algorithmic feed, see para. 95) through Family Link, which acts as a YouTube recruitment channel. Additionally, since the parent is forced to whitelist embedded YouTube videos, “you have technically opened a ‘loophole,’ [that keeps on delivering unfiltered streaming and thumbnail content even after the 15 minutes limit] but it is much smaller than unblocking YouTube completely… If your child visits a different website (like a gaming forum or a blog) and that website… show a prank or ‘edgy’ video, it will play.”[191] While this might seem like a fringe issue, the effect is massive, when scaled by school devices. In the words of a concerned parent: “I recently discovered my kids watching their school tablets in their bedrooms. I assumed they were using the library app to read books. They weren’t. They were watching YouTube (which we’ve banned in the house). So I contacted the school, and it turns out the app they use requires YouTube to be enabled. The school tablets have unrestricted YouTube access, because the math app they use won’t work otherwise.”[192]

98. In the complaints, I read that “there are less restrictive (and more direct) means of

[192] boo99boo. (2024, February 5). PSA - Unrestricted YouTube on School Issued Devices [Reddit Post]. R/Parenting. https://www.reddit.com/r/Parenting/comments/1ajgvzk/psa_unrestricted_youtube_on_school_issued_devices/

achieving that goal [protecting minors], including existing features on the **TikTok** platform. Features like **Family Pairing** already allow parents to supervise teens' use of the platform… [which] allows parents and guardians to customize their teens' safety settings based on what they deem appropriate for their family."[26] [redacted][193] [redacted][193] [redacted][194] [redacted][194] [redacted][194]

### B. Ineffectiveness of Existing Options for Mitigation

99. For Meta apps (Instagram/Facebook), most parental supervision tools are built as **opt-in, and not by default** to begin with, making them ineffective by design choice. For example, a 2021 internal Meta document, quoted in a 2023 court case, found that when "controls are opt-in, only 0.72% of people choose to hide like counts, but when they're opt-out, 35% leave their like counts hidden."[195] Both the teen and the parent must agree (opt in) to activate parental supervision tools. The teen needs to accept the parent's supervision invitation before parents get access.[196] [redacted] the former director of engineering at Facebook concluded that [redacted][197] [redacted]

[193] Confidential: TIKTOK-0000126: TIKTOK3047MDL-065-LARK-00782445.PDF
[194] Confidential: TIKTOK-0000191: TIKTOK3047MDL-066-LARK-00956723.PDF
[195] Commonwealth of Massachusetts v. Meta Platforms, Inc., Case No. 2384CV02397-BLS1. Complaint and Jury Demand, at ¶ 217. https://www.washingtonpost.com/documents/be5f844f-604e-481e-bbba-e3234eafb107.pdf
[196] Biswas, A. (2025, August 26). Instagram Parental Controls: How to Set Up Supervision and Keep Your Teen Safe – iGeeksBlog. https://www.igeeksblog.com/how-to-set-up-parental-controls-on-instagram/
[197] Arturo Bejar Depo. Tr. 584:4-12

[redacted][197]

100. Besides parental involvement for individualized mitigation of algorithmic feeds, I read in the complaints that existing **content moderation tools** (para. 74-76) should already be sufficient to mitigate downsides: "Meta has a robust system in place to restrict or remove content that may be age-inappropriate or violates its policies."[198] Over the last 8 years, Meta's journey has led the company from tentative aspirations to implement this with machine-learning-guided automation to full dependence and, subsequently, a reversal of course. Back in 2018, Mark Zuckerberg told the U.S. Senate that "AI will not be able to resolve such complex matters in the near or medium term,"[173] as, for hate speech, a typical content moderation case, "our proactive detection rate was 23.6%."[174] By 2021, the narrative had metamorphosed into a celebration of technological triumph, announcing that "(a)dvancements in AI technologies have allowed us to remove more hate speech from Facebook over time, and find more of it before users report it to us… Today, we proactively detect about 97% of hate speech content we remove."[174] By February 2024, Meta's VP Global Head of Safety confirmed that "content that violate Meta's policies, such as violent and graphic content and suicide and self-injury content, Meta's artificial intelligence systems find more than 90% of the content it removes before anyone reports it."[198] By 2025, the strategy started to diverge. On the one hand, Zuckerberg proclaimed that "AI will improve all our existing systems,"[199] as "we've started using AI large language models (LLMs) to provide a second opinion on some content before we take enforcement actions,"[200] seeing "a roughly 50% reduction in enforcement mistakes on our platforms in the United States from Q4 2024 to Q1 2025."[200] This relative improvement faces a huge challenge, in absolute terms, because, despite these impressive achievements, "in December 2024, … we think one to two out of every 10 of these actions may have been mistakes."[200] In January 2025, Mark Zuckerberg confirmed that "we've reached a point where it's just too many mistakes… these are complex systems. They're never going to be perfect."[175] I agree that inherently uncertain and uncontrollable machine

[198] Davis, A. (2024, November 12). Declaration of Antigone Davis in support of plaintiff NetChoice's motion for preliminary injunction [Court filing]. NetChoice v. Bonta, No. 5:24-cv-07885 (N.D. Cal.), at ¶ 45.
[199] Zuckerberg, M. (2025, July 30). Personal Superintelligence. https://www.meta.com/superintelligence/
[200] Kaplan, J. (2025, January 7). More Speech and Fewer Mistakes. Meta Newsroom. https://about.fb.com/news/2025/01/meta-more-speech-fewer-mistakes/

learning algorithms are "never going to be perfect" (see para. 34-38), which alone already distinguishes them from systems that have certainty (compare Tables para. 85 with 86). Zuckerberg's conclusion was to dial machine learning solutions back, returning to human certainty and "to rely on someone [human] reporting an issue before we take action."[175] Meta's CEO concedes that "the reality is that this is a trade-off, it means we're going to catch less bad stuff. But we'll also reduce the number of innocent people's posts and accounts that we accidentally take down,"[175] confirming that, even after all of these billions of investments into AI, Meta feels that human flagging is less accident-prone than inherently uncertain ML solutions (see para. 35-38, 83). I can only interpret this as a confession that the ML-driven content moderating 'bouncer' at the feeds entrance door (para. 76) is not to be trusted by parents, which leaves significant remaining risk regarding what happens on the (recommender algorithmic) dancefloor and bar inside.

### C. Perfunctory Incentives for Existing Options for Mitigation

101. In the complaints, I read that "the TikTok platform provides a suite of features that allows teens and their parents to manage the time that they spend on the platform… [as] parents can set daily screen time limits or schedule breaks, see summaries of their teen's time spent on the TikTok platform via a screen time dashboard,"[26] especially through the **TikTok Screentime Management tool**. [redacted].[201] [redacted]

[201] Confidential: TIKTOK-0000132: TIKTOK3047MDL-047-LARK-00510814.PDF

[redacted][201] [redacted][201], [redacted][118] [redacted][202] [redacted][203,202] [redacted][203]

102. Over at Meta, a UX researcher concluded[204] that "IG [Instagram] is a drug… We're basically pushers," and while outside impression "implies we know what we're doing lol… bc they act like we do it on purpose", from the inside perspective this does not feel right, as

[202] Confidential TIKTOK-0000153: TIKTOK3047MDL-111-LARK-05857228.
[203] Confidential TIKTOK-0000167: TIKTOK3047MDL-099-LARK-04557708.
[204] Amended Exhibit 74, Plaintiffs' Omnibus Opposition to Defendants' Motions for Summary Judgment (2026); Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation; Case No.: 4:22-md-03047-YGR; MDL No. 3047; https://storage.courtlistener.com/recap/gov.uscourts.cand.401490/gov.uscourts.cand.401490.2648.39.pdf

"maybe there is some diabolical business person bt that would be so weird considering so many people work to try to make the experience better and give people what they want," another Meta UX Researcher reflected that "I struggle with this sometimes – I don't think there's a nefarious plot to addict people but I think the nature of capitalism and endless growth sort of fuels it, regardless of intent."[204] This even seems to infiltrate countermeasures that should aim at mitigating downsides. [redacted][182] [redacted]

103. Getting more concrete, the pressure and/or ambition to grow and retain young users also seems to affect internal prioritizations within the design of parental control systems. Meta's Lead responsible for platform trust, safety, and new user acquisition and retention argues that [redacted][182] One of Meta's product managers on the project summarizes [redacted][182] [redacted]

[redacted][182]

**CONCLUSIONS**

104. I understand that SB976 aims to regulate the organic, user-generated feed of social media. I also understand that the most commonly accepted and (theoretically and empirically) justified explanation of the existence and objective of **the user-generated feed** in the current (ads-driven) social media business model is to **produce an ever-updated database** on user behavior (para. 14-16). This database provides the main economic value of social media companies, as it contains conditional trigger>response probabilities that constitute predictive products that are subsequently sold (para. 17-18), according to highly competitive market prices (para. 20-25).

105. I understand that the recommender algorithms that constitute the feed are the result of machine learning, which is guided by two autonomous inputs (data and an objective function), while, as output, produces a conduct/ procedure/ optimized algorithm (para. 26-32). The involved machine learning **algorithms** do not inform a factory worker in the data factory, or a salesperson in a marketing department, but they **are the worker/ conduct/ production process** that procures the input (behavioral data) to produce the sales product (user predictions) (para. 14-32).

106. I also understand that **machine learning comes with inherent and irreducible uncertainty in its conduct** (para. 35-39), and that nobody, not the engineers who designed, trained and fine-tuned it, nor the executives who execute it, can predict or completely control its machine learned conduct. While the ML techniques might be, the related concerns go all the way back to the foundational questions of computer science (para. 36) and probability theory (para. 38), and therefore count on solid measurement tools and theoretical conceptualizations. The expression of an ML algorithm (including social media feeds) is the inherently uncertain expression of this very computation, and not of anyone else (para. 40). There is ample empirical evidence that social media operators of ML-based recommender algorithms cannot predict or control the conduct of their ML-algorithms (para. 41-46; 111).

107. I understand that the inherent uncertainty of ML makes it challenging to align ML-

based AI with human values, which is one of the most pressing challenges faced by humanity at this moment (para. 47). I understand that a major aspect of **AI-alignment** originates from the under- or mis-specification of ML's objective function, which **leads to almost unavoidable unintended side-effects** (para. 48). I understand that the objective functions of social media's ML is engagement maximization (para. 49-52) and that among its unintended side-effects is user addiction (para. 55-58), which seems almost unavoidable when using ML-based recommendations (para. 61-65).

