Isaac D. Chaput (Bar No. 326923)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com

Alexander L. Schultz (Bar No. 340212)
Max A. Cherman (Bar No. 353565)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4800
aschultz@cov.com
mcherman@cov.com

Mark W. Mosier (pro hac vice)
Teena-Ann V. Sankoorikal (pro hac vice)
Jeffrey E. Sandberg (pro hac vice)
Kuntal V. Cholera (pro hac vice)
Alexandra J. Widas (pro hac vice)
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
mmosier@cov.com
tsankoorikal@cov.com
jsandberg@cov.com
kcholera@cov.com
awidas@cov.com

*Attorneys for Plaintiff Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| META PLATFORMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROB BONTA, in his official capacity as Attorney General of California, <br><br> Defendant. | Case No.: 5:25-cv-09792-EJD <br><br> **PLAINTIFF META PLATFORMS, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: June 10, 2026 <br> Time: 9:00 AM <br> Judge: Honorable Edward J. Davila <br> Dept.: Courtroom 4 – 5th Floor |

**Table of Contents**

INTRODUCTION AND SUMMARY ........................................................................................... 1

ARGUMENT......................................................................................................................... 1

CONCLUSION...................................................................................................................... 7

PLAINTIFF META PLATFORMS, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Brown v. Entm't Merchants Ass'n*,
  564 U.S. 786 (2011)...................................................................................................................2, 5

*Doe v. Harris*,
  772 F.3d 563 (9th Cir. 2014) ..................................................................................................2

*Edenfield v. Fane*,
  507 U.S. 761 (1993)...................................................................................................................2, 5

*Imperial Sovereign Ct. of Mont. v. Knudsen*,
  170 F.4th 820 (9th Cir. 2026) ..................................................................................................2

*Nixon v. Shrink Mo. Gov't PAC*,
  528 U.S. 377 (2000)....................................................................................................................2

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) (*Turner I*).................................................................................................2

*Turner Broad. Sys., Inc. v. FCC*,
  520 U.S. 180 (1997) (*Turner II*) ...............................................................................................2

*United States v. Alvarez*,
  567 U.S. 709 (2012)....................................................................................................................2

*Victory Processing, LLC v. Fox*,
  937 F.3d 1218 (9th Cir. 2019) ..................................................................................................2

**Other Authorities**

U.S. Const. amend. I ...................................................................................................................1, 2, 5, 7

**INTRODUCTION AND SUMMARY**

Meta respectfully files this supplemental brief to address whether the State's Medical Reply Declarations show a "link between viewing personalized content and harm to the physical or mental health of minors." Court Order of June 2, 2026. They do not, and that failure is fatal to the State's defense.

The State has had ample opportunity to try. As Meta explained in first moving for a preliminary injunction, the law requires the State to "show a causal connection between the specific activity regulated by" SB 976—personalized feeds, rather than social media in general—"and any purported harms to minors." Mot. 21 (emphasis and citations omitted). Yet in opposing Meta's motion, the State offered expert declarations and exhibits addressing only a purported correlation between social media use and certain mental health harms; it failed to present evidence that *personalized recommendations* themselves cause those harms. Meta identified this deficiency in its reply, explaining that "none of the State's experts opines that [the alleged] harms are caused by personalization 'specifically,' much less that those harms will be alleviated if minors continue to use social-media services presenting feeds that contain no user-based recommended content." Reply 17.

The State's four Medical Reply Declarations—belatedly submitted for the first time with its sur-reply—do not cure this defect.[1] Even assuming the Court considers these belated filings, they fall well short of the evidentiary showing required by precedent. As explained by Meta's expert, Dr. Baiocchi, nothing in the State's expert materials—whether initial or rebuttal—"supports the claim that personalized feeds are, or can be, intrinsically harmful to adolescent mental health." Baiocchi Suppl. Decl. ¶ 35; see also Baiocchi Decl. ¶ 131. They accordingly are insufficient to sustain the law under First Amendment scrutiny.

**ARGUMENT**

As Meta's prior filings explained, the State's defense of SB 976 fails on multiple independent grounds. *See* Mot. 20-24; Reply 15-19. A failure to show causation is one of them.

---

[1] As this Court correctly recognized, "Plaintiffs' motions for preliminary injunctions each argued that Defendant failed to show a causal relationship between personalized feeds and harm to minors," so "Defendant had the opportunity to address this purported 'gap' in its Omnibus Opposition." 6/2 Order.

