# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

META PLATFORMS, INC.,

    Plaintiff,

    v.

ROB BONTA, in his official capacity as Attorney General of California,

    Defendant.

Case No.: 5:25-cv-09792-EJD

**SUPPLEMENTAL DECLARATION OF PROFESSOR MICHAEL BAIOCCHI IN SUPPORT OF META PLATFORMS, INC.'S MOTION FOR PRELIMINARY INJUNCTION**

Date: June 10, 2026
Time: 9:00 a.m.
Judge: Honorable Edward J. Davila  Dept.:
Courtroom: 4 – 5th Floor

**Table of Contents**

I.  Introduction.................................................................................................................... 3

II.  The Opinions Offered in the Rebuttals of Professors Christakis, Radesky, Twenge and Telzer Continue to Be Flawed and Inconsistent with the Existing Scientific Evidence..... 3

    A.  Response to Professor Christakis............................................................................. 3

    B.  Response to Professor Radesky .............................................................................. 7

    C.  Response to Professor Telzer................................................................................... 7

    D.  Response to Professor Twenge ................................................................................ 9

III.  Conclusion .................................................................................................................. 12

## I.      Introduction

1.      This declaration supplements the declaration I previously submitted in this proceeding on April 10, 2026.  My opinions in this report respond to the supplemental expert declarations of Professors Christakis, Radesky, Twenge, and Telzer.

2.      In summary, none of the opinions offered in the Rebuttal expert declarations of Professors Christakis, Radesky, Twenge, or Telzer changes the opinions I submitted in my opening declaration. Their declarations repeat many of the flawed methodological approaches and reach the same unsupported conclusions as their opening declarations. They offer no additional evidence for a connection between Meta's personalization algorithms and adverse outcomes in adolescents. Further, these responsive declarations by Professors Christakis, Radesky, Twenge, and Telzer remain methodologically flawed and are inconsistent with the scientific evidence.

## II.     The Opinions Offered in the Rebuttals of Professors Christakis, Radesky, Twenge and Telzer Continue to Be Flawed and Inconsistent with the Existing Scientific Evidence.

3.      After reviewing the Rebuttals submitted by Professors Christakis, Radesky, Twenge, and Telzer in this litigation, I conclude that their opinions continue to exhibit a number of key methodological flaws and fundamental misreadings of the scientific literature, undermining the validity of their conclusions.

### A.      Response to Professor Christakis

4.      Professor Christakis has bespoke objections to the points made in my rebuttal report. I discuss each in turn.

5.      First, Professor Christakis's Rebuttal pushes back against the discussion of the limitations of cross-sectional work that I included in my prior declaration by pointing to the fact that I have previously conducted cross-sectional studies. See Christakis Rebuttal ¶ 8. But there is no inconsistency between what I said in my prior declaration and my prior work. My declaration contends that establishing causal inferences on the basis of cross-sectional studies poses considerable challenges. See Baiocchi April 10, 2026, Decl. ¶¶ 12–21. When I published studies that employed cross-sectional data to make causal claims, I had to use rigorous statistical methods to reach those conclusions. But if those

methods were not present, no causality could be inferred. Repeatedly finding certain conclusions based on poorly designed cross-sectional studies does not miraculously generate causal inference.

6.    Professor Christakis also writes:

In fact, many of the plaintiffs' experts have themselves conducted such studies in the interest of advancing science. If they truly find them to be of no value, one might rightly ask why they have undertaken and published them. (Christakis Decl., ¶ 8).

This is a poor argument for multiple reasons. First, not all research is interested in establishing causality. In fact, many interesting papers are purely descriptive. Second, Professor Christakis's statement here is ultimately nonresponsive to my primary contention; namely, that the State's experts rely on poor-quality, low-rigor statistical analyses that cannot support causality.