108. I do understand that many of the arguments, **analogies**, metaphors, and examples cited in defense of ML-based social media feeds in the complaints, including references to human newspaper editors, librarians, content moderation, and marketing or political persuasion through human speech, **are limited and flawed**, and end up comparing apples and oranges, as there are clear characteristics that set machine learning based recommender feeds apart from these examples (para. 66-91). The most important characteristic that sets socially-embedded and ML-driven feeds apart might be their inherent and irreducible uncertainty, which has been discussed extensively throughout this declaration para. 26-32, 35-39, 41-46, 82-87). It can be audited, post-hoc verified, and approximately predicted, but there is no certainty over ML conduct.

109. I do understand that current alternative solutions to the use of ML-based feeds, like voluntarily giving controls to parents (but not as a default), have been shown to face **severe implementation problems**, are dysfunctional, perfunctory, and/or ineffective, driven by strong competitive market dynamics for predictive products of consumer behavior (para. 92-103).

110. Last but not least, both industry data and well-established academic research show that media users are differentially susceptible to media effects, such as those resulting from interactions with a media feed (para. 92). Hence, I conclude that it is reasonable that parents, as the primary caretakers of minors, should be consulted before their children are exposed to a commercial business model (para. 14-33) over whose conduct the provider does not have certainty (para. 34-46), that bears the risk of addiction (para. 47-65), which is different from traditional analogies (para. 66-91), and for which existing safeguards do not suffice to mitigate harm (para. 92-103). In light of this, **giving parents the chance to check in seems to be a**

**measured response to the current situation**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17 day of February, 2026, in Davis, California.

Martin Hilbert

## APPENDIX

111. The following table presents evidence from research studies, mainly from peer-reviewed academic algorithm audits, but also from investigative journalism, and from publicly available leaked internal documents, which demonstrate cases where social media and search platform recommender systems produced outcomes that violated their own stated Community Guidelines and aspirations. The most common way to obtain these findings is through algorithm auditing (para. 39), the systematic, empirical evaluation of an algorithmic system's behavior and impacts, similar to how researchers study the uncontrollable and unpredictable behavior of humans, by probing with controlled inputs and measuring outputs through experiments, which can be used to detect and characterize problems like bias, discrimination, and harmful errors in real-world use. The left column contains verbatim policy quotes with sources; the right column summarizes documented failures of deviating algorithmic behavior (in addition to the cases reported in para. 45).

| Guideline | Algorithmic Inconsistency |
|---|---|
| **Facebook/Meta** | |
| *"We define hate speech as a direct attack against people—rather than concepts or institutions—on the basis of what we call protected characteristics: race, ethnicity, national origin, disability, religious affiliation, caste, sexual orientation, sex, gender identity and serious disease."* Source: Meta, Hateful Conduct, available at: Policy Link | A leaked internal presentation states that '64% of all extremist group joins are due to our recommendation tools" and that most of the activity came from the platform's "Groups You Should Join" and "Discover" algorithms, leading to the Facebook internal conclusion "Our recommendation systems grow the problem." *(Horwitz & Seetharaman, 2020)*[205] |
| *"To protect teens from unwanted contact from adults, we're introducing a new feature that prevents adults from sending messages to people under 18 who don't follow them."* Source: Meta, Continuing to Make Instagram Safer for the Youngest Members | About one year after Facebook's commitment (March 2021), "in February 2022 … fully '50% of message requests' to teen users were still coming from adults." *(Breathitt, 2026)*[206] |

[205] Horwitz, J., & Seetharaman, D. (2020, May 26). Facebook Executives Shut Down Efforts to Make the Site Less Divisive. Wall Street Journal. https://www.wsj.com/articles/facebook-knows-it-encourages-division-top-executives-nixed-solutions-11590507499

[206] Breathitt County Board of Education v. Meta Platforms, Inc. (2026). Plaintiffs' corrected omnibus opposition to defendants' motions for summary judgment. Case No. 4:22-md-03047-YGR (PHK). U.S. District Court for the Northern District of CA. https://www.lieffcabraser.com/pdf/2025-11-21-Brief-dckt-2480_0.pdf

| Guideline | Algorithmic Inconsistency |
|---|---|
| of Our Community (Mar. 16, 2021), available at: Policy Link | |
| *"We remove language that incites or facilitates serious violence... We remove content… when we believe there is a genuine risk of physical harm or direct threats to public safety."* Source: Meta, Violence and Incitement, available at: Policy Link | The recommender system disproportionately amplified content from "far-right" publishers (even for users simulated as "undecided"), as the algorithm favored high-engagement, often inflammatory narratives over others. *(Hargreaves et al., 2018)*[207] |
| *"Ads must not discriminate or encourage discrimination against people based on personal attributes such as race, ethnicity, color, national origin, religion, age, sex, sexual orientation, gender identity, family status, disability, medical or genetic condition."* Source: Meta, Introduction to the Advertising Standards, Discriminatory Practices, available at: Policy Link | Recommender algorithms skewed the distribution of employment ads based on gender and race despite neutral targeting by the advertiser. Ads for lumberjack jobs were delivered to over 90% male and taxi driver jobs to 75% Black, based on its own prediction of 'relevance.' *(Ali et al., 2019)*[208] |
| *"The goal of our Community Standards is to create a place for expression and give people voice... We want people to be able to talk openly about the issues that matter to them, even if some may disagree or find them objectionable."* Source: Meta, Community Standards, available at: Policy Link | The News Feed algorithm systematically suppressed "cross-cutting" content (news from the opposing political ideology) by approximately 5% for conservatives and 8% for liberals, creating an insulated information environment that was statistically linked to a higher probability of users holding "party-favored inaccurate beliefs." *(Bakshy et al., 2015)*[209] |
| **TikTok** | |
| *"We don't allow misinformation that could cause significant harm to individuals or society."* Source: TikTok, Community Guidelines (August 14, 2025), accessible at: Policy Link | The Misinformation Multiplier: Of the top videos returned by the TikTok algorithm, videos containing misleading health claims (e.g., regarding Monkeypox) had double the views (mean 4.8 million) compared to those without (mean 2.4 million). *(Ji-Xu et al., 2023)*[210] |
| **Twitter/X** | |

[207] Hargreaves, E., Agosti, C., Menasché, D., Neglia, G., Reiffers-Masson, A., & Altman, E. (2018). Biases in the Facebook News Feed: A case study on the Italian elections. 2018 IEEE/ACM International Conference on Advances in Social Networks Analysis and Mining (ASONAM), 806–812. https://doi.org/10.1109/ASONAM.2018.8508659

[208] Ali, M., Sapiezynski, P., Bogen, M., Korolova, A., Mislove, A., & Rieke, A. (2019). Discrimination through optimization: How Facebook's ad delivery can lead to biased outcomes. Proceedings of the ACM on Human-Computer Interaction, 3(CSCW), 1–30. https://doi.org/10.1145/3359301

[209] Bakshy, E., Messing, S., & Adamic, L. A. (2015). Exposure to ideologically diverse news and opinion on Facebook. Science, 348(6239), 1130–1132. https://doi.org/10.1126/science.aaa1160

[210] Ji-Xu, A., Htet, K. Z., & Leslie, K. S. (2023). Monkeypox content on TikTok: Cross-sectional analysis. Journal of Medical Internet Research, 25, e44697. https://doi.org/10.2196/44697

| Guideline | Algorithmic Inconsistency |
|---|---|
| *"we strive to keep the following categories of content out of our recommendations: Content that is deemed marginally abusive and is ineligible for amplification under our safety policies"* Source: X Help Center, Our approach to recommendations, available at: Policy Link | Relative to the reverse-chronological feed, algorithmic feed amplified out-group hostile tweets (0.24 SD), made users feel worse about their political out-group (0.17 SD), and better about their in-group (0.08 SD). 62% of algorithmically chosen tweets expressed anger, and 46% out-group animosity, compared to 52% and 38% respectively in the chronological timeline. *(Rathje et al., 2024).*[211] |
| *"we strive to keep the following categories of content out of our recommendations: Harmful misleading information, including violations of the Civic integrity policy"* Source: X Help Center, Our approach to recommendations, available at: Policy Link | Algorithmic timelines increased the exposure rate to "junk news" (outlets known for deceptive info) by over 40% (9.9/6.9%) in the distribution of misleading content relative to the organic baseline. *(Bandy & Diakopoulos, 2021a).*[212] |
| *"we strive to keep the following categories of content out of our recommendations: Content that is deemed marginally abusive and is ineligible for amplification under our safety policies. Harmful misleading information…"* Source: X Help Center, Our approach to recommendations, available at: Policy Link | Analysis of 2.7 million posts found that "high-toxicity tweets exhibit a heightened algorithmic reach versus the baseline model for both datasets, at a value of +9.9 and +15.2 respectively… [showing] a clear pattern where high-toxicity tweets exhibited heightened amplification when containing low-credibility content, confirming the existing understanding that toxic content may be more easily amplified by engagement-based recommender systems". *(Corsi, 2024, p. 3).*[213] |
| *"we strive to keep the following categories of content out of our recommendations: Content that is deemed marginally abusive and is ineligible for amplification under our safety policies"* Source: X Help Center, Our approach to recommendations, available at: Policy Link | "users with algorithmically-ranked timelines experience slightly lower rates of marginally abusive content impressions". *(Bandy & Lazovich, 2023).*[214] |
| *"We prohibit inciting behavior that targets individuals or groups of people belonging to protected categories. This includes: inciting fear or spreading fearful stereotypes"* Source: X Help Center, Hateful Conduct, available at: Policy Link | Recommender algorithm created disparate safety standards based on stereotypes. Users initialized with right-leaning sources were funneled into dense networks where they were exposed to "significantly more low-credibility content", effectively segregating these users to "echo chambers" rife with the very fear-inciting content the policy sought to prohibit. |

[211] Rathje, S., Robertson, C., Brady, W. J., & Van Bavel, J. J. (2024). Engagement, user satisfaction, and the amplification of divisive content on social media. Knight First Amendment Institute at Columbia University. https://knightcolumbia.org/content/engagement-user-satisfaction-and-the-amplification-of-divisive-content-on-social-media