PLAINTIFF META PLATFORMS, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**A.** Under any level of First Amendment review, the State bears the burden of showing that the activity it chooses to regulate is the cause of the harm it seeks to redress.  Under strict scrutiny, courts require a "direct causal link between the restriction imposed and the injury to be prevented." *United States v. Alvarez*, 567 U.S. 709, 725 (2012) (plurality op.) (citing *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011)).  As the Ninth Circuit has explained, "[t]he standard for demonstrating a direct causal link is a demanding one," ordinarily requiring "medical or scientific studies," *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 865 & n.28 (9th Cir. 2026), not mere "anecdote and supposition," *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1228 (9th Cir. 2019).  Moreover, evidence of mere "correlation" is not enough; rather, a State must show "unambiguous evidence of a causal link." *Knudsen*, 170 F.4th at 865.  And because "'ambiguous proof will not suffice,'" "the [S]tate 'bears the risk of uncertainty.'"  *Id.* (quoting *Brown,* 564 U.S. at 799); *see Brown*, 564 U.S. at 799-800 (invalidating California statute where the State relied on the legislature's "predictive judgment[s]" drawn from "competing psychological studies," which "show[ed] at best some *correlation*" between violent video games and real-world harms).

Although SB 976 is subject to strict scrutiny, similar principles apply even under intermediate scrutiny.  Under that standard, a State must not only "demonstrate that the recited harms are real" but also that its regulation "will *in fact* alleviate these harms in a *direct* and *material* way." *Doe v. Harris*, 772 F.3d 563, 576–77 (9th Cir. 2014) (emphases added) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (*Turner I*)).  As with strict scrutiny, that burden cannot be satisfied by mere argument or "speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993).  Rather, the law requires "substantial evidence" that the regulated conduct is the source of relevant harms, *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (*Turner II*), and that the State's "restriction will in fact alleviate th[ose harms] to a material degree." *Edenfield*, 507 U.S. at 771.  And "the quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments" is still greater where, as here, a "novel[]" form of regulation is at issue.  *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000).

**B.** The State has not satisfied those standards.  As Dr. Baiocchi previously explained, "[n]one of the State's experts provides any opinion, backed by evidence, indicating that personalized feeds are

intrinsically harmful or have any connection to adolescent mental health." Baiocchi Decl. ¶ 8. And upon undertaking his own "independent review of the literature," Dr. Baiocchi likewise found "no studies that attempt to analyze the effects, if any, of social media algorithms or personalization algorithms on adolescent mental health." *Id.* ¶ 10; *see also id.* ¶¶ 84-85.

Those conclusions still hold. As Dr. Baiocchi explains in his supplemental declaration, the State's rebuttal declarations still "offer no additional evidence for a connection between Meta's personalization algorithms and adverse outcomes in adolescents." Baiocchi Suppl. Decl. ¶ 3. Rather, the State's experts simply "repeat many of the flawed methodological approaches" from their prior declarations, and their hypothesis about alleged harms from feeds containing personalized recommendations remains "unsupported" by "scientific evidence." *Id.*[2] The Medical Reply Declarations thus fail to carry the State's burden of showing a direct and material link between personalized feeds and harms to minors.

It is noteworthy that the State's four expert reply declarations do not even coalesce around a particular body of scientific evidence. Instead, with few exceptions, the State's rebuttal declarations each rely on different studies, none of which was designed to study whether personalized recommendations are a potential cause of harm. That the State's experts cannot even agree on which studies are arguably relevant is indicative of the lack of any direct scientific support for the State's theory of causation.

**Dr. Twenge**. Dr. Twenge's original declaration provided no "valid basis for [drawing] causal conclusions" with respect to whether the personalization of social-media feeds causes harm to adolescents. Baiocchi Decl. ¶ 78. To her credit, Dr. Twenge now effectively agrees, admitting that her original declaration "did not focus enough on studies relevant to personalized feeds" and stating that she "will do so here." Twenge Suppl. Decl. ¶ 35.

---

[2] Dr. Baiocchi's conclusions thus align with those of YouTube's causation expert, Dr. Jeffrey Hall, who similarly explained that the Medical Reply Declarations "fail[] to identify any peer-reviewed evidence or other published academic research showing that personalization causes"—or even "is correlated with"—"harm to the physical or mental health of minors." Hall Suppl. Decl. ¶ 11.

Dr. Twenge's supplemental declaration nonetheless still fails to identify evidence sufficient to demonstrate a causal link. Across the 27 pages of her rebuttal declaration, only 2 pages purport to address the question whether personalization causes harm. *See* Twenge Suppl. Decl. ¶¶ 9, 35-38. And despite acknowledging the importance of "studies relevant to personalized feeds," those 2 pages cite only one new source, an unpublished working paper identified as "Mandile (2025)." *Id.* ¶¶ 35-36. According to Dr. Twenge, the Mandile working paper found that the introduction of personalized feeds on Instagram in 2016 caused "no significant changes among adults over age 22," but "poor mental health increased by .39 standard deviations … among adolescent Instagram users." *Id.* ¶ 36.