7.    Professor Christakis also disagrees with the conclusion of the NASEM report that there was insufficient evidence that social media was causing changes in adolescent health at the population level. See Christakis Rebuttal Decl., ¶¶ 34–35. Professor Christakis supports this position by selectively quoting from the preface of the NASEM report. But this excerpt is clearly qualified elsewhere, where it says that while "temptation to draw causal inference … is strong … in careful deliberation and review of the published literature, the committee arrived at more measured conclusions." (NASEM Report, Pages xv and xvi (2023))[1].   This clearly does not undermine the report's conclusion.

8.    Additionally, Professor Christakis concedes that his conceptual map of the existing literature includes studies that are dependent on content (and does not isolate the effect of a platform's features). But he attempts to sidestep this inconvenient fact by arguing, in conclusory fashion, that:

The point of my conceptual map is that the studies that explore social media use are in fact content agnostic. [Christakis Rebuttal Decl. ¶ 35]

9.    My point, however, is that studies should emphatically not be content agnostic if they were to be relevant here.  For instance, testing the effect of personalized algorithms would require that

---

[1] Moreover, the preface of the report was written by the chair of the NASEM committee and is not the report itself.

SUPPLEMENTAL DECLARATION OF PROFESSOR MICHAEL BAIOCCHI IN SUPPORT OF META PLATFORMS, INC.'S MOTION FOR PRELIMINARY INJUNCTION

treatment and exposure groups be exposed to different content; otherwise, the feature, "personalization," would be meaningless. Professor Christakis conflates the isolation of a feature for testing with the presence, or lack thereof, of content itself as a relevant factor. Ignoring content (i.e., being "agnostic") is not the same as isolating its effect and separating it from the effect of the features of social media. In fact, as an expert in empirical causation, I can state to a reasonable degree of scientific certainty that an "agnostic" analysis is inherently biased—it biases the estimate of interest and further biases the analysis through the very variable the analyst claims to treat "agnostically." Indeed, Professor Christakis himself goes on to describe his argument in ways that are not "content agnostic." For example, he cites an internal Facebook study that showed positive posts (content) induce more positive posting. This study does not consider volume of social media use alone; rather, this study involves content that is driving content-related use.

10.    At another point in his rebuttal, Professor Christakis notes:

```
Dr. Baiocchi, opines that I cite an "undergraduate" senior thesis
project as evidence of the harms posed by infinite scroll.[41]
Putting aside the pejorative remark which implies that undergraduates
cannot make substantive scientific contributions, this young scientist
created a well-designed experiment that simulated reduced exposure to
infinite scroll and looked at changes in time spent on Facebook.
Importantly, it confirms both what other studies have found and the
assertion of the inventor of infinite scroll, Aza Raskin, (also 22
when he invented it) who referred to it as "digital cocaine".[42]
[Christakis Rebuttal Decl. ¶ 38]
```

11.    This misses the point. We can set aside the debate about whether rigorous evidence is likely to be found in the appendix[2] of an unpublished, non-peer-reviewed undergraduate thesis project

---

[2] The thesis is not primarily about the study Professor Christakis is relying upon; rather, the study is briefly discussed in the supplementary materials.

SUPPLEMENTAL DECLARATION OF PROFESSOR MICHAEL BAIOCCHI IN SUPPORT OF META PLATFORMS, INC.'S MOTION FOR PRELIMINARY INJUNCTION

with no descriptive statistics nor granularly described methodology.[3]  Even absent those red flags, the design of the study itself does not test infinite scroll. On the contrary, it tests whether an interruption decreased website usage on a computer, as opposed to a mobile device. This is clearly a different context from a phone application (where the social media features would generally, if not exclusively, be utilized). Professor Christakis, therefore, claims this study reports on a feature it is not even properly designed to examine. Thus, Professor Christakis's statement that this study "clearly confirms" that infinite scroll is "digital cocaine" is almost assuredly wrong, given all of the issues described above.