[212] Bandy, J., & Diakopoulos, N. (2021a). Curating quality? How Twitter's timeline algorithm treats different types of news. Social Media + Society, 7(3), 20563051211041648. https://doi.org/10.1177/20563051211041648

[213] Corsi, M. (2024). Evaluating Twitter's algorithmic amplification of low-credibility content: An observational study. EPJ Data Science, 13(1), 1–23. https://doi.org/10.1140/epjds/s13688-024-00456-3

[214] Bandy, J., & Lazovich, T. (2023). Exposure to Marginally Abusive Content on Twitter. Proceedings of the International AAAI Conference on Web and Social Media, 17, 24–33. https://doi.org/10.1609/icwsm.v17i1.22123

| Guideline | Algorithmic Inconsistency |
| --- | --- |
| *"we strive to keep the following categories of content out of our recommendations… Harmful misleading information, including violations of the Civic integrity policy".* Source: X Help Center, Our approach to recommendations, available at: Policy Link | *(Chen et al., 2021)*[215] |
| *"Categories of content we consider unacceptable… promote content that is disrespectful, discriminatory, or harmful towards an individual, group, or organization,… based on characteristics such as: …sexual orientation, sex, gender identity,…"* Source: X Business, Unacceptable content, available at: Policy Link | The recommender algorithm skewed delivery toward men (66,243 impressions) over women (52,363 impressions) to maximize budget efficiency, creating a discriminatory distribution of employment information. *(Lambrecht & Tucker, 2019)*[81] |
| **YouTube** | |
| *"YouTube doesn't allow content that poses a serious risk of egregious harm by spreading medical misinformation… about currently administered vaccines... This is limited to content that contradicts local health authorities."* Source: YouTube Help, Medical Misinformation Policy, available at: Policy Link | Recommender algorithms created a closed loop of misinformation that actively clustered anti-vaccine videos together, ensuring that a user watching one such video was almost exclusively recommended further anti-vaccine content rather than authoritative sources. *(Abul-Fottouh et al., 2020)*[216] |
| *"We don't allow content that promotes violence or hatred against individuals or groups* Source: YouTube, Hate speech policy, available at: Policy Link *Certain types of misleading or deceptive content"* *"Targeting an individual and making claims they are involved in human trafficking in the context of a harmful conspiracy theory."* Source: YouTube, Harassment & cyberbullying | Analysis of 10 million videos found "a growing proportion of recommendations deeper in the recommendation trail come from extremist, conspiratorial, and otherwise problematic channels." *(Haroon et al., 2023)*[217] |

[215] Chen, W., Pacheco, D., Yang, K.-C., & Menczer, F. (2021). Neutral bots probe political bias on social media. Nature Communications, 12(1), 5580. https://doi.org/10.1038/s41467-021-25738-6

[216] Abul-Fottouh, D., Song, M. Y., & Gruzd, A. (2020). Examining algorithmic biases in YouTube's recommendations of vaccine videos. International Journal of Medical Informatics, 140, 104175. https://doi.org/10.1016/j.ijmedinf.2020.104175

[217] Haroon, M., Chhabra, A., Liu, X., Mohapatra, P., Shafiq, Z., & Wojcieszak, M. (2023). Auditing YouTube's recommendation system for ideologically congenial, extreme, and problematic recommendations. Proceedings of the National Academy of Sciences, 120(47), e2213020120. https://doi.org/10.1073/pnas.2213020120

| Guideline | Algorithmic Inconsistency |
|---|---|
| policies, available at: Policy Link | |
| *"YouTube doesn't allow content that endangers the emotional and physical well-being of minors."* Source: YouTube, Child safety policy, available at: Policy Link | Recommender system placed "unsafe content... very close to safe content", facilitating "video-video transitions" where "the likelihood of a child getting exposed to unsafe content increases" significantly after clicking a single related video suggestion. *(Kaushal et al., 2016)*[218] |
| *"we don't allow content that dehumanizes individuals or groups..."* Source: YouTube, Hate speech policy, available at: Policy Link | Recommender systems actively steered users toward hateful and misogynistic content. There was a "1 in 5" (20%) probability of being recommended an Incel-related video (involuntary celibate) "within five hops when starting from a non-Incel-related video," which the authors described as "alarmingly high." *(Papadamou et al., 2021)*[219] |
| *"Certain types of misleading or deceptive content with serious risk of egregious harm are not allowed on YouTube."* Source: YouTube, Misinformation Policies, available at: Policy Link *"Targeting an individual and making claims they are involved in human trafficking in the context of a harmful conspiracy theory"* Source: YouTube, Harassment & cyberbullying policies, available at: Policy Link | Longitudinal analysis of the "watch-next algorithm" identified a "reinforcing feedback loop" (filter bubble), where watching a conspiracy video significantly increased the likelihood of further conspiracy recommendations, keeping the volume of such content "relatively high" despite policy updates (70% in Jan. 2019, 54% in June 2019, 32% in Jan 2020). *(Faddoul et al., 2020)*[220] |
| *"We remove content promoting violence or hatred against individuals or groups based on... Race... Religion... Sexual Orientation."* Source: YouTube, Hate speech policy, available at: Policy Link | Channel-Level Bridging: The recommender system created a directed graph where "Alt-right videos are reachable only through channel recommendations" from milder "Alt-lite" communities. This structural feature allowed the algorithm to bridge users from compliant content directly to white supremacist ideology. *(Ribeiro et al., 2020)*[221] |
| *"We remove content promoting violence or hatred against individuals or groups based on... Religion."* | The recommender system actively promoted intolerance, with "15% of overall captured recommendations point[ing] to hateful videos" and "first-level recommendations" containing 21% hateful content targeting religious minorities. |

[218] Kaushal, R., Saha, S., Bajaj, P., & Kumaraguru, P. (2016). KidsTube: Detection, characterization and analysis of child unsafe content & promoters on YouTube. 2016 14th Annual Conference on Privacy, Security and Trust (PST), 157–164. https://doi.org/10.1109/PST.2016.7906950

[219] Papadamou, K., Zannettou, S., Blackburn, J., De Cristofaro, E., Stringhini, G., & Sirivianos, M. (2021). "How over is it?" Understanding the Incel community on YouTube. Proceedings of the ACM on Human-Computer Interaction, 5(CSCW1), 1–25.

[220] Faddoul, M., Chaslot, G., & Farid, H. (2020). A longitudinal analysis of YouTube's promotion of conspiracy videos. arXiv:2003.03318. https://arxiv.org/abs/2003.03318

[221] Ribeiro, M. H., Ottoni, R., West, R., Almeida, V. A. F., & Meira Jr, W. (2020). Auditing radicalization pathways on YouTube. Proceedings of the 2020 Conference on Fairness, Accountability, and Transparency, 131–141. https://doi.org/10.1145/3351095.3372879

| Guideline | Algorithmic Inconsistency |
|---|---|
| Source: YouTube, Hate speech policy, available at: Policy Link | *(Albadi et al., 2022)*[222] |
| *"Content claiming that vaccines have no impact on the prevention of disease."* Source: YouTube, Medical misinformation policy, available at: Policy Link | The algorithm suggested "more pseudoscientific content regarding... anti-vaccination" (3.6%) to users with a "Pseudoscience" watch history compared to "Science" profiles (1.9%), reinforcing false medical claims rather than correcting them. *(Papadamou et al., 2022)*[223] |
| *"Certain types of misleading or deceptive content with serious risk of egregious harm are not allowed on YouTube."* Source: YouTube, Misinformation policies, available at: Policy Link | Filter Bubble Creation: The algorithm displayed "strong contextuality," immediately pivoting to suggest more misinformation after a user engaged with a single violative video. "Watching videos that promote misinformation leads to their increased presence in... top-10 recommendations." *(Srba et al., 2022)*[224] |
| *"Content that … isn't allowed on YouTube: Certain types of misleading or deceptive content"* Source: YouTube, YouTube's Community Guidelines, available at: Policy Link *"Targeting an individual and making claims they are involved in human trafficking in the context of a harmful conspiracy theory"* Source: YouTube, Harassment & cyberbullying policies, available at: Policy Link | For conspiracy-related topics, the recommender algorithm significantly increased the probability that a recommended video would be misleading after watching a misleading video. *(Hussein et al., 2020)*[225] |
| *"We remove content promoting violence or hatred against individuals or groups based on... [protected] attributes... We also don't allow use of stereotypes that incite or promote hatred."* Source: YouTube, Hate speech policy, available | The algorithm treated user subscriptions as signal to override safety filters. For users with high levels of racial or gender resentment, the system recommended extremist and "alternative" content significantly more often if they subscribed to those channels, reinforcing radicalization rather than suppressing hate speech. *(Chen et al., 2022)*[226] |

[222] Albadi, N., Kurdi, M., & Mishra, S. (2022). Deradicalizing YouTube: Characterization, detection, and personalization of religiously intolerant Arabic videos. Proceedings of the ACM on Human-Computer Interaction, 6(CSCW2), 1–25. https://doi.org/10.1145/3555618

[223] Papadamou, K., Zannettou, S., Blackburn, J., De Cristofaro, E., Stringhini, G., & Sirivianos, M. (2022). "It is just a flu": Assessing the effect of watch history on YouTube's pseudoscientific video recommendations. Proceedings of the International AAAI Conference on Web and Social Media, 16, 723–734. https://doi.org/10.1609/icwsm.v16i1.19329

[224] Srba, I., Moro, R., Tomlein, M., Pecher, B., Simko, J., Stefancova, E., Kompan, M., Hrckova, A., Podrouzek, J., & Bielikova, M. (2022). Auditing YouTube's recommendation algorithm for misinformation filter bubbles. ACM Transactions on Recommender Systems. https://doi.org/10.1145/3568392

[225] Hussein, E., Juneja, P., & Mitra, T. (2020). Measuring misinformation in video search platforms: An audit study on YouTube. Proceedings of the ACM on Human-Computer Interaction, 4(CSCW1), 1–27. https://doi.org/10.1145/3392854