This unpublished, non-peer-reviewed working paper falls short of supporting Dr. Twenge's hypothesis for numerous reasons, many of which are acknowledged by the paper's author. The study was not designed to address whether personalized feeds cause harm relative to non-personalized feeds. *See* Baiocchi Suppl. Decl. ¶ 32. Instead, the study included personalized feeds in both the "treatment" (experimental) and "control" groups, and sought only to determine whether there were differential effects associated with Instagram as compared to other services. Indeed, the paper's author repeatedly emphasized that she made no findings about the effects of "algorithmic curation *per se*," Mandile (2025) at 4, 8, 13, but instead sought only to study the impact of Instagram as compared to other services. Even then, the study focused on the effects of Instagram on an insufficiently representative sample population: a small group of Dutch youth. Importantly, the author also acknowledged that her modest finding—that poor mental health "increased by .39 standard deviations" among adolescents—was below the statistical "minimum detectable effect size" associated with the number of participants in the study, meaning that the finding was statistically insignificant. *Id.* at 9. And the author also acknowledged selection bias in the study's choice of participants as well as the possibility that the participants' worsening mental health had alternative causes. *Id.* at 1, 9, 17.

**Dr. Radesky.** Dr. Radesky's original declaration "offer[ed] no empirical evidence of any connection between personalization algorithms and adolescent mental health." Baiocchi Decl. ¶ 79. Her supplemental declaration does not do so either. To the contrary, she essentially concedes that there is not adequate empirical evidence on the subject, thus dooming the State's position.

Dr. Radesky suggests that the lack of evidence should be excused on the theory that it would be "nearly impossible" for independent researchers to design an ideal study.  Radesky Suppl. Decl. ¶ 4. Instead, Dr. Radesky suggests, the State should be permitted to settle for reliance on anecdotal data, including "youth reports of their own negative experiences with algorithm personalization."  *Id.* ¶ 5; *see id.* ¶ 23 (asserting that "[t]eens themselves are excellent historians" concerning the root causes of "their feelings").  But the State cites no case indicating that they may be relieved of their evidentiary burden whenever they feel they are incapable of satisfying it.  To the contrary, the Supreme Court has repeatedly made clear that a burden on First Amendment rights cannot be justified by mere anecdotes and conjecture. *See, e.g.*, *Brown*, 564 U.S. at 799-800; *Edenfield*, 507 U.S. at 770-71.

The scientific study that Dr. Radesky cites, Milli et al. (2025), does not provide relevant evidence of adolescent mental health harms resulting from personalization.  As Dr. Baiocchi previously explained, that study focused on adults viewing only political content on Twitter, and it was designed only to measure a person's emotional response to personalized political material.  Baiocchi Decl. ¶ 83. Even assuming Dr. Radesky were correct that the Milli study supports an inference that viewing "personalized, engagement-ranked feeds [can] *change the emotional state* of [an adult] user," Radesky Suppl. Decl. ¶ 6 (emphasis added), that says nothing about whether personalized feeds inherently impair young users' well-being.[3] Notably, the study's authors did *not* express support for a ban on personalized content recommendations; rather, they recommended "greater integration of [users'] stated preferences" in the recommender algorithms so that they focus "*more* on what users explicitly say they want."  Milli et al. at 1 (emphasis added).

The Knight-Georgetown Institute's *Better Feeds* report, discussed in Dr. Radesky's conclusion, even more clearly undermines the State's position. Dr. Radesky asserts that the policy report reflects an

---

[3] Similarly, the Van der Wal (2026) study, which Dr. Radesky cites in passing as assertedly having "isolated the difference between feed-based platforms versus messaging platforms," Radesky Suppl. Decl. ¶ 15, did not study the effects of personalization specifically, but simply reported on survey respondents' self-reported social-media use in general.

"academic consensus" that personalized feeds "are a key mechanism of harm." Radesky Suppl. Decl. ¶ 25. But the report specifically acknowledged the lack of evidence on that topic, stating that "not enough research has decomposed how [alleged social-media] harms result from specific elements of platform design, such as optimization of recommender systems." KGI Report at 16 (noting only a "small literature base" even indirectly bearing on this topic). And the report *reject*s the approach taken by SB 976, arguing that although "some policymakers have turned to blanket bans on personalization," "there are many better alternatives." *Id.* at iv; *see also id.* (asserting that the duality "between today's default feeds[,] and chronological or non-personalized feeds[,] creates a false choice"); *id.* at 2-3 (criticizing "[b]lanket regulations" on "the use of algorithmic recommender systems" because they "fail to account for the vast space of potential algorithmic designs that could be beneficial to users"); *id.* at 3 (observing that "some approaches hold up chronological feeds as the preferred alternative to algorithmic feeds" but concluding that "chronological feeds have important limitations and naturally reward spam-like behavior").