12.    Professor Christakis also maintains that his analogy between substance use and social media use is probative, but this argument is not convincing. He notes:

> Dr. Baiocchi argues that I do not adequately define what constitutes "casual" or "habitual" usage.[43] The point of that diagram was to provide a conceptual framework analogous to what has been done with alcohol and gambling. There are usage patterns of addictive substances that increase risk and I expound on that in my JAMA article cited in paragraph 151 of my report. However, my citation of that report was merely to document usage patterns, and it was one of several that used passive sensing that I cite (including from the plaintiffs themselves). My assertion of a causal relationship between that usage and addiction is based on countless other studies, my own clinical experience, and the industry's own studies. [Christakis Rebuttal Decl. ¶ 39]

13.    But analogies are not evidence and can be misleading if used as such. Empirical details about alcohol use disorder, not any empirical evidence for or against "social media addiction," are discussed in the JAMA article emphasized here by Professor Christakis.  To be relevant for our purposes, this argument from Professor Christakis therefore requires a leap in logic, as any empirical

---

[3] I want to be clear, further, that none of this language is meant pejoratively.  This is excellent work for an undergraduate. But these important debates about mental health require honest assessments of credibility. The same applies for a Nobel prize winning economist who, without the requisite knowledge and training, chose to write about biochemistry.

SUPPLEMENTAL DECLARATION OF PROFESSOR MICHAEL BAIOCCHI IN SUPPORT OF META PLATFORMS, INC.'S MOTION FOR PRELIMINARY INJUNCTION

findings about alcohol are not directly informative of social media. It is entirely reasonable – and typical of academic back-and-forth – that I ask about the validity of that analogy and inquire about the definitions and empirical foundations that warrant the analogy. Describing the analogous comparator(s) may generate hypotheses, but it does not provide evidence for the notion that empirical facts about one context are salient in the other.  Professor Christakis provides no meaningful response to these critiques.

14.    Professor Christakis has a handful of other critiques of my report. My original points stand without need for elaboration.

### B.    Response to Professor Radesky

15.    Professor Radesky writes in paragraph 20 of her rebuttal that I do not give sufficient credit to the two studies she cites in paragraphs 97 and 99 of her original report. Upon review, I note that neither study deploys a causal design. Indeed, one of them is explicit that it cannot be used to obtain certain causal effects. For these reasons, I find nothing warranting a change in my original contentions: "[Professor Radesky's] declaration contains various assertions about the fact that social media platforms employ personalized algorithms, which she says 'can lead to minors being recommended accounts and posts that nudge them in new, unhealthy directions' and 'include hazardous content.' She does not appear to cite any robust, causally relevant evidence in support of these assertions." Baiocchi Rebuttal Decl. ¶ 79.

16.    Professor Radesky takes issue with a handful of my other claims in my Declaration. In the light of her rebuttal, my original points stand on their own.

### C.    Response to Professor Telzer

17.    Professor Telzer's claims about the effects of social media based on fMRI studies, for which she relies heavily on Su et al. (2021),[4] are unfounded.

18.    First, Su et al. (2021) is replete with statistical errors. The authors report that they tested nine hypotheses, and they then perform a multiple testing correction (i.e., Bonferroni). This is an inadequate adjustment because they repeatedly run tests that compare to the same "control" measurements. The repeated testing against the same control-measurements introduces additional

---

[4] *See* Telzer Rebuttal Decl. ¶ 24.

SUPPLEMENTAL DECLARATION OF PROFESSOR MICHAEL BAIOCCHI IN SUPPORT OF META PLATFORMS, INC.'S MOTION FOR PRELIMINARY INJUNCTION

multiple testing concerns. Given that the results were already borderline "statistically significant," there is no way that a correctly adjusted analysis would have returned "significant" results. Therefore, the authors' reported results do not need to be taken as anything more than statistical noise.

19.    Further, Professor Telzer also overstates the ability of fMRI studies to make claims about the functioning of the brain. It is generally accepted in the neuroscience community that using fMRIs only provides correlates of brain activity (not measures of brain mechanisms). This is because researchers are not randomizing areas of the brain or regions of interest but merely seeing relative blood flow changes from various stimuli. Siddiqi et al. (2022),[5] for instance, notes how brain mapping studies fail to yield causal conclusions for a battery of reasons:

> Human brain mapping studies often rely on neurophysiological correlates of symptoms or behavior1-4. This approach has yielded a wealth of knowledge about brain organization5-8 but this knowledge has not routinely translated into therapeutic targets3,9-11. ***The difference between correlation and causation may be an important reason for this lack of translation***12,13. Correlative methods do not distinguish between brain regions that are causing a symptom, compensating for a symptom, or incidentally related to a symptom. As such, interventions based on neurophysiological correlates could improve a symptom, worsen a symptom, or have no effect. ***This "causality gap" is a well-recognized problem in human neuroscience10,13,14…"*** (Emphasis added).

20.    Su et al. (2021) fails to support Professor Telzer's claims due, in part, to these correlative limitations that are inherent with neuroimaging techniques. The assumption that an external stimulus is "addictive" because it activates the same "reward system" that known addictive behavior or substance activates is simply unfounded.

---

[5] The authors of this paper include top neuroscientists in the United States.

SUPPLEMENTAL DECLARATION OF PROFESSOR MICHAEL BAIOCCHI IN SUPPORT OF META PLATFORMS, INC.'S MOTION FOR PRELIMINARY INJUNCTION

21.     In paragraphs 51 and 52, Professor Telzer also disagrees with my critiques of fMRI studies. I maintain that these studies are both biased in reaching causal conclusions about the effect of external stimuli and non-generalizable. Professor Telzer's conclusory rebuttals do not change my position. First, while Telzer posits in paragraph 52 how some of the deficiencies in fMRI studies might be ameliorated in the abstract, the actual fMRI literature (i.e., Su et al. (2021)) that she cites largely fails to employ these methods. And further, none of her proposals actually solves the core issue with fMRI studies; namely, that for our purposes, they only provide correlative evidence.

22.     Ultimately, fMRI studies should not serve as a foundation for drawing rigorous conclusions about how social media impacts adolescents. In particular, Su et al. (2021) is not a useful paper, given its many flaws as well as its limited ability to be extrapolated to other populations.

          D.     Response to Professor Twenge

23.     Professor Twenge argues that my review of the summative literature is inadequate because I did not include "four of the meta-analyses cited in [her] report (Burnell et al, 2025; May et al., 2025; Nguyen et al., 2025; Teague et al., 2026)." Twenge Rebuttal Decl. ¶ 17.  This is not a claim grounded in fact and does not, in any way, undermine my original arguments.

24.     First, Professor Twenge misrepresents my literature review. None of the four meta-analyses that Professor Twenge cites were conducted on adolescent populations. Conversely, my literature review focused exclusively on adolescents because no other groups are salient to this discussion. High-quality empirical investigations do not generally extrapolate findings from one population to another; especially if, as many of the State's experts argue, those populations are affected in meaningfully different ways by the exposure variable (i.e., use of social media features).

25.     In any case, these four meta-analyses that I purportedly failed to consider do not support Professor Twenge's claims.

26.     First, in Burnell et al. (2025), the study authors themselves are clear about how demand characteristics and lack of objective measurement of social media restriction are factors that bias their results.  They note considerable limitations in their sample, including heavy reliance on convenience samples (i.e., college students) and failure to fully measure or report on key metrics.  The authors also note that "it is highly plausible that attrition, as well as recruitment efforts, were biased by unmeasured

variables (e.g., motivations for participation or desire to reduce social media use)." Burnell et al. (2025) also does not acknowledge the possibility that these results are due to the novelty effect as well, as none of the studies were long-term.

27.    For the Nguyen et al. (2025) study, 87% of the studies were merely correlational, which definitionally cannot prove causation. Indeed, Nguyen et al. (2025) straightforwardly supports my contention that the literature on social media and mental health is largely correlational and fails to adequately support any causal claims.

28.    Teague et al. (2026), similarly, only reviews longitudinal studies, and therefore is unable to support Professor Twenge's causal arguments.

29.    Additionally, while May et al. (2025) does review RCTs (ten of them in total), none of the studies appears to include adolescents, and only two of them even studied U.S. adults. The authors also acknowledged that most of the studies used a biasing estimation procedure (i.e., per protocol analyses, with dropout of non-compliers). Indeed, it appears that when a better analysis protocol was used (i.e., intent to treat, thus including non-compliers), there was no significant effect size. Thus, this meta-analysis provides poor-quality evidence, and the authors' conclusions appear to be essentially null. Further, their conclusions have questionable generalizability to adolescent populations in the United States.

30.    This is ultimately a non-exhaustive list of the deficiencies in Professor Twenge's discussion of the meta-analytic evidence; overall, however, nothing she outlines in her Rebuttal changes my original opinions.

31.    Professor Twenge also misrepresents the findings of the Project Mercury study in her rebuttal. See Twenge Rebuttal Decl. ¶ 19. In short, Professor Twenge's claim that the study "found causal evidence" is significantly overstated, given that the document she cites describing the study are insufficiently clear to allow one to judge the scientific methods implemented, the potential for biases, and whether an adequate, rigorous methodology was employed. Moreover, reliance on non-published, non-peer-reviewed literature as empirical evidence is fraught. As I've previously explained, see ECF No. 89-2 (Baiocchi Decl., ¶¶ 61-63), the descriptions of this and similar research are not clear enough to judge the scientific methods implemented, the empirical rigor, or the potential for biases.

32.     Professor Twenge also fails to support her argument that personalization algorithms have a causal effect on mental health. Much of her argument revolves around an unpublished working paper that she refers to as "Mandile (2025)."[6] *See* Twenge Rebuttal Decl. ¶ 36. But again, this study fails to support her claims, as it does not even directly analyze the effect of personalized algorithm(s) on adolescents' mental health, addiction, or any other relevant outcome variable. Instead, the study design compares Instagram to other platforms that use personalized algorithms to deliver content. Relatedly, this study does nothing to address the confounding effect of content, which would obviously be necessary to actually estimate the effect of any feature of Instagram (or any other platform). The author's caution—that they do not necessarily attribute any effects to "algorithmic curation per se"— makes sense given these design aspects. Professor Twenge's assertion that this research identifies a causal effect of personalized algorithms is simply not supported by this research.

33.     There are several other methodological flaws of this study by Mandile. First, though the author believes they are using a "nested" method for addressing multiple testing, the design does not implement it correctly; the sub-hypotheses are not on nested subgroups. Second, as described by the author, the tests were underpowered (and thus likely to produce unstable estimates). The authors' rebuttal to this limitation—"I address this concern by noting that the consistency of the results across alternative sample definitions (Figure A5, Table A11), across countries (Section 7), and across individual outcome variables (Figure A4) provides cumulative evidence that the main finding is not a false positive driven by a fortunate draw from a small sample"—is statistically incorrect. This claim would only hold if the outcomes were uncorrelated, which they demonstrably are not. Foundationally, the basic assumption of pre-test equivalent trend lines is violated by the co-use patterns of the participants —people used many different platforms, and they were free to swap between the platforms in their normal, everyday use (e.g., people could, and likely did, switch from Twitter to Instagram). This biases the study in ways that are impossible to statistically bound; that is, the analysis is unlikely to be

---

[6] Professor Twenge does not provide further clarification about the source of this document, and there appears to be two versions of the working paper that are publicly available.  My analysis is aimed at the updated version. Mandile, S. (2026). *The dark side of social media: Recommender algorithms and mental health* (CESifo Working Paper No. 11648). CESifo. https://www.ifo.de/DocDL/cesifo1_wp11648.pdf.

SUPPLEMENTAL DECLARATION OF PROFESSOR MICHAEL BAIOCCHI IN SUPPORT OF META PLATFORMS, INC.'S MOTION FOR PRELIMINARY INJUNCTION

correct, and its flaws are complicated to a degree that we cannot identify the direction(s) in which the analysis might be biased. For these reasons, this is not a study that can be relied upon.

34.    Professor Twenge offers other critiques of my report. My original points stand without need for elaboration.

**III.    Conclusion**

35.    In summary, nothing in the State's experts' rebuttal declarations supports the claim that personalized feeds are, or can be, intrinsically harmful to adolescent mental health. This echoes the lack of evidence in the broader literature for a causal connection between social media use and adolescent mental health problems.

36.    To conclude, in my expert opinion, the State's experts do not offer any further rebuttal evidence supporting the assertion that personalized feeds are harmful to adolescents.

_____          June 12, 2026
Michael Baiocchi, Ph.D.                              Dated

SUPPLEMENTAL DECLARATION OF PROFESSOR MICHAEL BAIOCCHI IN SUPPORT OF META PLATFORMS, INC.'S MOTION FOR PRELIMINARY INJUNCTION

CONFIDENTIAL

## SUPPLEMENTAL MATERIALS CONSIDERED LIST

1.    ECF No. 111.1, Rebuttal Report of Dimitri Christakis and cited materials therein.

2.    ECF No. 111.5, Rebuttal Report of Jenny Radesky and cited materials therein.

3.    ECF No. 111.6, Rebuttal Report of Eva Telzer and cited materials therein.

4.    ECF No. 111.7, Rebuttal Report of Jean Twenge and cited materials therein.

5.    Burnell K, Meter DJ, Andrade FC, Slocum AN, George MJ. The effects of social media restriction: Meta-analytic evidence from randomized controlled trials. SSM-Mental Health. 2025 Jun 1;7:100459.

6.    Grimes DA, Schulz KF. Descriptive studies: what they can and cannot do. The Lancet. 2002 Jan 12;359(9301):145-9.

7.    Goldstone AB, Chiu P, Baiocchi M, Lingala B, Lee J, Rigdon J, Fischbein MP, Woo YJ. Interfacility transfer of Medicare beneficiaries with acute type A aortic dissection and regionalization of care in the United States. Circulation. 2019 Oct 8;140(15):1239-50.

8.    Liu M, Kamper-DeMarco KE, Zhang J, Xiao J, Dong D, Xue P. Time spent on social media and risk of depression in adolescents: A dose–response meta-analysis. International journal of environmental research and public health. 2022 Apr 24;19(9):5164.

9.    May W, Malouff JM, Meynadier J. Reducing Social Media Use Decreases Depression Symptoms: A Meta-Analysis of Randomised Controlled Trials. European Journal of Investigation in Health, Psychology and Education. 2025 Oct 27;15(11):222.

10.   Nguyen L, Walters J, Paul S, Monreal Ijurco S, Rainey GE, Parekh N, Blair G, Darrah M. Feeds, feelings, and focus: A systematic review and meta-analysis examining the cognitive and mental health correlates of short-form video use. Psychological bulletin. 2025 Sep;151(9):1125.

SUPPLEMENTAL DECLARATION OF PROFESSOR MICHAEL BAIOCCHI IN SUPPORT OF META PLATFORMS, INC.'S MOTION FOR PRELIMINARY INJUNCTION

11.    Shamay-Tsoory SG, Mendelsohn A. Real-life neuroscience: an ecological approach to brain and behavior research. Perspectives on Psychological Science. 2019 Sep;14(5):841-59.

12.    Stark CE, Squire LR. When zero is not zero: the problem of ambiguous baseline conditions in fMRI. Proceedings of the national Academy of Sciences. 2001 Oct 23;98(22):12760-6.

13.    Siddiqi SH, Kording KP, Parvizi J, Fox MD. Causal mapping of human brain function. Nature reviews neuroscience. 2022 Jun;23(6):361-75.

14.    Teague S, Somoray K, Shatte A, Miller D, Moss K, Crawford A, Wildman H, Kayal D, Hutchinson D. Digital media use and child health and development: a systematic review and meta-analysis. JAMA pediatrics. 2026 May;180(5):510-7.

15.    Van Horn JD, Poldrack RA. Functional MRI at the crossroads. International Journal of Psychophysiology. 2009 Jul 1;73(1):3-9.

SUPPLEMENTAL DECLARATION OF PROFESSOR MICHAEL BAIOCCHI IN SUPPORT OF META PLATFORMS, INC.'S MOTION FOR PRELIMINARY INJUNCTION