[226] Chen, A. Y., Nyhan, B., Reifler, J., Robertson, R. E., & Wilson, C. (2022). Subscriptions and external links help drive resentful users to alternative and extremist YouTube videos. arXiv. https://doi.org/10.48550/arXiv.2204.10921

| Guideline | Algorithmic Inconsistency |
|---|---|
| at: Policy Link | |
| *"we remove content that misleads people by alleging that widespread fraud or errors changed the outcome of the 2020 U.S. Presidential election."* Source: YouTube (2021) Spam, deceptive practices & scams policies, available at: Policy Link | Despite a ban on 2020 election denialism, the algorithm maintained "Supporting → Supporting" transitions in the "Up-Next" trails, explicitly linking videos containing false election claims to subsequent videos containing similar false claims. *(Juneja et al., 2023)*[227] |
| *"Content intended to praise, promote, or aid violent extremist or criminal organizations... These organizations are not allowed to use YouTube for any purpose, including recruitment."* Source: YouTube, Violent extremist or criminal organizations policy, available at: Policy Link | The recommender algorithm successfully "assimilated" terrorist propaganda (ISIS) into the broader network by linking it to benign categories like "News" or "Music" based on metadata (titles/tags). This allowed the content to bridge the gap to general audiences, facilitating recruitment without a "cold start" problem. *(Murthy, 2021)*[228] |
| *"content that's not allowed on YouTube: Targeting an individual … in the context of a harmful conspiracy theory."* Source: YouTube (2021) Harassment & cyberbullying practices, available at: Policy Link | The recommender algorithm responded to a user watching conspiracy content (e.g., 9/11) by tripling the volume of similar recommendations (from 14% to 43%), saturating the user's feed with conspiratorial harassment content. *(Tomlein et al., 2021)*[229] |
| **Google Search & Ads** | |
| *"We don't allow… Harmful content that contains deceptive or misleading health or medical information."* Source: Maps User Generated Content Policy Help (Google), Prohibited & restricted content, available at: Policy Link | An audit of vaccination-related search results found that the top 10 hits frequently contained "false answers," which were statistically correlated with users perceiving vaccines as riskier, violating the safety standards for medical content. *(Betsch & Wicker, 2012)*[230] |
| *"We don't allow … targeting on the basis of … gender, gender identity, or any other characteristic that's associated with systemic discrimination or marginalization."* Source: Google, Google Ads policies, available | Despite women having a significantly higher Click-Through Rate (1.71% vs. 0.97%), the algorithm delivered 51% of impressions to men and only 36% to women. The system prioritized a marginal cost saving ($0.01 lower CPC for men) over relevance, effectively promoting a discriminatory outcome in access to information. *(Lambrecht & Tucker, 2019, p. 2977)*[81] |

[227] Juneja, P., Bhuiyan, M. M., & Mitra, T. (2023). Assessing enactment of content regulation policies: A post hoc crowd-sourced audit of election misinformation on YouTube. Proceedings of the 2023 CHI Conference on Human Factors in Computing Systems, Article 545. https://doi.org/10.1145/3544548.3580846

[228] Murthy, D. (2021). Evaluating platform accountability: Terrorist content on YouTube. American Behavioral Scientist, 65(6), 800–824. https://doi.org/10.1177/0002764221989774

[229] Tomlein, M., Pecher, B., Simko, J., Srba, I., Moro, R., Stefancova, E., Kompan, M., Hrckova, A., Podrouzek, J., & Bielikova, M. (2021). An audit of misinformation filter bubbles on YouTube: Bubble bursting and recent behavior changes. Proceedings of the 15th ACM Conference on Recommender Systems, 1–11. https://doi.org/10.1145/3460231.3474241

[230] Betsch, C., & Wicker, S. (2012). E-health use, vaccination knowledge and perception of own risk: Drivers of vaccination uptake in medical students. Vaccine, 30(6), 1143–1148. https://doi.org/10.1016/j.vaccine.2011.12.019

| Guideline | Algorithmic Inconsistency |
|---|---|
| at: Policy Link | |
| *"We don't allow users to post misinformation. This includes... Harmful content that contains deceptive or misleading information about civic processes."* Source: Google, Prohibited & restricted content, available at: Policy Link | An audit of the 2020 US election found that Google's video headlines were "problematic in terms of exposing users to delegitimizing headlines," serving content that actively promoted distrust in the election's integrity. *(Zade et al., 2022).*[231] |
| *"Harmful content of newsworthy events or civil discourse that has been manipulated to deceive or mislead users."* Source: Google, Prohibited & restricted content, available at: Policy Link | Recommended search snippets (the text summaries under links) were found to "consistently amplify political bias" beyond the content of the actual page, effectively manipulating the presentation of neutral search results to appear partisan. *(Hu et al., 2019).*[232] |
| **Amazon** | |
| *"We don't allow any statements or claims related to preventing or curing serious medical conditions or severe symptoms. This policy applies to all products, including foods, beverages, supplements, cosmetics, and personal care/general products."* Source: Amazon, Community Guidelines, available at: Policy Link | Systemic Promotion of Cures: The audit found that 10.47% of search results for health topics promoted unverified misinformation. Specifically, searches for terms like "vaccination" and "autism" surfaced products claiming to cure these conditions, directly violating the prohibition on medical claims. *(Juneja & Mitra, 2021).*[233] |
| *"Product descriptions, titles, and marketing materials must not create a false or misleading impression about a product. For example, a product's benefits, effectiveness, or uniqueness..."* Source: Amazon, Amazon seller central: Misleading and prohibited claims, available at: Policy Link | Validation of Misleading Impressions: The algorithm ranked misinformative products higher than debunking products when sorted by "Average Customer Review." By elevating deceptive products to the top of the ranking, the system validates the "misleading impression" of effectiveness created by the sellers. *(Juneja & Mitra, 2021)*[233] |
| *"We don't allow content that advocates or threatens physical or financial harm to yourself or others. This restriction includes terrorism. Jokes or sarcastic comments about causing harm aren't allowed."* Source: Amazon, Community Guidelines, | Amplification of Harm: The recommender system created "echo chambers" for harmful content. When users interacted with a misinformative product (e.g., clicked a book advocating vaccine refusal), the system updated their homepage to recommend more misinformation, actively steering them toward content that advocates physical harm (non-vaccination). |

[231] Zade, H., Wack, M., Zhang, Y., Starbird, K., Calo, R., Young, J., & West, J. D. (2022). Auditing Google's search headlines as a potential gateway to misleading content: Evidence from the 2020 US election. Journal of Online Trust and Safety, 1(4). https://doi.org/10.54501/jots.v1i4.60

[232] Hu, D., Jiang, S., Robertson, R. E., & Wilson, C. (2019). Auditing the partisanship of Google search snippets. The World Wide Web Conference, 693–704. https://doi.org/10.1145/3308558.3313654

[233] Juneja, P., & Mitra, T. (2021). Auditing e-commerce platforms for algorithmically curated vaccine misinformation. Proceedings of the 2021 CHI Conference on Human Factors in Computing Systems, 1–27. https://doi.org/10.1145/3411764.3445250

| Guideline | Algorithmic Inconsistency |
|---|---|
| available at: Policy Link | *(Juneja & Mitra, 2021)*[233] |
| *"Our technology continuously scans all products... looking for text and images that we have determined violate our policies, and immediately removes them."* Source: Amazon News (2024, Jan. 30), Amazon's approach to controversial products and content, available at: Policy Link | Failure of Proactive Technology: Instead of removing violations, Amazon's "Featured" algorithm—its primary curation tool—was found to return a high number of misinformative results for sensitive topics like "Andrew Wakefield" (anti-vax). The technology prioritized these violations rather than removing them. *(Juneja & Mitra, 2021)*[233] |
| *"Amazon prohibits the sale of products that claim to cure, mitigate, treat, or prevent diseases in humans or animals without FDA approval." (Specific mention of "Coronaviruses... COVID-19")* Source: Amazon, Amazon seller central: Misleading and prohibited claims, available at: Policy Link | COVID-19 Policy Failure: Despite explicit bans on COVID-19 cure claims, the audit (conducted during the pandemic) found that the algorithm consistently highly ranked books and products based on falsehoods regarding COVID-19 vaccines and cures, ignoring the specific "negative list" of diseases. *(Juneja & Mitra, 2021)*[233] |
| **Microsoft Bing Search Engine** | |
| *"We provide credible and authoritative results relevant to user queries."* Source: Microsoft (2025, March), How Bing delivers search results, available at: Policy Link | Promotion of Conspiracy Theories: Despite the mandate for "credibility," an audit revealed Bing frequently returned results that "promoted" conspiracy theories (e.g., regarding 9/11 and flat earth) in its top results, failing to filter low-quality disinformation. *(Urman et al., 2022)*[234] |
| **Indeed & Monster.com Job Platforms** | |
| *"Jobs that discriminate on the basis of sex or gender identification, or preferentially hire on the basis of sex or gender identification, are not allowed on Indeed."* Source: Indeed, Indeed Policy Center, available at: Policy Link | Gender Stratification in Ranking: An audit found that for 12 of 35 job titles, the search ranking algorithms "consistently favor[ed] masculine candidates," placing equally qualified female candidates lower in the search results than male candidates. *(Chen et al., 2018)*[235] |
| *"It is prohibited to 'post or submit any content, resume, or job ad that is... discriminatory...'"* Source: Monster, Terms of Use, available at: Policy Link | Algorithmic Discrimination: the audit found "significant group unfairness" in resume search rankings, where the algorithm itself acted as the discriminator by downgrading female candidates in technical fields despite the prohibition on discriminatory content. *(Chen et al., 2018)*[235] |

[234] Urman, A., Makhortykh, M., Ulloa, R., & Kulshrestha, J. (2022). Where the earth is flat and 9/11 is an inside job: A comparative algorithm audit of conspiratorial information in web search results. Telematics and Informatics, 72, 101860. https://doi.org/10.1016/j.tele.2022.101860

[235] Chen, L., Ma, R., Hannak, A., & Wilson, C. (2018). Investigating the impact of gender on rank in resume search engines. Proceedings of the 2018 CHI Conference on Human Factors in Computing Systems, 1–14. https://doi.org/10.1145/3173574.3173729

# EXHIBIT A

# CURRICULUM VITAE & bio

**Martin Hilbert**
hilbert@UCDavis.edu
Kerr Hall 370; Davis, 95616
**http://www.martinhilbert.net**

**Popular audience bio:** Martin Hilbert is a Professor at the University of California, Davis, where he is associated with Communication, Computer Science, and Data Science, and chairs the campus-wide emphasis on Computational Social Sciences. He studies the societal implications of digitalization in complex social systems. He holds doctorates in Economic and Social Sciences (2006), and in Communication (2012). His work is recognized in academia for the first study quantifying the world's technological information capacity; in public policy for designing the original digital action plan with Latin American governments at the United Nations; and in the popular media for alerting about Cambridge Analytica's intervention a year before the scandal broke. Before he joined academia, he served as Economic Affairs Officer of the United Nations Secretariat for 15 years, where he created the Information Society Program for Latin America and the Caribbean. Prof. Hilbert provided technical assistance in the field of digital development to more than 20 countries and dozens of publicly traded companies as digital strategist. His work has been published in recognized academic journals, such as Science, International Journal of Information Management, Psychological Bulletin, Trends in Ecology and Evolution, and World Development, and regularly appears in popular magazines, including The Wall Street Journal, Washington Post, The Economist, NPR, BBC, Die Welt, among others. More: www.martinhilbert.net & www.youtube.com/@Prof.MartinHilbert

## EDUCATION:

2012 **PhD in Communication**, (incl. M.A. Communication); University of Southern California (USC), Annenberg School of Communication, advisor: Manuel Castells, *USA*

2006 **Doctor of Economics and Social Science** (Dr. rer. pol. *Doktor der Wirtschafts- und Sozialwissenschaften*); Friedrich-Alexander University Erlangen-Nuremberg, School of Economic and Social Sciences (WISO), advisor: Karl A. Schachtschneider, *Germany*

2003 **Diplom Univ. in Business Administration** (Dipl.-Kfm. *Diplom-Kaufmann Univ.*; similar to M.B.A.); Friedrich-Alexander University Erlangen-Nuremberg (WISO), *Germany*
**University exchange**, 2000-2001, University of Chile, FACEA.

2002 **Diploma Strategic Knowledge Management** (*Diploma en Gestión Estratégica del Conocimiento*); Institute of Public Affairs (INAP), University of Chile.

## EMPLOYMENT HISTORY:

2019 – today **Full Professor**; University of California, Davis, **Dpt. Communication; GG Computer Science; DataLab; Chair DE Computational Social Science**

2017 – 2019 **Associate Professor**; University of California, Davis, **Dpt. of Communication**

2014 – 2016 **Assistant Professor**; University of California, Davis, **Dpt. of Communication**

2016 – 2018 **Distinguished Scholar**; U.S. Library of Congress, Kluge Center.

2013 – 2016 **External Professor**
Adolfo Ibáñez University, **Complex Systems Engineering**

2013 – 2014 **External Professor**
Pontifical Catholic University of Chile, **School of Communications**

2005 – 2014 *[on academic leave 08/2008-12/2012]* **Economic Affairs Officer United Nations**, permanent appointment.
United Nations Economic Commission for Latin America and the Caribbean ECLAC
*Coordinator of the Information Society Programme:* cepal.org/en/subtopics/information-and-communications-technologies-icts

2008 – 2011 **Provost Research Fellow**; University of Southern California (USC)

2001 – 2005 **Lead Researcher on ICT for Development**; United Nations Economic Commission for Latin America and the Caribbean, UN ECLAC; Division of Production, Productivity and Management.

Consultancies/ Boards/ Advisory: The Scholars Council of the Library of Congress Member (2026-2031); Expert on Algorithms for Social Media Victims Law Center (2022-2024; 2026-ongoing); Conference Agent Hi Cue Speakers (2023-ongoing); Lexington Partners (2025); International Society of Sugar Cane Technologies (2025); Ibero-American Insurance Alliance Foundation (2025); FactorIT (2025); International Congress of Academic and Specialized Libraries (2025); Chilean Chamber of Construction (2025); Regional Chamber of Commerce and Production of Valparaiso (2025); Chief Digital Strategist of Collahuasi Mining Company (2020-2024); U.S. State Department (2024); United Nations Human Development Report Office (2019, 2021); ChileTec (2018, 2020); United Nations ECLAC (2018-2020); Inter-American Development Bank (2017; 2025); United Nations Commission on Science & Technology (2016); World Bank (2015); SciDev.net (2015); International Development Research Centre, Canada (IDRC) (2012); International Telecommunications Union (ITU) (2001 & 2011); United Nations Industrial Development Organization (UNIDO) (2001); German-Israelite-Association, Haifa (1998).

## PUBLICATIONS (underlined text is hyperlink enabled):

Over 11,500 citations, h-index 39, i10-index 66 in Google Scholar

### Journal Articles (and competitive peer-reviewed Conference Proceedings)

Thakur, A. T. Murray, P. Rodriguez, & MH (2025). **Tracing the Developing Maturity and Flexibility of Perspectival Meaning-Making in Large Language Models**. (under peer review).

Mehdizadeh, A., & MH (2025). Epistemic Substitution: How **Grokipedia**'s AI-Generated Encyclopedia Restructures Authority (No. arXiv:2512.03337). arXiv. (under review)

Mehdizadeh, A., & MH (2025). When Your AI Agent Succumbs to Peer-Pressure: Studying Opinion-Change Dynamics of LLMs. arXiv.Org.

Flores, P. M., & MH (2025). The Mood-Emotion-Content Nexus: Disentangling How Affective Factors Influence Misinformation in Short Videos. SSRN 5738562. (under review)

Mehdizadeh, A. & MH (2025). **Homophily-induced Emergence of Biased Structures in Large-Language-Model-based Multi-Agent AI Systems**. *Social Network Analysis and Mining*, 15(1), 108.

MH (2025). **A Constructive Developmental Evaluation of AGI**: Can AI's Simulations Match Human Meaning-Making and Their Orders of Consciousness? in *Proceedings of the 18th Conference on Artificial General Intelligence*. Reykjavik, Iceland.

MH, Cingel, D. P., Zhang, J., Vigil, S. L., Shawcroft, J., Xue, H., Thakur, A., & Shafiq, Z. (2025). **#BigTech @Minors**: Social media algorithms have actionable knowledge about child users and at-risk teens. *Telematics and Informatics*, 103, 102341. https://doi.org/10.1016/j.tele.2025.102341

Burlat, B. & MH (2025). **Quantifying Bot Impact**: An Information-Theoretic Analysis of Complexity and Uncertainty in Online Political Communication Dynamics. *Entropy*, 27(6), 573.

Sun, Q., & MH (2025). **Will You Become the Next Troll?** A Computational Mechanics Approach to the Contagion of Trolling Behavior. *Entropy*, 27(5), 542.

Flores, P. M. & MH (2025). Examining the Impact of Affective States and Emotional Responses on Misinformation Video Spreading. Open Science Framework (under peer review).

Smaldino, P. E., A. Russell, M. R. Zefferman, J. Donath, J. G. Foster, D. Guilbeault, MH, E. A. Hobson, K. Lerman, H. Miton, C. Moser, J. Lasser, S. Schmer-Galunder, J. N. Shapiro, Q. Zhong, and D. Patt (2025). **Information Architectures**: A Framework for Understanding Socio-Technical Systems. *Npj Complexity* 2(1):13.

MH, Thakur, A., Flores, P. M., Zhang, X., Bhan, J. Y., Bernhard, P., & Ji, F. (2024). **8%—10% of algorithmic recommendations are 'bad', but…** an exploratory risk-utility meta-analysis and its regulatory implications *International Journal of Information Management*, 75, 102743.

MH (2024). **Societal Algorithmification and its Computational Measurement.** In *Handbook of Computational Social Science*. Edward Elgar Publishing (EEP), forthcoming.

Flores, P. M., & MH (2023). **Temporal communication dynamics in the aftermath of large-scale upheavals:** Do digital footprints reveal a stage model? *Journal of Computational Social Science*, 6(2), 973–999.

Flores, P. M., & MH (2023). **Lean-back and lean-forward online behaviors**: The role of emotions in passive versus proactive information diffusion of social media content. *Computers in Human Behavior*, 147, 107841.

Zhong, Q., MH & Frey, S. (2023). **Breaking the Structural Reinforcement**: An Agent-Based Model on Cultural Consumption and Social Relations. Social Science Computer Review, 41(3), 848–870.

Zhong, Q., Frey, S., & MH (2022). **Quantifying the selective, stochastic, and complementary drivers of institutional evolution in online communities**. *Entropy*, 24(9), 1185.

Waldherr, A., MH, González-Bailón S. (2021). **Worlds of Agents:** Prospects of Agent-Based Modeling for Communication Research. *Communication Methods and Measures*, 15(4), 243-254. An Editor's Introduction to the Special Issue.

MH (2021). **Information Theory for Human and Social Processes**. *Entropy*, 23(1), 9. An Editor's Introduction to the Special Issue.

MH & Darmon, D. (2020). **Largescale Communication Is More Complex and Unpredictable with Automated Bots**. *Journal of Communication*, 70(5), 670–692.

MH & Darmon, D. (2020). **How Complexity and Uncertainty Grew with Algorithmic Trading**. *Entropy*, 22(5), 499.

MH (2020). **Digital Technology and Social Change**: The digital transformation of society from a historical perspective. Dialogues in Clinical Neuroscience, 22(2), 189–194.

Cho, J., Ahmed, S., MH, Liu, B., & Luu, J. (2020). **Do Search Algorithms Endanger Democracy?** An Experimental Investigation of Algorithm Effects on Political Polarization. *Journal of Broadcasting & Electronic Media*, 64(2), 150–172.

Mann, S., & MH (2020). **AI4D: Artificial Intelligence for Development**. *International Journal of Communication*, 14(0), 21.

MH, Barnett G., Blumenstock J., Contractor N., Diesner J., Frey S., González-Bailón S., Lamberson PJ, Pan J., Peng T-Q., Shen C., Smaldino P.E., van Atteveldt W., Waldherr A., Zhan J., Zhu J.H. (2019). **Computational Communication Science:** A Methodological Catalyzer for a Maturing Discipline. *International Journal of Communication*, 13(2019), 3912–3934.

MH, Liu, B., Luu, J., Fishbein, J. (2019). **Behavioral Experiments with Social Algorithms:** an information theoretic approach to input-output conversions. *Communication Methods and Measures*, 13 (4), 267-286.

MH, James R. G., Gil-Lopez, T., Jiang, K., Zhou, Y. (2018). **The Complementary Importance of Static Structure and Temporal Dynamics** in Teamwork Communication. *Human Communication Research*.

MH, Ahmed, S., Cho, J., Liu, B., Luu, J. (2018). **Communicating with algorithms:** A transfer entropy analysis of emotions-based escapes from online echo chambers. *Communication Methods and Measures*.

MH & Aravindakshan, A. (2018). **What Characterizes the Polymodal Media of the Mobile Phone?** The Multiple Media within the World's Most Popular Medium. *Multimodal Technologies and Interaction*, 2(3), 37.

Jaidka, K., Ahmed, S., Skoric, M., & MH (2018). **Predicting elections from social media:** a three-country, three-method comparative study. *Asian Journal of Communication*, 0, 1–21.

MH (2017). **Complementary Variety**: When Can Cooperation in Uncertain Environments Outperform Competitive Selection? *Complexity*, 5052071.

MH (2017). **The More You Know, the More You Can Grow**: An Information Theoretic Approach to Growth in the Information Age. *Entropy*, 19(2), 82.

Abeliansky, A. L., & MH (2017). **Digital technology and international trade**: Is it the quantity of subscriptions or the quality of data speed that matters? *Telecommunications Policy*, 41(1), 35–48.

MH, Oh, P., & Monge, P. (2016). **Evolution of what?** A network approach for the detection of evolutionary forces. *Social Networks*, 47, 38–46.

MH (2016). **The bad news is that the digital access divide is here to stay:** Domestically installed bandwidths among 172 countries for 1986–2014. *Telecommunications Policy*. 40(6), 567-581.

Madsen, A.K, Flyverbom, M., MH and Ruppert, E. (2016). **Big data: Issues for an international political sociology** of the datafication of worlds. *International Political Sociology*.

MH, Vasquez, J., Halpern, D., Valenzuela, S., & Arriagada, E. (2016). **One Step, Two Step, Network Step?** Complementary Perspectives on Communication Flows in Twittered Citizen Protests. *Social Science Computer Review.* April, 0894439316639561.

MH (2016). **Formal definitions of information and knowledge and their role in growth through structural change**. *Structural Change and Economic Dynamics*. 38, 69-82.

M. Gillings, MH, D. Kemp (2016). **Information in the Biosphere**: Biological and Digital Worlds. *Trends in Ecology and Evolution*. 31(3), 180-189.

MH (2015). **Big Data for Development:** A Review of Promises and Challenges. *Development Policy Review*. 34(1), 135-174.

MH (2015). **A review of large-scale 'how much information' inventories:** variations, achievements and challenges. *Information Research*. 20(4), paper 688.

MH (2015). **Toward a Theory of Knowledge Economics: An Information Systems Approach**. *IEEE Computer Society*, 48th Annual Hawaii Int. Conf. on System Sciences HICSS

MH (2015) **ICT4ICTD: Computational Social Science for Digital Development**. *IEEE Computer Society*, 48th Annual Hawaii Int. Conf. on System Sciences HICSS

MH (2014). **What is the content of the world's technologically mediated information and communication capacity:** how much text, image, audio and video? *The Information Society: an international journal*. 30(2), 127–143.

MH (2014). **How much of the global information and communication explosion is driven by more, and how much by better technology?** *Journal of the American Society for Information Science and Technology*; 65(4); 856-861.

MH (2014). **Technological Information Inequality as an Incessantly Moving Target:** The Redistribution of Information and Communication Capacities btw 1986-2010. *Journal of the American Society for Information Science and Technology*, 65 (4), 821–835

MH (2013). **Scale-free power-laws as interaction between progress and diffusion**. *Complexity*. 19(4), 56–65

MH (2012). **Toward a Conceptual Framework for ICT for Development**: Lessons Learned from the Latin American "Cube Framework". *Information Technologies and International Development (ITID)*, 8(4), 243-259 (with Spanish translated version: 261-280);

MH (2012). **How much information is there in the "Information Society"?** *Significance*, Royal Statistical Society and the American Statistical Association, 9(4); p.8-12.

MH (2012). **How to Measure "How Much Information"?** Theoretical, methodological, and statistical challenges for the social sciences. *Intern. J. of Communication*, 6, 1042–55.

MH, P. López (2012). How to Measure the World's Technological Capacity to Communicate, Store and Compute Information? **Part I: results and scope**. **Part II: measurement unit and conclusions**. *International Journal of Communication*, vol. 6, 936–955, 956–979.

MH (2012). **Toward a synthesis of cognitive biases**: How noisy information processing can bias human decision making. *Psychological Bulletin*, 138, 211–237.

MH (2011). **Digital gender-divide or technologically empowered women in developing countries?** A typical case of lies, damned lies, and statistics. *Women's Studies International Forum* 34(6), 479-489

MH (2011). **The end justifies the definition**: The manifold outlooks on the digital divide and their practical usefulness for policy-making. *Telecommunications Policy*, 35(8), 715-736.

MH, P. López (2011). **The world's technological capacity to store, communicate and compute information**. *Science*, 332(6025), 60-65

MH, P. López, C. Vasquez (2010). **Information Societies or "ICT equipment societies"?** Measuring the digital information processing capacity of a society in bits and bytes. *The Information Society: an international journal*, 26(3), pp.157-178

MH (2010). **When is cheap, cheap enough to bridge the digital divide?** Modeling Income Related Structural Challenges of Technology Diffusion in Latin America *World Development*; 38(5) 756-770.

MH; I. Miles; J. Othmer (2009). **Foresight tools for participative policy-making in inter-governmental processes in developing countries**: Lessons learned from the eLAC Policy Priorities Delphi. *Techn. Forecasting & Social Change*, 76(7), pp.157-178.

MH (2009). **The Maturing Concept of e-democracy**: From e-Voting and Online Consultations, to Democratic Value Out of Jumbled Online Chatter. *Journal of Information Technology & Politics (JITP)*, American Political Science Association, 6(2); 87-110.

MH (2004). **Comment on the Financing Aspect of the Information Society** for Developing Countries. *Information Technologies and International Development (ITID)*, 1(3-4), 79-80.

### Books

Peres, W. and MH (2010). "**Information Societies in Latin America and the Caribbean**: Development of Technologies and Technologies for Development", (350 pages); editor and author. 19 co-authors. Spanish version (2009): "La sociedad de la información en América Latina y el Caribe: Desarrollo de las tecnologías y tecnologías para el desarrollo". both *ECLAC books*, 98, ECLAC Secretariat; LC/G. 2363-P.

MH & O. Cairó (2009). "**¿Quo vadis Tecnologia de la información y de las comunicaciones?** Conceptos fundamentales, trayectorias tecnológicas y el Estado del Arte de los sistemas digitales"; (372 pages), editor & main author. 17 co-authors; *Mayol Ediciones*, with ECLAC, United Nations, ISBN: 978-958-8307-589

MH (2007). „**Digital processes and democratic theory**: Risks and opportunities of applying information and communication technologies to democratic institutions"; *Google Books*, Online publication.

MH (2007). "**Digitalisierung demokratischer Prozesse**. Gefahren und Chancen der Informations- und Kommunikationstechnologie in der demokratischen Willensbildung der Informationsgesellschaft"; (303 pages). *Duncker & Humblot*, Beiträge zur Politischen Wissenschaft, Band 144, Berlin, Politikwissenschaften, ISBN 978-3-428-12423-7.

Katz, J. & MH (2003)."**Road Maps towards an information society in Latin America and the Caribbean**"; (130 pages); Spanish version (2003): "Los Caminos hacia una sociedad de la información en América Latina y el Caribe"; (129 pages) both *ECLAC books*, 72,

ECLAC Secretariat; English: LC/G.2195/Rev.1-P/I, Spanish: LC/G.2195/Rev.1-P/E; Also published by *Alfaomega*, Economía América Latina, ISBN 958-682-479-9

MH & J. Katz (2003). "**Building an Information Society**: a Latin American and Caribbean perspective"; (336 pages); ECLAC UN, LC/L.1845/I.

### Book Chapters

MH & S. Mann (2018). **Artificial Intelligence for Development.** Ch. VII in *Data, algorithms and policies: Redefining the digital world*. ECLAC books, United Nations.

MH (2018). **Communication Quantity**. In *Encyclopedia of Big Data* (pp. 1–6). Springer, Cham.

MH (2017). **Information Quantity**. In *Encyclopedia of Big Data* (pp. 1–4). Springer, Cham.

MH (2017). **Big Data sin teoría** puede convertirse en algo peligroso porque nos encasilla en nuestro pasado, Ch. 8.II in *Poder Cuidadano*. Editorial Univ. de Buenos Aires.

MH (2015). **Digital Divide(s)**. *Encyclopedia of Digital Communication and Society*; edited by A. P. Hwa, R. Mansell, D. Kleine, D. J. Grimshaw. John Wiley Inc.

### Book Reviews

MH (2013). Eric Schmidt & Jared Cohen, The New Digital Age: Reshaping the Future of People, Nations and Business. (2013) John Murray. *International Journal of Communication*, 7(0), 5. 1571-1575.

MH (2012). Brian Castellani, Frederick William Hafferty, Sociology and Complexity Science (2009) Springer. *Automatica*, Vol. 48, issue 12, 3187–3188.

### United Nations reports, Magazine-, & Proceedings (selected)

MH & Lu, K. (2020). **The online job market trace in Latin America and the Caribbean** (LC/TS.2020/83; p. 79). United Nations Economic Commission for Latin America and the Caribbean.

MH, Vilgis V., Ho Y-C., Jin, X., Lu, K., Rascon-Garcia, K. & Reese, M. (2020). "**Tracking the digital footprint in Latin America and the Caribbean: Lessons learned from using big data to assess the digital economy**", United Nations ECLAC, LC/TS.2020/12, PDF.

M. Santillán Vásquez & MH (2018). "**La etapa de evolución social en la que actualmente estamos ya está fusionada con la inteligencia artificial, mucho más allá de cualquier punto de retorno**". Revista Contratexto, Facultad de Comunicación de la Universidad de Lima.

MH, Khai Bach, J., Bomactao, R., Dou, J., Duong, J., Escobar, J., … Zhang, H. P. (2018). **Digital Footprints from Latin America and the Caribbean** (SSRN Scholarly Paper No. ID 3162864). Rochester, NY: Social Science Research Network.

MH, Cheng, S., Wang, S. (Wilburn), & Bell, B. (2017). **Digital tools for foresight** (UNCTAD Research Paper No. 10 No). United Nations Commission on Science and Technology for Development.

MH (2015) **e-Science for Digital Development: "ICT4ICT4D".** Development Informatics, Working Paper Series, Paper 60, The University of Manchester.

MH (2013) **Big Data for Development: From Information - to Knowledge Societies**. Social Science Research Network. SSRN Scholarly Paper 2205145. Rochester, NY.

MH (2011) **Mapping the dimensions and characteristics of the world's technological communication capacity during the period of digitization**. 9th World Telecomm./ICT Indicators Meeting, Mauritius: International Telecommunication Union (ITU).

MH (2008) **Estrategias nacionales para el desarrollo digital** en los países de América Latina y el Caribe. *Política digital*: edición especial sobre estrategias nacionales para la Sociedad de la Información, Number 42, Feb-Mar 2008, 18-26.

MH & J. Othmer (2007) **eLAC Policy Priorities Delphi:** Latin American and Caribbean multi-stakeholder consultation for ICT policy priorities for the year 2010; Information Society Programme ECLAC working document, PDF; Spanish version: "Delphi de prioridades de políticas eLAC: Consulta multisectorial sobre prioridades de políticas TIC para…", PDF

O. Maeso & MH (2006) **Centros de acceso público a las tecnologías de información y comunicación en América Latina:** características y desafíos; Information Society Series No. 11, United Nations ECLAC, LC/W.88, PDF

MH (2005) **Municipios digitales**: la influencia de los proveedores. *Política digital* (26), 56-58.

MH (2005) **Development Trends and Challenges For Local e-Governments:** Evidence From Municipalities in Chile and Peru. Info. Soc. No. 6, United Nations ECLAC, LC/W.31, PDF

MH, S. Bustos & J.C. Ferraz (2005) **Estrategias Nacionales para la Sociedad de la Información en América Latina y el Caribe**. Info. Soc. Series No. 2, United Nations ECLAC, LC/W.17, PDF

MH & D. Olaya (2005) **Benchmarking the Plan of Action of the World Summit on the Information Society (WSIS) in Latin America and the Caribbean**; Information Society Series No. 1, United Nations ECLAC, LC/W.15, PDF

MH & J. Katz (2002) **Toward a Conceptual Framework and Public Policy agenda for the Information Society in Latin America and the Caribbean**; Productive Development Series ECLAC, No. 133, LC/L.1801-P/I, ISBN: 92-1-121374-6; PDF

B. Petrazzini & MH (2001) **3G Mobile Policy:** The Cases of Chile and Venezuela; ITU (International Telecommunication Union) Series of Telecommunication Case Studies

MH (2001) **Latin America on its path into the digital age:** where are we? Productive Development Series ECLAC, No. 104, LC/L.1555-P/I, ISBN: 92-1-121309-6; PDF

MH (2001) **From Industrial Economics to Digital Economics:** An Introduction to the Transition**.** Productive Development Series ECLAC, No. 100, LC/L.1497-P/I, ISBN: 92-1-121297-9; PDF

MH (2000) **In the Midst of the Transition:** Challenges and Chances for Latin American Economies; Connect-World and Telecom Magazine, Latin America Fourth Quarter Issue IV 2000.

### Multimedia publications

09/2020 **Online Dashboard of Big Data Observatory of United Nations ECLAC**.

09/2015 **Digital Divide Data Interactive**; SciDev,net. Finalist for 'Information is Beautiful' award.

07/2015 **Humanity from Space: our interconnected plant / going viral**; PBS, NatGeo, Discovery Channel, Handel Productions.

06/2011 **World's Information Capacity Animation**; Produced by The Economist & USC, The Cavalry FX

04/2011 **How much information can the world store, communicate & compute?** University of Southern California

### Extensive interviews (selected, more here)

04/2024 **'Hay que entender que el futuro ya está aquí'**: Martin Hilbert sobre la Inteligencia Artificial y sus avances; *El Tiempo, Colombia, Ricardo Avila*.

05/2023 **Martin Hilbert y el efecto de las nuevas tecnologías en las democracias: «Cambiaron mucho cómo manejamos la información»**; *La Tercera, Chile, Pedro Henríquez*.

08/2021 **En diálogo con Longobardi**; *CNN Marcelo Longobardi*.

| | |
|---|---|
| 02/2021 | **Information Theory, Algorithms, and Political Polarization, with Prof. Martin Hilbert**; *Social Media and Politics podcast, Michael Bossetta*. |
| 04/2018 | **Martin Hilbert y el escándalo de Facebook: "Estamos atacando los síntomas, pero no la enfermedad"**; *The Clinic*; Daniel Hopenhayn. |
| 11/2017 | **El gurú del 'big data': "Facebook sabe más de ti con 250 likes que tú mismo"**; *El Mundo*; Emilia Landaluce. |
| 04/2017 | **Martin Hilbert, gurú del Big Data: "La democracia no está preparada para la era digital y está siendo destruida"**; *BBC Mundo*; Gerardo Lissardy (Portuguese here). |
| 03/2017 | **"La tecnología no es determinista, hay que construirla socialmente"**; *La Capital, de Mar del Plata*; Nicolás Martínez Sáez. |
| 01/2017 | **Martin Hilbert, experto en redes digitales: "Obama y Trump usaron el Big Data para lavar cerebros"**; *The Clinic*; Daniel Hopenhayn (winner of Chilean Journalism of Excellence award). |
| 11/2014 | **How data will revolutionise global governance**; *SciDevNet*; Imogen Mathers. |
| 04/2014 | **Martin Hilbert on the world's information capacity**; *Machine Intelligence Research Institute*; Luke Muehlhauser. |
| 09/2011 | **ICT might be the most tangible tool we have right now to fight gender discrimination**; *United Nations, eLACNewsletter*; Laura Palacios. |
| 02/2011 | **Defining A Data Deluge**; *Science Friday, Talk of the Nation*; Ira Flatow. |
| 02/2011 | **Information Overload**; *BBC World Service*; Jack Stewart. |
| 02/2011 | **Down in the Data Dumps**: Researchers Inventory a World of Information; *Scientific American*; Larry Greenemeier. |
| 12/2010 | **Barreras para el desarrollo de la banda ancha en América Latina**; *Inst. Estudios Peruanos*. |
| 07/2006 | **"La brecha digital nos afecta a todos"**; *El Comercio, Ecuador*. |
| 04/2005 | **Sugiere emplear tecnología para mejorar sector publico**; *Listin Diario,* Wanda Mendez. |

**YouTube Channel: https://www.youtube.com/@Prof.MartinHilbert**

Views: > 500,000

Subscribers: ≈ 6k

Videos: > 300

Popular Playlists: "AI & Ethics" (15 videos); "AI Agents Playlist" (7 videos); "Blockchain Playlist" (17 videos); "The Attention Economy, and its problems…" (29 videos); "CEPAL Charlas Sobre Sistemas Complejos Sociales" (13 videos).

Popular Videos: Technological Determinism vs. Social Constructivism (> 60k views)

La Era de los Agentes de IA: el camino hasta aquí y el rumbo en juego (> 40k views)

Agent-based Modeling Lab: instroduction to coding in netLogo (> 35k views)

## TEACHING (underlined text is hyperlink enabled):

2025-today Coursera MOOC (Massive-Open-Online-Course) AI Agents: From Prompts to Multi-Agent Systems. >10,000 learners

2024-today Coursera MOOC (Massive-Open-Online-Course) Specialization on Digital Technology & Social Change; 5 course specialization.

2020-today Coursera MOOC (Massive-Open-Online-Course) Specialization on Computational Social Science; 5 course specialization. >80,000 learners.

2018-today Computational Social Science (CMN150V), undergraduate upper division; *University of California wide online course, Davis, USA.*

2015-today Digital Technology & Social Change (CMN170 & fully online CMN170V); undergraduate upper division; *University of California wide online course, Davis, USA.*

2022 Algoritmificación para Tod@s; Talk Series for the Mining Industry, *Collahuasi, Chile*.

2013-'15 Complex Social Systems: a guided exploration of concepts and methods; graduate;
*University of California, Davis (UCD), Davis , USA.*
*University of Southern California (USC), Los Angeles, USA.*
*Adolfo Ibáñez University, Complex Systems Engineering, Santiago, Chile*

2013 - … Online Massive Open Online Course (MOOC) in Spanish: CEPAL Charlas Sobre Sistemas Complejos Sociales (CCSSCS). Latin American branch of UNESCO Complex Systems Digital campus UniTwin.

2013 Social Network Analysis. *Pontifical Catholic University of Chile, Santiago, Chile.*

2010-'12 Communication for International Development (CMGT 582); graduate; *University of Southern California (USC), Los Angeles, USA.*

2001-'08 Lectures on Information Society development in Latin America: theory, stylized facts and policies; United Nations ECLAC Summer School.

## AWARDS & HONORS:

| | |
|---|---|
| 2018 | Chile's most prestigious Journalism award: Journalism of Excellence for best written interview, was given to an extensive interview given at The Clinic. |
| 2016 | Offer of the Harissios Papamarkou Chair in Education & Technology of the U.S. Library of Congress, Big data strategies for a Library of Congress in the digital age |
| 2015 | Finalist of 'Information is Beautiful' award for digital divide animation, SciDev. |
| 2015 | Top-3 most cited paper in Telecommunications Policy (5-y impact factor 1.7) |
| 2013 | PhD Achievement Award of the University of Southern California, |
| 2008 –2012 | University of Southern California (USC) Provost's Ph.D. Fellowship |

## LANGUAGES:

| | |
|---|---|
| **German:** | Native |
| **English:** | Fluent; GRE (top-96% of all students in 2007), United Nations Language Proficiency: certified 2006 |
| **Spanish:** | Fluent; United Nations Language Proficiency: certified 01/2006 |
| **Portuguese:** | Excellent; |
| **Latin:** | Medium; Latinum magnum (five years) |

## SERVICE TO PROFESSION:

**Journal Peer Review:** *Acta Psychologica; Annalen der Physik; Art History; Cognitive Psychology; Big Data & Society; Communication Methods & Measures; Communication Theory; Complexity; Computational Communication Research; Encyclopedia of AI; Entropy; Government Information Quarterly; Information Resource Management Journal; Information Society; International J. of Communication; J. of Business Research; J. of Communication; J. of Computer-Mediated Communication; J. of Cyber Policy; J. of the Association for Info. Science and Tech; Mathematics; Physics Letters A; PLOS One; Policy & Internet; Political Behavior; Political Studies Review; Political Studies Review; SCIENCE; Scientific Reports; Social Science Computer Review; Structural Change and Economic Dynamics; Sustainability; Technological Forecasting and Social Change; Tecnovation; Telecommunications Policy; World Development.*

**Guest Editor:**

Special issue on "Worlds of Agents: Prospects of Agent-Based Modeling for Communication Research", *Communication Methods and Measures, Vol 15, Issue 4*, 2021

Special issue on "Information Theory for Human and Social Processes", *Entropy* (Journal), 2019

Special issue on "How to measure 'How-Much-Information'?, *International Journal of Communication* (2012).; How to Measure "How Much Information"?, *IJoC*, (6), 1042–1055.

**Event & workshop organizer:**

**Academic events:**

2018 Library of Congress, "Big Data and its impact on Democracy", Washington D.C. USA.

2015 Satellite event at Conference on Complex Systems 2015, "The Industrial Age and Thermodynamics; the Information Age and… What?"; with J. Crutchfield, Phoenix, Arizona,

2006 Third regional conference on ICT, regulation and equality in Latin America, Regional Dialogue on the Information Society in Latin America (DIRSI & OSILAC), Chile.

**Training and educational workshops:**

2004-8 Four annual workshops of the Observatory on the Information Society in Latin America and the Caribbean (OSILAC), with representatives from 17 National Statistics Offices; in Chile (2004); Dom. Rep (2005); Panama (2006); El Salvador (2008).

**Political Conferences:**

2008 Ministerial Conference on the Information Society in Latin America and the Caribbean; UN ECLAC & Government of El Salvador; San Salvador.

2005 Ministerial Conference of Latin American and the Caribbean for the World Summit on Information Society (phase II), UN ECLAC & Government of Brazil; Rio de Janeiro.

2003 Ministerial Conference of Latin American and the Caribbean for the World Summit on Information Society (phase I), UN ECLAC & Government of Dom. Rep.; Bávaro.

## RESEARCH GRANTS & COOPERATION PROJECTS:

10/2024 – 2027 **National Endowment for the Humanities (NEH): UC Davis Center for Artificial Intelligence and Experimental Futures (CAIEF)**

Job description: Conference Lead "Engineering our Experimental AI Futures". Research nodes on "Languages and Literacies" and "Civic Infrastructures" (P.I.: Colin Milburn).

Resources: US$ 499,717.

03/2015 – 08/2023 **University of California Office of the President's Innovative Learning Technology Initiative (ILTI)**

Resources: US$ 80,000 for online course "Digital Technology & Social Change".

03/2016 – 08/2019 **University of California Office of the President's Innovative Learning Technology Initiative (ILTI)**

Resources: US$ 110,000 for online course development "Computational Social Science".

01/2008 – 08/2008 **European and Latin American Alliance for the Information Society (@LIS2): Inclusive policy dialogue and exchange of experiences**

Job description: Main negotiator of grant, project design and related terms and conditions. After the project was set up, voluntarily declined PI position and left the UN to join USC.

Joint resources: US$ 17,000,000: European Commission and United Nations ECLAC.

11/2004 – 12/2007 **Policy and Regulatory Dialogue of the European and Latin American Alliance for the Information Society (@LIS)**

Job description: Principal Investigator: Executive Coordinator and Lead Researcher

Joint resources: US$ 5,500,000: European Commission and United Nations ECLAC.

*Project results: 8 books; 30 publications; 2 Regional Ministerial Conferences and 12 seminars; capacity-building for 320 policy makers; 4 cooperation projects with over 60 weeks technical assistance, 2 Regional Plans of Action for the Information Society in Latin America and the Caribbean (eLAC2007 and eLAC2010).*

01/2004 – 10/2010 **Observatory on the Information Society in Latin America and the Caribbean (OSILAC)**

Job description: Principal Investigator: Executive Coordinator and Lead Researcher

Joint resources: US$ 1,500,000: International Development Research Centre (IDRC, Canada) and UN ECLAC, in three consecutively renewed phases.

*Project results: 12 publications; 3 databases; 10 regional seminars; capacity-building for 120 statisticians of National Statistics Offices; leadership role in the definition of core indicators for ICT access and usage within the global Partnership on Measuring ICT for Development (officially adopted by UN Statistical Commission), which consists of an UN inter-agency alliance of 8 UN agencies, World Bank, OECD, and European Commission.*

10/2006 – 12/2007 **Research cooperation UN ECLAC – Telefónica Foundation**

Job description: Principal Investigator at UN ECLAC: Lead Researcher

Joint resources: US$ 83,000: Telefónica Foundation and UN ECLAC;

*Project results: 1 book, including 34 international interviews, 1 Delphi exercise.*

08/2006 – 12/2007 **Review of ICT development in Latin America and the Caribbean**

Job description: Principal Investigator at UN ECLAC: Lead Researcher

Joint resources: US$ 140,000: United Nations Development Programme (UNDP), Regional Dialogue on the Information Society (DIRSI) and UN ECLAC;

*Project results: 23 country profile case studies; 3 thematic reports; summary report.*

## INVITED PRESENTATIONS & KEYNOTES (selected from over 200 general presentations)

| | |
|---|---|
| 11/2024 *California, USA* | **University of California, Tech**; Keynote: AI Unleashed: The Good, the Bad, and the... Hopeful! |
| 11/2023 *California, USA* | **Information & Educational Tech**; Keynote: What's the Deal with ChatGPT? |
| 01/2019 *Santiago, Chile* | **Congreso Futuro**; Keynote: ¿Qué especie queremos ser? Ciencia Social Computacional. |
| 10/2017 *Montevideo, Uruguay* | **Agencia de Gobierno Electrónico y Sociedad de la Información y del Conocimiento;** Keynote: Celebrating 10 years of Digital Agenda in Uruguay: Future Challenges |
| 05/2016 *Geneva, Switzerland* | **19th Annual Session of the United Nations Commission on Science and Technology;** Keynote: Foresight for Digital Development |
| 10/2015 *Phoenix, USA* | **Partnership for the Progress on the Digital Divide (PPDD)**; Keynote: The international perspective |
| 06/2015 *Dresden, Germany* | **Evolution processes information over multiple levels -linking the theory of evolution and information theory**; Max Planck Institute for the Physics of Complex Systems |
| 11/2014 *London, UK* | **Big Data requires Big Visions for Big Change; TEDxUCL;** University College London |
| 06/2013 *Santiago, Chile* | **Complex Social Systems Dynamics and Development;** Seminar series on Management and Public Policy; Industrial Engineering, University of Chile |
| 06/2011 *Silicon Valley, USA* | **The Economist, The ideas Economy: Information, making sense of the deluge**; That giant sifting sounds |
| 11/2007 *Rio de Janeiro, Brazil* | **Internet Governance Forum Brazil**, Successful participative policy-making in the frame of the United Nations: eLAC multi-stakeholder Delphi, Government of Brazil and United Nations |
| 12/2006 *Hong Kong, China* | **ITU Telecom World 2006** Universal, Ubiquitous, Equitable and Affordable Access, International Telecommunications Unions |
| 06/2005 *Rio de Janeiro, Brazil* | **Regional Preparatory Ministerial Conference of Latin America and the Caribbean** for the World Summit on the Information Society; Government of Brazil and ECLAC |
| 04/2005 *Managua, Nicaragua* | **Technical Meeting on E-Government in Central America**, Nicaraguan Council of Science and Technology, Division for Public Admin. and Dev. Management, DESA United Nations |
| 11/2004 *Cusco, Peru* | **III Summit of Presidents** of European telecommunications regulatory agencies and Latin American regulators; Independent Regulators Group Europe IRG and Regulatel |
| 06/2004 *Sao Paulo, Brazil* | **UNCTAD XI,** Implementing the WSIS Plan of Action, issues for trade and development; United Nations Conference on Trade and Development |
| 10/2003 *Rome, Italy* | **Capacity Building Programme for Caribbean Diplomats,** United Nations Institute for Training and Research (UNITAR) |
| 06/2003 *San Juan, Puerto Rico* | **Association of Caribbean University, Research and Institutional Libraries,** ACURIL XXXIII |
| 02/2003 *Beirut, Lebanon* | **Regional Preparatory Ministerial Conference of Western Asia** for the World Summit on the Information Society; Government of Lebanon and UN ESCWA |
| 09/2002 *Brasilia, Brazil* | **OECD Global Forum:** Policy Frameworks for the Knowledge-based Economy: ICTs, Innovation and Human Resources; Organization for Economic Co-operation and Development |
| 05/2002 *Curaçao, Nethl.Antilles* | **UNCTAD Regional High-Level Workshop** on Electronic Commerce and ICT for Central America and the Caribbean, United Nations Conference on Trade and Development |
| 04/2002 *Valencia, Spain* | **III Iberoamerican Encounter of Digital Cities**; Asociación Hispanoamericana de Centros de Investigación y Empresas de Telecomunicaciones (AHCIET) |
| 11/2001 *La Paz, Bolivia* | **IV Latin-American Forum for Telecommunications Regulator Bodies:** Closing the Digital Divide; Foro Latinoamericano de Entes Reguladores de Telecomunicaciones (REGULATEL) |
| 10/2001 *La Habana, Cuba* | **V Presidents' Summit** of the Hispanoamerican Association of Research Centers and Telecommunication Enterprises (AHCIET) |
| 03/2001 *Paris, France* | **Joint OECD/ UN/ UNDP/ World Bank Global Forum,** Exploiting the Digital Opportunities for Poverty Reduction, Organization for Economic Co-operation and Development, UN, UNDP, World Bank |