**Dr. Telzer.** Dr. Baiocchi explained that the studies Dr. Telzer relied upon in her opening report did not show that personalized feeds tend to cause mental-health harms in minors. Baiocchi Decl. ¶¶ 73-77. Her rebuttal declaration suffers from the same deficiency.

The vast majority of Dr. Telzer's 55-page declaration is directed to defending her opinion that mental-health harms arise from social-media use, not to addressing personalized recommendations in particular. And although she opines that personalization "drive[s] harm to adolescent mental health," Telzer Suppl. Decl. ¶ 4, the additional studies she cites do not demonstrate any causal relationship. *See* Hall Suppl. Decl. ¶ 30 (explaining that none of the studies cited by Dr. Telzer "establishes that viewing personalized feeds causes or is correlated with harm to the physical or mental health of minors").

The new materials cited by Dr. Telzer say little about the purported harms of personalization. Dr. Telzer cites Harriger et al. (2022), but that study does not present any new empirical evidence of harm stemming from personalized recommendations. Rather, the authors simply offer their narrative "reflections" that algorithms, if poorly designed, can contribute to a "'rabbit hole' dynamic" under which adolescents may view more harmful content. Harriger et al. at 292; *cf.* Telzer Suppl. Decl. ¶ 15. Dr. Telzer claims that Griffiths et al. (2024) provides "the most systematic empirical evidence of algorithmic amplification to date," Telzer Suppl. Decl. ¶ 16, but that study—which focused exclusively on TikTok—

PLAINTIFF META PLATFORMS, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

likewise does not purport to measure or assess any harms to well-being arising from personalized feeds as opposed to other types of social-media feeds.  Parnell et al. (2026), which Telzer cites as a "qualitative[]" study, simply reports anecdotal statements made by 17 adults surveyed about their experience with TikTok, and the authors specifically disclaimed reliance on "any causal statements" made by the survey participants.  Parnell et al. at 5 n.2.  Thai et al. (2024) studied the effects of limiting social media use to 1 hour per day, not the effect of personalized feeds.  And Seekis et al. (2025) likewise did not study algorithmic design, but instead considered a "detox" strategy under which young women stopped following particular content creators associated with body-image messages to see how it would affect their social-media experience.

**Dr. Christakis.**  Finally, Dr. Christakis previously offered no "robust empirical evidence … of a causal connection between … personalized feeds and adolescent mental health concerns," Baiocchi Decl. ¶ 80, and in his supplemental declaration now forswears any attempt to do so.  Dr. Christakis agrees that "the majority of the extant literature looks at social media writ large," not at any "individual features." Christakis Suppl. Decl. ¶ 15.  But rather than make up for those deficiencies, he opines that because "there *is* no social media devoid of personalization," any evidence of harm from social media use should *ipso facto* be deemed evidence of harm from personalized recommendations.  *Id.* ¶ 5; *see also id.* ¶ 15.

That, of course, makes little sense.  There is also no social media devoid of computer programmers, but that does not mean that any evidence of harm from social media is also evidence that computer programmers are harmful.  To survive constitutional review, the State must come forward with actual evidence that supports the particular regulatory intervention that it has picked: a prohibition on *personalized feeds* (absent parental consent).  The State has not submitted that evidence.  Quite the opposite, Dr. Christakis's declaration amounts to a "tacit admission that the State and its experts are supporting a fundamental change to the online experience of millions of Californians through the removal of personalization without first doing any due diligence into whether and how this change will actually serve their goal." Hall Suppl. Decl. ¶ 54.  The First Amendment demands more.

## CONCLUSION

For the foregoing reasons, Meta respectfully requests a preliminary injunction prohibiting Defendant from enforcing the Act against it until this matter may be fully resolved on the merits.

DATED: June 12, 2026

Respectfully submitted,

By:      /s/ Isaac D. Chaput

Isaac D. Chaput (Bar No. 326923)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com

Alexander L. Schultz (Bar No. 340212)
Max A. Cherman (Bar No. 353565)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4800
aschultz@cov.com
mcherman@cov.com

Mark W. Mosier (pro hac vice)
Teena-Ann V. Sankoorikal (pro hac vice)
Jeffrey E. Sandberg (pro hac vice)
Kuntal V. Cholera (pro hac vice)
Alexandra J. Widas (pro hac vice)
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
mmosier@cov.com
tsankoorikal@cov.com
jsandberg@cov.com
kcholera@cov.com
awidas@cov.com

*Attorneys for Plaintiff Meta Platforms, Inc.*

PLAINTIFF META PLATFORMS, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION